No. _____

IN THE

# United States Court of Appeals
# for the Tenth Circuit

———————

In re EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES
PRACTICES AND ANTITRUST LITIGATION

———————

On Petition to Appeal from the
United States District Court for the District of Kansas
District Court Judge Daniel D. Crabtree, Magistrate Judge Teresa J. James
Case No. 2:17-MD-2785-DDC-TJJ (MDL No. 2785)

———————

**PETITION FOR PERMISSION TO APPEAL
PURSUANT TO FED. R. CIV. P. 23(f)**

———————

RAJ S. GANDESHA
STEVEN LEVY
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
rgandesha@whitecase.com

JOSEPH REBEIN
ELISABETH A. HUTCHINSON
SHOOK, HARDY & BACON LLP
2555 Grand Boulevard
Kansas City, MO 64108-2613
(816) 474-6550
jrebein@shb.com

*Counsel for Pfizer Petitioners*

March 12, 2020

CATHERINE E. STETSON
ADAM K. LEVIN
DAVID M. FOSTER
CAROLYN A. DELONE
KATHRYN M. ALI
KATHERINE B. WELLINGTON
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
cate.stetson@hoganlovells.com

BRIAN FRIES
LATHROP GPM
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108-2618
(816) 292-2000
brian.fries@lathropgpm.com

*Counsel for Mylan Petitioners*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioners disclose the following information:

<u>Mylan Petitioners</u>:    Petitioner Mylan Specialty L.P. is a wholly owned indirect subsidiary of Petitioner Mylan Pharmaceuticals Inc., which is a wholly owned subsidiary of Petitioner Mylan Inc.   Petitioner Mylan Inc. is a wholly owned indirect subsidiary of Petitioner Mylan N.V., which is a publicly held company organized and existing under the laws of the Netherlands.   Mylan N.V. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.   Petitioner Heather Bresch is the CEO of Mylan N.V.

<u>Pfizer Petitioners</u>:    Petitioner Pfizer Inc. is a publicly held company incorporated under the laws of the State of Delaware.   Pfizer Inc. does not have a parent corporation and no publicly held company owns 10% or more of its stock. Petitioner King Pharmaceuticals, Inc. (now known as King Pharmaceuticals LLC ("King")) is an indirect, wholly-owned subsidiary of Pfizer Inc.   Petitioner Meridian Medical Technologies, Inc. ("Meridian") is an indirect, wholly-owned subsidiary of Pfizer Inc.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ...........................................................i

TABLE OF AUTHORITIES ....................................................................................iv

STATEMENT OF PRIOR OR RELATED APPEALS......................................... viii

JURISDICTIONAL STATEMENT .........................................................................1

INTRODUCTION ....................................................................................................1

STATEMENT OF FACTS .......................................................................................2

QUESTIONS PRESENTED FOR REVIEW ...........................................................5

REASONS WHY THIS APPEAL SHOULD BE ALLOWED ................................5

    I.     THIS COURT SHOULD REVERSE THE DISTRICT
          COURT'S MANIFESTLY ERRONEOUS
          "PLAUSIBLITY" STANDARD ...............................................6

    II.    THIS COURT SHOULD ADDRESS AN
          ACKNOWLEDGED CIRCUIT SPLIT ON
          ASCERTAINABILITY..........................................................10

    III.   THIS COURT SHOULD ADDRESS AN
          ACKNOWLEDGED CIRCUIT SPLIT ON
          CERTIFICATION OF A CLASS WITH
          UNINJURED MEMBERS ....................................................13

    IV.   THIS COURT SHOULD ADDRESS WHETHER
          PLAINTIFFS MAY BOOTSTRAP CLAIMS THAT
          DO NO MEET THE REQUIREMENTS FOR CLASS
          CERTIFICATION ................................................................17

    V.    THIS COURT SHOULD REVERSE THE DISTRICT
          COURT'S RULINGS ON RICO CAUSATION ....................18

RELIEF SOUGHT...................................................................................24

CERTIFICATE OF COMPLIANCE

## TABLE OF CONTENTS—Continued

<u>Page</u>

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY
REDACTION

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

### CASES:

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009) ...............................................................7

*Avritt v. Reliastar Life Ins. Co.*,
    615 F.3d 1023 (8th Cir. 2010) .............................................................14

*Banks v. Cent. Refrigerated Servs., Inc.*,
    No. 2:16-CV-356-DAK, 2017 WL 1683056 (D. Utah May 2,
    2017) (unpublished) ...........................................................................11

*Bell Atl. Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) .............................................................14

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008).............................................................................22

*Brown v. Electrolux Home Prods., Inc.*,
    817 F.3d 1225 (11th Cir. 2016) ...........................................................9

*Carrera v. Bayer Corp.*,
    727 F.3d 300 (3d Cir. 2013) .........................................................6, 10

*CGC Holding Co. v. Broad & Cassel*,
    773 F.3d 1076 (10th Cir. 2014) ...............................................8, 20, 21

*Cline v. Sunoco, Inc. (R&M)*,
    No. 6:17-cv-313-JAG, 2019 WL 4879187 (E.D. Okla. Oct. 3,
    2019) (unpublished) ...........................................................................11

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).............................................................6, 7, 9, 16

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ..............................................................14

*EQT Prod. Co. v. Adair*,
    764 F.3d 347 (4th Cir. 2014) .............................................................10

iv

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Gates v. Rohm & Hass Co.*,
  655 F.3d 255 (3d Cir. 2011) .................................................................................17

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018)..............................................................6, 14, 15, 17

*In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*,
  790 F.3d 1112 (10th Cir. 2015) .........................................................................11

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008), *as amended* (Jan. 16, 2009) ..................7, 8, 13, 14

*In re Lidoderm Antitrust Litig.*,
  No. 14-md-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21,
  2017) (unpublished) ................................................................................................8

*In re Neurontin Mktg. & Sales Practices Litig.*,
  712 F.3d 60 (1st Cir. 2013).........................................................................19, 20

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015)...............................................................................7, 10

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017) ...............................................................................11

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  292 F. Supp. 3d 14 (D.D.C. 2017).............................................................7, 8, 16

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*,
  725 F.3d 244 (D.C. Cir. 2013).........................................................................9, 13

*In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*,
  934 F.3d 619 (D.C. Cir. 2019)...............................................................................8

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
  299 F.R.D. 555 (E.D. Tenn. 2014) .................................................................12

*In re Syngenta AG MIR 162 Corn Litig.*,
  No. 14-md-2591-JWL, 2016 WL 5371856 (D. Kan. Sept. 26,
  2016) (unpublished) .............................................................................................14

## TABLE OF AUTHORITIES—Continued

Page(s)

*In re Thalomid and Revlimid Antitrust Litig.*,
No. 14-6997, 2018 WL 6573118 (D.N.J. Oct. 30, 2018)
(unpublished) ...................................................................................................12

*In re Wellbutrin XL Antitrust Litig.*,
308 F.R.D. 134 (E.D. Pa. 2015)........................................................................12

*Karhu v. Vital Pharm. Inc.*,
621 F. App'x 945 (11th Cir. 2015) (unpublished).............................................10

*Kohen v. Pac. Inv. Mgmt. Co.*,
571 F.3d 672 (7th Cir. 2009) .............................................................................14

*McLaughlin v. Am. Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008) ..............................................................................22

*Messner v. Northshore Univ. Healthsystem*,
669 F.3d 802 (7th Cir. 2012) ...............................................................................7

*Mullins v. Direct Dig., LLC*,
795 F.3d 654 (7th Cir. 2015) .............................................................................11

*Myers v. Hertz Corp.*,
624 F.3d 537 (2d Cir. 2010) .................................................................................7

*Painters & Allied Trades Dist. Council 82 Health Care Fund v.
Takeda Pharm. Co.*,
943 F.3d 1243 (9th Cir. 2019) ...........................................................................19

*Poulos v. Caesars World, Inc.*,
379 F.3d 654 (9th Cir. 2004) .............................................................................22

*Ramirez v. TransUnion LLC*,
No. 17-17244, 2020 WL 946973 (9th Cir. Feb. 27, 2020).................................14

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis
U.S. LLP*,
806 F.3d (2d Cir. 2015) ........................................................................19, 20, 22

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Shook v. El Paso County*,
   386 F.3d 963 (10th Cir. 2004) ..........................................................11

*Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*,
   873 F.3d 574 (7th Cir. 2017) ...........................................................19

*St. Gregory Cathedral Sch. v. LG Elecs., Inc.*,
   No. 6:12-cv-739, 2015 WL 5604763 (E.D. Tex. Sept. 23, 2015)
   (unpublished) ..................................................................................21

*UFCW Local 1776 v. Eli Lilly & Co.*,
   620 F.3d 121 (2d Cir. 2010) ........................................................6, 19

*Vallario v. Vandehey*,
   554 F.3d 1259 (10th Cir. 2009) ..........................................................5

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011).........................................................6, 7, 9, 15, 18

**STATUTE:**

18 U.S.C. § 1964(c) ...............................................................................16

**RULES:**

Fed. R. App. P. 5(a) .................................................................................1

Fed. R. Civ. P. 12(b)(6)............................................................................7

Fed. R. Civ. P. 23 .................................................5-9, 11, 15, 17-18, 20

Fed. R. Civ. P. 23(b)(3)...............................................................11, 13, 14

Fed. R. Civ. P. 23(f) .................................................................................1

**OTHER AUTHORITY:**

1 McLaughlin on Class Actions § 3:14 (16th ed. 2019 update) ................9

## STATEMENT OF PRIOR OR RELATED APPEALS

There are no prior or related appeals.

No. _____
_____

IN THE

# United States Court of Appeals for the Tenth Circuit
_____

In re EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION
_____

On Petition to Appeal from the
United States District Court for the District of Kansas
District Court Judge Daniel D. Crabtree, Magistrate Judge Teresa J. James
Case No. 2:17-MD-2785-DDC-TJJ (MDL No. 2785)
_____

**PETITION FOR PERMISSION TO APPEAL
PURSUANT TO FED. R. CIV. P. 23(f)**
_____

**JURISDICTIONAL STATEMENT**

This Court has jurisdiction under Fed. R. Civ. P. 23(f) and Fed. R. App. P. 5(a) over this petition to appeal the District Court's February 27, 2020 class certification ruling.

**INTRODUCTION**

The standard for granting an appeal is plainly met.  This case involves no fewer than five case-dispositive open issues of law and multiple circuit and intra-circuit splits, certified classes that Plaintiffs say contain millions of persons, and a record where the court granted certification under eighteen separate laws and three disparate factual theories even though as many as a *million* or more class members

are uninjured under several of Plaintiffs' claims. The District Court repeatedly "predict[ed]" that this Court would adopt an approach rejected by many other circuits. App. 24, 67, 101. It took positions contrary to, or in significant tension with, governing Tenth Circuit precedent. And it applied a pleading standard for evaluating class certification that the Supreme Court has expressly rejected. The result: The certification of two classes alleging that Petitioners violated state antitrust laws and the Racketeer Influenced and Corrupt Organizations Act ("RICO") through a "pricing scheme" for EpiPen® ("EpiPen") devices.

This appeal has consequences well beyond this case. To counsel's knowledge, no court has ever certified a class of this size with so many uninjured persons, where there is no way to identify or remove those persons without millions of individual inquiries. This Court should grant the petition.

## STATEMENT OF FACTS

Meridian manufactures, and Mylan markets and distributes, EpiPen Auto-Injectors, which are used to treat severe allergic reactions. Add. 5. Among other claims, Plaintiffs assert that Petitioners engaged in a RICO "conspiracy" and violated state antitrust laws by causing consumers and their insurers to overpay for EpiPen devices. Add. 6-10.

Plaintiffs alleged three separate theories of injury as the bases for their class certification motion. First, Plaintiffs claim that Petitioners committed fraud when

they stopped selling EpiPen devices in single-packs, and only sold two-packs, forcing them to pay for unwanted devices. Add. 7-8. Second, Plaintiffs claim that Mylan foreclosed a competing branded epinephrine auto-injector ("EAI") from some health plan formularies, allowing Mylan to raise EpiPen prices. Add. 6-7. Third, Plaintiffs claim that a patent settlement delayed entry of a generic EAI, causing them to pay more for the branded EpiPen device. Add. 9-10.

In response, Petitioners demonstrated that for each theory of injury, as many as a million or more class members were uninjured, and there was no way to identify and remove those persons from the classes absent individual trials. Plaintiffs' expert estimated that two-thirds of consumers—over a million class members—"preferred to purchase a 2-Pak instead of a single EpiPen," precluding certification on the "two-pack" theory. Add. 168. Plaintiffs' expert agreed that consumers who paid a co-pay for EpiPen devices—again over a million class members—did not suffer injury (because they paid the same co-pay regardless of retail prices), precluding certification on the "foreclosure" theory. Defs.' Opp. to Mot. for Class Certification ("Opp.") at 32-33 (Dkt. 1503-3); *see* Defs.' Class Certification Hr'g Phase 2 Slide Deck ("Slide Deck") at 8, 10 (Dkt. 1645-1); Add. 68 n.38. And Plaintiffs' expert agreed that "brand loyalists"—*at least* 100,000 Plaintiffs, and possibly many times that, who prefer branded rather than generic

EAIs—are uninjured by the alleged delayed generic entry, precluding certification on the "generic delay" theory. Opp. 35-39; Slide Deck 8, 11-12.[1]

Petitioners also pointed to differences among named plaintiffs to demonstrate the individualized nature of these issues. For example, 19 of 35 named plaintiffs *chose* to purchase at least two EpiPen devices annually (so were uninjured by the unavailability of single-packs); 11 had a co-pay (so were unaffected by alleged foreclosure); and at least 7 preferred branded devices (so were uninjured by alleged generic delay). *See* Opp. 73-75. One named plaintiff testified that she "prefer[red] to use the brand name rather than to use a generic." Opp. Ex. 100 at 100:25-101:2. Another testified that she carries two EpiPen devices because "[t]hat's what my doctor tells me" and she does not want "to have fewer." Opp. Ex. 32 at 110:19-22.

The District Court nevertheless certified the classes.[2] This petition follows.

---

[1] Petitioners identified many other categories of uninjured class members, including health plans. *See* Opp. 22-45.

[2] The court denied certification of Plaintiffs' proposed consumer protection, unjust enrichment, and injunction classes and revised the class definitions.

## QUESTIONS PRESENTED FOR REVIEW

1. Whether the District Court's "plausibility" standard for class certification is consistent with Rule 23.

2. Whether a class whose members are not ascertainable can be certified.

3. Whether a class that contains uninjured members can be certified, and if so, whether the District Court's ruling is manifestly erroneous.

4. Whether a class can be certified where plaintiffs bootstrap claims that do not themselves satisfy Rule 23.

5. Whether the District Court applied the wrong standards for RICO causation.

## REASONS WHY THIS APPEAL SHOULD BE ALLOWED

This Court has broad discretion to grant interlocutory review of class certification rulings. *Vallario v. Vandehey*, 554 F.3d 1259, 1264 (10th Cir. 2009). Review is appropriate where (1) "a questionable class certification order is likely to force either a plaintiff or a defendant to resolve the case based on considerations independent of the merits"; (2) the case poses a significant and "unresolved issue of law relating to class actions that is likely to evade end-of-case review"; or (3) the decision below is "manifestly erroneous." *Id.* at 1263. All three circumstances exist here.

The District Court acknowledges that its decision implicates at least three circuit splits, each of which it decided against Petitioners. *See* Add. 24, 67, 99-

101.    Plaintiffs seek hundreds of millions of dollars in damages, creating substantial pressure to resolve the case on considerations independent of the merits, and important unresolved issues of law—which are certain to arise in future class actions—would in that event evade end-of-case review.  The certification ruling is also manifestly erroneous in several respects.  *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 47 (1st Cir. 2018) (granting petition to address one of the circuit splits at issue); *Carrera v. Bayer Corp.*, 727 F.3d 300, 304 (3d Cir. 2013) (same); *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 130 (2d Cir. 2010) (same).

## I. THIS COURT SHOULD REVERSE THE DISTRICT COURT'S MANIFESTLY ERRONEOUS "PLAUSIBLITY" STANDARD.

To begin, the District Court applied the wrong baseline standard.  "Rule 23 does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  "A party seeking class certification must affirmatively demonstrate his compliance with the Rule," meaning they "must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Id.*  Before certifying a class, the trial court must be satisfied "after a *rigorous analysis*, that the prerequisites of [Rule 23] have been satisfied."  *Id.* at 350-351 (emphasis added and internal quotation marks omitted); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

6

The District Court, however, did exactly what *Wal-Mart* forbids:  it used a "plausibility" *pleading* standard from Fed. R. Civ. P. 12(b)(6) for evaluating whether Plaintiffs had met their evidentiary burden to certify a class.  The District Court repeated this "plausibility" standard *20 times*, using it to decide a wide range of issues including ascertainability, Add. 25-26 n.15, whether classwide injury can be shown, Add. 38, 71, whether Plaintiffs can demonstrate RICO causation using common proof, Add. 91 n.46, 101, and whether Plaintiffs' experts could even obtain the data needed to support their economic models, Add. 37-38 n.21, 51-52, 101, 114.  This error infected the court's entire analysis and is wrong as a matter of law.

At least five circuits hold that "[t]he party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met."  *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010); *see In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008), *as amended* (Jan. 16, 2009); *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 228 (5th Cir. 2009) (per curiam); *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 811 (7th Cir. 2012).  And the D.C. Circuit affirmed a district court that *rejected* a "plausibility" standard as inconsistent with *Comcast*.  *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 90-91, 145 (D.D.C.

2017), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019). This Court has not directly addressed this issue—but it has observed that "the requirements of Rule 23 are heavily scrutinized and strictly enforced," and "actual, not presumed, conformance with Rule 23 remains indispensable." *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014) (internal quotation marks and alterations omitted).

The District Court nonetheless applied a "plausibility" standard, relying on a statement from an unpublished, out-of-Circuit district court opinion. *See* Add. 51 (citing *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367, at *18 (N.D. Cal. Feb. 21, 2017)). The court then described at length the parties' positions on disputed issues—without deciding them. For example, the court declined to determine if Plaintiffs met their Rule 23 burden to show that injury—a key element of Plaintiffs' antitrust and RICO claims—could be proven with evidence common to the class, instead accepting Plaintiffs' expert analysis as "plausible." Add. 71 (refusing to decide "the merits of [the parties'] disagreements"). The court repeatedly noted that Plaintiffs' experts' opinions were sufficiently reliable to be admissible under *Daubert*, *see, e.g.*, Add. 37-38 n.21, 50 & n.27, 69, even though "reliability under Rule 23 is a higher standard than reliability under *Daubert*." *In re Rail Freight*, 292 F. Supp. 3d at 42-43, 91; *see In re Hydrogen Peroxide*, 552 F.3d at 323 ("opinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the

court holds the testimony should not be excluded"). And in its *Daubert* ruling, the court at times imposed an even lower "possibility" standard for Plaintiffs' expert testimony, despite relying on that testimony to certify the classes. *See, e.g.*, Add. 204 (finding that while Plaintiffs' expert's opinion was founded on an "unlikely" assumption, it was admissible because "it's not impossible").[3]

This Court should grant the petition and hold that Plaintiffs must satisfy Rule 23 under a preponderance standard. The *Wal-Mart/Comcast* "rigorous analysis" requires courts to "weigh[] conflicting expert testimony and resolv[e] disputes" if resolution "is necessary to determining whether a Rule 23 requirement has been met." 1 McLaughlin on Class Actions § 3:14 (16th ed. 2019 update). "[I]f a question of fact or law *is* relevant to" the court's determination " 'whether the Rule 23 prerequisites for class certification are satisfied,' . . . then the district court has a duty to actually decide it and not accept it as true." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016) (citation omitted); *see In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 255 (D.C. Cir. 2013) (*Rail Freight I*) (after *Comcast*, "[i]t is now clear" that "Rule 23

---

[3] This "not impossible" assumption informs two other expert opinions and serves as the basis for Plaintiffs' position that they are injured by generic delay. *See* Add. 112-113 n.57; Opp. 41 ("Without [this] critical input, Plaintiffs' generic delay theory collapses.").

not only authorizes a hard look at the soundness of statistical models that purport to show predominance—the rule commands it").

The District Court did not "actually decide" the disputed factual issues on which class certification turns; nor did it weigh conflicting expert testimony or give the soundness of Plaintiffs' statistical models a "hard look." Instead, the court repeatedly stated that it would revisit these issues later, *after* certification. *See, e.g.*, Add. 18 n.12, 25-26 n.15, 39-40 n.23, 68 n.38, 75, 88-89. This Court should grant the Petition to correct the District Court's manifest error and align this Circuit with its sister circuits.

## II. THIS COURT SHOULD ADDRESS AN ACKNOWLEDGED CIRCUIT SPLIT ON ASCERTAINABILITY.

This Court should also grant the petition to resolve an important and still-undecided question of law, which even as recently as a few months ago continues to divide district courts in this Circuit: Whether Plaintiffs must show an administratively feasible mechanism for readily ascertaining class members *prior* to certification. The First, Third, Fourth, and Eleventh Circuits hold that it is plaintiffs' burden to meet this standard. *See In re Nexium*, 777 F.3d at 19 (1st Cir.); *Carrera*, 727 F.3d at 307 (3d Cir.); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014); *Karhu v. Vital Pharm. Inc.*, 621 F. App'x 945, 946-947 (11th Cir. 2015) (unpublished). Other circuits have held that plaintiffs are not required to establish that class members are readily ascertainable prior to certification. *See,*

*e.g.*, *In re Petrobras Sec.*, 862 F.3d 250, 267-268 (2d Cir. 2017); *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 657-658 (7th Cir. 2015).

As the court below acknowledged, the district courts in this Circuit are similarly divided, with the majority *rejecting* the District of Kansas's approach in favor of the "administrative feasibility" standard. *See* Add. 24 n.14 (citing *Cline v. Sunoco, Inc. (R&M)*, No. 6:17-cv-313-JAG, 2019 WL 4879187, at *8-9 (E.D. Okla. Oct. 3, 2019) (unpublished), which adopted the "administratively feasible" standard); *Banks v. Cent. Refrigerated Servs., Inc.*, No. 2:16-CV-356-DAK, 2017 WL 1683056, at *4 (D. Utah May 2, 2017) (unpublished) ("Although at least one district court in the Tenth Circuit has applied the Seventh Circuit's weak version of ascertainability . . . the majority of district courts in the Tenth Circuit appear to apply the Third Circuit's more stringent standard for ascertainability.").

This Court has not squarely addressed the ascertainability requirement. It has stated, however, that Rule 23 requires "establishing an ascertainable class." *In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*, 790 F.3d 1112, 1118 (10th Cir. 2015). And it has explained that where class members cannot be identified, "that may defeat Rule 23(b)(3) class certification." *Shook v. El Paso County*, 386 F.3d 963, 972 (10th Cir. 2004). The District Court nevertheless "predict[ed]" that this Court would "decline to recognize ascertainability" as a Rule 23 requirement. Add. 24. This Court should grant the petition to address this

important issue, which arises frequently and is likely to escape end-of-case review.[4]  Where plaintiffs cannot identify class members, mini-trials are required to make this determination, preventing certification.

Moreover, to the extent the District Court suggested that Plaintiffs identified an administratively feasible method for ascertaining class members, that conclusion is manifestly erroneous.  Add. 25-26 n.15.[5]  The court stated only that it *might* be possible to ascertain class members through further discovery *after* class certification, which is plainly not enough.  *See id.*  It also recognized that the methods proposed by Plaintiffs may not be administratively feasible, accepting the word of Plaintiffs' experts without proof that they could actually do what they say. *See id.*  For example, the court acknowledged that Plaintiffs' expert "*may* be able to use her methodology to identify" certain Plaintiffs who used coupons (and thus are uninjured and should be excluded) through further discovery.   Add. 162 (emphasis added).  But it did not find that she *would* be able to do so, much less

---

[4] Case in point: after interlocutory review was denied on this issue in *In re Syngenta AG Mir162 Corn Litigation*, No. 16-607 (10th Cir.), that case settled, and the divide among the district courts in this Circuit has since deepened.

[5] Multiple district courts have held that the ascertainability requirement is not met under similar facts.  *See, e.g.*, *In re Wellbutrin XL Antitrust Litig.*, 308 F.R.D. 134, 150-151 (E.D. Pa. 2015); *In re Thalomid and Revlimid Antitrust Litig.*, No. 14-6997, 2018 WL 6573118, at *21-22 (D.N.J. Oct. 30, 2018) (unpublished); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 560, 572 (E.D. Tenn. 2014).

that she could do so prior to class certification—and class discovery is closed.  The court likewise acknowledged that identifying Plaintiffs who bought EpiPen devices using cash (who are part of the classes and Plaintiffs' damages calculations) would require gathering records from *65,000* pharmacies, and that this task "may prove overwhelming."    Add. 165.    Indeed, the District Court was "persuaded that defendants have come forward with legitimate and even substantiated questions about" whether the class is ascertainable.  *Id.*  It should have stopped there and denied certification.  Ascertainability is not a post-hoc inquiry.  It is a predicate. This Court should grant review and reverse.

## III. THIS COURT SHOULD ADDRESS AN ACKNOWLEDGED CIRCUIT SPLIT ON CERTIFICATION OF A CLASS WITH UNINJURED MEMBERS.

There is a six-to-one circuit split over whether a class containing uninjured members may be certified.  The District Court "predict[ed]" that this Court would side with the outlier.  Add. 67.

At least six circuits hold that either Rule 23(b)(3)'s predominance requirement, or Article III itself, forbids certification where, as here, the proposed class contains uninjured members that cannot be identified and removed without individualized inquiries.  In the D.C. Circuit, plaintiffs must "show that they can prove, through common evidence, that all class members were in fact injured." *Rail Freight I*, 725 F.3d at 252; *see In re Hydrogen Peroxide*, 552 F.3d at 311 (3d

Cir.); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003).  The First Circuit agrees that a class cannot be certified unless plaintiffs identify a "mechanism that can manageably remove uninjured persons from the class in a manner that protects the parties' rights." *Asacol*, 907 F.3d at 54.  The Second and Eighth Circuits hold that a class must "be defined in such a way that anyone within it would have standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006); *see Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034-35 (8th Cir. 2010).[6]

The Seventh Circuit is the outlier.  It permits a Rule 23(b)(3) class to be certified as long as it does not contain "a great many" uninjured members. *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677-678 (7th Cir. 2009).

The District Court nonetheless "predict[ed]" that this Court would follow the Seventh Circuit's approach.  Add. 64-67 (citing *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-md-2591-JWL, 2016 WL 5371856 (D. Kan. Sept. 26, 2016) (unpublished), which followed the Seventh Circuit).  It also erroneously concluded that even 100,000 uninjured Plaintiffs did not amount to "a great many."  Add. 74-75.

---

[6] The Ninth Circuit recently stated that Article III requires each class member to show injury to obtain damages, and that district courts should consider at the class certification stage whether there is a "mechanism for identifying class members who lack standing at the damages phase." *Ramirez v. TransUnion LLC*, No. 17-17244, 2020 WL 946973, at *8 n.6 (9th Cir. Feb. 27, 2020).

This Court should grant the petition and adopt the majority rule. "The fact that plaintiffs seek class certification provides no occasion for jettisoning the rules of evidence and procedure, the Seventh Amendment, or the dictate of the Rules Enabling Act . . . ." *Asacol*, 907 F.3d at 53. Where, as here, there is no way to identify and remove uninjured plaintiffs from the class without individualized inquiries, Article III and Rule 23 have not been met. A defendant has a due process right to challenge each plaintiff's entitlement to relief, *see id.* at 51-54, which here requires *millions* of mini-trials to determine which Plaintiffs are injured—preventing class certification. *See supra* pp. 3-4; *Wal-Mart*, 564 U.S. at 367 ("a class cannot be certified on the premise that" the defendant "will not be entitled to litigate its statutory defenses to individual claims").

Even under the Seventh Circuit's standard, the decision below is manifestly erroneous. It might be possible in some cases to quibble over what qualifies as "a great many" uninjured members. But not here. According to Plaintiffs' expert's analysis, there are *at least* 100,000 uninjured Plaintiffs in each class. *See* Add. 72 n.41.[7] By any measure, 100,000 persons—enough to fill Empower Field at Mile High stadium, with 25,000 people in line outside—is "a great many" persons. *See* Add. 72-73 (citing case where court denied certification because 2,037 class

---

[7] Petitioners maintain that a far greater number of Plaintiffs—over 1 million—are uninjured. The District Court noted the disagreement on this issue but did not decide it. *See* Add. 72-73.

members were uninjured). Petitioners have the right to challenge each of those Plaintiff's entitlement to relief. *See* Slide Deck 8-17.[8]

And if that were not enough to reverse, the District Court's decision, which discusses at length Plaintiffs' *classwide damages* calculations, incorrectly overlooked Plaintiffs' failure to demonstrate *individual injury* through evidence common to the class. *See* Add. 47-53. To certify an antitrust or RICO class, it is Plaintiffs' burden to show an "individual injury" that is "capable of proof at trial" through common evidence. *Comcast*, 569 U.S. at 30 (internal quotation marks omitted); *see* 18 U.S.C. § 1964(c). Yet Plaintiffs' experts conceded that they did not identify a method for determining whether any individual plaintiff suffered injury; they calculated only aggregate damages. One expert testified that she was not "asked to identify a methodology for telling whether a particular class member was impacted." Opp. Ex. 7 at 38:12-14. A second testified that he "didn't look at any particular transactions being affected." Opp. Ex. 38 at 173:23-24. And the record is replete with evidence of named plaintiffs who suffered no injury for individualized reasons. *See supra* p. 4.

---

[8] The District Court's observation about the *percentage* of uninjured Plaintiffs, *see* Add. 75, is manifestly inappropriate in a class containing millions of Plaintiffs. Even the Seventh Circuit's standard asks whether "a great many" persons are uninjured, which requires an analysis of the *number* of uninjured Plaintiffs. And even a small percentage of millions is a great many people. Conducting mini-trials for millions of class members to determine which 100,000 were uninjured is impossible. *See In re Rail Freight*, 292 F. Supp. 3d at 137-138.

Worse still, the District Court wrongly held that Plaintiffs could "prov[e] injury" through an expert's mere statistical analysis of the percentage of class members who *could have* suffered injury, based on the *average* price she calculates they should have paid for an EpiPen device. Add. 69-71. But that kind of analysis does not answer—or even address—whether common evidence can be used to demonstrate actual injury to any individual plaintiff. *See Asacol*, 907 F.3d at 54; *Gates v. Rohm & Hass Co.*, 655 F.3d 255, 266 (3d Cir. 2011) (plaintiffs "cannot substitute evidence" of harm to "actual class members with evidence of hypothetical, composite persons in order to gain class certification"). The decision below thus hinges entirely on an open issue of law and is manifestly erroneous.

## IV. THIS COURT SHOULD ADDRESS WHETHER PLAINTIFFS MAY BOOTSTRAP CLAIMS THAT DO NOT MEET THE REQUIREMENTS FOR CLASS CERTIFICATION.

This Court should grant the petition to resolve whether a class can be certified where Plaintiffs bootstrap claims that do not independently meet the requirements for certification. The District Court concluded that as long as Plaintiffs' generic delay claims satisfied Rule 23, Plaintiffs could also pursue their two-pack and foreclosure claims—regardless of whether *those* claims separately met the requirements for certification. The court recognized that the typicality requirement may not be met if "plaintiffs' generic delay theory fails." Add. 40 n.23; *see* Add. 27 (same conclusion as to standing). The court also revised the

class definition to exclude consumers who could not state a generic delay claim because they purchased EpiPen devices only prior to the alleged delay, to "avoid the potential that a class would include a great number of members who sustained no injury." Add. 18-19. But it did not conduct the same inquiry with the other two theories; it allowed Plaintiffs to pursue their two-pack and foreclosure claims on a classwide basis, without requiring proof that those claims independently satisfy Rule 23. *See* Add. 18-19, 39-40 & n.23.

The "Rules Enabling Act forbids interpreting Rule 23 to abridge, enlarge or modify any substantive right." *Wal-Mart*, 564 U.S. at 367 (internal quotation marks omitted). Yet the decision below does exactly that: It permits *all* class members to pursue two-pack and foreclosure claims even though (i) many Plaintiffs suffered no injury under these claims, and (ii) the court never found that those claims independently satisfy Rule 23. If the court's ruling is permitted to stand, nothing prevents plaintiffs in future class actions from tacking on claims that cannot otherwise be litigated under Rule 23, and from extracting settlements on the basis of those claims. This Court should grant the petition and reverse the District Court's manifestly erroneous resolution of this question.

## V. THIS COURT SHOULD REVERSE THE DISTRICT COURT'S RULINGS ON RICO CAUSATION.

This Court should grant the petition to address the District Court's conclusions about RICO causation at class certification that are (i) contrary to the

law of numerous circuits, (ii) contrary to Tenth Circuit law, and (iii) manifestly erroneous.

*First*, the District Court's conclusion that Plaintiffs could show RICO causation for their foreclosure claims classwide, Add. 97-98, is (again) contrary to several other circuits. *See* Add. 99. Both the Second and Seventh Circuits have held that prescribing decisions by physicians and purchasing decisions by patients are inherently individualized—and several layers removed from any action by drug manufacturers—preventing Plaintiffs from showing RICO causation at class certification through common proof. *See Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 88-91 (2d Cir. 2015); *UFCW Local 1776*, 620 F.3d at 134; *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, 873 F.3d 574, 578 (7th Cir. 2017).

The District Court declined to follow the Second and Seventh Circuits' approach. *See* Add. 100-101. Instead, it "predict[ed]" that the "Tenth Circuit would follow" the First and Ninth Circuits' approach in *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 60, 70 (1st Cir. 2013), and *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co.*, 943 F.3d 1243, 1257-58 (9th Cir. 2019). Add. 101. But neither *Neurontin* nor *Painters* evaluated RICO causation in the context of class certification, as the District Court concedes. Add. 99. Indeed, *Neurontin*—which the District Court repeatedly cites—

"express[ed] no view as to whether the plaintiffs can . . . meet the requirements of Rule 23." 712 F.3d at 70; *see Sergeants Benevolent*, 806 F.3d at 97 (distinguishing *Neurontin* on the grounds that "the First Circuit did not address class certification"). At best, then, the court picked sides in a circuit split on RICO causation, which is reason enough to grant this petition. At worst, the court rejected two on-point circuit cases in favor of two inapplicable cases—similarly necessitating review.[9]

*Second*, the District Court failed to follow this Court's precedent when it certified the RICO class on the grounds that Plaintiffs could show causation for their generic delay claims "through [a] classwide inference of reliance." Add. 93. An inference of reliance is "not . . . appropriate in most RICO class actions," and is proper *only* "where the behavior of plaintiffs and the members of the class *cannot be explained in any way other than* reliance upon the defendant's conduct." *CGC*

---

[9] The District Court's ruling on RICO causation is particularly troubling because Plaintiffs never explained the causal chain between Petitioners' alleged predicate acts and Plaintiffs' alleged injuries. *See* Opp. 53-54. Nor did Plaintiffs present any expert testimony on RICO causation. The District Court found that Plaintiffs' expert's model sufficed to show classwide evidence of RICO causation for foreclosure, Add. 102 & n.50, yet this expert testified that he was "not asked to" (and did not) "evaluate RICO damages." Opp. Ex. 38 at 76:22-24. And Plaintiffs did not introduce expert testimony on RICO causation for their two-pack or generic delay theories.

*Holding*, 773 F.3d at 1089-91 & n.9 (emphasis added and internal quotation marks omitted).

The District Court fundamentally misapplied that standard. It did not—and could not—conclude that there was *no other* explanation for Plaintiffs' decision to purchase an EpiPen device than Petitioners' alleged misrepresentations. *See St. Gregory Cathedral Sch. v. LG Elecs., Inc.*, No. 6:12-cv-739, 2015 WL 5604763, at *4-5 (E.D. Tex. Sept. 23, 2015) (unpublished) (rejecting inference of reliance and denying certification of RICO claim where testimony left "open numerous possibilities" for why plaintiffs made certain purchases, unlike *CGC Holding*, which "involved economic transactions that no rational individual would enter into absent the fraud"). Petitioners cited significant evidence, including named plaintiff testimony, explaining that Plaintiffs would have purchased EpiPen devices even had they known about the alleged fraud, because purchases were made for multiple, individualized reasons having nothing to do with any statements (or omissions) by Petitioners. As one named plaintiff testified: "[W]e purchased the EpiPen because . . . it was a prescription that our doctor had given us. *There were no statements by [Petitioners] that would have influenced that decision . . . .*" Opp. Ex. 83 at 162:4-8 (emphasis added). Another testified that she purchased EpiPen devices because she "didn't want to risk my daughter's life by switching" products. Opp. Ex. 14 at 48:13-22.

The District Court's conclusion that RICO causation can be shown by inference in this case is manifestly erroneous.  A doctor's decision to prescribe a product, and a patient's decision to purchase it, are individualized, multifaceted decisions that cannot be inferred.  *See Sergeants Benevolent*, 806 F.3d at 90-91 (rejecting inference of reliance because prescribing decisions are "multifaceted"); *see also McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 223 (2d Cir. 2008) (rejecting inference of reliance because of "the possibility that a member of the purported class purchased Lights [cigarettes] for some reason other than the belief that Lights were a healthier alternative"), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008); *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 665-668 (9th Cir. 2004) (rejecting inference of reliance because there is "no single, logical explanation for gambling").

*Third*, the District Court credited Plaintiffs' allegations that "they will show that defendants' conduct caused classwide injury because it forced consumers to buy more EpiPens" under Plaintiffs' two-pack theory.  Add. 87 n.45.  But, as the court acknowledged, Plaintiffs' expert testified that "65% of patients would have preferred to purchase a 2-Pak instead of a single EpiPen."  Add. 168.  Two-thirds of the class—well over 1 million Plaintiffs—were not "forced" to "buy more EpiPens"; they *preferred* to buy more EpiPens (indeed, many *benefitted* by receiving a second device for the same co-pay).  Opp. 26-28.  The District Court's

conclusion that Plaintiffs can show "classwide injury" under RICO for their two-pack theory, where Plaintiffs *admit* two-thirds of the class is uninjured, is manifestly erroneous. Indeed, the District Court appears unpersuaded by its own opinion, noting it "retains the flexibility to modify its class certification decision and preclude plaintiffs from using the 2-Pak theory to support the RICO class claims." Add. 89. The time for that modification is now. This Court should grant the petition and reverse.

## RELIEF SOUGHT

Petitioners respectfully request that this Court grant leave to appeal the District Court's class certification order.

Respectfully submitted,

/s/ Catherine E. Stetson

March 12, 2020

CATHERINE E. STETSON
ADAM K. LEVIN
DAVID M. FOSTER
CAROLYN A. DELONE
KATHRYN M. ALI
KATHERINE B. WELLINGTON
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
cate.stetson@hoganlovells.com

BRIAN FRIES
LATHROP GPM
2345 Grand Boulevard, Suite 2200
Kansas City, MO 64108-2618
(816) 292-2000
brian.fries@lathropgpm.com

*Counsel for Mylan Petitioners*

RAJ S. GANDESHA
STEVEN LEVY
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
rgandesha@whitecase.com

JOSEPH REBEIN
ELISABETH A. HUTCHINSON
SHOOK, HARDY & BACON LLP
2555 Grand Boulevard
Kansas City, MO 64108-2613
(816) 474-6550
jrebein@shb.com

*Counsel for Pfizer Petitioners*

## CERTIFICATE OF COMPLIANCE

This petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 5(c) because it contains 5,197 words, excluding the parts of the petition exempted by Federal Rules of Appellate Procedure 5(b)(1)(E) and 32(f).

This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Times New Roman 14-point font.

<u>/s/ Catherine E. Stetson</u>
Catherine E. Stetson

*Counsel for Petitioners*

**CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTION**

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made pursuant to Tenth Circuit Rule 25.5;

(2) if required to file additional hard copies, the ECF submission is an exact copy of those documents; and

(3) the ECF submission has been scanned for viruses with the most recent version of a commercial virus-scanning program, Carbon Black Defense version 3.5.0.1523. The most recent update was March 12, 2020. According to the program, the digital submissions are free of viruses.

/s/ Catherine E. Stetson
Catherine E. Stetson

*Counsel for Petitioners*

**ADDENDUM**

# TABLE OF CONTENTS

**Page**

Memorandum and Order Granting in Part and Denying in Part
Motion to Class Certification (ECF No. 2018)............................................Add. 1

Memorandum and Order Denying Motion to Strike the Partial
Testimony of Dr. Michael Blaiss; Denying Motion to
Exclude Expert Opinions of Professor Meredith Rosenthal;
Granting in Part and Denying in Part Motion to Exclude
Expert Opinions of Professor Einer Elhauge; Denying
Motion to Exclude Opinions and Proposed Testimony of
Andrew K. Torrance; and Denying Motion to Strike the
Testimony of Professor James Hughes (ECF No. 2017)........................Add. 130

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation | MDL No:  2785 |
| | Case No. 17-md-2785-DDC-TJJ |
| (This Document Applies to Consumer Class Cases) | |

## MEMORANDUM AND ORDER

Class plaintiffs filed a motion for class certification (Doc. 1353), seeking to represent five classes of end-payors in the United States who paid or reimbursed others for some or all of the purchase price of branded or authorized generic EpiPens.  Plaintiffs allege that the Mylan defendants (composed of Mylan N.V., Mylan Specialty, L.P., Mylan Pharmaceuticals, Inc., and Mylan's CEO Heather Bresch) as distributors of the EpiPen, and the Pfizer defendants (composed of Pfizer, Inc., King Pharmaceuticals, Inc., and Meridian Medical Technologies, Inc.) as manufacturers of the EpiPen, have maintained a monopoly over the epinephrine auto-injector ("EAI") market and its profitable revenues by devising an illegal scheme to monopolize the market for EAI devices.  For the reasons explained below, the court grants the motion in part and denies it in part.

The Consolidated Class Action Complaint ("Class Complaint") (Doc. 60) asserts the collective claims of five consumer class cases transferred by the Judicial Panel on Multidistrict Litigation.[1]  The Class Complaint asserts federal and state antitrust claims, federal RICO Act

---

[1]  The JMPL also transferred a case filed by Sanofi-Aventis U.S. LLC ("Sanofi") as part of this Multidistrict Litigation.  It proceeds on a separate track, and this certification motion does not affect the claims or defenses in Sanofi's case.

violations, various state consumer protection law violations, and unjust enrichment claims.  The

Class Complaint asserts its claims against the two groups of defendants who either sell or

manufacture the EpiPen, the Mylan defendants and the Pfizer defendants.  When referring to

both sets of defendants, this Order calls them, collectively, "defendants."

*TABLE OF CONTENTS*

I.      Factual Background……………………………………………………..5

II.     Procedural History…………………………………………………...10

III.    Legal Standard………………………………………………………13

IV.     Discussion…………………………………………………………...15

    A.    Proposed Class Definitions………………………………………15

    B.    Proposed Class Exclusions…………………………………..…17

    C.    Class Certification Under Rule 23………………………………20

        1.    Ascertainability……………………………………..…20

        2.    Standing………………………………………………..26

    D.    Rule 23(a) Requirement……………………………………27

        1.    Numerosity………………………………………………27

        2.    Commonality……………………………………………28

        3.    Typicality………………………………………………30

            a.    Local 282……………………………………….31

            b.    Named Plaintiffs………………………………….36

        4.    Adequacy………………………………………………40

    E.    Rule 23(b)(3) Requirements…………………………………44

        1.    Superiority………………………………………………44

        2.    Predominance……………………………………………45

            a.    Individual Damages Issues………………………47

            b.    Uninjured Class Members…………………………53

                i.  Collateral Source Doctrine………………………...…54

**Add. 3**

ii. The Presence of Uninjured Class Members………………58

(a) Legal Standard………………………………59

(b) Prof. Rosenthal's Probability Analysis…......67

(c) Number of Uninjured Class Members…......72

(d) Constitutional Considerations……………76

c.     RICO……………………………………………………79

i. RICO Causation………………………………………...82

(a) Switch to 2-Pak…………………………………..84

(b) Delay of Generic Competition Through
    "Pay for Delay" Settlements…………………………90

(c) Exclusive Dealing Contracts with PBMs………………95

ii. RICO Damages……………………………………………103

d.     Antitrust…………………………...…………………..…106

i. Market Power……………………………………...…107

ii. Exclusive Dealing Arrangements…………………………108

iii. Generic Delay…………………………………...…111

e.     Consumer Protection………………………………………115

f.     Unjust Enrichment…………………………………...…121

F.     Rule 23(b)(2) Injunction Class…………………………...…123

V.     Class Definitions…………………………………………...…126

VI.     Appointment of Class Counsel…………………………………127

VII.     Notice…………………………………………………………128

Add. 4

## I.      Factual Background[2]

The EpiPen is a portable EAI device used to administer epinephrine to treat an

anaphylactic reaction to an allergen.  In 2007, Mylan acquired the right to market and distribute

the EpiPen.  Pfizer supplies Mylan with 100% of its EpiPen supply through two wholly-owned

subsidiaries—King Pharmaceuticals, Inc., and Meridian Medical Technologies, Inc.—who

manufacture the epinephrine and hold the EpiPen patents.  Since at least 2009, Mylan's market

share of EAI devices in the United States EAI market has remained above 80%.  And, since

2009, Mylan's market share consistently has exceeded 90%, and, in 2012, its share was almost

100%.  During the same time—and while the cost of the EpiPen's dose of epinephrine has

remained about $1—Mylan has raised the EpiPen's price by more than 600%.  In 2007, Mylan

priced the EpiPen at $100.  By 2016, Mylan was charging more than $600.  In 2015, Mylan

announced that the EpiPen had reached $1 billion in annual sales for the second consecutive

year—up from $200 million in 2007.

### Mylan's Dealings with Pharmacy Benefit Managers (PBMs)

Pharmacy Benefit Managers ("PBMs") are third-party administrators of prescription drug

programs for commercial health plans, self-insured employer plans, Medicare Part D plans, the

Federal Employees Health Benefits Program, and state government employee plans.  More

specifically, PBMs administer a health coverage provider's prescription benefit program by

developing the coverage provider's formulary (the list of prescription benefits included in the

coverage at various pricing "tiers"), processing claims, creating a network of retail pharmacies

who provide discounts in exchange for access to a provider's plan participants, and negotiating

---

[2]      To determine whether plaintiffs have met their burden of affirmatively demonstrating compliance with Rule 23's requirements, the court "must accept the substantive allegations of the complaint as true." *Shook v. El Paso Cty.*, 386 F.3d 963, 968 (10th Cir. 2004) (citing *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999)).

with drug manufacturers.  A significant majority of patients with prescription drug insurance

coverage receive their benefits through a third-party payor whose drug formulary is determined

by a PBM.  From 2013 to 2015, commercial third-party payors accounted for about 71% of the

EAI drug device market in the United States.  So, for a competitor to enter and compete

vigorously in the EAI drug device market, it is imperative that the competitor access these third-

party payors' drug formularies.

      Between 2013 and 2015, Mylan significantly increased the EpiPen's price.  Plaintiffs

allege Mylan then used the additional profit margins to offer PBMs significantly higher rebates

and percentage discounts if the PBM would provide exclusive or preferred placement for EpiPen

on the PBM's drug formulary.  In 2013, when Sanofi launched a rival EAI device—Auvi-Q—

Mylan began taking steps to block Auvi-Q from drug formularies, plaintiffs contend.  It did so by

offering large rebates—30% or higher—to PBMs who controlled formularies for third-party

payors and expressly conditioning those rebates on the PBMs:  (a) granting the EpiPen exclusive

position on the formulary; and (b) removing or severely restricting access to Auvi-Q.

Adrenaclick, another rival EAI device, achieved a market share that ranged from 2% in 2013 to

8% in 2016.  In 2014, CVS Caremark added Adrenaclick to its Formulary Drug Removals List,

effectively eliminating a consumer or other end-payor's opportunity to purchase Adrenaclick as

an alternative to the EpiPen.  Plaintiffs contend Mylan knew that neither Adrenaclick nor Auvi-Q

could raise prices to inflate their margins sufficiently to offer rebates or discounts similar to

those Mylan was offering to PBMs.

### *Defendants' Pricing Scheme*

      Plaintiffs allege defendants implemented a pricing scheme that defrauded U.S. consumers

into paying an inflated price for the EpiPen—one that climbed by more than 500%, in nine years.

Plaintiffs assert that defendants' exclusionary pricing scheme deprives patients of a fair price for EAI devices—the price that would result from normal market forces. They describe the pricing scheme this way: Mylan, instead of lowering its prices to gain market share, bargains for market share by providing ever-larger rebates and other kickbacks to PBMs, conditioned on exclusive relationships with those PBMs. Mylan can place itself on the drug formularies by using its monopoly power to charge consumers higher prices for its product. It then can share these revenues with the PBMs (the ones who create the formularies) through substantially enhanced rebates conditioned on excluding insurance coverage for rival products. This conduct, in turn, inflates the prices that consumers pay for the EpiPen so that Mylan can preserve its net realized price and sales volumes. Plaintiffs contend that the net effect of this scheme harms both consumers and competitors alike.

Mylan primarily is a generics pharmaceutical company that makes low margins on drug sales. But the EpiPen, a specialty branded drug, represented a unique and highly profitable revenue stream for Mylan. Plaintiffs assert that Mylan CEO Heather Bresch and other executives recognized this opportunity and decided to exploit the EpiPen to generate billions of dollars in revenue. One of the ways defendants allegedly implemented their pricing scheme was to change the way Mylan sold the EpiPen.

On August 24, 2011, Mylan announced that it no longer would sell individual EpiPens in the United States. Instead, Mylan began selling EpiPens in just one kind of packaging—the EpiPen 2-Pak. This configuration forced U.S. consumers to purchase EpiPens in pairs. Plaintiffs refer to this change as the "hard switch," and allege that it forced consumers and third-party payors to overpay for the EpiPen 2-Pak because the switch effectively doubled the EpiPen's price. While Mylan asserts a medical necessity supported the switch, plaintiffs contend nothing

changed in 2011 that required Mylan to sell the EpiPen in a 2-Pak. Moreover, Mylan continued selling EpiPens individually in every other country where Mylan markets the product.[3]

Beginning in 2011, Mylan began raising the EpiPen's price while forcing customers to buy EpiPens in the 2-Pak. In October 2011, Mylan increased the price of an EpiPen 2-Pak to $181. And by May 2016, the price of an EpiPen 2-Pak had jumped to $608.

According to plaintiffs, Mylan developed and implemented a pricing scheme to monopolize the EAI market. This scheme, plaintiffs allege, used a variety of tactics. They included spreading false and misleading information and omitting material information. Plaintiffs contend defendants and the PBMs distracted consumers and regulators from the reality that Mylan was raising the price of the EpiPen from $100 to $600 by launching a campaign of false and misleading statements and actions. These statements and actions include: (a) distributing misinformation about Auvi-Q intended to undermine the FDA's conclusion that Auvi-Q had demonstrated bioequivalence to the epinephrine in the EpiPen; (b) paying formularies to exclude Auvi-Q from coverage, while telling physicians about the exclusion and suggesting the decision was based on clinical recommendations, rather than large, conditional rebate offers; and (c) issuing a fraudulent and misleading press release about the "hard switch" to the 2-Pak that included erroneous medical claims. Plaintiffs also contend that Mylan CEO Heather Bresch testified untruthfully in a Congressional hearing on September 21, 2016. Specifically, they assert, Ms. Bresch misrepresented that: (a) Mylan's profit on the EpiPen as $50 per device when its profits were reportedly 60% higher than that amount; (b) the investment Mylan had made in EpiPen as $1 billion (when Mylan, in fact, had acquired the EpiPen in 2007 without incurring any research and development expenses); (c) Mylan had reduced U.S.

---

[3]     The lone exception is France, where Mylan also sells the EpiPen in just one packaging format: the 2-Pak.

healthcare costs by about $180 billion; and (d) 85% of EpiPen patients pay less than $100 for a

2-Pak and a majority pay less than $50.

### *Patent Infringement Lawsuits*

The Pfizer defendants own the patents protecting the EpiPen and serve as contract

supplier of the product.  The Mylan defendants own the trademarked brand names and control

the worldwide marketing and sale of the product.  Together, plaintiffs assert, defendants have a

unified interest in protecting the EpiPen's alleged monopoly.  To that end, defendants allegedly

added patents to the already-patented EpiPen to stop generic competitors.  For instance, on

September 14, 2010, Meridian (a Pfizer subsidiary) secured U.S. Patent No. 7,794,432, just three

weeks before Intelliject submitted a New Drug Application ("NDA") to the FDA for Auvi-Q.

Defendants also filed patent infringement lawsuits against two generic EpiPen rivals—

Teva and Intelliject—and then entered into settlements with these impending generic

manufacturers which, plaintiffs assert, were anticompetitive.[4]  In December 2008, Teva filed an

Abbreviated New Drug Application ("ANDA") seeking FDA approval to market a generic

EpiPen.  In August 2009, Pfizer's subsidiaries, King and Meridian, sued Teva for infringing U.S.

Patent No. 7,449,012 ("the Teva patent litigation").  In November 2010, King and Meridian filed

a First Amended Complaint that included a claim for infringing the newly secured '432 patent.

Later, King and Meridian dropped their claims based on the '012 patent, leaving only the

infringement claims for the '432 patent.  On April 27, 2012, the parties settled the Teva patent

litigation.  According to plaintiffs, defendants and Teva entered into an unlawful settlement

agreement requiring Teva to delay launching its generic EAI for three years—until June 22,

2015—in exchange for defendants providing significant consideration, incentives, and benefits to

---

[4]    The Class Complaint also describes patent litigation with Sandoz, but plaintiffs do not include
any allegations about that litigation in their certification motion.

Teva.  Plaintiffs allege the settlement included a substantial "reverse payment" from defendants to Teva to convince Teva to delay bringing its competing product to market.  Plaintiffs offer expert testimony from Prof. Andrew K. Torrance about (a) Teva's likelihood of success in the Teva patent litigation, and (b) the costs and duration of that litigation had the parties not settled it.

Defendants also initiated another patent lawsuit against Intelliject, the inventor of Auvi-Q, when Intelliject sought FDA approval for its competing EAI.  On January 11, 2011, King filed suit against Intelliject seeking to block FDA approval of Intelliject's NDA for the product that later became known as Auvi-Q.  On August 1, 2011, the FDA announced that it was giving Intelliject's EAI "tentative final approval," pending resolution of the patent litigation King had filed.  Doc. 1500 at 33.  Six months later, the parties announced that they had settled the Intelliject litigation, with Mylan making the announcement jointly for itself and Pfizer.  The settlement included an agreement by Intelliject and Sanofi not to enter the EAI market until November 15, 2012, in exchange for valuable consideration.  Plaintiffs allege that defendants, through the Intelliject patent litigation, forestalled competition that Intelliject's competing device would have presented for nearly two years.

## II.   Procedural History

On August 20, 2018, the court granted in part and denied in part defendants' motions to dismiss the Class Complaint (Doc. 896).  The court directed the parties to conduct coordinated discovery for both the consumer class cases and the Sanofi case, followed by dispositive motions in the Sanofi case and a motion for class certification in the consumer class cases.  Class plaintiffs now have moved for class certification (Doc. 1353).  In response, the Mylan defendants filed an opposition to class plaintiffs' motion (Doc. 1636, Doc. 1834 (sealed)), as did the Pfizer

defendants (Doc. 1841).[5]  Class plaintiffs filed a reply memorandum supporting their motion for class certification (Doc. 1837, Doc. 1839 (sealed)).  On June 11 and 12, 2019, the court conducted a hearing on the class certification motion and took it under advisement.

After briefing on plaintiff's Motion for Class Certification had closed, defendants filed a Motion for Leave to File a Sur-reply.  Doc. 1574.  Defendants assert that plaintiffs improperly presented two new arguments in their Reply to the Motion for Class Certification.  Specifically, defendants assert that the Reply raised new arguments about Prof. Rosenthal's probability analysis and the collateral source rule.  Defendants thus ask the court for leave to file a Sur-reply to address these two arguments.  Defendants have attached their purposed Sur-reply to their motion (Doc. 1574-1).

Plaintiffs respond that defendants' Motion for Leave to File a Sur-reply is baseless.  Plaintiffs contend they properly offered their arguments about the collateral source rule and Prof. Rosenthal's probability analysis to respond to arguments defendants had raised in their response brief opposing class certification.  Hedging their bets, plaintiffs say they don't oppose defendants' Motion for Leave to File a Sur-reply, so long as the court allows them to file a short response to defendants' arguments in the Sur-reply.  Plaintiffs have submitted their proposed response to defendants' Sur-reply as an attachment to their Response (Doc. 1579-1).  And, plaintiffs contend, they should have the last word on their Motion for Class Certification because they are the moving party.

---

[5]  In their brief, the Pfizer defendants join the arguments in the Mylan defendants' brief, but they also separately argue two other issues.  So, arguments made by the Mylan defendants are also attributable to the Pfizer defendants.  For ease, the court refers to arguments asserted by the Mylan defendants as ones asserted by Mylan.  And it refers to arguments asserted separately by the Pfizer defendants as ones asserted by Pfizer.  Also, this Order generally identifies which party made an argument or asserted a position.  If neither defendant has addressed an issue that applies to both Mylan and Pfizer, the court notes that defendants have not addressed the issue.

**Add. 11**

The court's local rules limit briefing on motions to the motion, a memorandum in support, a response, and a reply. D. Kan. Rule 7.1(a) & (c). "Surreplies are typically not allowed." *Taylor v. Sebelius*, 350 F. Supp. 2d 888, 900 (D. Kan. 2004), *aff'd on other grounds*, 189 F. App'x 752 (10th Cir. 2006). Instead, sur-replies are permitted only with leave of court under "rare circumstances." *Humphries v. Williams Nat. Gas Co.*, No. 96-4196-SAC, 1998 WL 982903, at *1 (D. Kan. Sept. 23, 1998) (citations omitted). For example, when a moving party raises new material for the first time in a reply, the district court has discretion to grant leave to file a sur-reply to afford the opposing party an opportunity to respond to the new material. *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n.13 (10th Cir. 2003). The rules limiting sur-replies "are not only fair and reasonable, but they assist the court in defining when briefed matters are finally submitted and in minimizing the battles over which side should have the last word." *Humphries*, 1998 WL 982903, at *1.

Here, the court concludes that plaintiffs' Reply didn't improperly assert new arguments. As plaintiffs explain, they presented arguments about the collateral source rule and Prof. Rosenthal's probability analysis in direct response to defendants' arguments opposing class certification. Specifically, defendants' Opposition to class certification argued that the court should not certify plaintiffs' putative classes because the proposed definitions include uninjured class members—for example, consumers who used a co-pay to purchase their EpiPens. In their Reply, plaintiffs responded that the collateral source rule bars this argument because that rule requires the court to exclude evidence of payments from a third-party (such as an insurer) that would reduce a tortfeasor's liability. Doc. 1837 at 14. Also, plaintiffs cited a probability analysis that Prof. Rosenthal presented in her rebuttal report to show that the number of

uninjured class plaintiffs in each class is *de minimis*. *Id.* at 19–22.  It was proper for plaintiffs to assert these arguments in their Reply because they responded directly to assertions in defendants' Opposition claiming that the proposed classes include uninjured class members.

Yet, it is equally true that these two arguments are "new" in the sense they don't appear in the class certification briefing until the Reply.  And, the court finds the parties' additional submissions helpful to the court's consideration of the difficult issues raised in the class certification briefing.

While this court limits sur-replies and such to "rare circumstances," *Humphries*, 1998 WL 982903, at *1, there's nothing ordinary about this case or this certification motion.  The rare circumstances presented in this case warrant granting leave for a sur-reply.  Exercising its discretion, the court grants defendants' Motion for Leave to File a Sur-reply (Doc. 1574).  Also, the court grants plaintiffs' request to file a response to defendants' Sur-reply.  The court will consider the arguments presented by defendants' Sur-reply (Doc. 1574-1) and plaintiffs' Response (Doc. 1579-1) in its analysis, below.

### III.   Legal Standard

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).  The court has considerable discretion when deciding whether to certify a class action.  *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1227 (10th Cir. 2013) (because class certification involves "intensely practical considerations," decision rests within trial court's discretion (citation and internal quotation marks omitted)).  But when exercising this discretion, district courts must conduct a "rigorous analysis" and decide whether the putative class satisfies the requirements of Federal Rule of

Civil Procedure 23.  *Comcast*, 569 U.S. at 33 (citation and internal quotation marks omitted);

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011).

      The elements of the class certification standard are (1) numerosity, (2) commonality, (3)

typicality, and (4) adequate representation, plus one of the requirements established by Rule

23(b)(1), (b)(2), or (b)(3).  *See* Fed. R. Civ. P. 23(a)–(b).  Here, plaintiffs seek certification under

Rules 23(b)(2) and (3).  Rule 23(b)(2) applies when "final injunctive relief or corresponding

declaratory relief is appropriate respecting the class as a whole."  Rule 23(b)(3)-based motions

require plaintiffs to demonstrate that "questions of law or fact common to class members

predominate over any questions affecting only individual members, and that a class action is

superior to other available methods for fairly and efficiently adjudicating the controversy."

      Rule 23 "'does not set forth a mere pleading standard.'"  *Comcast*, 569 U.S. at 33

(quoting *Dukes*, 564 U.S. at 350).  As the party requesting class certification, plaintiffs bear the

burden of "'affirmatively demonstrat[ing]'" compliance with the rule's requirements.  *Id.*

(quoting *Dukes*, 564 U.S. at 350).  Plaintiffs "must be prepared to prove that there are *in fact*

sufficiently numerous parties, common questions of law or fact, etc."  *Dukes*, 564 U.S. at 350.

When deciding whether plaintiffs have met their burden, the court "must accept the substantive

allegations of the complaint as true," but it cannot "'blindly rely on conclusory allegations which

parrot Rule 23.'"  *Shook v. El Paso Cty.*, 386 F.3d 963, 968 (10th Cir. 2004) (quoting *J.B. ex rel.*

*Hart v. Valdez*, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999)).  The court "is not limited to the

pleadings but may 'probe behind the pleadings' and examine the facts and evidence in the case."

*Tabor*, 703 F.3d at 1227–28 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982));

*see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (rigorous analysis

requires evaluations about persuasiveness of evidence). "[A]ctual, not presumed, conformance with Rule 23(a)" is required. *Falcon*, 457 U.S. at 160.

The court's "rigorous analysis" "[f]requently . . . will entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 351. But the careful examination and rigorous analysis requirements do not authorize mini-trials to determinine whether the class, if certified, actually could prevail on the merits of their claims. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013); *Dukes*, 564 U.S. at 351 n.6. "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at 466. Rather, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

## IV.   Discussion

### A.   Proposed Class Definitions

"Defining the class is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the 'best notice practicable' in a Rule 23(b)(3) action." *Sibley v. Sprint Nextel Corp.*, 254 F.R.D. 662, 670 (D. Kan. 2008) (quoting *Manual for Complex Litigation* § 21.222 (4th ed. 2004)). Thus, "[t]he [class] definition must be precise, objective and presently ascertainable." *Id.*

Class plaintiffs ask the court to certify five classes. They are:

**1.   Nationwide Injunctive Relief Class ("Injunctive Class").** All persons and entities in the United States who paid or provided reimbursement for some or all of the purchase price of Branded or authorized generic[6] EpiPens for the

---

[6]   Class plaintiffs' original definition for classes 1, 2, and 5 contained the phrase "Branded or AB-rated" EpiPens instead of "Branded or authorized generic EpiPens." An AB-rated device is one the U.S. Food and Drug Administration (FDA) rates as therapeutically equivalent to the brand device. U.S. FOOD & DRUG ADMIN., APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE EVALUATIONS xvi (2019), https://www.fda.gov/media/71474/download. An authorized generic is an

purpose of consumption, and not resale, by themselves, their family member(s), insureds, plan participants, employees, or beneficiaries, at any time from August 24, 2011, until the effects of defendants' unlawful conduct cease.[7]

2.     **Nationwide RICO Damages Class ("RICO Class").** The proposed nationwide RICO Class is coterminous with the Injunctive Class.

3.     **State Antitrust Damages Class ("State Antitrust Class").** All persons and entities in the Antitrust States[8] who paid or provided reimbursement for some or all of the purchase price of Branded EpiPens at any time from January 28, 2013, until the effects of defendants' unlawful conduct cease, for the purpose of consumption, and not resale, by themselves, their family member(s), insureds, plan participants, employees, or beneficiaries.

4.     **Consumer Protection Damages Class ("CP Class").** All persons and entities in the Consumer Protection States[9] who paid or provided reimbursement for some or all of the purchase price of Branded EpiPens at any time from August 24, 2011, until the effects of defendants' unlawful conduct cease, for

---

approved brand-name drug that is marketed without the brand name on its label, either by the brand name drug company or another company with the brand company's permission. *FDA List of Authorized Generic Drugs*, U.S. Food & Drug Admin., https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/fda-list-authorized-generic-drugs (last updated Dec. 19, 2019). Plaintiffs' first version of the proposed definitions seemed to include a mistake because the only AB-rated product available during the defined period is one manufactured by Teva Pharmaceuticals. Plaintiffs report they never intended purchasers of that product to qualify as members of any putative class. And, in their Reply, plaintiffs explain that "reference in the class definitions to 'AB-rated generic EpiPens' should be changed to 'authorized generic EpiPens.'" Doc. 1837 at 13 n.6. Consistent with plaintiffs' request, the court makes this change to the class definitions.

[7]     During the hearing on class certification, class plaintiffs' counsel suggested that "until the effects of Defendants' unlawful conduct cease" should refer to the date when class notice is given. Doc. 1789 at 133 (Tr. of Mot. Hr'g Class Certification – Phase II 133:17–18).

[8]     Plaintiffs define the "Antitrust States" as: Alabama, Arizona, California, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. As discussed below, even if class certification is warranted under Rule 23, plaintiffs cannot assert class action claims under some of these state laws because no named plaintiff resides in the particular state.

[9]     Plaintiffs define the "Consumer Protection States" as: Alaska, California, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Maine, Maryland, Massachusetts, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Oklahoma, Rhode Island, Vermont, Washington, and West Virginia. As discussed below, even if class certification is warranted under Rule 23, plaintiffs cannot assert class action claims under some of these state laws because no named plaintiff resides in the particular state.

**Add. 16**

the purpose of consumption, and not resale, by themselves, their family member(s), insureds, plan participants, employees, or beneficiaries.

      **5.**      **Unjust Enrichment Class ("UE Class")**.  All persons and entities in the Unjust Enrichment States[10] who paid or provided reimbursement for some or all of the purchase price of Branded or authorized generic EpiPens for the purpose of consumption, and not resale, by themselves, their family member(s), insureds, plan participants, employees, or beneficiaries, at any time from August 24, 2011, until the effects of defendants' unlawful conduct cease.

      **B.**      **Proposed Class Exclusions**

Plaintiffs' motion lists the following groups as ones who are excluded from each of the classes:

(a) Defendants and their officers, directors, management, employees, subsidiaries, and affiliates;

(b) Government entities, other than government-funded employee benefit plans;

(c) Fully insured health plans (*i.e.*, plans that purchased insurance that covered 100% of the plan's reimbursement obligations to its members);

(d) "Single flat co-pay" consumers who purchased EpiPens or generic EpiPens only via a fixed dollar co-payment that is the same for all covered devices, whether branded or generic (*e.g.*, $20 for all branded and generic devices);

(e) Consumers who purchased or received EpiPens or authorized generic equivalents only through a Medicaid program;

(f) All persons or entities who purchased branded or generic EpiPens directly from defendants; and

(g) The judges in this case and members of their immediate families.

---

[10]    Class plaintiffs assert all 50 states are "Unjust Enrichment States."  If one of the other remedies eventually provides a remedy at law, class plaintiffs intend to exclude Arizona, Delaware, Louisiana, and North Dakota from this class.

Also, at oral argument on the certification motion, plaintiffs conceded that the classes should exclude another group of entities. Specifically, the court raised concern about including "third-party payors who in effect run their own PBMs." Doc. 1789 at 27 (Tr. of Mot. Hr'g Class Certification – Phase II 27:13–16). Plaintiffs conceded that these "separate entities [who] fill the PBM role . . . should still be excluded from the class[es]." *Id.* at 27–28 (Tr. of Mot. Hr'g Class Certification – Phase II 27:17–28:4). To the extent plaintiffs seek to limit this exclusion to the PBMs themselves,[11] the court broadens the exclusion to include third-party payors who own or otherwise function as a PBM or control an entity who functions as a PBM. This exclusion is needed to avoid the potential conflict that otherwise could arise by including entities in the classes who allegedly sustained harm from defendants' conduct but who also, allegedly, benefited from defendants' exclusive dealing arrangements.

In their reply brief, plaintiffs offer another exclusion to the class definitions, if necessary. Doc. 1837 at 23. Plaintiffs assert that this exclusion would address the issue of including potential "uninjured class members" in the classes. The proposed exclusion excludes from each class definition individual consumers whose only purchases of an EpiPen occurred before March 13, 2014 (the "Generic Start Date").[12] To avoid the potential that a class would include a great

---

[11]     The following exchange between the court and plaintiffs' counsel occurred at oral argument:

        THE COURT:  You lost me. Those—you're talking about now CVS and—what  was the other one—Humana? They should be excluded?
        MR. BURNS:  Their PBMs should be.
        THE COURT:  They should be but third-party payors should not?
        MR. BURNS:  Right. Third-party payors should not.

Doc. 1789 at 28 (Tr. of Mot. Hr'g Class Certification – Phase II 28:11–18).

[12]     March 13, 2014 is the date class plaintiffs refer to as the "Generic Start Date," arrived at by their experts as the date when a generic device would have entered the EAI market but for defendants' allegedly anticompetitive behavior. Plaintiffs concede that subsequent discovery may shift this date forward in time, *i.e.* later than March 2014.

number of members who sustained no injury, the court adds this exclusion to the class

definitions.  The court more fully explains the reasons for this additional exclusion to the class

definitions in Part IV.E.2.b.i., below.

The case authorities permit the court to refine the class definitions.  "A court is not bound

by the class definition proposed in the complaint and should not dismiss the action simply

because the complaint seeks to define the class too broadly."  *Robidoux v. Celani*, 987 F.2d 931,

937 (2d Cir. 1993); *see also In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004)

("[H]olding plaintiffs to the plain language of their definition would ignore the ongoing

refinement and give-and-take inherent in class action litigation, particularly in the formation of a

workable class definition."); *Sibley v. Sprint Nextel Corp.*, 254 F.R.D. 662, 671 (D. Kan. 2008)

("If the class definition should require tailoring as the litigation progresses, the Court and parties

are authorized to do so." (citing Fed. R. Civ. P. 23(c)(1), (d))).

Plaintiffs also ask the court to select the named plaintiffs as class representatives.  For the

damages classes, Mylan opposes this request to an extent.  It argues certain named plaintiffs are

uninjured and are, therefore, inadequate class representatives.  The court will address this issue

in its analysis of Rule 23(b)(3)'s requirement of typicality, below.  *See infra* Part IV.D.3.b.

Finally, plaintiffs ask the court to appoint Warren T. Burns, Paul J. Geller, Lynn Lincoln

Sarko, and Rex Sharp as co-class counsel for class plaintiffs.  Mylan does not question the

experience of plaintiffs' counsel.  But asserts, albeit in conclusory fashion, that it is inappropriate

to have the same counsel represent plaintiffs with different theories of injury and competing

damages claims.  The court will address the request to appoint class counsel at the conclusion of

this Order, in Part VI.

### C.    Class Certification under Rule 23

Plaintiffs seeking to certify a class under Rule 23 must first satisfy Rule 23(a)'s

prerequisites of numerosity, commonality, typicality, and adequacy of representation, along with

the elements for one of the three types of class actions described in Rule 23(b).  As referenced

above, class plaintiffs here seek to certify four classes under Rule 23(b)(3) and one class for

injunctive relief under Rule 23(b)(2).  Mylan argues, that in addition to these explicit

requirements, Rule 23 also requires ascertainable classes.  In other words, Mylan contends, class

plaintiffs must demonstrate the definition of each putative class is sufficiently definite to allow

the court to ascertain class membership.  Mylan also argues that plaintiffs have ignored the

ascertainability requirement.  And, their failure to address ascertainability, Mylan contends,

requires the court to reject plaintiffs' motion altogether.  The court thus begins its analysis of the

certification motion by considering whether plaintiffs must satisfy an ascertainability

requirement as a prerequisite to certification.

### 1.    Ascertainability

It is unsettled whether ascertainability is a separate and distinct requirement for class

certification under Rule 23(b)(3).  Some courts, including the Third Circuit, have held that "[t]he

predominance and ascertainability inquiries are distinct[.]"  *Byrd v. Aaron's Inc.*, 784 F.3d 154,

164 (3d Cir. 2015); *see also Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)

(recognizing an implied requirement of ascertainability that is "distinct from predominance").

The Third Circuit has explained how the two inquires differ:  "'[T]he ascertainability

requirement focuses on whether individuals fitting the class definition may be identified without

resort to mini-trials, whereas the predominance requirement focuses on whether essential

elements of the class's claims can be proven at trial with common, as opposed to individualized,

evidence.'" *Id.* (quoting *Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 184 (3d Cir.

2014)).  Thus, courts in the Third Circuit have concluded that "[a]scertainability should not be

conflated with other Rule 23 requirements, such as the predominance requirement of Rule

23(b)(3)."  *In re Wellbutrin XL Antitrust Litig.*, 308 F.R.D. 134, 147 (E.D. Pa. 2015); *see also In

re Thalomid and Revlimid Antitrust Litig.*, No. 14-6997, 2018 WL 6573118, at *18 (D.N.J. Oct.

30, 2018) ("Ascertainability should not be conflated with the predominance requirement.").

The Third Circuit requires a class movant to demonstrate ascertainability by:  (1)

showing the class is "defined with reference to objective criteria," and (2) providing "some

assurance that there can be a reliable and administratively feasible mechanism for determining

whether putative class members fall within the class definition."  *Byrd*, 784 F.3d at 164–65

(citation and internal quotation marks omitted); *see also Brecher*, 806 F.3d at 24 (clarifying that

the Second Circuit's test for ascertainability asks "whether the class is sufficiently definite so

that it is administratively feasible for the court to determine whether a particular individual is a

member" (citation and internal quotation marks omitted)).

In contrast, other Circuits conclude that Rule 23(b)(3) includes an implied requirement of

ascertainability, but they have rejected the Third Circuit's "administrative feasibility" standard

for determining ascertainability.  These Circuits apply a less stringent test.  *See Mullins v. Direct

Dig., LLC*, 795 F.3d 654, 657, 662–72 (7th Cir. 2015) (recognizing "an implicit requirement

under Rule 23" to establish ascertainability but rejecting the "heightened ascertainability

requirement" imposed by the Third Circuit); *see also Sandusky Wellness Ctr., LLC v. Medtox

Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016) (discussing criticism of the Third Circuit's standard

and refusing to install "a separate, preliminary [ascertainability] requirement"); *Rikos v. Procter

& Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015) ("We see no reason to follow [the Third

Circuit's ascertainability standard], particularly given the strong criticism it has attracted from other courts.").

Here, Mylan begins its ascertainability argument by contending the class definitions for the injunction, RICO, and unjust enrichment classes are defective because they include consumers and entities who purchased or reimbursed Teva's generic EAI. Recognizing this error, plaintiffs have suggested the substitution of "AB-rated" with "authorized generic" in those class definitions, as discussed *supra* in footnote 6. The court is satisfied that the substituted language cures Mylan's threshold issue.

Returning to the broader ascertainability debate, the court has found no Tenth Circuit case that specifically addresses whether ascertainability is a separate requirement under Rule 23(b)(3).[13] But the most recent class action case from our Circuit includes a footnote acknowledging that the defendant there had asserted Rule 23 includes an implied requirement of ascertainability. *See Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 788 n.9 (10th Cir. 2019) ("[Defendant] asserts that Rule 23 includes an implied requirement of ascertainability and that [plaintiff] cannot satisfy this implied requirement here." (citations and internal quotation marks omitted)). The Circuit did not address this argument though, because defendant could not show it had raised the issue to the district court. *Id.* (declining to address the ascertainability

---

[13]     The court recognizes that the Tenth Circuit has held that an ascertainability requirement does not apply to certification under Rule 23(b)(2). *See Shook v. El Paso Cty.*, 386 F.3d 963, (10th Cir. 2004) (noting the Rule 23(b)(2) is "well suited for cases where the composition of a class is *not* readily ascertainable (emphasis added)). But the court has found no case discussing whether an ascertainability requirement applies to Rule 23(b)(3) cases.

Quoting four words from *In re Cox Enterprises, Inc. Set-top Cable Television Box Antitrust Litig.*, 790 F.3d 1112, 1118 (10th Cir. 2015), Mylan suggests they demonstrate that the Tenth Circuit requires ascertainability. Doc. 1636 at 63. But the phrase "establishing an ascertainable class" appears in a sentence where the court is criticizing plaintiffs for belatedly moving to compel arbitration until after the class was certified. Whether the class should have been certified, and whether it was sufficiently ascertainable, was not at issue in that case. So, the court doesn't view *Cox Enterprises* the same way Mylan does.

argument because defendant "fails to 'cite the precise references in the record where' this

ascertainability argument 'was raised and ruled on' below" and "also fails to make a case for

plain error on appeal" (quoting 10th Cir. Rule 28.1(A))).

In contrast, this court explicitly considered whether ascertainability is an independent

requisite for class certification.  *See In re Syngenta AG MIR 162 Corn Litig.*, No. 14-md-2591-

JWL, 2016 WL 5371856, at *2–3 (D. Kan. Sept. 26, 2016).  The defendants in that case argued

that the putative class proposed by plaintiffs was not sufficiently ascertainable.  *Id.* at *2.

Finding no answer in Tenth Circuit decisions, Judge Lungstrum summarized the holdings from

other circuits, most of which have imposed a requirement that the proposed class be readily

identifiable.  *Id.* (citing *Sandusky Wellness Ctr.*, 821 F.3d at 995 (collecting cases)).  Also, Judge

Lungstrum recognized that "[a] few circuit courts have applied a stricter standard of

ascertainability, by which the plaintiff must show not only that the class is defined by reference

to objective criteria, but also that class members may be determined in an economical and

'administratively feasible manner,' such that 'class members can be identified without extensive

and individualized fact-finding or mini-trials.'"  *Id.* (first quoting *Carrera v. Bayer Corp.*, 727

F.3d 300, 307 (3d Cir. 2013); then citing *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d

Cir. 2015); and then citing *Karhu v. Vital Pharms., Inc.*, 621 F. App'x 945, 947 (11th Cir.

2015)).  But, Judge Lungstrum also noted, "[o]ther courts have criticized and rejected such a

heightened standard for ascertainability."  *Id.* (first citing *Mullins v. Direct Dig., LLC*, 795 F.3d

654, 659–72 (7th Cir. 2015); then citing *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821

F.3d 992, 996 (8th Cir. 2016); and then citing *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525

(6th Cir. 2015)).

In the end, Judge Lungstrum was persuaded by the Seventh Circuit's "thorough and well-reasoned analysis" in *Mullins*. *Id.* at *3. *Mullins* had rejected a strict standard requiring an administratively feasible mechanism for identifying class members. *Id.* at *2 (citing *Mullins*, 795 F.3d at 662). Specifically, Judge Lungstrum was persuaded that a stricter view of ascertainability furthers no interest not already protected by Rule 23's explicit requirements, nor is it necessary to prevent unfairness to absent class members. *Id.* (citing *Mullins*, 795 F.3d at 662–72). Moreover, Judge Lungstrum recognized that the Seventh Circuit had concluded that the risk of fraudulent claims is low, and applying a lower standard does not deny the defendant due process. *Id.* (citing *Mullins*, 795 F.3d at 665–72).

After coming to this conclusion, Judge Lungstrum applied the Seventh Circuit's "'weak' version of ascertainability." *Id.* at *2–3. This test requires that "the class definition must not be too vague, the class must not be defined by subjective criteria, and the class must not be defined in terms of success on the merits." *Id.* at *2 (citing *Mullins*, 795 F.3d at 659–60). And, he concluded, the proposed class definitions in *Syngenta* satisfied the ascertainability requirement because they were "sufficiently definite and objective." *Id.* at *3–4.

The court concurs with Judge Lungstrum's conclusions. It thus predicts that the Tenth Circuit, if confronted with this question, would decline to recognize ascertainability as a separate, unstated requirement of Rule 23 requiring certification movants to satisfy the more stringent ascertainability standard adopted by the Third Circuit. Instead, the court predicts that our Circuit would follow the Seventh Circuit's approach, applying the less restrictive ascertainability test on certification.[14]

---

[14]   *But cf. Cline v. Sunoco, Inc. (R&M)*, ___ F.R.D. ___, 2019 WL 4879187, at *8–9 (E.D. Okla. Oct. 3, 2019) (recognizing Tenth Circuit does not consider ascertainability a separate Rule 23 factor but concluding that class definition must make class membership determination administratively feasible (citing *Carrera*, 727 F.3d at 306–07)).

Applying that standard to the class definitions here, the court concludes that they satisfy the *Mullins* criteria. Specifically, the class definitions are based on objective criteria—*i.e.*, each one defines a class member as a person or entity who paid part of the purchase price for an EpiPen during a specific date range. Also, the definitions aren't impermissibly vague, and they are not defined in terms of success on the merits.

Relying on the opinions of their expert, defendants assert that Prof. James Hughes concluded that none of the data found in the record allows plaintiffs to identify who meets the class definitions and exclusions. *See* Doc. 1636-4 at 30–40 (Hughes Expert Report ¶¶ 63–84). Thus, defendants argue, plaintiffs can't satisfy the ascertainability standard. But Prof. Hughes's opinions don't identify any ascertainability issues with third-party payors. Doc. 1837-12 at 9 (Hughes Dep. 113:7–114:1). And, as Prof. Hughes testified, to ascertain whether a person or entity qualifies as a class member, he must "demonstrate that [he] paid or provided reimbursement for some or all of the purchase price" of an EpiPen. *Id.* at 8 (Hughes Dep. 111:16–23). This criteria is sufficiently precise and objective to satisfy the Seventh Circuit's version of the ascertainability standard and, by extension, the standard the court predicts our Circuit would adopt.[15] Thus, the court finds that the proposed class definitions are sufficiently ascertainable.

---

[15]     The court recognizes that Prof. Hughes's Report focuses on the data produced in the case and concludes that "[p]laintiffs have not provided a reliable methodology for identifying who is included or excluded from the class." Doc. 1636-4 at 30–31 (Hughes Expert Report ¶ 63). As discussed above, the court rejects defendants' assertion that plaintiffs must satisfy this heightened standard of ascertainability at certification. But, even if the court applied this heightened standard, plaintiffs assert that they can identify such class members using pharmacy and medical records. Indeed, plaintiffs' expert, Prof. Meredith Rosenthal, has identified various data that, she says, will allow plaintiffs to ascertain who qualifies as a class member. This information includes data from PBMs, pharmacy records, and individuals' own records documenting EpiPen purchases. Doc. 1711-1 at 15–16, 28–29 (Rosenthal Reply Report ¶¶ 20–21, 46–49). Other courts have noted that, in prescription medication cases, this kind of information makes it "fairly easy to identify potential class members through pharmacy and medical records." *Krueger v. Wyeth, Inc.*, No. 03CV2496 JAH (AJB), 2011 WL 8984448, at *2–3 (S.D. Cal. July

## 2.      Standing

For the most part, defendants concede that plaintiffs have standing.  As our court has

recognized, "as long as at least one plaintiff has standing with respect to each claim alleged . . . ,

it will satisfy the injury requirement of standing."  *Roco, Inc. v. EOG Res., Inc.*, No. 14-1065-

JAR-KMH, 2014 WL 5430251, at *3 (D. Kan. Oct. 24, 2014).  But Mylan does challenge

plaintiffs' standing in one important respect.  It contends plaintiffs lack standing to assert state

law claims for states where no named plaintiff resides.[16]

Plaintiffs respond, contending they have standing to bring 33 state-law claims because at

least one named plaintiff lives in those 33 states.  For the other states, plaintiffs cite *Roco*, and

argue they are entitled to amend to add additional plaintiffs to cure standing issues for specific

states where, currently, no named plaintiff reside.  *See id.* at *4, 6 (granting leave to amend to

add additional plaintiff to fix standing issues).  Mylan has the better of this issue.  The court

---

13, 2011); *see also In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 214 F.R.D. 614, 619 (W.D.
Wash. 2003) (contrasting cases "involving . . . prescription medication verifiable by medical and
pharmacy records" from the current case involving over-the-counter medication where "the process of
simply identifying who rightfully belongs within the proposed class would entail a host of mini-trials").
Thus, even under a heightened ascertainability standard, plaintiffs have identified a viable method for
identifying members of the classes.

In reaching this conclusion, the court recognizes that defendants have challenged Prof.
Rosenthal's ascertainability opinions with a *Daubert* motion.  By separate Order, the court denies
defendants' motion, concluding that Prof. Rosenthal's opinions are sufficiently reliable for the court to
consider on class certification.  As discussed in that Order, defendants question whether the data
identified by Prof. Rosenthal is capable of identifying class members or even if it still exists.  The court
recognizes that merits discovery may establish that these records can't discharge the task Prof. Rosenthal
assigns to them (specifically, identifying consumers who paid nothing for EpiPens, those who used a flat
co-pay, or individuals who paid cash for their EpiPens).  But, for now, and on the current record, Prof.
Rosenthal supplies a reasonably reliable and plausible method for identifying putative class members
sufficient to respond to Prof. Hughes's criticisms.

[16]      The "reside there" requirement is likely imprecise.  The court can imagine a named plaintiff who
may have purchased EpiPens in a nearby state where the plaintiff doesn't reside.  Such a named plaintiff
could have standing to bring a state law claim under the laws of the place of purchase even though the
plaintiff doesn't reside in that state.  But plaintiffs never argue this nuance and nothing suggests the court
needs to consider it here.

declines to certify a class claim for states lacking a named plaintiff to represent the classes. And, the court revises the class definitions to make appropriate exclusions for states where no named plaintiff resides.

Defendants also assert that plaintiffs have a standing problem because many named plaintiffs are uninjured under the legal theories at issue in the certification motion. And, defendants argue, the court cannot certify state law claims for states where the only named representative is an uninjured plaintiff. The court addresses this argument in the typicality section below. *See infra* Part IV.D.3.b. As that section explains, the current record doesn't establish a standing problem for the named plaintiffs.

In sum, the court finds that plaintiffs have standing to assert their class action claims for states where at least one named plaintiff resides in the state. The court now turns to the Rule 23 requirements.

### D.     Rule 23(a) Requirements

The universal prerequisites for class certification are (1) numerosity, (2) commonality, (3) typicality, and (4) adequate representation. Fed. R. Civ. P. 23(a). They apply to every certification request made under Rule 23. *See* Fed. R. Civ. P. 23(b) ("A class action may be maintained if Rule 23(a) is satisfied *and* if" one of the requirements in Rule 23(b)(1), (b)(2), or (b)(3) is met (emphasis added)). The next four subsections consider these four requirements.

### 1.     Numerosity

To be certified, a proposed class must be so "numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Defendants do not contest this element, and for good reason. Plaintiffs assert there are hundreds of thousands of EpiPen users and millions of EpiPen

devices are sold every year in the United States. Those numbers easily satisfy the numerosity requirement.[17]

## 2.   Commonality

Next, Rule 23 requires a court to find that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).

As the Supreme Court has explained, this "same injury" requirement "does not mean merely that they have all suffered a violation of the same provision of law." *Id.* at 350. Instead, the claims of the putative class plaintiffs "must depend upon a common contention" that is "of such a nature that it is capable of classwide resolution." *Id.* This requirement "means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Although "[e]ven a single [common] question will do," *id.* at 359 (citation and internal quotation marks omitted), the focus is not on common questions but on "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (citation and internal quotation marks omitted).

Defendants do not address commonality as a separate requirement. Instead, Mylan argues that plaintiffs have not met their burden to prove that common questions predominate, nor have they demonstrated commonality for each factual theory of harm plaintiffs assert. Mylan also argues that each of the Rule 23(b)(3) classes fails the commonality and predominance requirements. In other words, Mylan does not make any commonality arguments that are independent of the predominance analysis.

---

[17]   *See* 1 William B. Rubenstein, *Newberg on Class Actions* § 3:12 (5th ed. 2013) (suggesting that a class of 40 or more members should presumptively satisfy numerosity).

The court find that plaintiffs have satisfied the commonality requirement for each of the five classes they ask the court to certify. They have identified a number of questions with common answers that "would 'resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 916 (10th Cir. 2018) (quoting *Dukes*, 564 U.S. at 350). The questions include: (1) whether defendants used anticompetitive pay-for-delay settlements that delayed generic entry into the EAI market, (2) whether defendants entered unlawful exclusive dealing agreements with PBMs in an effort to protect their monopoly and drive up the price of the EpiPen, and (3) whether defendants unlawfully forced consumers to purchase the EpiPen exclusively in a 2-Pak based on a purported medical necessity when defendants' true motive for removing single EpiPens from the market was to increase profit. Each of these questions involves common factual and legal issues about the existence, scope, and legality of defendants' conduct. *See, e.g.*, *Beltran v. InterExchange, Inc.*, No. 14-CV-03074-CMA-CBS, 2018 WL 1948687, at *4 (D. Colo. Feb. 2, 2018) ("Numerous courts have determined that the commonality prerequisite of Rule 23(a) was satisfied in antitrust and RICO class actions" because they involve common factual and legal questions about defendants' conduct). To resolve these questions, plaintiffs will rely on common evidence to generate common answers. *Id.* (concluding that plaintiffs satisfied the commonality requirement where "numerous class-wide questions of law and fact may be resolved with common answers drawn from common proof"). Also, as our Circuit has recognized, "any one of these questions alone would satisfy the commonality requirement . . . ." *Menocal*, 882 F.3d at 916–17; *see also id.* at 914 ("A finding of commonality requires only a single question of law or fact common to the entire class." (citation and internal quotation marks omitted)).

In sum, each of the putative classes satisfies the commonality requirement of Rule 23(a)(2).

### 3.     Typicality

The typicality element requires a finding that the claims of representative plaintiffs are typical of the claims of the proposed class.  Fed. R. Civ. P. 23(a)(3).  But, the named plaintiffs' interests and claims "need not be identical" to those of the putative class members.  *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1198 (10th Cir. 2010).  As long as the claims of the named plaintiff and class members "are based on the same legal or remedial theory, differing fact situations of the class members do not defeat typicality."  *Id.* at 1198–99; *see also Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 914 (10th Cir. 2018) (same).

The typicality requirement asks:

> whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.  In other words, when such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff.  Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.

*In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 78 (D. Mass. 2005) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996) (quoting 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.13 (3d ed. 1992))).

The typicality and commonality requirements are similar because "'[b]oth serve as guideposts for determining . . . whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected . . . .'" *Dukes*, 564 U.S. at 349 n.5 (quoting *Falcon*, 457 U.S. at 157 n.13).  The typicality "requirement has been liberally construed by courts[,]" and "in the antitrust context, typicality 'will be

established by plaintiffs and all class members alleging the same antitrust violations by

defendants.'" *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002) (quoting *In re

Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 241 (E.D.N.Y. 1998)).  "If the claims of the

named plaintiffs and putative class members involve the same conduct by the defendant,

typicality is established regardless of factual differences."  *Newton v. Merrill Lynch, Pierce,

Fenner & Smith, Inc.*, 259 F.3d 154, 183–84 (3d Cir. 2001).

Plaintiffs assert every class member here relies on the same legal theory—they all paid

artificially elevated prices for or were oversold EpiPens—and the claims of the named plaintiffs

are typical of the claims of the proposed classes.  Mylan disagrees, arguing (1) named plaintiff

Local 282 Welfare Trust Fund ("Local 282") is not a typical payor, and (2) many of the named

plaintiffs are not typical because they are uninjured.[18]  The court examines Mylan's two

arguments, below.

### a.      Local 282

Local 282 is an employee health and welfare benefit plan, and it is a named plaintiff in

this lawsuit.  Mylan argues Local 282 is atypical and its interests actually conflict with other

third-party payors because it does not bear the price risk of increased drug costs.  According to

Mylan, Local 282's costs are fully reimbursed by the employers who fund it.  In other words, if

costs increase, Local 282 simply goes back to the union and negotiates higher contribution rates

for union contributions to the Welfare Trust Fund.

To support its argument, Mylan cites the deposition testimony of a Local 282

representative.  The representative was asked what it would mean for an insured member of

---

[18]      Mylan makes these same arguments to assert that the named plaintiffs are inadequate class
representatives.  Thus, Mylan also contends that plaintiffs can't satisfy Rule 23(a)'s fourth requirement—
adequacy.  The court addresses the adequacy argument below, *infra* note 24.

Local 282's health plan if Local 282 prevails in this lawsuit.  The representative answered by explaining that members of the plan are not insured.  Instead, he testified, plan members are owners of self-insured trust funds.  If the plan were to receive reimbursement funds by prevailing in this action, it would:

> stem[] the tide of potentially having to go back—for the union to have to go back and negotiate higher contribution rates to the welfare trust fund.  If those rates do not have to go up, then the members in a roundabout way can then receive higher wages. . . . They will not be reimbursed with a check per se after settlement if one does occur.

Doc. 1636-34 at 4–5 (Bulding Dep. 59:21–60:7).

Citing the testimony of the same union representative, plaintiffs dispute the proposition that Local 282 bears no price risk.  Asked who pays the remaining cost of an EAI for a member who pays a co-pay for the device, the witness answered that the Local 282 Welfare Trust Fund pays the cost.  Doc. 1839-10 at 4–5 (Bulding Dep. 197:10–198:18).  No insurance company pays any portion of the remaining cost, nor does the Welfare Trust Fund seek reimbursement for any part of that cost from any other person or entity.  *Id.*

Plaintiffs also note that Dr. Johnson's[19] report concedes that self-insured plans—such as Local 282's plan—pay for claims using their own funds, including premiums collected from employees, and assume all insurance risk.  Dr. Johnson acknowledges that these self-insured plans are responsible for a portion (or even all) of the cost of covered drugs.  Doc. 1636-2 at 39–40 (Johnson Expert Report ¶ 41).

---

[19]    John Johnson, Ph.D. is an antitrust economist and statistician, retained by defendants, to evaluate the damage models prepared by plaintiffs' experts, Professors Rosenthal and Elhauge.  Defendants did not ask Dr. Johnson to prepare an affirmative methodology for assessing impact or damages, and he did not offer such an assessment.  *See* Doc. 1724 at 91–92 (Tr. of Mot. Hr'g Class Certification – Phase I 91:25–92:5 ("Q:  Were you asked to offer any affirmative assessment of a classwide method for assessing impact or damages in this case?  A:  No.  My assignment was not to put forward an affirmative methodology, it was to assess the work of Professor Rosenthal and Professor Elhauge.").

**Add. 32**

The court rejects Mylan's assertion that Local 282 bears no price risk for increased drug costs. The record simply won't support that conclusion. Even if a union whose members participate in Local 282 negotiated higher contributions from employers sufficient to offset increased costs caused by EpiPen overcharges, that is a forward-looking exercise. Local 282 still has sustained injury when the benefit plan was overcharged (if it was). *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503, 2017 WL 4621777, at *18 (D. Mass. Oct. 16, 2017) (explaining that even when institutional payors can offset overcharges by increasing premiums after the fact, the institutional payors "experience[ ] antitrust impact at the time of the initial overcharge"). Mylan's argument does not persuade the court that Local 282's injuries are atypical of the classes it seeks to represent.

Mylan next asserts that Local 282, because it is a small not-for-profit trust who does not own its own PBM or negotiate directly with Mylan, does not have the same bargaining power as large payors with millions of members. As a consequence, Mylan argues, the court shouldn't let Local 282 represent the interests of other payors who have not sought to participate in this case and who have different interests. Mylan cites third-party payors such as Anthem, Express Scripts, Inc., Caremark, Change Healthcare, and Humana as companies with a significantly greater number of members and larger revenues. Describing the differences between Local 282 and large third-party payors as a fundamental and uncontroverted conflict, Mylan cites deposition testimony from Humana, Anthem, Cigna Presbyterian, Magellan, MedImpact, Aetna, and United showing each one favors rebates because they produce lower costs. Doc. 1636 at 87–88. It's no surprise those third-party payors would favor higher rebates and the profits they capture from the current pricing regime. But, Mylan offers no evidence tending to establish a "fundamental and uncontroverted conflict" between larger third-party payors and Local 282, *id.*

at 87, nor does it make a convincing argument that the number of members in larger third-party payors affects Local 282's typicality.  Our court's precedent is more forgiving than Mylan suggests.

For instance, Mylan quotes *Nieberding v. Barrette Outdoor Living, Inc.*, 302 F.R.D. 600, 610 (D. Kan. 2014) as recognizing that typicality requires all class members to be "at risk of being subjected to the same harmful practices."  But this characterization of *Nieberding*, while accurate, stops too soon.  The court's observation about typicality continued beyond the words quoted by Mylan:  "The interests and claims of the named plaintiff and class members need not be identical to satisfy typicality; so long as the claims of the named plaintiff and class members are based on the same legal or remedial theory, differing fact situations of the class members do not defeat typicality."  *Id.* (citing *Devaughn*, 594 F.3d at 1198–99).  Under this standard, it is possible for Local 282 to serve as a class representative of third-party payors even if some of them were harmed by defendants' alleged efforts to prevent competitors from entering the market but also benefited from rebates Mylan paid them.  Also, the court already has addressed Mylan's concerns.  As discussed above, and during oral argument, *see* Doc. 1789 at 27–28 (Tr. of Mot. Hr'g Class Certification – Phase II 27:13–28:18), the court will exclude from the class definitions third-party payors who own or otherwise function as a PBM (or control any entity that functions as a PBM).  Mylan's argument that Local 282 cannot represent the interests of payors who benefit from owning or controlling their own PBM is unpersuasive.

Finally, Mylan contends Local 282 is an atypical representative because it lacks familiarity with how rebating works.  Mylan cites testimony by a representative of Local 282 but it does not support the conclusion Mylan attributes to it.  *See* Doc. 1636 at 85 n.120, 88 n.126. The witness was never asked to explain how rebating works.  Instead, the submitted transcript

34

**Add. 34**

pages show that Local 282 used the services of The Segal Group to negotiate with PBMs on its

behalf, and that it joined other benefit trust funds as a member of the National Alliance of Labor

Health Care Organizations to negotiate collectively with PBMs for a better deal.  Doc. 1636-34

at 7, 8 (Bulding Dep. 98:5–14, 103:4–18).  Moreover, Mylan never explains why it matters

whether Local 282 negotiates its own rebates or, instead, hires The Segal Group to negotiate on

its behalf.  Indeed, it appears common for third-party payors to employ services of a consultant

like The Segal Group.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61,

72 (D. Mass. 2005) ("A TPP considering the use of a PBM will typically send out a request for

proposals, describing its goals. . . . Throughout the process, TPPs are commonly advised by

benefits consulting companies like Segal Company . . . In virtually all instances, self-insured

employers and union benefit funds retain consultants to represent them in negotiations with

PBMs . . . .").

The court is not persuaded that Local 282 is atypical, nor is the court convinced that it

should reject Local 282 as a class representative because its interests conflict with the classes it is

nominated to represent.  Defendants have failed to support their claim that any particular number

of third-party payors are potentially adverse, nor have they demonstrated that any third-party

payors (other than those with their own PBMs) are indeed adverse.[20]  The court has excluded

from the class definitions any third-party payors who have separate entities filling the PBM role.

---

[20]     Although not highlighted in Mylan's brief, Dr. Hughes's Expert Report notes:  "Of the 50,216 group health plans of all types in the US in 2009, only 1,801, or less than 4 percent, are multiemployer, collectively bargained plans like Local 282."  Doc. 1636-4 at 24 n.58 (Hughes Expert Report ¶ 47 n.58) (citing U.S. DEPT. OF LABOR, EMP. BENEFITS SEC. ADMIN., GROUP HEALTH PLANS REPORT:  ABSTRACT OF 2009 FORM 550 ANNUAL REPORTS REFLECTING STATISTICAL YEAR FILINGS 6, tbl.A2 (2012), https://www.dol.gov/sites/dolgov/files/EBSA/researchers/statistics/retirement-bulletins/annual-report-on-self-insured-group-health-plans-2012-appendix-a.pdf.).  While multiemployer, collectively-bargained plans may represent a relatively small proportion of group plans, the raw number of plans similar to Local 282 is nonetheless a significant number of similar plans.

**Add. 35**

In short, the injury claimed by Local 282 "arises from or is directly related to the wrong" claimed by the classes.  *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. at 78 (citations and internal quotation marks omitted).  Plaintiffs have discharged their burden to demonstrate that Local 282's claims typify those that the classes seek to assert.

### b. Named Plaintiffs

Next, Mylan argues that most of the other named plaintiffs are atypical of the classes they seek to represent because they are uninjured.  By Mylan's count, nine named plaintiffs cannot establish injury under any of plaintiffs' legal theories; more than 75% are uninjured under the 2-Pak theory based on their reported purchases; at least 50% are uninjured under the Auvi-Q foreclosure theory based on their reported purchases (or lack of them) during the relevant period; and at least 50% are uninjured under the generic delay theory based on their preferences.  Mylan also asserts no named plaintiff can represent the RICO class because every named plaintiff either acknowledged that they did not rely on an alleged misrepresentation or their testimony requires additional inquiry to determine whether they relied on a misrepresentation.

Mylan's RICO argument is unpersuasive.  The Supreme Court has held—explicitly—that first-party reliance is not required to establish a RICO claim premised on the predicate act of mail fraud.  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649 (2008).  The Supreme Court recognized that RICO provides a cause of action for "'[a]ny person injured in his business or property by reason of a violation of'" the statute.  *Id.* (quoting 18 U.S.C. § 1964(c)).  And, the Court found it "difficult to derive a first-party reliance requirement" from the words of the statute.  *Id.*  Thus, the Supreme Court refused to "read a first-party reliance requirement into a statute that by its terms suggests none."  *Id.* at 650.

Applied here, *Bridge* means the named plaintiffs need not establish first-party reliance to assert their fraud-based RICO claim.  Instead, the named plaintiffs just need to establish an injury to business or property "by reason of" defendants' RICO violations.  Plaintiffs assert that the named plaintiffs satisfy this requirement for their RICO claim—and all other claims— because, they allege, all named plaintiffs have sustained injury from defendants' conduct.  Specifically, plaintiffs assert that each named plaintiff sustained injury under at least one of their theories—the generic delay theory.  And, they argue, this showing suffices to establish that each named plaintiff sustained an injury from defendants' conduct.

But Mylan argues that many named plaintiffs aren't injured under this theory.  According to Mylan, seven named plaintiffs preferred the branded EpiPen or purchased a branded EpiPen after the launch of the EpiPen AG (an authorized generic of the EpiPen, made by Pfizer and sold by Mylan); at least six named plaintiffs paid less for their EpiPens than plaintiff's expert, Prof. Rosenthal, calculates they would have paid in the but-for world; and at least one named plaintiff concedes that it is his own fault that he never researched whether alternative generic EAIs were available for him to purchase.  Plaintiffs respond with three reasons supporting their argument that all named plaintiffs sustained injury under the generic delay theory.

*First*, plaintiffs argue that a consumer's preference for or purchase of a branded EpiPen instead of the EpiPen AG is not an appropriate proxy to demonstrate the absence of injury.  Plaintiffs cite Prof. Rosenthal's opinions and argue that each named plaintiff sustained injury from the delayed generic entry because the delay affected consumer switching patterns.[21]  Prof.

---

[21]    Defendants have sought to exclude Prof. Rosenthal's opinions about injured class members by *Daubert* motion.  By separate Order, the court denies defendants' motion, concluding the opinions are sufficiently reliable for the court to consider at class certification.  The court concludes in this Order that Prof. Rosenthal's opinions support plaintiffs' assertion that each named class member sustained injury.  The court recognizes that defendants' expert has criticized Prof. Rosenthal's assumptions and attacked her calculated generic penetration rate as flawed.  But, the court finds that Prof. Rosenthal has shown she

Rosenthal calculates plaintiffs' alleged damages using "various but-for entry scenarios," using an assumed generic entry date of March 13, 2014. Doc. 1711-1 at 5, 36–37 (Rosenthal Reply Report ¶¶ 4.e, 60). And, in the but-for world, Prof. Rosenthal calculates a generic penetration rate, recognizing several factors that would drive consumers to switch from a branded EpiPen to a generic. *See id.* at 19–20 (Rosenthal Reply Report ¶ 28 (explaining that consumers are likely to switch to a generic because the EpiPen is more expensive and because it is a product that consumers don't use regularly, thus they aren't likely to develop brand affinity)). As Prof. Rosenthal explained, her opinions take into account consumer switching patterns in a but-for world, which she explained, would have begun once the authorized generic becomes available. *See* Doc. 1711-5 at 7–8 (Rosenthal Dep. 145:15–146:23). And, she didn't use market share data from the EpiPen AG's entry to form her opinions because the entry of an authorized generic sold by Mylan wasn't a competitive situation and not the same as an independent generic device entering the market. *Id.* at 9–10 (Rosenthal Dep. 156:2–160:18). Based on Prof. Rosenthal's opinions, plaintiffs have made a plausible showing that each named plaintiff—even if he or she purchased the branded EpiPen in the real world after the launch of the EpiPen AG—sustained injury from the delayed generic entry.[22]

---

used a reasonable method to reach her opinions, and her opinions plausibly establish that each named class member sustained an injury.

[22]     Also, plaintiffs' expert, Prof. Elhauge, opines that brand loyalists sustained harm under the PBM foreclosure theory because "[t]he foreclosure of brand-brand competition between EpiPen and Auvi-Q would predictably have an additional adverse price effect not only on customers who would have continued to buy branded EpiPens but paid a lower price in the but-for world for it, but also on customers who would have bought a generic at a discount from what would have been a lower branded EpiPen price." Doc. 1711-2 at 89–90 (Elhauge Reply Report ¶ 123). So, Prof. Elhauge opines, "during the overlap period [*i.e.*, months when there is an overlap between the foreclosure of Auvi-Q and the exclusion of the generic], all customers would suffer one harm or the other, whether or not they were brand loyalists." *Id.*

*Second*, plaintiffs refute defendants' argument that some named plaintiffs aren't injured because they paid less for their EpiPens than Prof. Rosenthal calculates they would have paid in the but-for world.  Plaintiffs argue that comparing an insured's actual co-pay amount to a but-for co-pay amount improperly equates real-world transactions with hypothetical averages used as input for a damages calculation.  As Prof. Rosenthal explains, her hypothetical average is just that—an average of aggregate damages.  Doc. 1711-1 at 21 (Rosenthal Reply Report ¶ 32).  Prof. Rosenthal asserts that when the time comes to determine individual damages for a named plaintiff, "the relevant question will be what the Class member's generic copayments would have been at the same point in time as the brand purchase they made."  *Id.*  So, Prof. Rosenthal credibly explains, her calculations don't suggest that any named plaintiffs escaped injury because of what they paid for their EpiPens.  *Id.*  The court finds this explanation sufficient to establish that each named plaintiff has a colorable claim of injury under the generic delay theory.

*Finally*, plaintiffs contend, because generic delay involves a but-for world, whether a consumer actually knew about EpiPen alternatives is a meaningless point.  As Prof. Rosenthal opines, in the but-for world, the rates at which consumers would switch from the branded EpiPen to a generic differ from what actually happened in the real world where, plaintiffs allege, defendants prevented a generic product from entering the market at an earlier date.  *Id.* at 19–20 (Rosenthal Reply Report ¶ 28); Doc. 1711-5 at 7–8, 9–10 (Rosenthal Dep. 145:15–146:23, 156:2–160:18).

In sum, the court concludes plaintiffs have presented plausible evidence sufficient to establish that each named plaintiff has sustained an injury under at least one of plaintiffs' theories—*i.e.*, the generic delay theory.[23]  Prof. Rosenthal's opinions sufficiently support

---

[23]    Because each named plaintiff has sustained injury under one of plaintiffs' theories, the named plaintiffs are typical representatives of the classes they seek to represent.  To the extent named plaintiffs

plaintiffs' assertions that each named plaintiff sustained injury sufficient to make their legal theories typical of the other class members they seek to represent. *See Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 914 (10th Cir. 2018) (holding that plaintiffs satisfied the typicality requirement where "the claims of all the class members—including the representatives—share the same theory" and "present no circumstances that would give rise to a different theory of liability"). The court concludes plaintiffs have satisfied Rule 23's typicality requirement.

### 4.      Adequacy

A certified class must have representative parties who will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). The adequacy requirement asks whether the named plaintiffs and counsel (a) "have any conflicts of interest with other class members" and (b) will prosecute the action vigorously on behalf of the class. *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652, 671 (D. Kan. 2013) (citing *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (further citations omitted)). "Minor conflicts among class members do not defeat certification[.]" *Id.* Only a "fundamental conflict" about the specific issues in controversy will prevent a named plaintiff from representing the interests of the class adequately. *Id.* A fundamental conflict exists where some class members claim an injury resulting from conduct that benefited other class members. *Id.* Defeating "[the] adequacy requirement of Rule 23" requires a conflict that is "more than merely speculative or hypothetical." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003) (citation and internal quotation marks omitted).

---

were injured by plaintiffs' other two theories (*i.e.*, the 2-Pak and PBM foreclosure theories), those plaintiffs are typical of class members who also allegedly sustained injury under the other two theories. The court recognizes that if plaintiffs' generic delay theory fails on its merits, the court may have to revisit the typicality requirement to determine whether the named plaintiffs are typical of the classes they seek to represent.

Mylan submits that significant intra-class conflicts exist, making the named plaintiffs inadequate class representatives and thus precluding certification.[24]  Mylan described the first such conflict by arguing that Local 282 is not typical of other payors who benefit from Mylan's rebating practices that plaintiffs challenge.[25]  The court already has addressed this challenge, *see supra* Part IV.D.3.a., and explained why it is unpersuasive.

Mylan also contends a conflict exists between consumers and payors within the proposed classes because plaintiffs have not tried to apportion among themselves the alleged overcharge for each EpiPen purchase.  Delving into what it perceives as plaintiffs' strategy, Mylan describes how plaintiffs could have avoided an alleged conflict by proposing a class consisting solely of consumers, thereby avoiding prejudice to the legal arguments and damage recovery for both consumers and payors.  Plaintiffs respond, saying the allocation between consumers and third-party payors will be governed by factors such as the proportion each of them paid toward the cost of the EpiPen in a given transaction.  At this point, however, the issue is merely speculative. Mylan has not shown that the composition of any class will create internal competition for

---

[24]     As discussed above, *supra* note 18, Mylan also asserts that Local 282 is an inadequate class representative because it differs from other payors in the classes.  Also, Mylan asserts that many named plaintiffs are inadequate class representatives because they are uninjured.  The court rejected Mylan's arguments in the preceding section, finding that these arguments don't establish that the named plaintiffs are atypical of the classes they seek to represent.  *See supra* Part IV.D.3.  For the same reasons, the court concludes that defendants' arguments don't prevent the named plaintiffs from fairly and adequately representing the classes.

[25]     Mylan also asserts that PBMs likely are class members, and that conflicts exist between plaintiffs and PBMs because plaintiffs allege the PBMs are RICO co-conspirators.  As plaintiffs point out, however, no PBM can qualify as a class member under the class definitions.  The proposed definition requires that the entity must have (a) paid or provided reimbursement for an EpiPen; (b) for the purpose of consumption, not resale; and (c) that purchase was intended for consumption by themselves, their family member(s), insureds, plan participants, employees, or beneficiaries.  Also, the court has added an exclusion to the class definitions, excluding all third-party payors who own, operate, or control their own PBM.  *See supra* Part IV.B.  So, nothing suggests a PBM will qualify under the class definitions.  Mylan certainly hasn't identified any PBMs who would qualify.

41

**Add. 41**

damages shares.  Moreover, binding authority from the Circuit recognizes that defendants can

claim "no interest in the method of distributing the aggregate damages award among the class

members."  *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1269 (10th Cir. 2014).

Also, other courts have considered objections similar to Mylan's argument here and have

rejected the challenges.  For example, in *In re Lidoderm Antitrust Litigation*, No. 14-md-2521-

WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017), defendants asserted that conflicts between

consumers and third-party payors precluded certification.  *Id.* at *26.  Specifically, defendants in

that case asserted (a) the amount of overcharge damages would need to be assigned between

third-party payors and consumers, "putting the parties into conflict over who gets what

recovery," and (b) some third-party payors "would prefer different legal theories about what

would have happened in the but-for world, creating conflicts."  *Id.*  The court rejected both

challenges.  *First*, the court found defendants had not shown the alleged conflict "would

permeate the aggregate damages calculation."  *Id.*  Instead, the court reasoned, the conflict would

arise when damages are allocated.  *Id.*  And, at that point, claims mechanisms may be used to

resolve any conflict "between, for example, an end payor consumer and her health insurance plan

over how their overcharge damages should be split."  *Id.*  Thus, the court concluded the

purported conflict "[did] not create a type of conflict that precludes certification."  *Id.*  *Second*,

the court found the mere possibility of differing opinions over damage theories might arise

among third-party payors did not create a conflict preventing certification.  *Id.*  The court noted

that, if such a situation arose, then third-party payors who wanted to pursue different damage

theories simply could opt out of the class.  *Id.*

Likewise, in *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, No. 14-md-

02503, 2017 WL 4621777 (D. Mass. Oct. 16, 2017), defendants challenged the end payors'

showing of adequacy of representation because third-party insurers and consumers are fundamentally different groups. *Id.* at *12. The court rejected this argument, finding those parties shared a common goal. Each wanted to show they all were injured in the same way by overcharges, and through the same illegal conduct by defendants. *Id.* This, the court ruled, created an "alignment of incentives" sufficient to overcome the conflict challenge. *Id.* Also, defendants argued that class members would compete with one another for damage shares. *Id.* at *13. Citing *Lidoderm*, the court concluded it could address this issue, if necessary, when damages were allocated. *Id.* at *13 (citing *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *26–27).

Likewise, here, defendants don't persuade the court that the alleged conflict between consumers and third-party payors precludes class certification. To the contrary, the current record shows that consumers and third-party payors share an "alignment of incentives" because they both seek to prove that defendants' illegal conduct caused them to sustain injuries in the form of overpaying for the EpiPen. *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2017 WL 4621777, at *12. Defendants haven't shown that the alleged conflict in apportioning damages among consumers and third-party payors "would permeate the aggregate *damages calculation*." *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *26 (emphasis added). As other courts have recognized, the court can address this issue, if a conflict actually emerges, when damages are allocated. *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2017 WL 4621777, at *13 ("Defendants have not shown that alleged conflicts among putative class members would 'permeate the aggregate damages calculation' and not merely arise at the time damages are allocated, which can be addressed then." (quoting *In re Lidoderm Antitrust Litig.*,

2017 WL 679367, at *26)).  For these reasons, the court doesn't find an intra-conflict exists that precludes certification.

Instead, the court concludes that plaintiffs have established that the named plaintiffs can fairly and adequately represent the interests of the classes.  As discussed above, the named plaintiffs' claims are typical of the classes they seek to represent because they allege they sustained the same injuries as a result of defendants' illegal conduct.  And, based on the history of the case to date, the named plaintiffs have prosecuted the action vigorously on behalf of the classes through discovery and the class certification proceedings.  *See Syngenta*, 2016 WL 5371856, at *5 (finding the adequacy requirement was met where "[t]he class representatives' claims are typical" and defendant hasn't "suggested any reason why the class representatives lack sufficient incentive to prosecute fully the claims on the behalf of the classes").  The court thus concludes that plaintiffs satisfy Rule 23's adequacy requirement.

In sum, the court finds plaintiffs satisfy each prerequisite for class certification under Rule 23(a).  Accordingly, the analysis now turns to the elements of Rule 23(b)(3) in the context of the proposed RICO, state antitrust, consumer protection, unjust enrichment, and injunctive classes.

### E.      Rule 23(b)(3) Requirements

#### 1.      Superiority

To certify a class under Rule 23(b)(3), a class action proceeding must be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "It is enough that class treatment is superior because it will 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'"  *CGC*

*Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1096 (10th Cir. 2014) (quoting *Amchem Prods.,*

*Inc. v. Windsor*, 521 U.S. 591, 615 (1997)).

Mylan contests superiority. It asserts that differently situated plaintiffs with divergent

claims, many of whom are uninjured, will require extended, individualized examination and

cross-examination. So, Mylan contends, plaintiffs have not shown a class action is the most

efficient way to litigate the claims at issue.

Plaintiffs assert the individual claims are negative value claims: they would cost far more

to litigate than they are worth. They also assert that most of the class members are

geographically dispersed. So, plaintiffs say, the claims of individual class members will be

doomed if individual members are forced to take on defendants alone.

The scale of this case, the desirability for uniformity of decision, and the continued

economies of time, effort, and expense all support a finding that class treatment is the superior

method to decide this dispute fairly and efficiently. Defendants identify no better alternative

method, and a class action will protect defendants from multiple or inconsistent verdicts. The

court thus finds that the Rule 23(b)(3) superiority requirement is satisfied here.

### 2.    Predominance

Rule 23(b)(3) also requires a plaintiff to "show that common questions subject to

generalized, classwide proof *predominate* over individual questions." *CGC Holding Co. v.*

*Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014). This requirement does not mean a

plaintiff must show "that all of the elements of the claim entail questions of fact and law that are

common to the class" or "that the answers to those common questions [are] dispositive" of the

claim. *Id.* (citation omitted). Instead, the predominance inquiry "'asks whether the common,

aggregation-enabling issues in the case are more prevalent or important than the non-common,

aggregation-defeating, individual issues.'" *Id.* (quoting 2 William B. Rubenstein, *Newberg on Class Actions* § 4:40 (5th ed. 2012)).  To decide whether a plaintiff can satisfy the predominance requirement, a court must first "*characterize* the issues in the case as common or not, and then *weigh* which issues predominate." *Id.*  Critically, so long as at least one common issue predominates, a plaintiff can satisfy Rule 23(b)(3)—even if individual issues (such as damages) remain and require the court to try them separately. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).

The determination "'whether "questions of law or fact common to class members predominate" begins, of course, with the elements of the underlying cause of action.'" *CGC Holding Co.*, 773 F.3d at 1088 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (quoting Fed. R. Civ. P. 23(b)(3))).  Here, plaintiffs argue, common issues predominate each of their asserted legal claims because they intend to prove the elements of their RICO, antitrust, state consumer protection, and unjust enrichment claims using common, classwide evidence.  Mylan disagrees.  Mylan argues that plaintiffs have not met their burden to show common issues predominate over individual questions.  Generally, Mylan asserts three arguments to support its position that individual issues overwhelm the common questions here, thus precluding certification.

*First*, Mylan argues, the damage calculations for each plaintiff require individualized inquiries that will overwhelm the common questions for all of their legal claims.  *Second*, Mylan asserts, plaintiffs cannot prove through common evidence that all class plaintiffs sustained injury.  *Finally*, Mylan argues, individual questions predominate over the common issues presented by each of plaintiffs' five proposed classes:  the RICO class, the state antitrust class,

the state consumer protection class, the unjust enrichment class, and the injunctive class.  The court addresses each argument, in turn, below.

### a.     Individual Damages Issues

Mylan argues plaintiffs have not met their burden to show common issues predominate because, according to Mylan, individual questions about each plaintiff's damages calculation overwhelm the common issues.  More specifically, Mylan asserts that plaintiffs haven't provided a common method for measuring damages for each class member.  Mylan contends that the damage calculation for each plaintiff requires an individual inquiry about the dates and amounts of each EpiPen purchase, the specifics of the individual's health plan and rebate arrangements, and the action that defendants took to cause that particular plaintiff to sustain harm (*i.e.*, a plaintiff claiming generic delay could not recover damages before the Generic Start Date or after generic delay ended).

Plaintiffs respond that the Tenth Circuit has rejected the argument that individual damages issues preclude certification.  Indeed, the Tenth Circuit recently held:  "'The fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification.'"  *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 798 (10th Cir. 2019) (quoting *Menocal v. GEO Group, Inc.*, 882 F.3d 905, 922 (10th Cir. 2018)).  Instead, the Circuit explained, "'material differences in damages determinations'" will destroy predominance only "if those 'individualized issues will overwhelm . . . questions common to the class.'"  *Id.* (quoting *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1220 (10th Cir. 2013)).  In *Naylor Farms*, the Tenth Circuit concluded that plaintiffs' expert report provided evidence that the expert could determine damages on a classwide basis through use of a specified model.  *Id.*  And, the court noted, defendant had failed to explain why

the expert's model was inaccurate or unworkable.  *Id.*  The Circuit thus affirmed the district court's conclusion that individual questions about damages did not defeat predominance.  *Id.*

This court has concluded that the Supreme Court's *Comcast* opinion does not require a classwide damages model for certification under Rule 23(b)(3).  In *Syngenta*, Judge Lungstrum rejected defendant's argument that plaintiffs "must provide a damages model that 'establish[es] that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).'"  2016 WL 5371856, at *9 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)).  Judge Lungstrum explained:  "Multiple circuit courts . . . including the Tenth Circuit, have rejected such a reading of *Comcast*, which did not create a broadly applicable rule as suggested by [defendant]."  *Id.* (first citing *XTO*, 725 F.3d at 1220; then citing *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374–75, 75 n.10 (3d Cir. 2015); then citing *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014); then citing *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1258 (10th Cir. 2014)); *see also In re Urethane Antitrust Litig.*, 768 F.3d at 1258 (refusing to apply *Comcast* because, "unlike the claimants in *Comcast*, our plaintiffs did not concede that class certification required a method to prove class-wide damages through a common methodology")); *XTO*, 725 F.3d at 1220 (explaining that, after *Comcast*, still "there are ways to preserve the class action model in the face of individualized damages").

Even so, Judge Lungstrum then recognized that "plaintiffs here *do* rely on a class-wide method to show damages", using their experts' models to calculate aggregate damages. *Syngenta*, 2016 WL 5371856, at *9–10; *see also In re Urethane Antitrust Litig.*, 768 F.3d at 1268–69 (affirming jury's damage award calculated on an aggregate basis and, after trial, was distributed among the class members using an expert's damages model).  And, Judge Lungstrum

concluded, this method sufficed to establish "that common questions predominate here despite any possible individual questions" about damages. *Syngenta*, 2016 WL 5371856, at *10.

Applying the Tenth Circuit's holdings in *Naylor Farms* and *Urethane* and Judge Lungstrum's reasoning in *Syngenta* to the facts here, the court concludes that the individual damages questions that defendants have identified don't preclude class certification. Like the plaintiffs in *Syngenta* and *Urethane*, plaintiffs here have proposed a common methodology for calculating damages on an aggregate basis through opinions by their experts, Profs. Rosenthal and Elhauge. Specifically, Prof. Rosenthal has proposed a methodology for calculating damages classwide resulting from defendants' alleged anticompetitive conduct in delaying generic entry and forcing customers to purchase the EpiPen exclusively in a 2-Pak. *See* Doc. 1500-3 at 21–35 (Rosenthal Expert Report ¶¶ 47–82) (describing her methodology for calculating: (1) damages caused by generic delay for plaintiffs' RICO, antitrust, and consumer protection claims; (2) damages caused by the forced purchase of 2-Paks for plaintiffs' RICO and consumer protection claims; (3) damages based on unjust profits realized as a result of defendants' alleged misconduct for plaintiffs' unjust enrichment claims; and (4) an alternative damages theory for defendants' alleged pricing scheme to support plaintiffs' RICO claim); *see also* Doc. 1497-3 at 21–35 (Rosenthal Expert Report ¶¶ 47–82) (sealed version). And, Prof. Elhauge has proposed a methodology for calculating aggregate damages in the form of alleged EpiPen overcharges arising from defendants' foreclosure of brand competition through use of exclusionary contracts with PBMs. *See* Doc. 1500-2 at 56–64, 66 (Elhauge Expert Report ¶¶ 110–120, Table 4) (providing a classwide methodology for calculating share and price impacts of PBM coverage

restrictions); *see also* Doc. 1497-2 at 56–64, 66 (Elhauge Expert Report ¶¶ 110–120, Table 4) (sealed version).[26]

Mylan criticizes Profs. Rosenthal and Elhauge's methodologies for calculating classwide damages.[27]  This criticism relies on defendants' expert's report that identifies purported flaws in: (1) Prof. Rosenthal's method for calculating classwide damages resulting from defendants' switch to the 2-Pak and generic delay, *see, e.g.*, Doc. 1636-2 at 47–58, 133–34 (Johnson Expert Report ¶¶ 54–72, 166–67), *see also* Doc. 1503-4 at 47–58, 133–34 (Johnson Expert Report ¶¶ 54–72, 166–67) (sealed version); and (2) Prof. Elhauge's method for determining classwide damages caused by defendants' alleged use of exclusionary contracts with PBMs, *see, e.g.*, Doc. 1636-2 at 62–71, 74–81 (Johnson Expert Report ¶¶ 78–89, 92–99), *see also* Doc. 1503-4 at 62–71, 74–81 (Johnson Expert Report ¶¶ 78–89, 92–99) (sealed version).

But the court can't decide this issue—*i.e.*, whether plaintiffs' expert reports actually prove classwide damages—on a certification motion.  *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 468–69 (2013) (at class certification stage, plaintiffs "need not . . . prove that the predominating question will be answered in their favor"; ultimate failure of proof on essential element dooms claim, but does not mean individualized claims predominate); *see also In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 100 (D. Conn. 2009) ("[T]he issue at class certification is not which expert is the most credible, or the

---

[26]      Mylan asserts that Profs. Rosenthal and Elhauge's models contradict each other, and they criticize plaintiffs for not providing a method to determine which model applies to any particular plaintiff.  Plaintiffs respond that Mylan's argument presents no problem on class certification.  Instead, plaintiffs argue, Mylan's argument goes to the issue of damage allocation, and damage allocation will occur at a later stage of the proceeding, based on a jury's findings.  Plaintiffs also explain, at that stage, the court can allocate the damage award based on a jury's findings in a way that prevents double recovery.  The court agrees that Mylan's argument goes to damage allocation, not to the question whether plaintiffs can prove damages on a classwide basis.

[27]      Also, by separate motions, defendants ask the court to exclude Profs. Rosenthal and Elhauge's opinions under *Daubert*.  By separate Order, the court denies those motions.

50

**Add. 50**

most accurate modeler, but rather have the plaintiffs demonstrated that there is a way to prove a

class-wide measure of damages through generalized proof."); *Natchitoches Parish Hosp. Serv.

Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 270 (D. Mass. 2008) ("To determine predominance, a

court need not plunge into the weeds of an expert dispute about potential technical flaws in an

expert methodology.").

At class certification, plaintiffs need not prove that a proposed method for determining

damages is valid; instead, the proper inquiry at this stage asks whether damages are capable of

proof on a classwide basis. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (holding that

plaintiffs failed to establish predominance because their damages model "falls far short of

establishing that damages are capable of measurement on a classwide basis"); *see also In re

Wellbutrin XL Antitrust Litig*., 282 F.R.D. 126, 144 (E.D. Pa. 2011) ("At the class certification

stage, the plaintiffs are not required to prove damages by calculating specific damages figures for

each member of the class, but rather they must show that a reliable method is available to prove

damages on a class-wide basis." (first citing *In re Neurontin Antitrust Litig.*, No. 02-1390, 2011

WL 286118, at *9 (D.N.J. Jan. 25, 2011); then citing *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d

294, 303 (5th Cir. 2003))).  And, if each expert's approach is plausible based on classwide proof

and does not rely on or implicate individualized questions that will predominate over common

ones, "[i]t is sufficient at [the class certification stage] to note that both [experts'] methods . . .

are plausible approaches . . . ." *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017

WL 679367, at *18 (N.D. Cal. Feb. 21, 2017) (recognizing that, "in the end," deciding which

expert opinion accurately estimates the but-for prices of generic and branded drugs "is subject to

further merits-based determinations and findings by the trier of fact").  *Cf. Sheet Metal Workers

Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, No. 04-5898, 2010 WL 3855552, at

*6 (E.D. Pa. Sept. 30, 2010) (explaining that "resolving expert disputes in order to determine whether a class certification requirement has been met is always a task for the court" and "[w]eighing expert opinions is not only permissible; it may be integral to the rigorous analysis Rule 23 demands" if the expert opinion is necessary to determine whether plaintiff satisfies the certification requirement (citations and internal quotations omitted)).

Here, plaintiffs have come forward with a plausible method for determining classwide damages through the opinions of Profs. Rosenthal and Elhauge.[28]  Mylan's attacks against these experts' methodologies don't undermine their plausibility for establishing classwide damages; instead, they go to the weight the trier of fact should give them when it decides whether the methodologies, in fact, establish that the classes—as a whole—have sustained damage.  *See Syngenta*, 2016 WL 5371856, at *10 (concluding that defendants' criticisms about plaintiffs' experts' methodologies failed to show that they "are so unreliable as to preclude certification" but instead, "[m]ore importantly for purposes of certification, these criticisms present common questions that do not undermine a finding of predominance"); *see also In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503, 2017 WL 4621777, at *10 (D. Mass. Oct. 16, 2017) (concluding, at the class certification stage, "any disagreement [about expert's method of calculating damages] does not overcome the Plaintiff's showing that damages will be substantially shown by common proof").  Plaintiffs here have shouldered their burden to

---

[28]     The court recognizes that this case involves no competing expert methodologies for calculating damages.  Defendants' expert, Dr. Johnson, explicitly states that his opinions, to date, advance no methodology for calculating damages.  Doc. 1724 at 91–92 (Tr. of Mot. Hr'g Class Certification – Phase I 91:25–92:5 ("Q: Were you asked to offer any affirmative assessment of a classwide method for assessing impact or damages in this case?  A: No.  My assignment was not to put forward an affirmative methodology, it was to assess the work of Professor Rosenthal and Professor Elhauge.")).  And, even if the certification decision required the court to weigh opposing expert opinions, which it does not, *see In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *18, that exercise would not apply to damage calculations.

52

**Add. 52**

establish that common issues predominate the damages inquiry by presenting a common method for calculating classwide damages on an aggregate basis. This showing satisfies Rule 23's predominance requirement.

### b.    Uninjured Class Members

Next, Mylan argues that plaintiffs cannot shoulder their burden to establish predominance because they cannot show that all putative class members sustained injury. Instead, Mylan argues, plaintiffs' proposed class definitions contain too many uninjured class members for the court to certify a class action under Rule 23. According to Mylan, predominance fails for each of plaintiffs' liability theories—*i.e.*, the 2-Pak theory, the Auvi-Q foreclosure theory, and the generic delay theory—across all proposed classes because there are uninjured class members who cannot be identified without mini-trials. Mylan criticizes the alleged absence of or flawed analyses by plaintiffs' expert witnesses which, it contends, accounts for plaintiffs' failure to carry their burden to show all class members were injured under any of plaintiffs' legal theories. For these reasons, Mylan urges the court to deny certification for lack of predominance.

Plaintiffs respond with two arguments. First, plaintiffs argue that the collateral source doctrine bars Mylan's argument that the proposed class definitions contain class members who are uninjured because they used a co-pay, coinsurance, or deductible to pay for their EpiPens, and thus had their EpiPens paid for by insurance companies. Second, plaintiffs argue that they have established, through common evidence, that the proposed classes have sustained injury classwide sufficient to satisfy the Tenth Circuit's requirements for certification. According to plaintiffs, Mylan demands a standard of proof that the law in our Circuit does not require. And, plaintiffs assert, their experts provide ample support to show an injury sustained across the classes. Also, plaintiffs argue, all class members have sustained injury because defendants'

conduct deprived them of a choice in the market, whether that loss of choice involved the absence of a less expensive generic, foreclosed access to competing brands, or a preference for a single purchase EpiPen.  The court addresses each argument, separately, below.

### i.    Collateral Source Doctrine

Plaintiffs assert that the collateral source doctrine bars Mylan's arguments that certain class plaintiffs—ones who used insurance to pay for their EpiPens—are not injured.  The Tenth Circuit has explained that the collateral source rule is "[d]erived from the common law [and] posits that '[p]ayments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable.'"  *Friedland v. TIC-The Indus. Co.*, 566 F.3d 1203, 1205–06 (10th Cir. 2009) (quoting Restatement (Second) of Torts § 920A(2) & cmt. d (1979)).  "Th[is] rule thus permits an injured plaintiff to recover more than the damages he has suffered as the result of an injury." *Id.* at 1206.  The Circuit has explained the rationale for applying the rule:  "'[P]ublic policy favors giving the plaintiff a double recovery rather than allowing a wrongdoer to enjoy reduced liability simply because the plaintiff received compensation from an independent source.'"  *Prager v. Campbell Cty. Mem'l Hosp.*, 731 F.3d 1046, 1059 (10th Cir. 2013) (quoting *Green v. Denver & Rio Grande W. R.R. Co.*, 59 F.3d 1029, 1032 (10th Cir. 1995)).  "Thus, courts have applied the rule when the injured plaintiff has been compensated by, for example, . . . the plaintiff's [own] insurance." *Friedland*, 566 F.3d at 1206 (citation omitted).

Defendants argue that the collateral source rule doesn't apply here.  Specifically, they argue that the collateral source rule contradicts the way plaintiffs have litigated the case to date—*i.e.*, choosing to include both consumers and third-party payors as class members in the proposed class definitions.  Defendants argue there is no need to include payors in the classes if

consumers can assert injuries for the amounts paid by those payors.  Also, defendants assert that

applying the collateral source doctrine would raise conflicts between class members over who

can recover for what payments.

Defendants also emphasize that plaintiffs repeatedly have described their EpiPen

expenses as payments made "out of pocket, after insurance."  *See, e.g.*, Doc. 60 at 11, 23–24

(Class Compl. ¶¶ 11, 13, 62–64).  Plaintiffs' expert has calculated damages separately for

consumers and third-party payors.  *See, e.g.*, Doc. 1500-3 at 29 (Rosenthal Expert Report ¶ 67)

(separating damages for third-party payors, insured consumers, and cash payers).  And,

importantly, plaintiffs expressly have excluded from the class definitions:  "Single flat co-pay"

consumers who purchased EpiPens or generic EpiPens only via a fixed dollar co-payment that is

the same for all covered devices, whether branded or generic (*e.g.*, $20 for all branded and

generic devices).[29]  Defendants suggest that plaintiffs excluded this group because they

recognize that a consumer who paid a single, flat co-pay didn't sustain any damage.  For all these

---

[29]     At oral argument on the certification motion, plaintiffs' counsel suggested that this exclusion isn't necessary if the court applies the collateral source doctrine to plaintiffs' claims.  Doc. 1789 at 26 (Tr. of Mot. Hr'g Class Certification – Phase II 26:9–20).  Regardless whether the collateral source doctrine applies to plaintiffs' claims, the court refuses to remove this exclusion from the proposed class definition.  As defendants asserted at oral argument, plaintiffs included this proposed exclusion in their original motion.  Defendants have litigated the certification motion on the understanding that plaintiffs' class definition excluded single, flat co-pay consumers.  *Id.* at 94 (Tr. of Mot. Hr'g Class Certification – Phase II 94:4–95:11).  And defendants' expert prepared his report based on his assumption that this exclusion was part of the class definitions.  Thus, defendants argue, the court shouldn't permit plaintiffs to remove the exclusion at this late stage.

The court agrees with defendants.  The court will not expand the class definitions from the ones plaintiffs previously proposed.  *See In re Wholesale Grocery Prods. Antitrust Litig.*, No. 09-MD-2090 ADM/TNL, 2016 WL 4697338, at *5–6 (D. Minn. Sept. 7, 2016) (rejecting plaintiffs' revised class definition that included more putative plaintiffs on certification motion because "[p]laintiffs [had] impermissibly expanded the class definition"); *see also Costelo v. Chertoff*, 258 F.R.D. 600, 604–05 (C.D. Cal. 2009) ("The Court is bound to class definitions provided in the complaint and, absent an amended complaint, will not consider certification beyond it.").  And, the court finds no reason to remove the exclusion based on an assertion made by plaintiffs at oral argument.

**Add. 55**

reasons, defendants argue the collateral source doctrine shouldn't apply to a case where plaintiffs have chosen to bring a class action on behalf of consumers and third-party payors collectively.

The court concludes that it need not decide—as a matter of law—whether the collateral source rule applies to plaintiffs' claims here on this certification motion. As Judge Lungstrum found in *Syngenta*, the court didn't need to decide on certification the "legal issue" whether the collateral source doctrine barred defendants from offsetting benefits realized by certain putative class members. 2016 WL 5371856, at *9. Instead, the question was whether "the necessary individual inquiries [to determine whether a class member sustained injury] would be so overwhelming as to defeat predominance . . . ." *Id.* Judge Lungstrum concluded that they weren't. *Id.* Judge Lungstrum also found it was "worth noting that the availability of such offsets presents a common question." *Id.*

Similarly, here, the court must decide whether individual questions about the putative class members' injuries overwhelm the common issues. As discussed below, even without considering or applying the collateral source doctrine, plaintiffs have presented sufficient classwide evidence in their expert reports that the amount of potentially uninjured class members in the putative classes isn't so large that it precludes class certification under Tenth Circuit case law. Also, as Judge Lungstrum recognized in *Syngenta*, the question whether the collateral source doctrine applies to plaintiffs who used insurance to pay for their EpiPen purchases is a legal issue that presents a common question that applies classwide.

Defendants disagree. They argue that applying the collateral source rule raises even more individual questions because the collateral source rule is a creature of state law, at least when it is applied to plaintiffs' state law claims. *See Blanke v. Alexander*, 152 F.3d 1224, 1231 (10th Cir. 1998) (identifying the collateral source rule as a "substantive state rule[ ] of evidence" (citation

56

**Add. 56**

and internal quotation marks omitted)).  And, defendants contend, many states have abolished or limited the collateral source rule in recent years.  Thus, they argue, differences in state laws will require individual inquiries to determine whether and how to apply a particular state's collateral source rule to specific class members.

Plaintiffs respond, arguing that recent modifications to state rules governing the collateral source doctrine apply to cases involving medical malpractice, personal injury, or wrongful death.  *See* Bryce Benjet, *A Review of State Law Modifying the Collateral Source Rule: Seeking Greater Fairness in Economic Damages Awards*, 76 Def. Counsel. J. 210, 211 (Apr. 2009) (explaining that "collateral source damages are often limited in health care liability cases as part of broader tort-reform legislation"); *see also generally id.* (describing the differences among the states' collateral source rules).  But, plaintiffs contend, defendants haven't identified any state law departures from the collateral source rule under the federal common law that would apply to the claims asserted here.  The court agrees that—to the extent the collateral source doctrine applies to plaintiffs' claims here—any variations in the state laws governing the collateral source rule don't raise individual issues that will overwhelm the common questions.

Finally, in both their Reply and their Response to Defendants' Surreply, plaintiffs offer to exclude another group of individuals from the class definitions.[30]  Doc. 1837 at 23; Doc. 1579-1 at 7.  Plaintiffs suggest that the class definitions could exclude individual consumers who did not purchase an EpiPen after the Generic Start Date.  Plaintiffs question whether more than a *de minimis* number of such consumers exist when most EAI consumers make repeat purchases

---

[30]     Plaintiffs propose this exclusion as an "alternative to applying the collateral source rule."  Doc. 1579-1 at 7.  Although the court doesn't decide whether to apply the collateral source rule now, it concludes that this exclusion is warranted because it removes from the class definitions individual consumers who could not have sustained injury because their only EpiPen purchases occurred before the Generic Start Date.

every year so that they have an EAI device on hand to treat anaphylaxis.  In any event, plaintiffs concede that removing these individuals from the class definitions would reduce the number of purportedly uninjured class members.  And, plaintiffs explain, their expert has provided damages calculations that segregate these consumers from her aggregate damage calculations.  Doc. 1711-1 at 23–24 (Rosenthal Reply Report ¶ 36, Tables 6–7).  Defendants never argue that the court should reject plaintiffs' proposed exclusion.  After considering plaintiffs' proposal, the court agrees that this exclusion further protects against including uninjured class members in the classes.  And, as our court has recognized, "the [c]ourt and parties are authorized" to narrow the class definitions "[i]f the class definition should require tailoring as the litigation progresses[.]" *Sibley v. Sprint Nextel Corp.*, 254 F.R.D. 662, 671 (2008); *see also McCurley v. Royal Seas Cruises, Inc.*, 331 F.R.D. 142, 162 (S.D. Cal. 2019) ("A plaintiff may properly narrow the class for which it seeks class certification even in a reply brief."); *Abraham v. WPX Energy Prod., LLC*, 322 F.R.D. 592, 611 (D.N.M. 2017) (holding that "a plaintiff is not bound to the class definition in the operative complaint" and concluding that "[s]ome flexibility . . . is needed in crafting a class action where one is warranted").  So, the court will add this exclusion to the class definitions.

### ii.   The Presence of Uninjured Class Members

Next, Mylan asserts that plaintiffs fail to shoulder their burden to establish predominance because they cannot prove that all putative class members sustained injury.  Relying on cases from other Circuits, Mylan argues that the law requires plaintiffs to "show that they can prove, through common evidence, that all class members were in fact injured by" defendants' conduct. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623–24 (D.C. Cir. 2019)

[hereinafter "*Rail Freight II*"] (affirming district court's denial of class certification because plaintiffs had failed to establish classwide injury; instead, the evidence showed that 2,037 putative class members sustained no injury, and that finding established a need for individual inquiries that defeated predominance);[31] *In re Asacol Antitrust Litig.*, 907 F.3d 42, 57–58 (1st Cir. 2018) (reversing district court's grant of certification because Rule 23 does not permit "a trial in which thousands of class members [must] testify" to establish that they sustained injury).

Mylan's position relies heavily on the First Circuit's opinion in *Asacol*. The Tenth Circuit has not examined *Asacol* or otherwise indicated if it would follow the case. The analysis that follows is, therefore, an assessment of *Asacol*, relevant Tenth Circuit law, and a prediction whether the Tenth Circuit would adopt *Asacol*.

### (a) Legal Standard

In *Asacol*, union-sponsored benefit plans sued drug manufacturer Warner Chilcott Limited on behalf of a class of similarly situated indirect purchasers, including individual consumers. 907 F.3d at 45. The plaintiffs alleged that Warner had suppressed entry of a generic drug by removing it from the market at the same time a new drug was introduced. *Id.* The district court had estimated that 10% of class members had not been injured by defendants' alleged anticompetitive conduct. *Id.* at 46–47. The court based its finding on conclusions drawn by both sides' experts who inferred the 10% figure from the number of brand loyalists who had purchased similar pharmaceutical products. *Id.* at 47. In other words, the 10% figure measured

---

[31] After oral argument, defendants submitted a letter to the court citing as supplemental authority the *Rail Freight II* opinion and another case from the District of Massachusetts. Doc. 1859 (first citing *Rail Freight II*, 934 F.3d 619; then citing *In re Intuniv Antitrust Litig.*, No. 1:16-cv-12396-ADB, 2019 WL 3947262 (D. Mass. Aug. 21, 2019)). Plaintiffs responded to defendants' submission, arguing that the supplement authority doesn't apply to this case because it is authority from outside the Tenth Circuit and factually different from the class certification record here. Doc. 1881. The court addresses these arguments more fully in the analysis below.

**Add. 59**

the percentage of brand-loyal customers would not have switched to the generic alternative, even if a lower-priced generic alternative were available, had it entered the market.  *Id.*  Nevertheless, the district court found that the number of uninjured class members—*i.e.*, 10%—was *de minimis*, and thus did not preclude class certification.  *Id.*  The First Circuit accepted the district court's estimate and found it necessary to consider how to treat these uninjured class members in the face of the principle requiring plaintiffs to show proof of injury.  *Id.* at 51.  The First Circuit framed the question as one asking whether a class can be certified "even though the injury-in-fact will be an individual issue, the resolution of which will vary among class members."  *Id.*

In its order granting class certification, the *Asacol* district court had approved plaintiffs' proposal for a process to cull out uninjured class members before judgment.  *Id.* at 52.  Under the process approved by the district court, class members would receive notice asking them to submit a claim form, along with data and documentation.  *Id.*  A claims administrator then would evaluate each claim under a court-approved formula, individuals could contest the calculations, and the court would review the administrator's report and make any necessary changes.  *Id.*

On appeal, the First Circuit concluded that review by a claims administrator of defendants' already-announced intention to challenge any affidavits would deprive defendants of their Seventh Amendment right to a jury trial and their due process rights.  *Id.* at 53 ("Plaintiffs' proposed claims process provides defendants no meaningful opportunity to contest whether an individual would have, in fact, purchased a generic drug had one been available.").  Also, the First Circuit found, plaintiffs hadn't established that the number of affidavits to which defendants could raise a legitimate challenge "is so small that it will be administratively feasible to require those challenged affiants to testify at trial."  *Id.* at 53.  The First Circuit concluded the need to identify thousands of uninjured individuals would predominate over common questions and

"render an adjudication unmanageable absent evidence such as . . . unrebutted affidavits . . . or some other mechanism that can manageably remove uninjured persons from the class in a manner that protects the parties' rights." *Id*. at 53–54.

The First Circuit also rejected plaintiffs' fallback position.  This alternative argued that plaintiffs could prove classwide impact through testimony by their expert, who calculated that "a generic substitute drug would have achieved approximately ninety percent market penetration in a but-for world, from which, in part, the district court estimated that about ten percent of the class was likely brand loyal and thus uninjured." *Id.* at 54.  The First Circuit held that where the aggregate damage amount is the sum of damages sustained by a number of individuals and determining whether any individual was injured "turns on an assessment of the individual facts concerning that person," the defendant must receive the opportunity to "challenge each class member's proof that the defendant is liable to that class member." *Id.* at 55.  And whether that inquiry precludes class certification because it threatens predominance "turns on whether such challenges are reasonably plausible in a given case and whether the plaintiff cannot demonstrate that allowing for such challenges in a manner that protects the defendant's rights will be manageable and superior to the alternatives." *Id.*

No Tenth Circuit case has addressed the First Circuit's *Asacol* opinion.  And Mylan's brief appears to concede that the Tenth Circuit has not embraced *Asacol*.  But during oral argument at the class certification hearing, Mylan tried to distinguish *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188 (10th Cir. 2010), and two cases from this District that appear to conflict with *Asacol*.  Mylan urged the court to adopt *Asacol*.  In sum, Mylan's view is that, as counsel argued, *Asacol* is "a better read of the law."  Doc. 1789 at 64 (Tr. of Mot. Hr'g Class Certification – Phase II 64:17–20).

The court agrees with Mylan on some fronts. *DeVaughn* doesn't provide direct Tenth Circuit authority on this issue. In *Devaughn*, the Tenth Circuit explained that "Rule 23's certification requirements neither require all class members to suffer harm or threat of immediate harm nor Named Plaintiffs to prove class members have suffered such harm." 594 F.3d at 1198. The Circuit recognized: "'[A] class will often include persons who have not been injured by the defendant's conduct. . . . Such a possibility or indeed inevitability does not preclude class certification.'" *Id.* (quoting *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009)). But, as Mylan posits, *Devaughn* is different because it was an injunction class case under Rule 23(b)(2), and thus the Tenth Circuit never has discussed whether Rule 23 permits certification of a class with uninjured class members in the context of a class seeking money damages under Rule 23(b)(3).

But, the court disagrees with Mylan on other fronts. For example, Mylan asserts that the two cases from this District—*Syngenta* and *Urethane*—differ from the question presented here. To the contrary, the court finds these two cases—both decided by Judge Lungstrum—highly persuasive on the question of what standard the Tenth Circuit would apply when deciding whether plaintiffs have made a sufficient showing of classwide injury for certification under Rule 23.

First, in *Urethane*, Judge Lungstrum denied a motion to decertify the class he previously had certified. *In re Urethane Antitrust Litig.*, No. 14-1616-JWL, 2013 WL 2097346, at *1 (D. Kan. May 15, 2013). Defendant argued that events after certification confirmed some class members sustained no damages, thereby making certification inappropriate. *Id.* at *2. Plaintiffs conceded the premise of the argument—that not every class member had sustained compensable damage. *Id.* Plaintiffs argued, instead, that all class members had been affected by a conspiracy

to elevate prices, even if some may have mitigated their damages or otherwise did not sustain damages that could be quantified. *Id.* Judge Lungstrum found that these facts didn't prevent class certification. *Id.* He noted that defendant "has not cited any authority supporting the argument that the presence of a few 'zero-damages' class members necessarily defeats certification." *Id.* And, citing Seventh Circuit case law, Judge Lungstrum recognized that "a class will almost inevitably include persons who have not been injured by the defendant's conduct, and that fact (or even inevitability) does not preclude certification." *Id.* (citing *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th Cir. 2012)). Judge Lungstrum wrote that the Seventh Circuit's opinion in *Messner* also "noted that a class is too broad to permit certification only if it includes a great number of members who *could* not have been harmed by the defendant's conduct (as opposed to a great number who *ultimately* are shown to have suffered no harm)." *In re Urethane Antitrust Litig.*, 2013 WL 2097346, at *2 (citing *Messner*, 669 F.3d at 824).

Judge Lungstrum's opinion in *Urethane* doesn't quantify what number would amount to a "great number" of members who sustained no harm. But, Judge Lungstrum denied the motion to decertify, finding that "plaintiffs have shown persuasively that only a very small percentage of class members suffered no damages." *Id.* And, Judge Lungstrum signaled his agreement with the Seventh Circuit's analysis by concluding, "the presence of those few members does not compel decertification." *Id.*

The Tenth Circuit affirmed Judge Lungstrum's certification order. *In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014), *cert. denied* 137 S. Ct. 291 (2016). Although the Tenth Circuit never addressed explicitly whether Judge Lungstrum correctly applied the Seventh Circuit's test for determining when certification of a class containing uninjured class

members is appropriate, the Circuit affirmed Judge Lungstrum's certification decision, noting that the "presence of individualized damages issues" did not preclude certification because "[c]lass-wide proof is not required for all issues" as long as plaintiffs made "a showing that the questions common to the class predominate over individualized questions." *Id.* at 1255.

In the second case in this District—*Syngenta*—Judge Lungstrum again relied on the Seventh Circuit's standard for determining whether the presence of uninjured putative class members defeats certification. *Syngenta*, 2016 WL 5371856, at *4. Judge Lungstrum held that "the possibility or even inevitability that the class will include members not injured by the defendant's conduct does not preclude class certification." *Id.* (citing *Kohen v.. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009)). Instead, again applying *Messner*, Judge Lungstrum recited the Seventh Circuit's test from that case: "[I]f 'a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification.'" *Id.* (quoting *Messner*, 669 F.3d at 824). Judge Lungstrum then considered defendants' arguments that some plaintiff corn producers may not have sustained injury based on a drop in central market corn prices because that price decrease didn't affect local pricing, or because some plaintiffs sold specialty corn, or because some plaintiffs benefitted by selling other crops or feeding livestock. *Id.* Judge Lungstrum concluded that the arguments were "merits-based defenses" and provided "no basis to conclude that a 'great number' of members *could not have been harmed* as alleged by plaintiffs." *Id.* (citing *Messner*, 669 F.3d at 824); *see also Messner*, 669 F.3d at 824 (noting the "critical" distinction between a "fatally overbroad" class and one that "consists largely (or entirely, for that matter) of members who are ultimately shown to have

suffered no harm" because "that may not mean that the class was improperly certified but only that the class failed to meet its burden of proof on the merits")).

In *Syngenta*'s predominance analysis, Judge Lungstrum noted several commonalities among the putative class members, including that plaintiffs' expert opinions would show both the fact of damage and the amount using classwide proof. *Syngenta*, 2016 WL 5371856, at *5. Judge Lungstrum rejected defendants' argument that the fact and amount of damages presented individual issues "that are so important [they] defeat predominance." *Id.* at *6. Defendants based their argument on the parties' competing expert opinions, which they urged Judge Lungstrum to weigh and to declare defendants the winner. *Id.* But Judge Lungstrum declined to perform that weighing function at certification, concluding that "the persuasiveness of such evidence [was a question] for the jury at trial." *Id.* at *7. Plaintiffs' burden at certification is to show predominance; they need not convince the court that their evidence will prevail at trial. *Id.* And, Judge Lungstrum concluded, "a reasonable juror could believe that" all class members sustained injury from a decrease in "local corn prices [that] reflect[ed] changes in the [Chicago Board of Trade] futures price, as opined by plaintiffs' experts." *Id.* Because the Supreme Court has allowed the use of such representative evidence to show classwide liability in a class action, Judge Lungstrum concluded that certification was warranted. *Id.* (citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016)). As Judge Lungstrum noted, "[p]laintiffs are required to offer evidence to show predominance," and, he concluded, "they have done so here." *Id.*[32]

---

[32]   Defendants filed an interlocutory Rule 23(f) Petition for Permission to Appeal Class Certification Order. The Tenth Circuit denied the request, noting that the decision to grant a Rule 23(f) petition is purely discretionary and finding that defendants had not established a reason warranting appellate review such as manifest error or an unresolved legal issue. Order, *In re Syngenta AG MIR 162 Corn Litig.*, No. 16-607 (10th Cir. Dec. 7, 2016), ECF No. 01019731851. The Circuit also described Judge Lungstrum's certification decision as "well-researched and reasoned, and if any rulings are error, those errors can be addressed on appeal, if necessary." *Id.* at 3.

As Judge Lungstrum's two opinions show, our court has followed Seventh Circuit precedent when analyzing whether the presence of uninjured class members defeats certification. That is, as the Seventh Circuit has held, "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant . . . ." *Kohen*, 571 F.3d at 677–78 (citations omitted). *Kohen* determined that this issue is best averted by focusing on the class definition. *Id.* at 677. "[I]f the definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad." *Id.*[33] The Seventh Circuit repeated this observation in *Messner* and distinguished it from a proposed class consisting "largely (or entirely, for that matter) of members who are ultimately shown to have suffered no harm, [as] that may not mean that the class was improperly certified but only that the class failed to meet its burden of proof on the merits." *Messner*, 669 F.3d at 824 (citing *Schleicher v. Wendt*, 618 F.3d 679, 686 (7th Cir. 2010)); *see also Schleicher*, 618 F.3d at 686 ("Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win."). But neither *Messner* nor *Kohen* provides a formula for determining when a class includes too many uninjured members. *See Messner*, 669 F.3d at 825 ("There is no precise measure for 'a great many.'"). How many is "too many" is "a matter of degree, and will turn on the facts as they appear from case to case." *Id.* at 825.[34]

---

[33]     On the other hand, the definition cannot narrow the class so much that it becomes an inappropriate fail-safe class, *i.e.*, one where the court has to decide the merits of each prospective individual class members' claims to determine class membership, thereby defining the class in terms of the legal injury. *See Messner*, 669 F.3d at 825.

[34]     In *Asacol*, the district court found 10% a *de minimis* number of uninjured class members. 907 F.3d at 47. When reversing the district court's certification decision, the First Circuit did not specify the percentage of uninjured plaintiffs that are "too many" to permit certification. Though later cases cite *Asacol* to find that 10% is not *de minimis*, this finding—if indeed *Asacol* made it—is an implicit conclusion.

Given the certification motion plaintiffs make here, the court finds persuasive the approach used by the Seventh Circuit and Judge Lungstrum.[35]  And, the court predicts the Tenth Circuit would follow those cases if presented with the issue.  The court also concludes that the Tenth Circuit wouldn't follow *Asacol*.[36]

Thus, the court applies the standard articled by the Seventh Circuit and applied by Judge Lungstrum, below.  And so, the court must answer the following question:  Is class certification precluded here because the putative class definitions "'contain[ ] a great many persons who have suffered no injury at the hands of the defendant[?]'"  *Messner*, 669 F.3d at 825 (quoting *Kohen*, 571 F.3d at 677).

### (b) Prof. Rosenthal's Probability Analysis

Plaintiffs rely on a probability analysis conducted by Prof. Rosenthal to assert that the proposed classes do not contain great numbers of class members who didn't sustain harm.  To

---

[35]     Our court also cited *Urethane* approvingly in another case.  *See Sibley v. Sprint Nextel Corp.*, 315 F.R.D. 642, 664 (D. Kan. 2016) ("[G]iven that so many cases and treatises agree that the need for individualized damage determinations does *not* defeat commonality or predominance, it follows that the fact that some class members suffered no damages *also* does not defeat commonality or predominance." (citing *In re Urethane Antitrust Litig.*, 2013 WL 2097346, at *2 (other citations omitted))).

[36]     Two district courts have issued recent orders that sharply criticize *Asacol* and its effect on consumers' ability to bring class actions.  *See In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 404 (D.R.I. 2019) (denying motion to certify a class of end-payor plaintiffs ("EPP") because *Asacol* left the court "no room to rewrite what the First Circuit has clearly scripted" but still the court was "troubled that over ninety percent of consumers in the proposed EPP class may have been injured by Defendants' alleged unlawful conduct, but now have no practical recourse under antitrust law"); *see also In re Intuniv Antitrust Litig.*, No. 1:16-cv-12396-ADB, 2019 WL 3947262, at *7 n.8, *8 (D. Mass. Aug. 21, 2019) (denying motion to certify class because "*In re Asacol* dictates the outcome here" but also recognizing "*In re Asacol* is likely a death knell for pharmaceutical, antitrust class actions brought by indirect purchasers [because] [g]iven the myriad ways in which consumers could theoretically be uninjured, once a defendant asserts an intent to challenge each claim to have been affected by their conduct, it becomes nearly impossible for indirect purchasers to show that common issues will predominate under *In re Asacol*," so "[a]bsent class certification, it is likely that most putative class members' claims will go unremedied," and "assuming that Defendants engaged in anticompetitive conduct, although *In re Asacol* eliminates the possibility that some consumers might obtain a recovery for damages they did not suffer, it also ensures that a much larger number of Intuniv consumers will receive no remedy for harm [they] actually suffered").

the contrary, plaintiffs contend that the number of uninjured class plaintiffs in each class, if any, is *de minimis.* First, Prof. Rosenthal estimates that the likelihood that a third-party payor who covered as few as five prescriptions sustained injury from generic delay is 99.999% or better. Doc. 1711-1 at 30–32 (Rosenthal Reply Report ¶¶ 53, 54, Table 8).[37]  Second, Prof. Rosenthal opines the likelihood that a third-party payor who reimbursed at least 10 patients for EpiPens was injured by Mylan's switch to the 2-Pak is 99%.  *Id.* at 32–33 (Rosenthal Reply Report ¶¶ 55–56).  Third, Prof. Rosenthal estimates that the likelihood that individual consumers sustained injury from generic delay or Mylan's switch to the 2-Pak is about 95%.  *Id.* at 34–37 (Rosenthal Reply Report ¶¶ 58–60).  Finally, Prof. Rosenthal opines that all third-party payors and all cash payor consumers sustained injury from brand foreclosure.  *Id.* at 33–34 (Rosenthal Reply Report ¶ 57).[38]

---

[37]    Defendants assert that plaintiffs don't define the classes to include third-party payors who have covered *five or more* prescriptions.  So, defendants contend, Prof. Rosenthal's conclusion shouldn't apply here.  But, as plaintiffs argue, Prof. Rosenthal's probability analysis estimates that the likelihood that a third-party payor who covered just two prescriptions sustained injury is between 98.9% and 99.3%.  Plaintiffs assert that these figures for just two purchases also demonstrate a very low probability that the putative classes include uninjured class members.  Also, as plaintiffs have demonstrated, most third-party payor plans involve thousands of consumers.  And, given the prevalence of anaphylaxis, it seems unlikely that a third-party payor would have covered just two, three, four, or even five EpiPen prescriptions during the class period.

[38]    Prof. Rosenthal recognizes that "[c]onsumers with copayments that would not have varied for Auvi-Q vs. EpiPen would not have paid this overcharge directly."  Doc. 1711-1 at 33–34 (Rosenthal Reply Report ¶ 57).  She estimates that such consumers represent between 41% at 71% of consumers, depending on a consumer's plan structure and EpiPen tier placement.  *Id.*  Plaintiffs assert that these consumers still sustained injury because the collateral source doctrine bars defendants from using insurance payments as an offset.  As discussed above, the court need not decide whether the collateral source doctrine applies on class certification.  But still, it presents another issue common to the classes.  And, if the collateral source doctrine doesn't apply and excludes evidence of such plaintiffs, the presence of these consumers doesn't present individual questions that overwhelm the common questions because Prof. Rosenthal has provided a method for identifying these consumers.  *See supra* Part IV.C.1 & n.15.  Using that method, plaintiffs can remove those uninjured consumers from the classes, if a merits determination finds that these consumers sustained no injury.

Defendants criticize Prof. Rosenthal's probability analysis and urge the court to disregard it as unreliable. By separate Order, the court denies defendants' motion to exclude Prof. Rosenthal's probability analysis under *Daubert*. Also, the court finds that defendants' criticisms of the probability analysis don't undermine its usefulness to the court's certification decision. The court already has addressed many of these criticisms in the *Daubert* Order[39] and in this Order, *see supra* Part IV.D.3.b.

For example, defendants assert that Prof. Rosenthal's analysis fails to account properly for "brand loyalists," *i.e.*, consumers who would continue purchasing the EpiPen even when a generic is available. Prof. Rosenthal's analysis uses a 95% estimate to calculate the rate consumers would have switched from the EpiPen to a generic EAI device. But, defendants' expert provides his own opinion about the proper switching rate to show that Prof. Rosenthal's estimate is wrong. Doc. 1503-4 at 145–46 (Johnson Expert Report ¶ 180) (sealed version). Prof. Rosenthal responds that defendants' expert has used the wrong metric: He estimates brand loyalty by using the switching rates from the EpiPen to Mylan's own authorized generic. As Prof. Rosenthal explains, those switching rates aren't an accurate indicator of brand loyalty because they aren't drawn from a competitive market. Instead, Prof. Rosenthal has explained how her analysis more accurately reflects a 95% switching rate in a but-for world where a generic is available in a competitive market.

Also, defendants argue that some consumers aren't injured because they paid less for their EpiPens than the but-for price calculated by Prof. Rosenthal. But, as plaintiffs argue, comparing the actual price a consumer paid with a but-for price used to calculate aggregate damages is like comparing apples to oranges. As discussed above, *supra* Part IV.D.3.b., Prof.

---

[39] *See* pages 37–45 of the court's Memorandum and Order ruling the *Daubert* motions.

Rosenthal's average but-for price is an average used to calculate aggregate damages. And, that average isn't relevant to determining an individual class member's damages. Instead, individual damages are assessed by determining the but-for generic price that an individual class member would have paid at the point in time when the class member made a branded purchase. Also, to the extent defendants' arguments about but-for prices are merit-based arguments, the court can't decide them now.

In sum, none of defendants' criticisms convince the court to disregard Prof. Rosenthal's probability analysis on class certification. Instead, the court agrees with plaintiffs: Prof. Rosenthal's probability analysis provides a plausible method for determining—across the classes—the number of class members who may not have sustained injury from defendants' purported conduct. Indeed, the First Circuit recently considered a similar analysis conducted by Prof. Rosenthal, albeit in the summary judgment context. *See In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 915 F.3d 1, 12–13 (1st Cir. 2019). Decided after *Asacol*, *Celexa & Lexapro* reversed the district court's summary judgment ruling against a third-party payor plaintiff's RICO claim, finding that plaintiff's causation evidence "does not seem clearly insufficient" to survive summary judgment. *Id.* at 12. In particular, the court recognized that Prof. Rosenthal "estimated that if [the third-party payor plaintiff] paid for as few as five independent prescriptions, there would be a 98% chance that at least one was the result of off-label marketing." *Id.* at 13. Because the record showed that plaintiff "likely paid for the Celexa or Lexapro prescriptions of more than five different patients[,]" the court found that "the odds that [plaintiff] was not harmed if the drugs were, indeed, ineffective was likely *infinitesimal* (assuming the prescriptions were independent of one another)." *Id.* (emphasis added).

Here, plaintiffs argue that Prof. Rosenthal performed a similar analysis and with more compelling results. And, they urge the court to accept her findings as classwide evidence of an "infinitesimal" number of uninjured class members that doesn't preclude certification. Doc. 1837 at 19 (citing *Celexa & Lexapro*, 915 F.3d at 13). Although *Celexa & Lexapro* affirmed the district court's decision to deny class certification on statute of limitations grounds, the First Circuit, in *dicta*, disagreed with the district court's conclusion that causation and injury issues defeated predominance. *Celexa & Lexapro*, 915 F.3d at 14. Instead, the First Circuit found, the third-party payor's "clinical and statistical evidence, if believed, could establish causation and injury at least for any TPP who paid for more than a handful of different patients' prescriptions." *Id.* Indeed, the First Circuit criticized the district court for "gaug[ing] the substantiality or merit of plaintiffs' proof [of causation] in the context of a Rule 23 motion." *Id.* at 12. The First Circuit recognized that "[c]ertainly there is room for reasonable disagreement on the merits of Dr. Rosenthal['s] assumption[,]" but, the First Circuit emphasized that "[t]he central issue [on certification] is not whether the method of proof would or could prevail" but "whether the method of proof would apply in common to all class members." *Id.* (citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047 (2016)).

Here, the court also recognizes the possibility for reasonable disagreement with Prof. Rosenthal's probability opinion. But, the court cannot decide the merits of those disagreements at the class certification stage. Instead, the court considers whether Prof Rosenthal has provided a plausible method for proving injury among the classes sufficient for the court to consider her opinion on certification. She has. So, the court accepts Prof. Rosenthal's analysis on this motion.

### (c) Number of Uninjured Class Members

Now, the court must decide, based on the data produced by Prof. Rosenthal, if her numbers estimating the likelihood of uninjured class members preclude class certification because they show that the putative class definitions "contain[ ] a great many persons who have suffered no injury at the hands of the defendant." *Messner*, 669 F.3d at 825. As recited above, plaintiffs assert that Prof. Rosenthal's calculations establish that the number of uninjured class members in each putative class is *de minimis*. Thus, plaintiffs argue, Prof. Rosenthal's analysis supports class certification.[40]

Mylan disagrees. It asserts that, even accepting Prof. Rosenthal's calculations, the number of uninjured class members in this putative class action simply is too great to permit certification.[41] For support, Mylan relies on cases from outside our Circuit denying class certification because the proposed classes contained too many uninjured class members. *See, e.g.*, *Rail Freight II*, 934 F.3d at 623, 625 (affirming the district court's denial of class

---

[40]    Briefly, in their Reply, plaintiffs assert that "[a]ll individual class members were injured by the loss of choice in the market . . . ." Doc. 1837 at 23. At oral argument, plaintiffs again asserted this argument and cited a Sixth Circuit case to support it. *See Energy Conversion Devices Liquidation Tr. v. Trina Solar Ltd.*, 833 F.3d 680, 690 (6th Cir. 2016) (noting "caselaw saying that a reduction in consumer choice can show anti-competitive harm" (first citing *Blue Shield of Va. v. McCready*, 457 U.S. 465, 481–84 (1982); then citing *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 789–90 (6th Cir. 2002)). The court recognizes some courts have applied such a rule in antitrust cases. *See Ross v. Bank of Am., N.A.*, 524 F.3d 217, 226 (2d Cir. 2008) (holding that plaintiffs sufficiently alleged antitrust injuries in the form of reductions in "consumer choice" and the "quality of [ ] services offered"); *Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384, 397 (S.D.N.Y. 2015) ("[A]nticompetitive conduct is injurious if it limits consumer options."). But the court doesn't address plaintiffs' argument here for two reasons. One, plaintiffs didn't develop this argument until the hearing on the certification motion. And two, the court finds that plaintiffs have shown plausibly that they can prove classwide injury using classwide evidence and the presence of uninjured class members doesn't defeat predominance.

[41]    At oral argument, Mylan's counsel provided an estimate of the number of uninjured class members using Prof. Rosenthal's analysis: "If you have a class of 2 million plaintiffs, . . . if you even have just 5 percent of the class that is uninjured, you're talking about 100,000 people who will be getting damages under the plaintiffs' models that we know are not [ ]injured and that the plaintiffs have no way to identify without individualized inquiries and many trials." Doc. 1789 at 73 (Tr. of Mot. Hr'g Class Certification – Phase II 73:13–20).

certification because plaintiffs' damages model showed "that 2,037 members of the proposed class—or 12.7 percent—suffered 'only negative overcharges' and thus *no* injury" and, as a consequence, the "need [for] individualized adjudications of causation and injury" to determine which class members sustained no injury defeated predominance); *Asacol*, 907 F.3d at 53–54 (reversing district court's certification order where about 10% of the class was uninjured because, the court found, "there are apparently thousands who in fact suffered no injury" and "[t]he need to identify those individuals will predominate and render an adjudication unmanageable absent . . . [a] mechanism that can manageably remove uninjured persons from the class in a manner that protects the parties' rights"); *In re Intuniv Antitrust Litig.*, No. 1:16-cv-12396-ADB, 2019 WL 3947262, at *8 (D. Mass. Aug. 21, 2019) (concluding that where one putative class contained some 25,000 uninjured class members and another class exceeded 10,000 uninjured members and plaintiffs had "failed to put forth a reasonable and workable plan to weed out the . . . uninjured class members in each putative class[,]" plaintiffs couldn't establish that common issues "'[will] predominate over any questions affecting only individual members'" (quoting Fed. R. Civ. P. 23(b)(3))).

Plaintiffs respond that the court need not follow these cases because they aren't binding precedent in this Circuit. And, plaintiffs assert, they contradict the case law from our court applying the Seventh Circuit's standard. For example, in *Urethane*, Judge Lungstrum refused to decertify a class where "plaintiffs [had] shown persuasively that only a very small percentage of class members suffered no damages . . . ." *In re Urethane Antitrust Litig.*, 2013 WL 2097346, at *2. Plaintiffs argue, like the percentage at issue in *Urethane*, the percentage here is very small— less than 5% for individual consumers and less than .001% for third-party payors.

As discussed above, the Seventh Circuit hasn't provided a formula for determining how many uninjured class members is a "great many" that would preclude certification. The Seventh Circuit says "too many" is "a matter of degree, and will turn on the facts as they appear from case to case." *Messner*, 669 F.3d at 825. In *Messner*, the defendant had conceded that "only about 2.4 percent of the putative class members" did not sustain injury. *Id.* at 826. The Seventh Circuit recognized the percentage "may prove, depending on the ultimate size of the class at issue here, to be a significant number of additional plaintiffs," but, it concluded, "a 2.4 percent decrease in the size of the class is certainly not significant enough to justify denial of certification." *Id.* Also, the Seventh Circuit noted, "the district court is free to revisit this issue at a later time if discovery shows that the number of members who could not have been harmed . . . was more significant than it appears at this time." *Id.* (citing *Kohen*, 571 F.3d at 679).

Other courts have reached similar conclusions based on the percentage of uninjured class members. *See, e.g.*, *Brown v. Hain Celestial Grp. Inc.*, No. C 11-03082 LB, 2014 WL 6483216, at *8 (N.D. Cal. Nov. 18, 2014) (granting certification under Rule 23(b)(3) and recognizing that "a small percentage of uninjured persons does not defeat" certification); *Mayo v. UBS Real Estate Sec., Inc.*, No. 08-00568-CV-W-DGK, 2012 WL 4361571, at *3 (W.D. Mo. Sept. 21, 2012) (holding that a putative class definition was not overbroad when "at least 94%" of its members sustained harm from defendants' purported conduct but denying class certification for other reasons). *Cf. Koss v. Norwood*, 305 F. Supp. 3d 897, 916 (N.D. Ill. 2018) ("While it is possible that some class members will turn out not to have good claims, that possibility does not defeat certification, and nothing in the definition or evidence tells the court how many, and so it is not 'apparent that it contains a great many persons who have suffered no injury at the hands of the defendant.'" (quoting *Messner*, 669 F.3d at 825)).

Similarly here, the court finds that plaintiffs have shown, at least at the class certification stage, that the percentages of uninjured class members are small enough that they don't preclude class certification. Still, the court recognizes that "depending on the ultimate size of the class at issue here," the factual record eventually may develop more fully and show that the number of uninjured class members is "more significant" than it now appears. *Messner*, 669 F.3d at 826. As the Seventh Circuit recognizes, the court "is free to revisit this issue" if that, in fact, occurs. *Id.* For now, the court finds that the current record doesn't defeat the predominance requirement simply because the putative class definitions contain a percentage of uninjured class members.

Also, as plaintiffs argue, even if the existence of uninjured class members presents an individual issue, it doesn't predominate over the common questions that plaintiffs say they will prove using class wide evidence. As the Tenth Circuit has recognized, "[c]lass-wide proof is not required for all issues" on certification. *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir. 2014). "Instead, Rule 23(b)(3) simply requires a showing that the questions common to the class predominate over individualized questions." *Id.* (citing *Amgen v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 468 (2013)). Just this past year, our Circuit held, "so long as at least one common issue predominates, a plaintiff can satisfy Rule 23(b)(3)—even if there remain individual issues, such as damages, that must be tried separately." *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 789 (10th Cir. 2019) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)); *see also In re Urethane Antitrust Litig.*, 768 F.3d at 1254 (affirming certification and noting that "some of the plaintiffs may have successfully avoided damages" but defendant "has not shown that the district court abused its discretion in finding that class-wide issues predominated over individualized issues" such as the existence and

impact of an alleged price-fixing conspiracy that "raised common questions that were capable of class-wide proof").

Here, plaintiffs have presented common questions that are capable of resolution through classwide proof through use of expert opinions and aggregate data. Specifically, those questions are whether defendants committed the alleged unlawful conduct and whether that alleged unlawful conduct affected consumers adversely. The court agrees that these common issues predominate. And, any questions about the absence of injury for some class members don't overwhelm the common issues and defeat predominance on class certification.

### (d) Constitutional Considerations

Mylan also argues that the court shouldn't certify classes with uninjured class members because it would violate Article III standing and defendants' constitutional right of due process. Tenth Circuit precedent rejects Mylan's standing argument. The Tenth Circuit has held, in the Rule 23(b)(2) context, that "only named plaintiffs in a class action seeking prospective injunctive relief must demonstrate standing by establishing they are suffering a continuing injury or are under an imminent threat of being injured in the future." *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1214 (10th Cir. 2014) (citation and internal quotation marks omitted). Although a Rule 23(b)(2) case, *Colorado Cross Disability Coalition* approvingly cited another case "support[ing] the notion that class 'standing' does not require individualized proof from class members" in the Rule 23(b)(3) context. *Id.* (citing *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (other citation omitted)). *Denney* held that Article III standing does "not require that each member of a class submit evidence of personal standing." 443 F.3d at 263.

Also, *Colorado Cross Disability Coalition* cited the concurring opinion in *Lewis v. Casey*, 518 U.S. 343 (1996), where "[t]hree Justices of the Supreme Court favorably quoted this principle from a leading class action treatise." *Id.* They said:

> "'[Unnamed plaintiffs] need not make any individual showing of standing [in order to obtain relief]. . . . Whether or not the named plaintiff who meets individual standing requirements may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions.'"

*Id.* (quoting *Lewis*, 518 U.S. at 395–96 (Souter, J., concurring) (quoting 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 2.07 (3d ed. 1992))). The Tenth Circuit noted that the majority "seemed to agree" with the concurring opinion's conclusion because it "point[ed] out that its holding did 'not rest upon the application of standing rules.'" *Id.* (quoting *Lewis*, 518 U.S. at 360 n.7). Thus, the Tenth Circuit framed the certification question as one "not answered by demanding proof of standing from each class member but by application of Rule 23." *Id.*

Applying the Tenth Circuit's holding in *Colorado Cross Disability Coalition* and the authorities that it cites favorably, the court finds that the Article III standing requirement does not demand that plaintiffs establish each putative class member has sustained injury. Instead, here, plaintiffs have satisfied Article III standing by showing that each named plaintiff has sustained injury sufficient to confer standing. *See supra* Part IV.D.3.b. And, as the Tenth Circuit directs, the court has answered the question whether plaintiffs can represent a class that includes uninjured class members by applying Rule 23. *See supra* Part IV.E.2.b.ii.(c).

The court also rejects Mylan's due process argument. To support this argument, Mylan again invokes *Asacol*. As discussed above, *Asacol* held that plaintiffs' proposed claims process—which involved a claims administrator reviewing contested claim forms—failed to protect defendants' Seventh Amendment and due process rights because the process "provides

defendants no meaningful opportunity to contest whether an individual would have, in fact, purchased a generic drug had one been available." *Asacol*, 907 F.3d at 53.  The First Circuit criticized plaintiffs for failing to establish that the number of affidavits to which defendants could raise a legitimate challenge "is so small that it will be administratively feasible to require those challenged affiants to testify at trial." *Id.*  And, because plaintiffs had failed to make the "administratively feasible" showing, the First Circuit held that plaintiffs failed the predominance requirement.  *Id.* at 53–54.  But *Asacol* isn't the governing law in our Circuit.  And for reasons already explained, the court declines to apply *Asacol*.

Instead, as discussed above, our court has refused "to apply a standard—one not adopted by the Tenth Circuit—that would preclude certification without a showing that class members may be determined in an administratively feasible manner." *Syngenta*, 2016 WL 5371856, at *3. In reaching this conclusion, Judge Lungstrum was persuaded by "the thorough and well-reasoned analysis of the Seventh Circuit" in *Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015). *Syngenta*, 2016 WL 5371856, at *3.  *Mullins* explained that, when a class action involves an aggregate damage calculation, "the identity of particular class members does not implicate the defendant's due process interest at all" because "[t]he addition or subtraction of individual class members affects neither the defendant's liability nor the total amount of damages it owes to the class." *Mullins*, 795 F.3d at 670 (citations omitted).  In reaching this conclusion, *Mullins* cited the Tenth Circuit's opinion in *Urethane* as support because, there, the Tenth Circuit had rejected a "Seventh Amendment challenge to allocation of damages award among class members because defendant 'has no interest in the method of distributing the aggregate damages award among the class members[.]'" *Id.* (quoting *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1269 (10th Cir. 2014)).

For the same reasons, the court finds that Mylan's due process rights aren't implicated here. Plaintiffs have made a plausible showing that they can prove damages on a classwide basis using an aggregate calculation based on their experts' opinions. And, using the Seventh Circuit's reasoning in *Mullins*, the court concludes that Mylan's constitutional arguments don't preclude certification here.

### c.     RICO

Plaintiffs premise their RICO claim on defendants' alleged EpiPen pricing scheme. Plaintiffs describe this scheme as a national, unified scheme to defraud. And, plaintiffs contend, the scheme did not vary among individual plaintiffs because defendants generally deployed it across the entire U.S. market. Thus, plaintiffs contend, the issues presented by the RICO claim are inherently classwide and subject to classwide proof because all of the claim's elements turn on defendants' conduct. Specifically, plaintiffs identify defendants' conduct susceptible to classwide proof as "the RICO enterprise involving the Mylan Defendants, the Pfizer Defendants, and the co-conspirator PBMs; the pattern of racketeering committed by the Mylan and Pfizer Defendants so that they could raise the price of the EpiPen without any fear of competition, consumer backlash, or regulatory oversight from Congress; the elimination of the EpiPen single pack; and causation and damages stemming from this misconduct." Doc. 1500 at 59–60.

When considering whether the Rule 23 predominance requirement is satisfied in a RICO action, the court must "survey the elements of the class's RICO claims to consider (1) which of those elements are susceptible to generalized proof, and (2) whether those that are so susceptible predominate over those that are not." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014) (citations omitted). So, the analysis "'whether "questions of law or fact common to class members predominate" begins, of course, with the elements of the

underlying cause of action.'" *Id.* at 1088 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (quoting Fed. R. Civ. P. 23)).  Or, more simply, deciding whether a class can rely on classwide proof starts with what the law requires the class to prove.

RICO "establishes a civil cause of action for persons injured as a result of a prohibited racketeering activity." *Id.* (citing 18 U.S.C. § 1962(c)).  A RICO violation has "four elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002) (first quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985); then citing *BancOklahoma Mortg. Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089, 1100 (10th Cir.1999)).  And, "[t]o prove a RICO violation, a plaintiff must show that the defendant violated the RICO statute, and the plaintiff was injured 'by reason of' that violation." *CGC Holding*, 773 F.3d at 1088 (first citing 18 U.S.C. § 1962; then quoting § 1964(c)).

Here, plaintiffs' RICO claim alleges an illegal scheme conducted by an "association-in-fact enterprise," consisting of the RICO Defendants (Mylan N.V., Mylan Specialty, LP, Heather Bresch, Pfizer, King Pharmaceuticals, and Meridian) and the PBM Conspirators (defined as at least four PBMs:  CVS Health Corporation, Express Scripts Inc., Optum Rx Inc., and Prime Therapeutics LLC ), "whose purpose was to fraudulently mislead and deceive American consumers to purchase the EpiPen at an inflated price, to purchase the EpiPen as a 2-Pak only, and to cause consumers to pay an artificially inflated price for EpiPens" from 2011[42] to the present.  Class Compl. ¶¶ 600, 604.

---

[42]     Mylan launched the EpiPen 2-Pak on August 24, 2011.  Plaintiffs use this date as the earliest date when the putative class sustained damages.

Plaintiffs claim they will prove each element of their RICO claim using classwide evidence. Thus, they contend, the common issues of the RICO claim "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Specifically, plaintiffs assert that they will prove the first and second elements of their RICO claim with common evidence showing that the RICO Defendants formed an enterprise with the PBM Conspirators and, together, they committed various acts as part of an effort to raise the price of EpiPens. Plaintiffs contend that they will prove the third and fourth elements of their RICO claim with common evidence of a pattern of racketeering activity that includes: (1) removing single EpiPens from the market and forcing consumers to buy EpiPens in the 2-Pak; (2) paying kickbacks to PBMs in exchange for exclusive formulary status; (3) adding patents to the EpiPen to prevent generic competition, filing patent infringement lawsuits against generic rivals, and issuing fraudulent press releases suggesting that settlements of patent lawsuits were legitimate; and (4) making false and misleading statements (a) about rival product, Auvi-Q, (b) about the reasons for the switch to the 2-Pak, (c) about coupons and rebates, and (d) during Heather Bresch's testimony under oath to Congress on September 21, 2016.

Plaintiffs also claim they will prove causation and damages on a classwide basis. Specifically, plaintiffs contend that they will offer generalized proof of RICO causation because their RICO claim is based on a single, common scheme, and thus, class members share common relevant circumstantial evidence showing causation. And, plaintiffs argue, they can prove on a classwide basis that defendants' RICO violations caused plaintiffs to sustain common damages in the form of overpayments for EpiPens. In short, plaintiffs predict their RICO evidence will focus on defendants' conduct.

Defendants respond, arguing the court should not certify the proposed RICO class because individual issues of causation and damages will overwhelm the common issues.[43]  Thus, defendants argue, plaintiffs' RICO claim cannot satisfy Rule 23(b)(3)'s predominance requirement.  The court addresses each of defendants' predominance arguments separately, below.

### i.   RICO Causation

The Tenth Circuit has explained that RICO's "'by reason of'" requirement requires a plaintiff to show "'a RICO predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well."'"  *CGC Holding*, 773 F.3d at 1088 (quoting *Hemi Grp., LLC v. City of N.Y.C.*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992))).  "Sufficiently establishing the element of causation—both actual and proximate—is crucial to proving any violation of RICO."  *Id.* (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 656–60 (2008)).

The Supreme Court has defined RICO proximate causation as "a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'"  *Bridge*, 553 U.S. at 654 (quoting *Holmes*, 503 U.S. at 272 n.20).  Proximate cause provides a "'label generically [for] the judicial tools used to limit a person's responsibility for the consequences of that person's own acts . . . .'"  *Id.* (quoting *Holmes*, 503 U.S. at 268).  And, it includes "a particular emphasis on the 'demand for some direct relation between the injury asserted and the injurious conduct alleged.'"  *Id.* (quoting *Holmes*, 503 U.S. at 268).

Thus, "'[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.'"  *Safe*

---

[43]     Defendants don't argue that the other elements of plaintiffs' RICO claim involve individual issues that defeat predominance.

*Streets All. v. Hickenlooper*, 859 F.3d 865, 889 (10th Cir. 2017) (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)).  The Supreme Court has instructed that "'no need [exists] to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly.'"  *Id.* (quoting *Anza*, 547 U.S. at 460).

But, in the context of RICO claims premised on predicate acts of mail fraud, the Supreme Court has held that "a plaintiff is not required to plead that he is a victim of the defendant's underlying crime (*e.g.*, that he relied on the fraudulent mailings) to establish a direct injury."  *Id.* (citing *Bridge*, 553 U.S. at 649–50).  "Rather, a plaintiff may establish proximate causation by plausibly pleading that his business or property has been directly injured as a result of the defendants' § 1962 violation."  *Id.* (citing *Bridge*, 553 U.S. at 649–50).

When a federal court decides whether issues of RICO causation satisfy the Rule 23 predominance inquiry, "the question is whether the link between defendants' actions and the class's injuries can be adduced through common evidence."  *GCG Holding*, 773 F.3d at 1088.  Our Circuit has explained that, in RICO actions, "individualized issues of reliance often preclude a finding of predominance."  *Id.*  "Since reliance is often a highly idiosyncratic issue that might require unique evidence from individual plaintiffs, it may present an impediment to the economies of time and scale that encourage class actions as an alternative to traditional litigation."  *Id.*  But, the Circuit found, this isn't always the case.  *Id.*

In *GCG Holding*, the Circuit explained that certification of a RICO claim is proper when "'causation can be established through an inference of reliance where the behavior of plaintiffs and the members of the class cannot be explained in any way other than reliance upon the defendant's conduct.'"  *Id.* at 1089–90 (quoting *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 277 F.R.D. 586, 603 (S.D. Cal. 2011)).  In such a situation, "where

circumstantial evidence of reliance can be found through generalized, classwide proof, then common questions will predominate and class treatment is valuable in order to take advantage of the efficiencies essential to class actions." *Id.*; *see also Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 918 (10th Cir. 2018) (holding that the "causation element is susceptible to generalized proof and thus cannot defeat class certification under Rule 23(b)(3)'s predominance requirement"); *see also id.* at 20 (explaining that when "class allegations are based on a single, common scheme, class members share the relevant circumstantial evidence in common, thus making class-wide proof possible").

Defendants argue that plaintiffs have not shouldered their burden to show how they can prove RICO causation on a classwide basis. More specifically, defendants assert, plaintiffs cannot show a "causal chain between any specific [RICO predicate] act and the amount paid by each plaintiff" for an EpiPen, much less that they can demonstrate the necessary causal chain through classwide proof. Doc. 1636 at 69. Plaintiffs respond, explaining how they will use classwide evidence to prove three components of the EpiPen pricing scheme using: (1) the "hard switch" to the 2-Pak and the elimination of single EpiPens from the market; (2) the delay of generic competition to the market; and (3) the elimination of branded competition by entering into exclusive dealing contracts with PBMs. The court addresses these three components, below.

### (a) Switch to 2-Pak

Plaintiffs contend they will prove that defendants engaged in a pattern of racketeering activity that included removing single EpiPens from the market and forcing consumers to buy EpiPens two at a time in the 2-Pak. And, plaintiffs argue, they will establish RICO causation using generalized proof that defendants' actions caused plaintiffs to pay more for EpiPens because defendants' actions forced them to buy two EpiPens.

To support this argument, plaintiffs rely on the Reports of their expert, Prof. Meredith Rosenthal. Prof. Rosenthal opines that Mylan's switch to the 2-Pak "led to an immediate and permanent increase in the number of [EpiPens] per prescription of approximately 0.5." Doc. 1497-3 at 24 (Rosenthal Expert Report ¶ 54). Prof. Rosenthal opines that this increase "represents the amount by which Class members were required to increase their consumption of EpiPens when they were constrained by the 2-Pak." *Id.*; *see also* Doc. 1711-1 at 13–14 (Rosenthal Reply Report ¶ 17) (explaining that her study supports a "causal inference" that "[t]he withdrawal of the single injector EpiPen forced the Class to purchase more pens than it would have [purchased] otherwise," and observing that "Mylan's own analysis makes the same causal inference: An EpiPen market review from 2012 cites a 0.23 pen per prescription increase from the end of 2011 compared to the 2012 average, noting 'Much of this growth was driven by elimination of Single Pack.'").[44]

After the switch to the 2-Pak, Prof. Rosenthal calculates that the ratio of EpiPens sold per prescription was more than 2.0. Doc. 1497-3 at 24 (Rosenthal Expert Report ¶ 54). By comparison, in Canada, where consumers still can buy EpiPens in a single pack, the average number of EAIs dispensed per prescription is about 1.5 or 1.48. Doc. 1499-5 at 4 (Rocheleau Dep. 176:3–25).

---

[44]     Defendants have challenged the reliability of Prof. Rosenthal's event study in a *Daubert* motion. The court's Order deciding that motion explains that defendants' challenges to Prof. Rosenthal's opinions go to the weight of her opinions but they don't preclude admissibility. The court thus considers her event study when deciding plaintiffs' Motion for Class Certification. And, the court finds, her opinions support class certification at this stage of the litigation.

     At this stage, plaintiffs don't need to establish that Prof. Rosenthal's opinions are indisputably correct. Instead, they merely must demonstrate that her opinions are capable of showing RICO causation on a classwide basis. The court finds they do. The persuasiveness of Prof. Rosenthal's opinions for proving classwide liability is a matter for the factfinder to consider at a later stage in the case. *See In re Syngenta AG MIR 162 Litig.*, No. 14-md-2591-JWL, 2016 WL 5371856, at *6 (D. Kan. Sept. 26, 2016) (explaining that "'persuasiveness [of an expert's opinion showing classwide liability] is, in general, a matter for the jury'" (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016))).

This evidence, plaintiffs assert, shows defendants' conduct involved "group coercion." *See Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 922 n.13 (10th Cir. 2018) (recognizing that alleged group coercion can support an inference of reliance). Plaintiffs describe defendants' coercion as having forced all consumers—as a group—to purchase EpiPens in sets of two. And, plaintiffs assert, our Circuit has held that allegations of "group coercion rather than individual arm's length transacting . . . not only allows for a class-wide inference of causation . . . but arguably supports an even stronger inference." *Id.* (affirming certification of a class of immigration detainees who alleged a private detention facility's sanitation policy violated the Trafficking Victim Protection Act's ("TVPA") prohibition against forced labor, and specifically holding that "a reasonable factfinder [could] conclude by a preponderance of the evidence that each TVPA class member would not have performed his or her assigned cleaning duties without being subject to the Sanitation Policy," and thus "a factfinder could—but need to—accept a class-wide inference of causation," *id.* at 922).

Plaintiffs also assert that Mylan's internal documents contradict its justification for switching to the 2-Pak. Mylan asserts that it made the switch based on medical guidance recommending that patients carry more than one EpiPen with them at all times. But, plaintiffs argue, Mylan's internal documents confirm that profit was the real reason for imposing the switch to the 2-Pak. *See, e.g.*, Doc. 1499-8 at 4 (Mylan slide deck explaining two reasons for eliminating the single EpiPen: (1) "Double the revenue per RX of 2 pack vs single" and (2) "Strong potential generic defense"); Doc. 1499-22 at 10 (Mylan slide deck projecting the "Impact of Eliminating Single Dose" included "Increase revenue by $81 million and gross profit by $41 million annually"). Plaintiffs argue that this evidence reveals Mylan's true motive for

switching to the 2-Pak, and this evidence applies across the board, showing defendants' conduct injured the putative class plaintiffs by requiring them to pay more for EpiPens.

In response, defendants argue that RICO causation is not susceptible to classwide proof because not all plaintiffs would have purchased a single EpiPen instead of the 2-Pak—had the single EpiPen remained available for purchase.[45]  Indeed, defendants cite deposition testimony by some named plaintiffs who testified that they preferred to purchase a 2-Pak even if they had the choice to buy one EpiPen at a time, in a single dose.  Doc. 1835-2 at 2–10.  Thus, defendants argue, the alleged RICO violations did not coerce these plaintiffs into paying more for the EpiPen.  And, defendants contend, individualized issues like this one—*i.e.*, identifying which class member would have purchased a 2-Pak even if a single dose was available—outweigh common issues embedded in the causation element.  The court disagrees.

As discussed above—when addressing the issue of uninjured class members—this court has recognized that "a class will almost inevitably include persons who have not been injured by the defendant's conduct, and that fact (or even inevitability) does not preclude certification."  *In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2013 WL 2097346, at *2 (D. Kan. May 15, 2013) (citing *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th Cir. 2012)).

---

[45]      Defendants also argue that a RICO plaintiff must show that "commission of the predicate acts" caused plaintiff's injuries.  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).  Here, defendants contend plaintiffs can't show that any specific RICO predicate act caused plaintiffs' injuries as opposed to Mylan's decision to stop selling the EpiPen in single doses.  Doc. 1636 at 72.  This argument misses the mark.  The predicate acts plaintiffs rely on to support their RICO claims are the false and misleading statements that defendants made about the medical justification for the switch to the 2-Pak.  *See, e.g.*, Doc. 60 at 172 (Class Compl. ¶ 655.b.).  Plaintiffs assert that they will show that defendants committed these predicate acts as part of a pattern of racketeering activity that included removing single doses of the EpiPen from the market and forcing consumers to buy the EpiPen in a 2-Pak.  And, plaintiffs assert, they will show that defendants' conduct caused classwide injury because it forced consumers to buy more EpiPens.  These allegations suffice to establish that plaintiffs will rely on classwide evidence to support their RICO theory that defendants' alleged commission of predicate acts caused plaintiffs' injuries.

Instead, "a class is too broad to permit certification only if it includes a great number of members who could not have been harmed by the defendant's conduct (as opposed to a great number who ultimately are shown to have suffered no harm)." *Id.* (citing *Messner*, 669 F.3d at 824).

Here, defendants rely on evidence that, ultimately, may show certain putative class members sustained no harm because they would have purchased the 2-Pak, even if a single dose product was available for purchase. But, at this stage of the litigation, the court is unpersuaded that the putative class includes "great numbers" of class members who *could not have been harmed* by defendants' switch to the 2-Pak. *See supra* Part IV.E.2.b. Plaintiffs have presented sufficient evidence that defendants' switch to the 2-Pak caused injury to the putative class on a classwide basis in the form of overpayment for the EpiPen. And thus, plaintiffs have shown that common issues of RICO causation predominate. *Cf. In re Syngenta AG MIR 162 Corn Litig.*, No. 14-md-2591-JWL, 2016 WL 5371856, at *7 (D. Kan. Sept. 26, 2016) (rejecting defendant's argument that "the fact and amount of injury present individual issues because the [Chicago Board of Trade ("CBOT")] price is not sufficiently tied to local corn prices," and explaining that the court would not "weigh the class-wide evidence concerning the relationship between CBOT and local prices" because "the persuasiveness of such evidence is for the jury at trial," and concluding that "a reasonable juror could believe that local corn prices do reflect changes in the CBOT futures price, as opined by plaintiffs' experts.").

In reaching this conclusion, the court recognizes that plaintiffs' 2-Pak theory is but one of the factual theories plaintiffs rely on to support their RICO claim. And, after ruling the class certification motion, the court still retains jurisdiction to refine and limit the scope of the class RICO claims. At this stage of the proceeding, defendants haven't convinced the court that the putative class includes "great numbers" of class members uninjured by the switch to the 2-Pak.

But, the court is mindful that defendants have presented evidence in the form of deposition testimony showing that the 2-Pak switch may not have injured some named plaintiffs. If the evidence develops to show that "great numbers" of putative class plaintiffs were unharmed by the 2-Pak switch, the court retains the flexibility to modify its class certification decision and preclude plaintiffs from using the 2-Pak theory to support the RICO class claims. *See, e.g.*, *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th Cir. 2012) (recognizing that "depending on the ultimate size of the class at issue here," the estimated percentage of uninjured class members "may prove . . . to be a significant number of additional plaintiffs" but noting, "the district court is free to revisit this issue at a later time if discovery shows that the number of members . . . was more significant than it appears at this time"). The court can revise its certification decision or even limit plaintiffs' use of certain factual theories to support their RICO class claim. *See* Fed. R. Civ. P. 23(d)(1)(A) ("In conducting an action under this rule, the court may issue orders that . . . determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument."). *Cf. Shook v. Bd. of Cty. Comm'rs*, 543 F.3d 597, 606–07 (10th Cir. 2008) (recognizing that a district court may create subclasses *sua sponte* as a way to segregate plaintiffs with different factual and individual circumstances used to support their claim); *Marisol A. v. Giuliani*, 126 F.3d 372, 379 (2d Cir. 1997) (recognizing that certifying subclass serves several purposes including an ability "to conduct the trial in a more orderly manner, by tying the order of proof to particular claims raised by the individual subclasses" and noting that "[o]ne possible method of developing proper subclasses would divide the present class based on the commonality of the [class members'] particular circumstances [or] the type of harm the [class members] allegedly have suffered . . . .")

Should defendants convince the court that "great numbers" of putative class members never could have been harmed by the switch to the 2-Pak because they would have purchased two EpiPens even if defendants had continued to make the single dose available in the market, the court has authority and discretion to modify its ruling.

### (b) Delay of Generic Competition Through "Pay For Delay" Settlements

Plaintiffs also assert that their generic delay theory uses classwide proof to establish RICO causation. Plaintiffs allege that one component of the EpiPen pricing scheme was defendants' use of reverse payment settlements to resolve EpiPen patent litigation. Plaintiffs describe the reverse payment settlements as anticompetitive "pay for delay" settlements that effectively delayed generic competition from entering the EAI market for more than three years. Doc. 60 at 172 (Compl. ¶ 655.c.). To support their RICO claim, plaintiffs allege that defendants committed predicate RICO acts by making false statements in press releases about the settlements, describing them as a legitimate means to resolve patent litigation and concealing the true, anti-competitive reasons for the agreements. *Id.*; *see also id.* at 176 (Compl. ¶ 659.e.). And, plaintiffs allege, defendants' RICO violations succeeded in delaying generic competition which, in turn, protected Mylan's monopoly in the EAI market and allowed defendants to continue to raise the EpiPen's price.

Through expert testimony by Profs. Einer Elhauge and Andrew Torrance, plaintiffs offer evidence that the patent settlements were not legitimate settlements. Instead, the two professors opine the settlements really were unlawful reverse payment settlements contrived to delay generic competition. Plaintiffs assert that their evidence supporting this theory is common to all class members. The court agrees with them. The evidence focuses entirely on defendants'

conduct and motivations.  It thus applies to each putative class plaintiffs' claims and either fails or succeeds "in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Also, through Prof. Rosenthal's testimony, plaintiffs offer evidence that defendants' misconduct delaying generic competition caused the RICO class—as a whole—to overpay for the EpiPen.[46]  Specifically, Prof. Rosenthal calculated overcharges from delayed generic entry on a classwide basis using classwide data and information (calculated separately for TPPs, insured consumers, and cash payors).  Doc. 1497-3 at 30, 77–82 (Rosenthal Expert Report ¶ 68, Attach. C.7.a–C.7.e).

Defendants respond that plaintiffs can't rely on their generic delay theory to establish RICO causation on a classwide basis because they can't show that all plaintiffs knew about, much less relied on, defendants' misrepresentations about the legitimacy of the patent litigation settlements.  Doc. 1636 at 72–73.  Thus, defendants contend, plaintiffs can't connect the specific RICO predicate acts to any overpayment by any particular plaintiff.  *Id.*  Plaintiffs disagree. They contend that defendants' argument improperly assumes plaintiffs must show evidence of first-party reliance to prevail on a RICO claim.  Plaintiffs have the better end of this dispute.

The Supreme Court has held—explicitly—that first-party reliance is not required to establish a RICO claim that relies on the predicate act of mail fraud.  *Bridge v. Phoenix Bond &*

---

[46]     Defendants separately filed *Daubert* motions challenging the reliability of Profs. Torrance, Elhauge, and Rosenthal's opinions.  The court's Order denying those motions explains that defendants' challenges go to the weight of expert opinions but don't preclude the court from "admitting them," *i.e.*, considering them when deciding the class certification motion.  Thus, on the class certification motion, the court considers these expert opinions.  And, the court concludes that they support class certification because they plausibly offer a classwide method for proving RICO liability.

Defendants' challenges to the persuasiveness of these experts' opinions is a different matter.  The factfinder can decide how persuasive these opinions are when deciding the merits of the case—*i.e.*, whether the opinions prove that defendants entered unlawful reverse payment settlements that violated RICO.  But for current purposes, the opinions present sufficient evidence of classwide causation to support plaintiffs' class certification motion.

*Indem. Co.*, 553 U.S. 639, 649 (2008).  Instead, RICO provides a cause of action for "[a]ny person injured in his business or property by reason of" a violation of" the statute.  18 U.S.C. § 1964(c).  The Supreme Court reasoned that this statutory language "suggest[s] a breadth of coverage not easily reconciled with an implicit requirement that the plaintiff show reliance in addition to injury in his business or property."  *Bridge*, 553 U.S. at 649.  So, plaintiffs argue, RICO doesn't require them to show classwide evidence of first-party reliance on defendants' misrepresentations.  Instead, plaintiffs assert, they just need to show classwide evidence of injury to business of property "by reason of" defendants' RICO violations.

*Bridge* illustrates this principle.  In that case, the Supreme Court held that a plaintiff could allege a RICO injury "'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations."  *Id.* at 649.  The Court found that plaintiffs' allegations "clearly" established that they "were injured by [defendants'] scheme."  *Id.*  Plaintiffs had alleged:  "As a result of [defendants'] fraud, [plaintiffs] lost valuable liens they otherwise would have been awarded."  *Id.*  This was "true even though [plaintiffs] did not rely on [defendants'] false attestations of compliance with the county's rules."  *Id.*

Likewise here, plaintiffs offer classwide evidence that one component of defendants' EpiPen pricing scheme—reverse payment settlements that delayed generic competition—injured plaintiffs by forcing them to overpay for the EpiPen.  Like *Bridge*, plaintiffs have asserted an actionable RICO claim even if they didn't rely on defendants' alleged misrepresentations about the settlements' legitimacy.

But, defendants assert, *Bridge* still requires plaintiffs to support their RICO claim with evidence that "*someone* relied on the defendant's misrepresentations."  *Id.* at 658.  Whether plaintiffs can marshal evidence to make that showing is a merits-based determination that the

court cannot make now.  Instead, what matters now is whether plaintiffs can prove this requirement of their RICO claim with common evidence.

Plaintiffs assert that they can make this showing on class certification through an classwide inference of reliance.  That is, according to plaintiffs, each plaintiff's payment for an EpiPen gives rise to an inference that he relied on defendants' fraudulent statements—or more specifically, defendants' fraudulent omissions[47]—about the EpiPen pricing scheme.  Indeed, the Tenth Circuit has recognized that "issues of reliance can be disposed of on a classwide basis without individualized attention at trial."  *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1089 (10th Cir. 2014) (citations omitted).  "For example, where circumstantial evidence of reliance can be found through generalized, classwide proof, then common questions will predominate and class treatment is valuable in order to take advantage of the efficiencies essential to class actions."  *Id.*

Also, in "certain circumstances . . . it is beneficial to permit a commonsense inference of reliance applicable to the entire class to answer a predominating question as required by Rule 23."  *Id.* (citations omitted).  And, "[i]n the RICO context, class certification is proper when 'causation can be established through an inference of reliance where the behavior of plaintiffs and the members of the class cannot be explained in any way other than reliance upon the defendant's conduct.'"  *Id.* at 1089–90 (quoting *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 277 F.R.D. 586, 603 (S.D. Cal. 2011)).

---

[47]    The court recognizes that "deceitful concealment of material facts may constitute actual fraud" sufficient to support a wire fraud claim.  *United States v. Cochran*, 109 F.3d 660, 665 (10th Cir. 1997).  "[A] misleading omission is actionable as fraud . . . if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled."  *Id.* (citation, internal quotation marks, and internal alternations omitted).

In *CGC Holding*, the Circuit held that "evidence of payment for [a] loan commitment—more specifically, the inference that arises from it—is sufficient to present a predominating question related to class member reliance that can resolve a central issue of this litigation in one swoop." *Id.* at 1091. "More specifically the fact that a class member paid [a] nonrefundable up-front fee in exchange for the loan commitment constitutes circumstantial proof of reliance on the misrepresentations and omissions regarding [one of the defendant's] past and the defendant entities' ability or intent to actually fund the promised loan." *Id.* at 1091–92.

Similarly, here, plaintiffs argue that the court can infer that the putative plaintiffs relied on defendants' misrepresentations or omissions about the EpiPen pricing scheme when purchasing their EpiPens. Defendants disagree. They assert that the Tenth Circuit has cautioned that an inference of RICO causation "would not be appropriate in most RICO class actions." *Id.* at 1091 n.9. But, in that same footnote, the Tenth Circuit said: "[T]he inference of reliance here is limited to transactional situations—almost always financial transactions—where it is sensible to assume that rational economic actors would not make a payment unless they assumed that they were receiving some form of the promised benefit in return." *Id.* That's the scenario we have in this case. It is "sensible to assume" that the putative plaintiffs "would not [have made] a payment for" their EpiPens had they known—as plaintiffs allege—that they were paying an inflated price for that product due to defendants' misconduct in delaying generic competition. *Id.* But, defendants argue, "the record is replete with examples of named plaintiffs who bought EpiPen products for rational reasons that had nothing to do with Mylan's alleged misconduct." Doc. 1636 at 71 n.79. These are merits-based defenses. Defendants assert they can rebut the classwide presumption of reliance with evidence that some plaintiffs would have purchased their EpiPens even if they had known about defendants' alleged misconduct. But, here, the question

on class certification is whether plaintiffs can prove reliance using classwide evidence.  The court determines that they can—by using a classwide inference, as approved by our Circuit in *CGC Holding*.  And this showing suffices to establish that common issues of RICO causation predominate under plaintiffs' generic delay theory.

### (c)  Exclusive Dealing Contracts with PBMs

Last, plaintiffs assert they will rely on common evidence to prove a third component of the EpiPen pricing scheme—*i.e.*, defendants' use of exclusive dealing contracts with PBMs. Plaintiffs assert that defendants' exclusionary contracts blocked branded competition from the market and allowed Mylan to raise the EpiPen's price which, in turn, caused plaintiffs to sustain injury in the form of overpaying for the EpiPen.  To support this argument, plaintiffs rely on Prof. Elhauge's Expert Report.[48]

Prof. Elhauge opines that Mylan's exclusive dealing contracts successfully foreclosed rival product Auvi-Q from accessing a percentage of the EAI market.  Doc. 1497-2 at 52–53 (Elhauge Expert Report ¶ 101).  Using classwide methodology, Prof. Elhauge has calculated the effects of this foreclosure on EpiPen sales and its price.  *Id.* at 56–66 (Elhauge Expert Report ¶¶ 110–20).  He then used those calculations to quantify overcharges incurred by EpiPen consumers.  *Id.* at 64–66 (Elhauge Expert Report ¶ 120, Table 3–4).  As Prof. Elhauge explains, his method of calculating the overcharges caused by defendants' exclusive dealing contracts with PBMs "is common to the class, based on classwide evidence, and produces a conclusion about the foreclosure share that is common to the class."  *Id.* at 52–53 (Elhauge Expert Report ¶ 101); *see also id.* at 54–55 (Elhauge Expert Report ¶ 104) (describing his "method of calculating" the

---

[48]     For the same reasons discussed above, *supra* note 46, the court finds Prof. Elhauge's opinions sufficient to establish that plaintiffs will offer classwide evidence of causation to support their RICO claims.

foreclosing effects on Auvi-Q sales and EpiPen's market price inflation as "common to the class, based on classwide evidence, and [one that] produces conclusions about the foreclosing effect and market price inflation that are common to the class").

Defendants respond that too many individual issues exist for the court to conclude that plaintiffs can satisfy the predominance requirement. Defendants argue that the drug supply chain is complex, and it involves too many participants who ultimately affect drug prices. As an example, defendants direct the court to Local 282's experience. Local 282, a named plaintiff and a putative class representative, hired The Segal Group to negotiate drug prices with Local 282's PBM, which, in turn, negotiated with Mylan. Defendants argue that Local 282's experience shows there is an immutable impediment to class certification. And, defendants contend, Local 282's experience is similar to other putative class members' purchasing experiences. According to defendants, Local 282's experience shows there simply are too many intervening and individualized issues in the causal chain between the alleged predicate acts and each plaintiff's ultimate purchase of an EpiPen at a price negotiated by other parties. Thus, defendants argue, common causation issues don't predominate over individuals ones.

Plaintiffs urge the court to find their method of proving causation is sound under the approach approved by the First Circuit in three RICO cases collectively known as *In re Neurontin Marketing & Sales Practices Litigation*.[49] Drug manufacturer Pfizer, the defendant in each case, asserted that intervening causes—in particular, actions of prescribing doctors—broke the chain of RICO causation between Pfizer's alleged misrepresentations when marketing the

---

[49]     The three cases are *Kaiser Foundation Health Plan v. Pfizer, Inc.*, 712 F.3d 21 (1st Cir. 2013), *Aetna, Inc. v. Pfizer, Inc.*, 712 F.3d 51 (1st Cir. 2013), and *Harden Manufacturing Co. v. Pfizer, Inc.*, 712 F.3d 60 (1st Cir. 2013). *Harden* was a class action of third-party payors; the other two cases were individual cases pursued by third-party payors.

drug Neurontin and plaintiffs' injury.  The First Circuit rejected Pfizer's argument for several reasons.

First, the First Circuit recognized that the Supreme Court had held in *Bridge* that first-party reliance on a defendant's misrepresentations is not required.  *Kaiser*, 712 F.3d at 36 (citing *Bridge*, 553 U.S. at 642); *Aetna*, 712 F.3d at 58 (citing *Bridge*, 553 U.S. at 642); *Harden*, 712 F.3d at 66–67 (citing *Bridge*, 553 U.S. at 642).  Thus, the First Circuit concluded, *Bridge* foreclosed Pfizer's argument that any alleged misrepresentations it had made were made to the prescribing doctors—and not to the doctors' patients or others—and broke the causal link for third-party payors.  *Kaiser*, 712 F.3d at 36–37; *see also Harden*, 712 F.3d at 67; *Aetna*, 712 F.3d at 58.

Second, the First Circuit found that plaintiffs could prove a "'direct relationship between the injury asserted and the injurious conduct alleged.'"  *Harden*, 712 F.3d at 67 (quoting *Holmes*, 503 U.S. at 268).  The First Circuit noted that plaintiffs in all three cases were the "primary and intended" victims of Pfizer's scheme to defraud.  *Kaiser*, 712 F.3d at 37; *see also Harden*, 712 F.3d at 67; *Aetna*, 712 F.3d at 58.  Thus, plaintiffs' injuries were "a 'foreseeable and natural consequence' of Pfizer's scheme—a scheme that was designed to fraudulently inflate the number of Neurontin prescriptions for which TPPs paid."  *Kaiser*, 712 F.3d at 37 (quoting *Bridge*, 553 U.S. at 658); *see also Harden*, 712 F.3d at 67; *Aetna*, 712 F.3d at 58.

The First Circuit's conclusion in the *Neurontin* cases applies with equal force here.  Plaintiffs allege that the RICO defendants implemented an EpiPen pricing scheme designed to foreclose competition in the EAI market, protect the EpiPen monopoly, and allow defendants to raise the EpiPen's price.  Here, the putative plaintiffs—consumers who paid for the EpiPen—were the primary and intended victims of the alleged pricing scheme.  Thus, plaintiffs' alleged

injuries—overpayments for the EpiPen—were a foreseeable consequence of defendants' alleged scheme. Defendants' arguments about the complexity of the drug supply chain and the involvement of other actors in that chain "does not add such attenuation to the casual chain as to eliminate proximate cause" but, instead, these arguments "present[ ] a question of proof, to be resolved at trial, regarding the total number of prescriptions (if any) that were attributable to [defendants'] actions." *Harden*, 712 F.3d at 67; *see also Kaiser*, 712 F.3d at 39; *Aetna*, 712 F.3d at 59. And, to prove their allegations, plaintiffs will rely on common evidence about defendants' conduct in the EpiPen pricing scheme, the intended targets of that scheme, and how that scheme injured the plaintiff class as a whole.

Also, the *Neurontin* cases held that aggregate statistical evidence presented by Professor Meredith Rosenthal—the same expert plaintiffs rely on here—and other circumstantial evidence provided strong evidence of but-for causation. *Harden*, 712 F.3d at 68; *see also Kaiser*, 712 F.3d at 45–46; *Aetna*, 712 F.3d at 57–58. This meant, the First Circuit held, that plaintiffs could show Pfizer's fraud had caused plaintiffs to pay more for Neurontin than they otherwise would have paid. *Harden*, 712 F.3d at 68; *see also Kaiser*, 712 F.3d at 45–46; *Aetna*, 712 F.3d at 57–58. The Circuit recognized that some prescribing doctors had testified that they decided to prescribe Neurontin without relying on Pfizer's alleged misrepresentations. *Harden*, 712 F.3d at 68; *see also Kaiser*, 712 F.3d at 45; *Aetna*, 712 F.3d at 57–58. But, *Neurontin* also held, such evidence did not preclude plaintiffs from proving but-for causation. *Harden*, 712 F.3d at 68–69; *see also Kaiser*, 712 F.3d at 45; *Aetna*, 712 F.3d at 57–58. Instead, this case explained: "Ultimately, it is a jury's task to weigh the individual testimony presented by Pfizer against the aggregate and circumstantial evidence presented by . . . plaintiffs." *Harden*, 712 F.3d at 69; *see also Kaiser*, 712 F.3d at 45; *Aetna*, 712 F.3d at 57–58. The same is true here. The court finds

that a factfinder can weigh any individual issues of causation against plaintiffs' projected common evidence to attempt to prove classwide RICO causation.

Defendants discredit plaintiffs' reliance on the *Neurontin* decisions, noting that the cases didn't decide class certification. Defendants are right. Defendants also correctly note that other Circuits have refused to apply *Neurontin* in the class certification context. *See Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 95–97 (2d Cir. 2015) (affirming district court's decision denying class certification and holding Prof. Rosenthal's regression analysis didn't support plaintiffs' classwide RICO causation theory because plaintiffs hadn't offered "anything beyond mere correlation that might support a reasonable inference that a [drug company's] alleged withholding of safety information played a legally sufficient causal role in the number of . . . prescriptions written"); *see also Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, 873 F.3d 574, 578 (7th Cir. 2017) (affirming dismissal of RICO class action claims after concluding that "improper representations made to physicians do not support a RICO claim by Payors" because they are "several levels removed in the causal sequence"). *But see Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1257–58 (9th Cir. 2019) (holding that plaintiffs sufficiently alleged proximate causation because their RICO claims sought "to hold Defendants liable for the consequences of their own acts and omissions toward Plaintiffs: the money spent by Plaintiffs to purchase" a pharmaceutical product and rejecting defendants' argument that "prescribing physicians' and pharmacy benefit managers' decisions constitute an intervening cause to sever the chain of proximate cause" because such a result "would . . . insulate [drug manufacturers] from liability for their fraudulent marketing schemes, as they could continuously

hide behind prescribing physicians and pharmacy benefit managers" which is "not the purpose the requirement of proximate cause is intended to serve").

Indeed, the Ninth Circuit has recognized that an "inter-circuit split" exists over the question "whether patients and TPPs suing pharmaceutical companies for concealing an allegedly known safety risk about a drug can satisfy RICO's proximate cause requirement." *Painters & Allied Trades*, 943 F.3d at 1253. The Ninth Circuit elected to join the First and Third Circuits and concluded that "prescribing physicians do not constitute an intervening cause to cut off the chain of proximate cause" needed to support a RICO claim. *Id.* at 1257; *see also id.* (holding that the First and Third Circuits "have it right because their reasoning is more consistent with the Supreme Court's direct relation requirement"). The Ninth Circuit recognized that "prescribing physicians serve as intermediaries between Defendants' fraudulent omission . . . and Plaintiffs' payments for [the drug]," but that "prescribing physicians do not constitute an intervening cause to cut off the chain of proximate cause" because their involvement in defendants' alleged scheme was foreseeable. *Id.* (concluding that "it was perfectly foreseeable that physicians who *prescribed* [the drug] would play a causative role in Defendants' alleged fraudulent scheme to increase [the drug's] revenue"). Also, the Ninth Circuit found that defendants "have always known that 'physicians would not be the ones paying for the drugs they prescribed,'" but instead, defendants "are well aware that TPPs and individual patients pay for the drugs." *Id.* (quoting *Neurontin*, 712 F.3d at 38–39). And, it recognized that "[d]efendants' alleged fraudulent marketing scheme, which was intended to increase [the drug's] sales, 'only became successful once [they] received payments for the additional [drug] prescriptions [they] induced'—the very injury for which Plaintiffs seek recovery." *Id.* (quoting *Neurontin*, 712 F.3d at 39). In sum, the Ninth Circuit held, plaintiffs had satisfied "the Supreme Court's requirement

that the proximate cause inquiry focus on the direct relation between the alleged violation and alleged injury." *Id.* (citing *Hemi Grp.*, 559 U.S. at 12).

While the facts alleged here don't present the exact same issue decided by *Painters & Allied Trades* or *Neurontin*, the court still finds the reasoning of these Circuit decisions persuasive. And, the court predicts, the Tenth Circuit would follow their lead and apply their principles to this case. Thus, the court concludes that the presence of intermediary players in the drug supply chain don't present individual causation issues that overwhelm common questions of RICO causation. Instead, the court holds, putative class plaintiffs have shown how they could prove RICO causation from classwide proof that could persuade the factfinder that the purpose of defendants' EpiPen pricing scheme was to raise the price of the EpiPen. In turn, plaintiffs also have shown how classwide proof could provide a basis to conclude that defendants' alleged scheme caused plaintiffs—the ones ultimately paying for the EpiPen—to pay more for the product than they otherwise would have paid without defendants' unlawful acts. This is the very injury that plaintiffs seek to redress.

Plaintiffs have discharged their burden to demonstrate that they can prove RICO causation with classwide evidence. Here, Prof. Elhauge's analysis of the effect of defendants' exclusionary contracts on the price of the EpiPen plausibly demonstrates classwide causation.[50]

---

[50]     The court recognizes that, in *Sergeants Benevolent*, the Second Circuit held that plaintiffs failed their burden to show they could prove RICO causation with classwide evidence because their expert (Prof. Rosenthal) provided "mere correlation evidence" that didn't suffice to prove classwide causation. 806 F.3d at 96. But, the Second Circuit contrasted Prof. Rosenthal's analysis there with her analysis in *Neurontin* that involved an aggregate regression analysis. *Id.* The Second Circuit recognized: "*Neurontin* does indicate that where individual physicians' reliance on a pharmaceutical company's misrepresentations forms a necessary link in the causal chain between those misrepresentations and the plaintiffs' injury, such reliance can be proved to a jury with sufficiently powerful aggregate evidence, as opposed to individualized inquiries as to each prescribing physician's actual decisionmaking." *Id.* at 97. Nevertheless, the Second Circuit concluded, it "need not (and do[es] not intend to) express any view here on whether or when an aggregate regression analysis similar to the one deployed in *Neurontin* might be sufficient to prove causation on a class-wide basis in other pharmaceutical-marketing cases alleging a pattern of mail fraud actionable under RICO" because plaintiffs' causation evidence there was too

As his Report explains, Prof. Elhauge used a regression model to "estimate the total impact of the restrictive PBM formulary positions on the quantity of [rival product Auvi-Q] pens Sanofi was able to sell each month that it was on the market." Doc. 1497-2 at 58 (Elhauge Expert Report ¶ 113). Next, Prof. Elhauge estimated Mylan's price elasticity when Auvi-Q was on the market. *Id.* at 62 (Elhauge Expert Report ¶ 119). Then, using his estimates about the impact of PBM restrictions on quantity and Mylan's price elasticity, Prof. Elhauge calculated the price of the EpiPen caused by PBM foreclosure, multiplied that foreclosure by the quantity of Mylan's actual sales, and determined the total amount of overcharge caused by PBM foreclosure. *Id.* at 64–66 (Elhauge Expert Report ¶ 120, Table 3–4). Plaintiffs here have come forward with far more than "mere correlation evidence." *Cf. Sergeants Benevolent*, 806 F.3d at 96 (holding that expert's analysis provided only "mere correlation evidence" that didn't support RICO causation). The court thus finds that Prof. Elhauge's expert opinion suffices to establish how plaintiffs will rely on classwide evidence to show RICO causation. And, the court concludes that the common causation issues predominate over individual ones on plaintiffs' RICO claim premised on the theory that defendants' use of exclusive dealing contracts with PBMs caused plaintiffs to pay more for the EpiPen.

For all these reasons, the court finds that plaintiffs have established that common issues of RICO causation predominate over individual issues sufficient to satisfy the Rule 23(b)(3) requirement.

---

"simplistic" to support classwide evidence of causation. *Id.* In contrast, as discussed above, plaintiffs here have offered classwide evidence of causation through Prof. Elhauge's regression model. And, as the court concludes above, this showing suffices to establish that common issues predominate the RICO causation analysis.

### ii. RICO Damages

Next, when it comes to RICO damages, defendants argue that plaintiffs cannot satisfy Rule 23's predominance requirement. Plaintiffs respond, arguing that the Expert Reports for Profs. Elhauge and Rosenthal sufficiently demonstrate how plaintiffs can prove their RICO damages on a classwide basis. Defendants dispute this proposition, contending plaintiffs' RICO damage calculations run afoul of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).

In *Comcast,* the Supreme Court determined that at the class certification stage, "any model supporting a 'plaintiff's damages case must be consistent with its liability case.'" 569 U.S. at 35 (quoting ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 57, 62 (2d ed. 2010)). Thus, in that antitrust case, *Comcast* held that plaintiffs must "tie each theory of antitrust impact to an exact calculation of damages." *Id.* at 37. The *Comcast* plaintiffs had alleged four different theories of antitrust impact, but the district court "accepted [just one of those theories] of antitrust impact as capable of classwide proof and rejected the rest." *Id.* at 31. Nevertheless, the district court certified a class based on an expert's regression model that "assumed the validity of all four theories of antitrust impact initially advanced" by plaintiffs. *Id.* at 36. On defendant's Rule 23(f) petition for interlocutory appeal, the Third Circuit affirmed the certification order. *Behrend v. Comcast Corp.*, 655 F.3d 182 (3d Cir. 2011). The Supreme Court reversed, holding the district court had erred when it accepted plaintiffs' regression model because it "falls far short of establishing that damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 35. And, "[w]ithout presenting another methodology," plaintiffs could not prove "Rule 23(b)(3) predominance." *Id.* Instead, the Court reasoned, "[q]uestions of individual damage calculations will inevitability overwhelm questions common to the class." *Id.*

Here, defendants argue Prof. Rosenthal's alternative RICO damages model contravenes *Comcast*'s requirement that class plaintiffs must connect each theory of liability to an exact calculation of damages. They assert that Prof. Rosenthal's calculation would require every class member to have sustained injury under every allegation in the Complaint for every transaction. The court rejects defendants' argument for two reasons.

*First*, defendants' argument ignores Prof. Rosenthal's actual estimate of RICO damages. In her analysis, she provided separate RICO damage estimates for plaintiffs' generic delay and single pack withdrawal theories and disaggregated each estimate among the affected group, *e.g.*, TPPs, insured consumers, and cash payors. *See* Doc. 1500-3 at 29, 31 (Rosenthal Expert Report ¶¶ 67, 72). Simply put, defendants' characterization of Prof. Rosenthal's work contradicts the content of the certification record.[51]

*Second*, as Prof. Rosenthal has explained, her alternative RICO damages calculation merely represents how plaintiffs' allegations—collectively—show that defendants' conduct permitted Mylan to raise prices on the EpiPen. It presents a summary of aggregate damages caused by defendants' alleged RICO violations, calculated by comparing the actual price per pen to the but-for price that, in her opinion, would have existed absent the EpiPen pricing scheme. Unlike the problematic damages evidence in *Comcast*, Prof. Rosenthal's alternative theory doesn't include a theory of liability that the court has excluded. Thus, Prof. Rosenthal's theory is consistent with *Comcast* because her work honors the Supreme Court's rule that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory." *Id.* at 35. Plaintiffs here have identified several theories that

---

[51]   Also, Prof. Elhauge provided a separate damage calculation for plaintiffs' other theory—exclusive dealing through defendants' use of exclusionary PBM contract. *See* Doc. 1500-2 at 56–66 (Elhauge Expert Report ¶¶ 110–120); *see also* Doc. 1497-2 at 56–66 (Elhauge Expert Report ¶¶ 110–120) (sealed version).

purportedly injured the putative class members and thus produced damages.  Prof. Rosenthal's

alternative RICO damages calculation properly combines plaintiffs' theories of liability.  And, at

the same time, her other analyses disaggregate plaintiffs' damages based on plaintiffs' legal

theories.

As the Seventh Circuit has recognized, "it was not the existence of multiple theories in

[*Comcast*] that precluded class certification; it was the plaintiffs' failure to base all the damages

they sought on the antitrust impact—the injury—of which the plaintiffs were complaining."

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013).  The *Comcast* scenario is not

present here.  Plaintiffs have presented a damages model that is consistent with their liability

theories.  It does not contravene *Comcast*.  And, it doesn't matter that they also have presented

an alternative model.

Last, defendants assert that plaintiffs can't show classwide proof of damages because

"some plaintiffs purchased EpiPen devices prior to events alleged in the Complaint."  Doc. 1636

at 73.  But, as plaintiffs explain, their class definitions dispense with this argument.  The class

definitions only include persons and entities who purchased the EpiPen after August 24, 2011—

the date when Mylan launched the 2-Pak.  Doc. 1353 at 2.  Thus, the class definitions only

include persons injured during the time defendants allegedly were executing the EpiPen pricing

scheme.  The court thus rejects defendants' argument that individual issues overwhelm the

common issues of RICO damages.

For all these reasons, the court concludes that plaintiffs have demonstrated that common

issues predominate the elements of their RICO claim sufficient to satisfy the class certification

requirement of Rule 23(b)(3).

### d.  Antitrust

Plaintiffs ask the court to certify as a class action their state antitrust claims under the laws of 27 states and the District of Columbia.[52]  Plaintiffs assert that their theories of antitrust liability involve common questions because they focus squarely on defendants' allegedly unlawful conduct:  (a) exclusive dealing arrangements where Mylan gave discounts to certain PBMs who drove and kept EpiPen prices above competitive levels; and (b) reverse payment patent litigation settlements where, plaintiffs allege, the EpiPen patent holder provided consideration to the alleged generic competitor/infringer in exchange for the generic competitor agreeing to delay entry of its generic product into the EAI market, thereby producing inflated EpiPen prices.  Defendants argue that plaintiffs cannot prove either antitrust theory on a classwide basis because they can't use common evidence to prove the required element of market power.  Also, defendants argue that plaintiffs cannot prove other elements of either one of their antitrust theories using classwide evidence.  Instead, defendants contend, individual issues predominate the analysis, thus precluding certification.  The court addresses defendants' arguments separately, below.[53]

---

[52]     The 27 states are:  Alabama, Arizona, California, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.  And, as noted above, plaintiffs also ask the court to certify a class under the laws of the District of Columbia.

But the court already has dismissed the state law antitrust claims brought under the laws of Arizona, the District of Columbia, Iowa, New Mexico, North and South Dakota, Oregon, Rhode Island, Vermont, West Virginia, and Wisconsin because the Class Complaint includes no named plaintiff residing in any of these states.  *See* Doc. 896 at 127; Doc. 1292 at 3.  So, the court cannot certify a class action asserting antitrust violations under the laws of these states.  That leaves 17 states subject to this portion of the certification motion.

[53]     Plaintiffs' opening brief acknowledges they must use common evidence to show that defendants inflicted antitrust impact, or injury, on the class.  Doc. 1500 at 73–74.  The antitrust injury requirement "'ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior.'"  *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1124–25 (10th

106

**Add. 106**

### i.    *Market Power*

Defendants assert that plaintiffs can't show market power in the EAI market with common evidence.  Plaintiffs respond, relying on Prof. Elhauge's report and his opinions about market power.  He opines that market power can be established through common proof, including proof sufficient to establish the relevant product and geographic markets, and Mylan's dominant position in that market.  According to Prof. Elhauge, Mylan held—at least—an 80% market share throughout the class period.  Doc. 1500-2 at 11, 15 (Elhauge Expert Report fig.1, ¶ 22); *see also* Doc. 1497-2 at 11, 15 (Elhauge Expert Report fig.1, ¶ 22) (sealed version). And, according to Prof. Elhauge's calculations, Mylan's market power was even greater than 80% for much of the relevant period.  *Id.*

Mylan asserts, in response, that Prof. Elhauge's opinions don't establish marker power for at least two reasons.[54]  *First*, Mylan asserts that Prof. Elhauge's calculations used incorrect data.  According to Mylan's expert, Dr. Johnson, plaintiffs' entire model is flawed and Prof. Elhauge's conclusions about market power are unreliable.  *Second*, Mylan argues, when PBMs shift to the lowest current formulary bid, it quickly changes the market share calculation.  Mylan contends that its market share and ability to change prices vary dramatically across PBMs and

---

Cir. 2005) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)).  At the certification stage, plaintiffs do not have to prove impact; instead, they need "only to demonstrate that the element of antitrust impact *is capable of proof at trial* through evidence that is common to the class rather than individual to its members."  *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 818 (7th Cir. 2012) (citation and internal quotation marks omitted).  As discussed above, plaintiffs have provided a common methodology for calculating aggregate damages stemming from defendants' alleged antitrust violations through Profs. Elhauge and Rosenthal's expert opinions, and these calculations apply classwide for each of plaintiffs' antitrust theories.  *See supra* Part IV.E.2.b.  The court finds that this showing suffices to establish that plaintiffs are capable of presenting common evidence of antitrust impact.

[54]    Defendants haven't asserted a *Daubert* challenge to Prof. Elhauge's opinions about market definition and market power.  But defendants assert that they are reserving their right to challenge these opinions at a later stage.  Doc. 1886 at 9 n.1.

formularies. Mylan asserts that Prof. Elhauge's failure to account for these variances undermines his conclusions. These showings, Mylan asserts, demonstrate that plaintiffs can't establish market power with evidence common to the entire class.

Mylan's arguments are not persuasive. As already discussed, on class certification, the court need not determine that Prof. Elhauge's calculations are right. Plaintiffs only need to demonstrate that his analysis applies to the claims for all class members and the issue does not affect class members differently. Plaintiffs have shouldered that responsibility. The court thus finds plaintiffs have made a plausible showing that they can establish market power in a relevant market with common evidence.

### ii.     *Exclusive Dealing Arrangements*

Next, defendants deny that plaintiffs can show "exclusive dealing" through common evidence. They argue that the alleged exclusionary contracts that plaintiffs rely on to support their antitrust claims are with different PBMs across different formularies at different times. Consequently, defendants assert, determining whether each consumer or payor's formula constitutes an "exclusive agreement" requires individualized inquiry.

In response, plaintiffs assert that Prof. Elhauge's PBM foreclosure analysis is common to all class members because Mylan's complete foreclosure across the EAI market increased prices for all payors, not just those foreclosed. Prof. Elhauge explained that Mylan, through rebates it offered to PBMs—conditioned on exclusionary terms requiring Auvi-Q to be placed in a less favorable formulary position than EpiPen—gave PBMs the highest rebates and significantly affected the share of EAI doses that EpiPen and Auvi-Q sold within each PBM. Stated differently, Prof. Elhauge opined that Mylan's conditional rebating strategy managed to restrict a substantial portion of the market. According to his calculations, based on Mylan, IQVIA

Xponent,[55] and Sanofi's data, Mylan's exclusionary PBM contracts, once fully implemented, consistently foreclosed more than 30% of all formulary lives—and, they typically foreclosed 40%–60% of them. *See* Doc. 1500-2 at 52–53 (Elhauge Expert Report ¶¶ 99–101) (providing a classwide methodology for calculating share and price impacts of PBM coverage restrictions); *see also* Doc. 1497-2 at 52–53 (Elhauge Expert Report ¶¶ 99–101) (sealed version). Prof. Elhauge then analyzed the price impact of defendants' exclusionary conduct to estimate prices but for defendants' alleged misconduct. *See* Doc. 1500-2 at 56–64, 66 (Elhauge Expert Report ¶¶ 110–120, Table 4) (providing a classwide methodology for calculating share and price impacts of PBM coverage restrictions); *see also* Doc. 1497-2 at 56–64, 66 (Elhauge Expert Report ¶¶ 110–120, Table 4) (sealed version).

To Mylan's argument that the numerous and varying agreements between Mylan and PBMs preclude predominance, plaintiffs rely on Prof. Rosenthal's findings. She opines that the prices paid by third-party payors and cash payors directly correlated to the EpiPen's WAC price[56] (a 99.9% and 99.8% correlation, respectively). Doc. 1711-1 at 8–9 (Rosenthal Reply Report ¶ 7, n.11, fig.2). Combining this correlation evidence with Prof. Elhauge's analysis, plaintiffs contend, shows that Mylan's actions raised baseline prices for all payors, even those on non-foreclosed formularies and despite the presence of prices negotiated from that baseline. Such common evidence supports a finding of predominance. *See In re Syngenta AG MIR 162 Corn Litig.*, No. 14-md-2591-JWL, 2016 WL 5371856, at *6–7 (D. Kan. Sept. 26, 2016)

---

[55]   The IQVIA Xponent data consists of pharmacy records that plaintiffs produced. Doc. 1711-1 at 29 (Rosenthal Reply Report ¶ 48).

[56]   As Prof. Rosenthal explained, the WAC price is the wholesale acquisition cost. Doc. 1724 at 15 (Tr. of Mot. Hr'g Class Certification – Phase I 15:12–22). It is the list price set by the manufacturer. *Id.* Once a manufacturer has determined a drug's WAC price, that price is typically used in transactions between the manufacturer and wholesaler. *Id.* It is essentially the benchmark the wholesaler uses for many of its sales to pharmacies. *Id.*

(holding plaintiffs satisfied the predominance requirement by showing that they would prove, through expert opinion, that defendants' actions caused a "general market price decrease" that applied across the board to each class member's corn sales); *see also In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254 (10th Cir. 2014) (holding district court did not abuse its discretion by determining that the antitrust impact of defendants' alleged conduct "involved a common question that would override other individualized issues" because defendants' alleged price-fixing "creat[ed] an inference of class-wide impact even when prices are individually negotiated[,]" especially when the evidence showed that defendants' "conspiracy artificially inflated the baseline for price negotiations"); *see also In re Lidoderm Antitrust Litigation*, No. 14-md-2521-WHO, 2017 WL 679367, at *20–21 (N.D. Cal. Feb. 21, 2017) (rejecting defendants' argument that "the terms of the rebates [for third-party payors ("TPPs")] vary across the board and require individualized review depending on the size of the TPP, the type of TPP . . . , and the TPP plan" because plaintiffs had provided a "common method of proof by [their] expert, who determined the existence of overcharges on all purchases after determining a but-for price and after taking into account rebates[,]" and thus differences in TPP rebates didn't defeat predominance requirement).

The court has found Profs. Elhauge and Rosenthal's methodologies sufficiently sound to withstand defendants' *Daubert* challenges. On certification, Mylan criticizes Prof. Elhauge's opinion as flawed because, defendants contend, he improperly defined "foreclosure." But, for purposes of the certification motion, the court need not determine whether Prof. Elhauge's opinion is correct. Instead, the court must decide whether plaintiffs have presented a plausible method for proving their antitrust claim using classwide evidence. *See In re Lidoderm Antitrust Litigation*, 2017 WL 679367, at *23 ("A rigorous review of [the experts'] opinions and their

reasoning, as required under recent Supreme Court precedent, establishes that the concepts and designs of their models are solid. What facts and assumptions are appropriate to include in those models (and which model is preferred) are not issues [the court] can or should resolve on *this* [certification] motion."). The court concludes that plaintiffs have satisfied this burden with their experts' opinions. They explain how aggregate foreclosure and price increases applied classwide, even if a particular class member wasn't subject to a foreclosed PBM formulary. The court thus finds that plaintiffs have satisfied the predominance requirement, as used to support their exclusive dealing claim. Some individual questions likely remain, but the common questions dominate the analysis.

### *iii. Generic Delay*

Defendants sharply contest plaintiffs' theory that defendants used a reverse payment settlement to delay entry of a generic EAI competitor. Defendants argue that plaintiffs can't show predominance of common issues for this theory. Plaintiffs respond, arguing that their expert opinions provide common evidence to support their generic delay claim, thus satisfying the predominance requirement.

Specifically, plaintiffs rely on Prof. Elhauge to (a) explain how reverse payment settlements can divide markets over time by delaying generic entry beyond what one otherwise would expect in a way that creates anticompetitive profits split among the settling parties; and (b) describe a methodology to calculate the economically rational entry date for the parties to have accepted in a no-payment settlement (had they been prevented from reaching a reverse payment settlement). Doc. 1500-2 at 17, 33–38 (Elhauge Expert Report ¶¶ 26, 56–66 ); *see also* Doc. 1497-2 at 17, 33–38 (Elhauge Expert Report ¶¶ ¶¶ 26, 56–66) (sealed version). Prof.

Elhauge, in turn, employs Prof. Torrance's analysis of the EpiPen patents and related litigation to derive a generic entry date. Doc. 1500-2 at 39, 42 (Elhauge Expert Report ¶¶ 70, 75 ).

Using Prof. Elhauge's calculated generic entry date, Prof. Rosenthal analyzes how the reverse payment settlement produced supra-competitive prices for the EpiPen, thus forcing consumers to pay inflated EpiPen prices. Doc. 1500-3 at 22–23 (Rosenthal Expert Report ¶¶ 48–53); *see also* Doc. 1497-3 at 22–23 (Rosenthal Expert Report ¶¶ 48–53) (sealed version). Prof. Rosenthal has calculated the classwide overcharges paid by EpiPen consumers, and she also has provided an aggregate damage calculation for the antitrust class based on defendants' alleged use of an unlawful reverse payment settlement. Doc. 1500-3 at 27–30 (Rosenthal Expert Report ¶¶ 58–68); *see also* Doc. 1497-3 at 27–30 (Rosenthal Expert Report ¶¶ 58–68) (sealed version).

Defendants take issue with each of these expert opinions. Defendants try to undermine both Profs. Elhauge's and Torrance's opinions by citing the opinion of their own expert, Mr. Folsom, to demonstrate that Teva's chances for success at trial were much lower than Prof. Torrance opines. Also, Mylan criticizes Prof. Rosenthal's opinion about the number of class members who would have switched to a generic product had one been available in the market (*i.e.*, the inverse of the proportion of "brand loyalists"), and her calculation of the average price consumers would have paid in the but-for world where Teva's generic entered the market.

Separately, Pfizer attacks Prof. Elhauge's analysis on two grounds. *First*, Pfizer contends that Prof. Elhauge's analysis fails to consider (a) Pfizer's economic incentives for settling the patent litigation (and also incorrectly calculates Teva's economic incentives), and (b) the merits of the patent claims in the litigation.[57] Plaintiffs respond, citing Prof. Elhauge's Reply Report.

---

[57] Plaintiffs don't respond specifically to Pfizer's arguments about the merits of the patent claims. Defendants criticize Prof. Elhauge's reliance on Prof. Torrance's opinion that Teva had more than a 70% chance of prevailing in the patent litigation. Defendants levied the same attacks against Prof. Torrance's opinion in the *Daubert* motion. As the court discussed in its Order denying that motion, defendants'

He opines that Pfizer and its subsidiaries—as the sole manufacturer and supplier of the EpiPen—"would benefit from any entry delay caused by the reverse payment, since that would give them more profits under their agreement to supply Mylan."  Doc. 1711-2 at 18 (Elhauge Reply Report ¶ 34).  Thus, Prof. Elhauge concludes, "Pfizer and its subsidiaries, regardless of their settlement or litigation payoffs, would have found it economically rational to agree to any reverse-payment settlement that was expected to delay Teva's entry."  *Id.*  And, Prof. Elhauge correctly notes, "any disputes about the extent to which Mylan drove bargaining about the delay in settlement entry date obtained for the reverse payment would be resolvable based on classwide evidence and any resolution of that issue would be common to the class."  *Id.*

*Second*, Pfizer contends that plaintiffs cannot hold it liable under the generic delay theory because the record contains no evidence that Pfizer induced any generic delay for the EpiPen.  Plaintiffs premise their generic delay theory on an allegation that the "reverse payment" that purportedly induced Teva to delay its generic EpiPen was an agreement by Mylan to delay entry of a Nuvigil generic—the product that was the subject of a separate lawsuit between Mylan and a Teva affiliate.  Pfizer argues that plaintiffs have adduced no evidence connecting Pfizer to the Nuvigil litigation when it settled the EpiPen patent litigation with Teva.  These arguments appear to address the merits of plaintiffs' antitrust claim against Pfizer—*i.e.*, whether plaintiffs can marshal evidence showing that Pfizer participated in the alleged unlawful reverse payment settlement.  The court need not—indeed, cannot decide the merits of that issue on certification.

---

arguments go to the weight of Prof. Torrance's opinions but don't preclude their admissibility.  And, here, on certification, the court need not weigh whether Prof. Torrance accurately opines about Teva's chances of success in the patent litigation.  Instead, the court must determine whether Prof. Elhauge's opinions, relying on Prof. Torrance's opinions, provide a plausible method for proving plaintiffs' generic delay theory on a classwide basis.  The court finds that they do.

In any event, as plaintiffs argue, they allege an antitrust conspiracy in this case. Members of a conspiracy are liable for acts committed by their co-conspirators in furtherance of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 646–48 (1946); *see also Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983) (holding "the law on civil conspiracy" imposes liability on co-conspirators for acts that are "a reasonably foreseeable consequence of the scheme"). So, if plaintiffs can prove that defendants engaged in a conspiracy, the law will hold Pfizer liable for the acts of Mylan as its co-conspirator. Also, as one leading treatise has noted, proof of a conspiracy "is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3)." 7AA Charles Alan Wright, *et al.*, *Federal Practice & Procedure* § 1781 (3d ed. 2005). The court rejects Pfizer's argument that its purported lack of participation in a reverse payment settlement precludes certification.

The court already has addressed many of defendants' other criticisms about plaintiffs' experts' methodologies and the accuracy of their calculations. By separate Order, the court has found these experts have substantiated their conclusions sufficient to survive *Daubert* challenges at this stage. Whether these expert opinions ultimately will persuade a factfinder that defendants violated the antitrust laws by delaying generic entry is not something the court can decide at certification. Nor do plaintiffs need to prove that these experts' opinions and calculations are accurate. Instead, to shoulder their certification burden, plaintiffs must show that common issues subject to classwide evidence predominate over individual questions. The court finds that plaintiffs have satisfied that burden. Plaintiffs' experts have presented a plausible method for proving their antitrust claims under a generic delay theory with evidence that applies on a

classwide basis.  This suffices to establish predominance to support plaintiffs' generic delay theory.

For the above reasons, the court finds that that plaintiffs have shouldered their burden to establish that common issues predominate their antitrust claim sufficient to satisfy the class certification requirement of Rule 23(b)(3).

### e.    Consumer Protection

Plaintiffs ask the court to certify as a class action their state consumer protection law claims under the laws of 20 states and the District of Columbia[58] that prohibit anticompetitive conduct or unfair practices.  Defendants oppose certification of any state consumer protection class action.  They contend that variations among the states' laws preclude certification because states use different tests to determine what is unfair conduct violating consumer protection statutes.[59]  The court agrees with defendants.  The differences among state consumer protection

---

[58]    The 20 states are:  Alaska, California, Connecticut, Florida, Hawaii, Illinois, Maine, Maryland, Massachusetts, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Oklahoma, Rhode Island, Vermont, Washington, and West Virginia.  Doc. 1500 at 86, 88.  And, as noted, plaintiffs also seek certification under the laws of the District of Columbia.

The court notes that the Consolidated Class Action Complaint doesn't plead a violation of the state consumer protection laws in Alaska, the District of Columbia, or Rhode Island.  *See* Doc. 60 at 182–394.  It only alleges violation of those three jurisdictions' antitrust laws.  *See id.* at 145–47, 149–50, 152–54, 157–59.  But the court has dismissed those three state law antitrust claims because the Class Complaint includes no named plaintiff residing in any of the three.  *See* Doc. 896 at 127 (dismissing "the class plaintiffs' state law antitrust claims asserted against both sets of defendants under the laws of Alaska, . . . the District of Columbia, [and] Rhode Island . . . because the Class Complaint includes no named plaintiff who resides in any of these states").  Also, the court has dismissed the state consumer protection law claims brought under the laws of New Mexico, Vermont, Washington, and West Virginia because the Class Complaint includes no named plaintiff residing in those states.  Doc. 896 at 127, Doc. 1292 at 3.

[59]    Defendants also make three other arguments.  They contend that the state consumer protection statutes at issue here award different types of damages, use varying rules for eligibility to sue, and impose differing statutes of limitations.  And, defendants argue, these differences in state laws present individual issues that overwhelm the common questions.  Because the court agrees with defendants' argument that differences in how the state laws define unfair conduct prevent certification, the court does not need to reach defendants' other arguments against certification.

**Add. 115**

statutes are significant, they present individual issues, and they overwhelm the common questions. As a consequence, plaintiffs fail to establish predominance, and thus, these individual issues defeat class certification of the state consumer protection class under Rule 23(b)(3).

As plaintiffs concede, states apply different tests when determining what qualifies as unfair conduct prohibited by a particular consumer protection statute. Doc. 1500 at 89; Doc. 1837 at 39–40. But, plaintiffs dismiss these differences, arguing they are just "[m]inor variations" in the laws. Doc. 1837 at 40. And, plaintiffs assert, the court can manage the differences by submitting special verdict forms or using other "mechanisms." *Id.*[60] The court disagrees.

The state laws at issue here use a variety of tests to define the form of conduct that will qualify as anticompetitive or unfair conduct prohibited under the consumer statutes. For example, some states consider the following factors: (1) whether the practice offends public policy, the common law, or otherwise; (2) whether it is immoral, unethical, oppressive, or unscrupulous; or (3) whether it causes substantial injury to consumers.[61] Other states examine

---

[60]     Plaintiffs don't identify the other mechanisms the court could employ. But, they cite *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-md-2591-JWL, 2016 WL 5371856 (D. Kan. Sept. 26, 2016), where our court certified eight, separate statewide class actions. *Id.* at *12–15 (certifying separate statewide classes consisting of corn producers in Arkansas, Illinois, Iowa, Kansas, Missouri, Nebraska, Ohio, and South Dakota). But this comparison isn't an apt one. Here, plaintiffs don't ask the court to certify separate statewide classes. Instead, they ask the court to certify one "Consumer Protection Damages Class" consisting of all persons and entities in the "Consumer Protection States" who purchased or paid for EpiPens. Doc. 1353 at 3.

[61]     These states include: **Connecticut** (*Cenatiempo v. Bank of Am., N.A.*, 219 A.3d 767, 790 (Conn. 2019) (discussing requirements of Connecticut Unfair Trade Practices Act)); **Florida** (*PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (discussing requirements of the Florida Deceptive and Unfair Trade Practices Act)); **Hawaii** (*Hungate v. Law Office of David B. Rosen*, 391 P.3d 1, 18 (Haw. 2017) (discussing requirements of Haw. Rev. Stat. § 480-2)); **Illinois** (*Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (Ill. 2002) (discussing requirements of the Illinois Consumer Fraud and Deceptive Business Practices Act)); **Massachusetts** (*Purity Supreme, Inc. v. Attorney Gen.*, 407 N.E.2d 297, 307 (Mass. 1980) (discussing requirements of Mass. Gen. Laws ch. 93A, § 2)); **Missouri** (*Chochorowski v. Home Depot U.S.A.*, 404 S.W.3d 220, 226 (Mo. 2013) (en banc) (discussing requirements of the Missouri Merchandising Practices Act)); **North Carolina** (*Bumpers v. Cmty. Bank of*

whether the act or practice:  (1) causes or is likely to cause substantial injury to consumers; (2) which is not reasonably avoidable by the consumer; and (3) not outweighed by countervailing benefits to consumers or to competition.[62]  Nebraska, New Hampshire, and New Mexico apply their own standards to define unfair conduct under their state consumer protection statutes.[63]

---

*N. Va.*, 747 S.E.2d 220, 228 (N.C. 2013) (discussing requirements of North Carolina's Unfair and Deceptive Practices Act)); **Oklahoma** (Okla. Stat. tit. 15, § 752(14) (Oklahoma Consumer Protection Act)); and **Vermont** (*Christie v. Dalmig, Inc.*, 396 A.2d 1385, 1388 (Vt. 1979) (discussing requirements of Vermont Consumer Fraud Act)).

[62]      These states include:  **Maine** (*Searles v. Fleetwood Homes of Pa., Inc.*, 878 A.2d 509, 519 n.10 (Me. 2005) (discussing requirements of the Maine Unfair Trade Practices Act)); and **Maryland** (*Sager v. Hous. Comm'n of Anne Arundel Cty.*, 957 F. Supp. 2d 627, 642 (D. Md. 2013) (discussing the requirements of the Maryland Consumer Protection Act and citing *Legg v. Castruccio*, 642 A.2d 906, 916 (Md. Ct. Spec. App. 1994)).  Also, **West Virginia** has not adopted this test explicitly, but the West Virginia Consumer Credit and Protection Act instructs courts construing that act to "be guided by the policies of the Federal Trade Commission and interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act . . . ."  W.Va. Code § 46A-6-101(1).  Section 45(a)(1) of Title 15 to the United States Code declares unlawful "[u]nfair methods of competition in or affecting commerce" and "unfair or deceptive acts or practices in or affecting commerce."  Section 45(n) prohibits the FTC from declaring an act unlawful on the ground that it is "unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."  The court predicts that West Virginia would apply this test when determining whether an act is an unfair act prohibited by the West Virginia Consumer Credit and Protection Act.

[63]      **Nebraska** requires the plaintiff asserting a Nebraska Consumer Protection Act claim to "prove that the practice either '(1) fell within some common-law, statutory, or other established concept of unfairness or (2) was immoral, unethical, oppressive, or unscrupulous.'"  *State ex rel. Stenberg v. Consumer's Choice Foods, Inc.*, 755 N.W. 2d 583, 591 (Neb. 2008) (quoting *Raad v. Wal-Mart Stores, Inc.*, 13 F. Supp. 2d 1003, 1014 (D. Neb. 1998) and noting that the Nebraska Supreme Court has not defined unfair practices under the state consumer protection act but recognizing that the Nebraska federal court defined the term in *Raad*).  **New Hampshire** applies "the rascality test" to determine whether an act is an unfair or deceptive act prohibited by the New Hampshire Consumer Protection Act.  *Axenics, Inc. v. Turner Constr. Co.*, 164 N.H. 659, 675–76 (N.H. 2013).  The rascality test requires that "the objectionable conduct . . . attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."  *Id.* (citation and internal quotation marks omitted).  **New Mexico**'s Unfair Trade Practices Act specifically defines the conduct prohibited by the statute.  *See* N.M. Stat. Ann. § 57-12-2(E) (defining an "unconscionable trade practice" as "an act or practice . . . that to a person's detriment:  (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid").  And New Mexico courts apply the statute's definition when determining whether conduct violates the statute.  *See, e.g.*, *State ex rel. King v. B & B Inv. Grp., Inc.*, 329 P.3d 658, 665 (N.M. 2014) (applying N.M. Stat. Ann. § 57-12-2(E)'s definition of "unconscionable trade practice").

Nevada's statute only prohibits deceptive conduct, not unfair conduct.[64]  And, in California, there is internal dissonance about the test courts should use under California's act.  Courts there have applied two different tests to determine what is an unfair practice under the California Unfair Competition Law.[65]

The court recognizes that differences in state laws don't always preclude class certification under Rule 23(b)(3)'s predominance requirement.  Courts have found class certification warranted when "the idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022–23 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011); *see also Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d

---

[64]      The Nevada Deceptive Trade Practices Act allows "any person who is a victim of consumer fraud" to bring an action under the statute.  Nev. Rev. Stat. § 41.600(1).  "Consumer fraud" includes "deceptive trade practices" as defined in §§ 598.0915 to 597.0925.  Nev. Rev. Stat. § 41.600(2)(e).  The Nevada federal district court has interpreted the statute's plain language to require a plaintiff to "show a defendant engaged in a consumer fraud of which the plaintiff was a victim."  *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 657 (D. Nev. 2009).

[65]      The Ninth Circuit has recognized that the California Unfair Competition Law ("UCL") "does not define the term unfair" and "the proper definition of unfair conduct against consumers is currently in flux among California courts."  *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (citation and internal quotation marks omitted).  The Ninth Circuit has cited two tests that the California courts have used to determine whether alleged conduct violates the UCL.  *Id.* at 1169–70.

     *First*, under the *South Bay* test, "'unfair' conduct occurs when that practice 'offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'"  *Id.* at 1169 (quoting *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 85 Cal. Rptr. 2d 301, 316 (Cal. Ct. App. 1999)).  *Second*, under the *Cel-Tech* test, a finding of "unfairness" under the UCL "'[must] be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition.'"  *Id.* at 1700 (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999)).  In *Davis*, the Ninth Circuit did not decide which of the two tests defines unfair conduct under the UCL because, it determined, plaintiff had failed "to state a claim under either definition."  *Id.*  The Ninth Circuit and California federal courts have followed *Davis*'s guidance and have applied both tests when determining whether alleged conduct qualifies as "unfair" conduct prohibited by the UCL.  *See, e.g.*, *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 866–67 (9th Cir. 2018); *Rhodeman v. Ocwen Loan Servicing, LLC*, No. EDCV 18-2363 JGB(KKx), 2019 WL 5955368, at *17 (C.D. Cal. Nov. 12, 2019); *In re Apple Inc. Device Performance Litig.*, 347 F. Supp. 3d 434, 463–64 (N.D. Cal. 2018).

288, 296 (1st Cir. 2000) ("As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of [state law] will not automatically foreclose class certification under Rule 23(b)(3).").

But "varying state laws may defeat predominance" in other situations. *Senne v. Kan. City Royals Baseball Corp.*, 934 F.3d 918, 928 (9th Cir. 2019); *see also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996) ("In a multi-state class action, variations in state law may swamp any common issues and defeat predominance."). Indeed, the Supreme Court has observed that "[d]ifferences in state law [can] compound . . . the disparities" among the factual questions, thus "undermining class cohesion." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

Courts have declined to certify class actions when the legal differences among varying state laws dominate the common questions. *See, e.g.*, *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 944 (6th Cir. 2011) (holding that "[t]he consumer-protection laws of many States . . . govern these claims and factual variations among the claims abound, making a class action in this setting neither efficient nor workable nor above all consistent with the requirements of Rule 23"); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189–90 (9th Cir. 2001) (affirming denial of class certification of a products liability action because "variances in state laws overwhelm common issues of fact"); *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300–02 (7th Cir. 1995) (decertifying class action and recognizing that negligence laws may vary among states "only in nuance" but "nuance can be important" and a review of differing state pattern instructions and judicial viewpoints about the meaning of negligence show that "the states of the United States sing negligence with a different pitch," thus the district court erred by finding that it could give a single instruction on negligence—one that "merg[ed] the negligence standards of

the 50 states and the District of Columbia"); *Commander Props. Corp. v. Beech Aircraft Corp.*, 164 F.R.D. 529, 541 (D. Kan. 1995) (O'Connor, J.) (denying class certification when "the significant number of individual inquiries required by the various state law claims make them ill-suited for class action treatment"); *Aks v. Bennett*, 150 F.R.D. 187, 192 (D. Kan. 1993) (Lungstrum, J.) (denying class certification because "common questions of law and fact [did] not predominate" when the claims were "subject to various state trust laws" and thus required analysis on a "state by state basis"). *Cf. Doll v. Chi. Title Ins. Co.*, 246 F.R.D 683, 689 (D. Kan. 2007) (Lungstrum, J.) (refusing to certify a class action that involved "varying limitations laws for tort claims in the 18 jurisdictions in which the class members resided" because "[t]he complexity of these analyses of differing states' laws makes the class action proposed by plaintiffs unmanageable and weighs against a finding that a class action would be superior").

This case presents the same situation. The disparity of standards the states use to define unfair conduct under various consumer protection statutes present individual issues, and they overwhelm the common issues. As defendants argue, a factfinder would have to apply each state's law to determine whether the conduct violates a specific state consumer protection statute. And, the factfinder properly could reach different conclusions about the legality of the same conduct based on the varying state law tests it must apply. It is difficult to imagine instructions that could fairly guide a jury to make classwide findings on varying state consumer protection laws and their many standards for defining prohibited conduct. Defendants have persuaded the court that this complexity would confuse the jury or prejudice defendants. The court finds that the variations among state consumer protection laws preclude predominance and thus make it inappropriate to certify the state consumer protection claims as a class action under Rule 23(b)(3).

### f.   Unjust Enrichment

Unjust enrichment claims generally require plaintiffs to prove three things:  (a) defendant received a benefit; (b) at plaintiff's expense; and (c) retention of the benefit would be unjust without compensation.  *See, e.g.*, *Haz-Mat Response v. Certified Waste Serv. Ltd.*, 910 P.2d 839, 847 (Kan. 1996) ("The basic elements of a claim based on a theory of unjust enrichment are threefold:  (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." (citation and internal quotation mark omitted)).

Plaintiffs contend defendants received increased profits at plaintiffs' expense, which they acquired unjustly and as a result of their own allegedly unlawful conduct.  Plaintiffs assert their unjust enrichment claims satisfy the predominance requirement because they premise their claims on many of the same alleged facts and will prove them using much of the same evidence as their other claims—*i.e.*, evidence focused on defendants' conduct as applied to the entire class.  While plaintiffs acknowledge some variations among the states' unjust enrichment laws, they dismiss those differences as minor or idiosyncratic and assert they do not significantly alter the central issue or manner or proof.  Mylan disagrees, arguing that the elements of an unjust enrichment claim are not uniform across all the states and the District of Columbia, which could produce different outcomes for different plaintiffs in different states.  These differences, Mylan argues, mandate individualized inquiry and preclude certification of an unjust enrichment class.

Plaintiffs urge the court to follow *Menocal v. GEO Group, Inc.*, 882 F.3d 905 (10th Cir. 2018), where the Tenth Circuit affirmed class certification of an unjust enrichment class.  But the class claim there was brought under the law of a single state (Colorado), and defendant only

challenged the predominance element, as it applied to the unjustness element and damages. *Id.* at 925–27. The Tenth Circuit concluded that even though unjustness requires a "fact-intensive inquiry," it presented a common question in that case because the theory depended on shared facts focusing on defendant's pay policy that applied uniformly to all class members. *Id.* at 925. On damages, the Tenth Circuit acknowledged damages would have to be ascertained on an individual basis, but agreed with the district court's finding that they should be easily calculable using a simple formula. *Id.* at 27.

This case is significantly different than *Menocal*, where plaintiffs asserted an unjust enrichment claim under the laws of just one state—Colorado. Here, plaintiffs want to certify a nationwide class to assert unjust enrichment claims. Our court has noted that differences among state law definitions of unjust enrichment and its availability as a remedy make federal courts, in general, reluctant to certify a nationwide class on this theory. *Thompson v. Jiffy Lube Int'l, Inc.*, 250 F.R.D. 607, 626 (D. Kan. 2008) ("Because of such variations [among state laws], federal courts have generally refused to certify a nationwide class based upon a theory of unjust enrichment.").

For the same reasons, the court finds here that the individualized inquiries required to determine claims from plaintiffs in 50 states plus the District of Columbia—such as whether a plaintiff conferred a benefit *directly* on defendants,[66] or whether the type of alleged misconduct

---

[66]     *See, e.g.*, *Danny Lynn Elec. & Plumbing, LLC v. Veolia ES Solid Waste Se., Inc.*, No. 2:09cv192-MHT, 2011 WL 2893629, at *6 (M.D. Ala. July 19, 2011) (dismissing Alabama unjust enrichment claim because "the individual defendants enjoyed no *direct* benefit") (emphasis added)); *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (N.Y. 2011) (holding that New York unjust enrichment claim failed because "the connection between the parties is too attenuated" and "the pleadings failed to indicate a relationship between the parties that could have caused reliance or inducement").

satisfies a particular state's law,[67] or assessing compliance with different statutes of

limitations[68]—would present significant manageability issues.  Also, as plaintiffs concede,

certain states preclude plaintiffs from maintaining an unjust enrichment claim if they have another

available remedy at law.[69]  These questions demand an individualized inquiry that will swamp the

common questions.  Because these variations exist and pose troubling case management

obstacles, the court follows the rule recognized in *Thompson*.  Exercising its discretion, the court

denies plaintiffs' request to certify a nationwide class based on an unjust enrichment theory.

### F.      Rule 23(b)(2) Injunction Class

Plaintiffs also seek to certify an injunctive relief class under Rule 23(b)(2).  They make

this request in addition to their requests that the court certify several Rule 23(b)(3) plaintiff

classes to seek monetary damages.  *See, e.g.*, Doc. 1353 at 2–3.  Plaintiffs explain that the

putative Rule 23(b)(2) plaintiff class seeks injunctive relief sufficient to restore consumer choice

to the market and the natural competitive equilibrium that would exist but-for Mylan's decision

---

[67]      *See, e.g.*, *Bland v. Abbott Labs., Inc.*, No. 3:11-CV-430-H, 2012 WL 32577, at *2 (W.D. Ky. Jan. 6, 2012) (noting that a Kentucky unjust enrichment claim requires proof of defendants' bad faith and dismissing unjust enrichment claim for failing to allege bad faith); *Bimbo Bakeries USA, Inc. v. Pinckney Molded Plastics, Inc.*, No. 4:06-CV-180-A, 2007 WL 836874, at *6 (N.D. Tex. Mar. 20, 2007) (dismissing Texas unjust enrichment claim because a viable claim requires "some type of unlawful behavior" and there was no "evidence of fraud, duress, or undue advantage" to support the claim).

[68]      An unjust enrichment claim in Kansas has a three year statute of limitations, Kan. Stat. Ann. § 60-512, and begins to run "when the enrichment becomes unjust[,]" *Estate of Draper v. Bank of Am., N.A.*, 205 P.3d 698, 715 (Kan. 2009) (internal citation and quotation marks omitted).  In contrast, an unjust enrichment claim in Michigan "accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results," Mich. Comp. Laws § 600.5827, and the statute of limitations is six years, *Williams v. Chase Bank*, No. 15-10565, 2015 WL 4600067, at *4 (E.D. Mich. July 29, 2015) (citing Mich. Comp. Laws § 600.5813)).

[69]      *See, e.g.*, *KLE Constr., LLC v. Twalker Dev., LLC*, 887 N.W.2d 536, 538 (N.D. 2016) (including as one of the elements of a North Dakota unjust enrichment claim "the absence of a remedy provided by law"); *Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011) (listing one of the elements of an Arizona unjust enrichment claims as "the absence of a remedy provided by law"); *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998) (reciting the elements of a Delaware unjust enrichment claim as including "the absence of a remedy provided by law").

**Add. 123**

to sell the EpiPen exclusively in the 2-Pak.  Plaintiffs allege that selling the EpiPen exclusively in a 2-Pak has caused consumers to pay more to purchase EpiPens than they would have paid if they could have purchased EpiPens in a single dose.  And, plaintiffs assert, they will continue to sustain injury as long as defendants continue to sell the EpiPen exclusively in the 2-Pak under the false pretext of medical necessity.  In simple terms, plaintiffs ask the court to enjoin Mylan from selling the Epi-Pen exclusively in the 2-Pak.

Rule 23(b)(2) allows a court to certify a class action if the requirements of Rule 23(a) are satisfied and "if the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).[70]  The Tenth Circuit has explained that Rule 23(b)(2) "demands at the class certification stage plaintiffs describe in reasonably particular detail the injunctive relief they seek 'such that the district court can at least "conceive of an injunction that would satisfy [Rule 65(d)'s] requirements," as well as the requirements of Rule 23(b)(2).'"  *D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1200 (10th

---

[70]     The Supreme Court has explained that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).  But Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant," or "when each class member would be entitled to an individualized award of monetary damages."  *Id.* at 360–61.

     After *Dukes*, a "sort of hybrid certification" has "gain[ed] ground in class actions suits."  *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 480 (8th Cir. 2016) (citing 2 William B. Rubenstein, *Newberg on Class Actions* § 4:38 (5th ed. 2019)); *see also West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295, 307 (N.D. Cal. 2017) ("District courts may certify both a 23(b)(2) class for the portion of the case concerning injunctive and declaratory relief and a 23(b)(3) class for the portion of the case requesting monetary damages." (citing *Newberg on Class Actions* § 4:38)).  Plaintiffs don't refer to this aspect of their certification motion as a request for a "hybrid" or "dual" class action under both Rule 23(b)(2) and 23(b)(3).  But the court assumes that's what plaintiffs intended to do because they ask the court to certify several different classes under either Rule 23(b)(2) or 23(b)(3).

Cir. 2010) (quoting *Shook v. Bd. of Cty. Comm'rs*, 543 F.3d 597, 605 (10th Cir. 2008) (quoting *Monreal v. Potter*, 367 F.3d 1224, 1236 (10th Cir. 2004))).

Plaintiffs' Rule 23(b)(2) certification request here doesn't satisfy this requirement. Indeed, defendants oppose plaintiffs' request for certification of a Rule 23(b)(2) class for this very reason. They argue that plaintiffs never identify the specific declaratory or injunctive relief they seek or the legal authority under which they seek it.

Plaintiffs respond to defendants' argument by explaining that "the precise form of this injunctive relief will take shape as the Court rules on the Parties' forthcoming dispositive motions and at trial." Doc. 1837 at 54. As one example, plaintiffs suggest that the court could order defendants to add a label to the EpiPen that recites no medical necessity exists to sell the device in a 2-Pak. *Id.* at 54 n.228. This vague, partially formulated request for injunctive relief doesn't meet the standard for certification under Rule 23(b)(2).

As our Circuit has explained, "Federal Rule of Civil Procedure 65(d) requires that injunctions be 'specific in terms' and 'describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained.'" *Monreal*, 367 F.3d at 1236 (quoting Fed. R. Civ. P. 65(d)). Here, plaintiffs' Rule 23(b)(2) certification request fails to describe the injunctive relief they seek with sufficient detail and, as a consequence, the court cannot determine whether classwide injunctive relief is appropriate under Rule 23(b)(2). *See id.* at 1236 (affirming district court's refusal to certify at Rule 23(b)(2) class because plaintiffs didn't specify the type of injunctive relief they sought and the Circuit couldn't "conceive of an injunction that would satisfy [Rule 65(d)'s] requirements"); *see also In re YRC Worldwide, Inc. ERISA Litig.*, No. 09-2593-JWL, 2011 WL 1303367, at *14 (D. Kan. Apr. 6, 2011) (denying certification under Rule 23(b)(2) when plaintiffs didn't "identify any particular injunctive relief

with sufficient specificity to enable the court to 'see how it might satisfy Rule 65(d)'s constraints and thus conform with Rule 23(b)(2)'s requirement'" (quoting *Shook*, 543 F.3d at 605 n.4)).

In short, plaintiffs have failed to shoulder their burden to show that Rule 23(b)(2) class certification is warranted.  They haven't provided sufficient information for the court to conclude that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  The court thus exercises its discretion and denies plaintiffs' request to certify a Rule 23(b)(2) class.

### V.      Class Definitions

Consistent with its analysis above, the court certifies the two following classes under Rule 23(b)(3):

> **1.      Nationwide RICO Damages Class ("RICO Class").**  All persons and entities in the United States who paid or provided reimbursement for some or all of the purchase price of Branded or authorized generic EpiPens for the purpose of consumption, and not resale, by themselves, their family member(s), insureds, plan participants, employees, or beneficiaries, at any time between August 24, 2011, and [specific date to be inserted when class notice is finalized].[71]

> **2.      State Antitrust Damages Class ("State Antitrust Class").** All persons and entities in the Antitrust States[72] who paid or provided reimbursement for some or all of the purchase price of Branded EpiPens at any time between January 28, 2013, and [specific date to be inserted when class notice is finalized], for the purpose of consumption, and not resale, by themselves, their family member(s), insureds, plan participants, employees, or beneficiaries.

---

[71]      As described above, *supra* Part IV.A. & n.7, plaintiffs' original certification motion proposed that the class period would run "until the effects of Defendants' unlawful conduct cease."  *See, e.g.*, Doc. 1353 at 2–3.  At oral argument, plaintiffs proposed to change this part of the class definitions to define the class period as ending on the date when class notice is given.  The court adopts that change in the certified class definitions.

[72]      As discussed above, *supra* note 52, the court cannot certify a class asserting antitrust violations under the laws of states where no plaintiff resides.  So, the court redefines the "Antitrust States" from the definition proposed by plaintiffs to remove those states that have no named plaintiff.  The court thus defines the "Antitrust States" to include:  Alabama, California, Florida, Hawaii, Illinois, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New York, North Carolina, Tennessee, and Utah.

**Add. 126**

The court excludes the following groups from each of the classes:

(a) Defendants and their officers, directors, management, employees, subsidiaries, and affiliates;

(b) Government entities, other than government-funded employee benefit plans;

(c) Fully insured health plans (*i.e.*, plans that purchased insurance that covered 100% of the plan's reimbursement obligations to its members);

(d) "Single flat co-pay" consumers who purchased EpiPens or generic EpiPens only via a fixed dollar co-payment that is the same for all covered devices, whether branded or generic (*e.g.*, $20 for all branded and generic devices);

(e) Consumers who purchased or received EpiPens or authorized generic equivalents only through a Medicaid program;

(f) All persons or entities who purchased branded or generic EpiPens directly from defendants;

(g) The judges in this case and members of their immediate families;

(h) All third-party payors who own or otherwise function as a Pharmacy Benefit Manager or control an entity who functions as a Pharmacy Benefit Manager; and

(i) Individual consumers whose only purchases of an EpiPen occurred before March 13, 2014 (the Generic Start Date).

The court appoints the named plaintiffs proposed as representatives in plaintiffs' Consolidated Class Action Complaint as class representatives for these two classes.

## VI.   Appointment of Class Counsel

Rule 23(g)(1) requires that a court certifying a class must appoint class counsel. When making this appointment, the court "must consider: (i) the work counsel has done in identifying

or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class[.]" Fed. R. Civ. P. 23(g)(1)(A). The court may appoint an applicant as class counsel "only if the applicant is adequate" under Rule 23(g)(1)'s criteria and if the applicant will adhere to Rule 23(g)(4)'s requirement that the applicant "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(2).

Plaintiffs ask the court to appoint Warren T. Burns, Paul J. Geller, Lynn Lincoln Sarko, and Rex Sharp as class counsel. The court finds these attorneys have adequately prosecuted the interests of the classes since the court appointed them as co-lead counsel.[73] Aside from Mylan's conclusory statement that it is inappropriate to have the same counsel represent plaintiffs with different theories of injury and competing damage claims, defendants do not challenge their appointment as class counsel. After considering Rule 23(g)'s factors, the court finds that appointing these attorneys as co-lead counsel is warranted here. Also, the court appoints one more lawyer to the group representing plaintiffs as class counsel—Elizabeth C. Pritzker. Ms. Pritzker has served as Chair of plaintiffs' Steering Committee since the court appointed her in that role. The court thus appoints Warren T. Burns, Paul J. Geller, Lynn Lincoln Sarko, Rex Sharp, and Elizabeth C. Pritzker as co-lead counsel for the class plaintiffs.

**VII.   Notice**

When a court certifies a Rule 23(b)(3) class, Rule 23(c)(2)(B) provides "the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Because plaintiffs have

---

[73]     The court also appointed Eric Hochstradt, counsel for Sanofi, as co-lead counsel.

not proposed a form or manner of notice under this rule, the court defers its direction of notice to the certified classes. The court orders plaintiffs to submit to the court a proposed plan for notice to the class members consistent with Rule 23(c)(2)(B) **on or before March 31, 2020.** The plan must include a proposed form of notice.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the plaintiffs' Motion for Class Certification (Doc. 1353) is granted in part and denied in part. The court certifies a nationwide RICO damages class and a state antitrust damages class under Rule 23(b)(3), as set forth in this Order. The court denies the motion in all other respects.

**IT IS FURTHER ORDERED THAT** defendants' Motion for Leave to File a Sur-reply (Doc. 1574) is granted. The court orders defendants to file their proposed Sur-reply (Doc. 1574-1) as a separate docket entry. Also, the court orders plaintiffs to file their proposed Response to Defendants' Sur-reply (Doc. 1579-1) as a separate docket entry.

**IT IS FURTHERED ORDERED THAT** plaintiffs must submit a proposed plan for notice to the class members consistent with Rule 23(c)(2)(B) **on or before March 31, 2020.**

**IT IS SO ORDERED.**

**Dated this 27th day of February, 2020, at Kansas City, Kansas.**

> **s/ Daniel D. Crabtree**
> **Daniel D. Crabtree**
> **United States District Judge**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE:  EpiPen (Epinephrine
       Injection, USP) Marketing,
       Sales Practices and Antitrust
       Litigation

(This Document Applies to
Consumer Class Cases)

MDL No:  2785

Case No. 17-md-2785-DDC-TJJ

## <u>MEMORANDUM AND ORDER</u>

This multi-district litigation ("MDL") involves antitrust, civil RICO, consumer protection, and unjust enrichment claims asserted by a putative class of plaintiffs.  The putative class members assert these claims against suppliers and manufacturers of the EpiPen ("the Mylan and Pfizer defendants").  The EpiPen is an epinephrine auto-injector ("EAI") that delivers epinephrine to treat severe allergic reactions known as anaphylaxis.  The putative class members—*i.e.*, end-payors who purchased the EpiPen—have filed a motion seeking class certification under Fed. R. Civ. P. 23.  Doc. 1353.  Contemporaneously, the parties have filed motions seeking to exclude certain expert testimony offered either to support or oppose the putative class members' Motion for Class Certification.  This Order rules those *Daubert* motions.

As explained more fully below, the court rules the parties' motions as follows:

The putative class plaintiffs' motions:

- Motion to Strike the Partial Testimony of Dr. Michael Blaiss (Doc. 1584) is denied.

- Motion to Strike the Testimony of Professor James Hughes (Doc. 1852) is denied.

The Mylan and Pfizer defendants' motions:

- Motion to Exclude Expert Opinions of Professor Meredith Rosenthal (Doc. 1602) is denied.

- Motion to Exclude Expert Opinions of Professor Einer Elhauge (Doc. 1604) is granted in part and denied in part.  The court grants the motion to exclude Professor Elhauge's opinions about Auvi-Q market foreclosure based on Mylan's EpiPens4Schools program because plaintiffs since have abandoned this theory.  The court denies the motion in all other respects.

- Motion to Exclude Opinions and Proposed Testimony of Andrew K. Torrance (Doc. 1847) is denied.

## I.  Legal Standard

The court has a "gatekeeping obligation" to determine whether expert testimony is admissible.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).  When performing this gatekeeping role, the court has broad discretion.  *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citing *Orth v. Emerson Elec. Co.*, 980 F.2d 632, 637 (10th Cir. 1992)).  Courts exercise this discretion under Federal Rule of Evidence 702.  It provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts
of the case.

Fed. R. Evid. 702.

The Tenth Circuit has not yet ruled whether a court must conduct a full *Daubert* analysis

at the class certification stage.  One federal court has noted that "[t]he issue of how to evaluate

expert testimony at the class-certification stage 'ha[s] beguiled the federal courts.'"  *Campbell v.*

*Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 294 (D.D.C. 2018) (quoting 3 William B.

Rubenstein, *Newberg on Class Actions* § 7:24 (5th ed. 2014)).  In dictum, the Supreme Court has

expressed "doubt" about the notion that "*Daubert* [does] not apply to expert testimony at the

certification stage of class-action proceedings."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338,

354 (2011).  But the Court has not yet ruled the question definitively.

Previously, this court recognized that "the case law contains some dissonance about the

proper breadth of *Daubert*-style challenges at the class certification stage."  Doc. 1532 at 4.  As

one leading treatise has explained, "two approaches . . . have emerged in the case law."  3

William B. Rubenstein, *Newberg on Class Actions* § 7:24 (5th ed. 2013).  Some Circuits have

held that a court must perform a "full *Daubert* analysis" before certifying a class.  *See Am.*

*Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010) (per curiam) ("We hold that

when an expert's report or testimony is critical to class certification, . . . the district court must

perform a full *Daubert* analysis before certifying the class . . . .");  *see also In re Carpenter Co.*,

No. 14-0302, 2014 WL 12809636, at *3 (6th Cir. Sept. 29, 2014) (holding district court did not

abuse its discretion by applying *Daubert* to determine admissibility of expert testimony offered

to support class certification); *Sher v. Raytheon Co.*, 419 F. App'x 887, 890–91 (11th Cir. 2011)

("Here the district court refused to conduct a *Daubert*-like critique of the proffered experts'

qualifications.  This was error.").[1]  The Eighth Circuit has adopted a different approach.  It directs trial courts to apply a "focused *Daubert* analysis" instead of a "full and conclusive *Daubert* inquiry before certification."  *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 610–11 (8th Cir. 2011).  The Third Circuit has considered both approaches and recognized that some differences might exist between these two approaches.  Nonetheless, the Third Circuit has declined "to examine whether there might be some variation between the Seventh and Eighth Circuit formulations" because "both courts limit the *Daubert* inquiry to expert testimony offered to prove satisfaction of Rule 23's requirements."  *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187, 188 n.8 (3d Cir. 2015) (joining with "sister courts to hold that a plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert*").

Here, the court likewise declines to decide whether the two approaches differ in a material fashion.  Instead, because the parties' motions seek to exclude expert opinions used to support or oppose Rule 23's class certification requirements, the court applies the *Daubert* standard to those proffered opinions to determine whether the court should consider them at the class certification stage.

---

[1]    Several district court decisions from the District of Columbia have adopted the view that a court must perform a full *Daubert* analysis before certifying a class.  *See, e.g.*, *Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 296 (D.D.C. 2018) (agreeing "with the heavy weight of authority that, when a party moves to exclude expert testimony proffered in support of a motion for class certification, the district court must perform a full *Daubert* analysis before certifying a class); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 07-0489(PLF), 2016 WL 2962186, at *2 (D.D.C. May 20, 2016) (holding that the court "will first address the relevance of all expert opinions and the reliability of the experts' methodology under *Daubert* and Rule 702, and then conduct the 'rigorous analysis' of all of the relevant evidence—including expert testimony that meets the *Daubert* and Rule 702 standards—that is critical to proving the class certification requirements" under Rule 23); *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 26 (D.D.C. 2012) (agreeing "with other courts that the Rule calls for careful and searching analysis of all evidence with respect to whether Rule 23's certification requirements have been met, including expert opinions").

**Add. 133**

Outside the class certification phase, our Circuit has directed trial judges to apply a two-part test when determining the admissibility of expert testimony under *Daubert* and Rule 702. *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013).  First, the court must determine "whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (quoting Fed. R. Evid. 702).  Second, the court  "'must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.'"  *Id.* (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006) (further citations omitted)).

To qualify as an expert witness, the witness must possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (citation and internal quotation marks omitted).  To determine whether the expert's testimony is reliable, the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.

In *Daubert*, the Supreme Court identified four factors that—though not exhaustive—trial courts should consider when determining the reliability of proffered expert testimony under Fed. R. Evid. 702.  They are:  (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community.  *Id.* at 593–94.  The Supreme Court has emphasized, however, that these four factors are not a "definitive checklist or test," and that a

court's gatekeeping inquiry about reliability "must be tied to the facts of a particular case."

*Kumho Tire*, 526 U.S. at 150 (citations and internal quotation marks omitted).

But in some cases, "the relevant reliability concerns may focus upon personal knowledge

or experience," rather than the *Daubert* factors and scientific foundation. *Id.* For such testimony

to satisfy the reliability standard, it "must be 'based on actual knowledge, and not mere

"subjective belief or unsupported speculation."'" *Pioneer Ctrs. Holding Co. Emp. Stock*

*Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1341–42 (10th Cir. 2017) (quoting

*Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 780 (10th Cir. 1999) (quoting *Daubert*, 509 U.S. at

590)). "When expert opinion 'is not supported by sufficient facts to validate it in the eyes of the

law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it

cannot support a jury's verdict' and will be excluded." *Id.* at 1342 (quoting *Brooke Grp. Ltd. v.*

*Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)).

"The proponent of expert testimony bears the burden of showing that the testimony is

admissible." *Conroy*, 707 F.3d at 1168 (citing *Nacchio*, 555 F.3d at 1241). "[R]ejection of

expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's

notes to 2000 amendments. While *Daubert* makes the court the gatekeeper for expert testimony,

"[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof" remain "the traditional and appropriate means of attacking shaky but admissible

evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

The court has discretion to determine how to perform its gatekeeping function under

*Daubert*. *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019). "The

most common method for fulfilling this function is a *Daubert* hearing, although such a process is

not specifically mandated." *Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th

Cir. 2000) (citations omitted); *see also United States v. Charley*, 189 F.3d 1251, 1266 (10th Cir. 1999) ("The trial judge is granted great latitude . . . in deciding whether to hold a formal [*Daubert*] hearing."). Alternatively, the district court may satisfy its gatekeeping role without a formal *Daubert* hearing "so long as the court has sufficient evidence to perform 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Goebel*, 215 F.3d at 1087 (quoting *Daubert*, 509 U.S. at 597). Here, exercising its discretion, the court concludes that it need not conduct a separate *Daubert* hearing to rule the parties' motions to exclude. The court has reviewed the parties' filings and attached exhibits carefully. And the court finds that the parties have provided a sufficient record to render a decision without a hearing.

## II.   Discussion

### A.  The Putative Class Plaintiffs' Motions to Exclude

The putative class plaintiffs have filed two motions seeking to exclude expert testimony: (1) Motion to Strike the Partial Testimony of Dr. Michael Blaiss (Doc. 1584); and (2) Motion to Strike the Testimony of Professor James Hughes (Doc. 1852). The court addresses each motion, in turn, below.

### 1.  Motion to Strike the Partial Testimony of Dr. Michael Blaiss

The putative class plaintiffs seek to exclude just one aspect of Dr. Michael Blaiss's testimony. Their motion asks the court to strike Dr. Blaiss's proffered opinions expressed in Section 6.0 of his expert report. Dr. Blaiss is a medical doctor with training in allergy and immunology. Section 6.0 of Dr. Blaiss's expert report opines about the likelihood that existing EpiPen users would have switched to the generic EAI product of Teva Parenteral Medicines Inc. ("Teva") had the Teva generic launched in the market at an earlier date. Dr. Blaiss concludes

7

**Add. 136**

EpiPen users may not readily have switched to the Teva generic because:  (1) EAI products are unique, (2) the Teva product is not identical to the EpiPen EAI, and (3) the Teva generic is not widely available.  Doc. 1585-1 at 18–19 (Blaiss Expert Report ¶ 6.0).

Plaintiffs assert that the court should exclude Dr. Blaiss's opinions because his conclusions in Section 6.0 are unsupported by data or analysis.  Thus, plaintiffs argue, Dr. Blaiss's opinions are:  (1) unreliable, and (2) not relevant because they do not fit with the facts of the case.[2]  The court rejects both of plaintiffs' arguments.

*First*, the court finds Dr. Blaiss's opinions sufficiently reliable.  Dr. Blaiss explains that he bases his opinions about patients' reluctance to switch from the EpiPen to the Teva generic on more than 30 years of clinical experience treating patients who present a risk of anaphylaxis and prescribing EAI products to those patients.  Also, Dr. Blaiss has reviewed the Teva generic product information and determined that it is "not identical to the EpiPen Auto-Injector."  *Id.* at 19 (Blaiss Expert Report ¶ 6.0); *see also id.* at 12–13 (Blaiss Expert Report ¶ 5.1.6).  Thus, Dr. Blaiss concludes, patients are likely to stick with EpiPen products instead of having to learn how to use another product with different instructions.  *Id.* at 19 (Blaiss Expert Report ¶ 6.0).

Plaintiffs characterize Dr. Blaiss's opinions as ones based on anecdotal evidence drawn from his clinical experience.  Plaintiffs assert that opinions about patient conversion present

---

[2]       Plaintiffs don't challenge Dr. Blaiss's qualifications to provide expert testimony.  Dr. Blaiss serves as the Executive Medical Director of the American College of Allergy, Asthma, and Immunology, and he is a Clinical Professor of Pediatrics at the Medical College of Georgia at Augusta University in Augusta, Georgia.  Doc. 1585-1 at 2 (Blaiss Expert Report ¶ 1.1).  Dr. Blaiss currently practices as an allergist at Good Samaritan Health Center of Gwinnett in Norcross, Georgia.  *Id.*  He is the former President of the American College of Allergy, Asthma and Immunology, and he has served as an officer or board member of several other allergy-related organizations.  *Id.*  He is certified in Allergy & Immunology by the American Board of Allergy and Immunology and certified in Pediatrics by the American Board of Pediatrics.  *Id.* at 3 (Blaiss Expert Report ¶ 1.2).  He has published more than 120 scientific peer-reviewed articles and presented at more than 500 meetings and seminars throughout the world, including presentations about anaphylaxis.  *Id.* (Blaiss Expert Report ¶ 1.3).  The court finds that Dr. Blaiss is sufficiently qualified to render the opinions he offers in his Expert Report.

**Add. 137**

economic questions, but, plaintiffs argue, Dr. Blaiss has no training or education in the law, finance, business, marketing, consumer behavior, pharmacy, or economics. Also, plaintiffs criticize Dr. Blaiss's opinions because he never used any economic methodologies to reach his conclusions about the likelihood that patients would switch products. Thus, plaintiffs argue, Dr. Blaiss's opinions are not reliable because he can't ground them in the study of economics. The court disagrees.

Dr. Blaiss has grounded his opinions using his observations and experiences as a medical doctor. Plaintiffs' criticisms about the absence of economic methodologies used to support Dr. Blaiss's opinions go to their weight. But, the court declines to find Dr. Blaiss's opinions inadmissible under *Daubert* at the class certification stage. *See In re Syngenta AG MIR 162 Corn Litig.*, No. 14-md-2591-JWL, 2016 WL 5371856, at \*10 (D. Kan. Sept. 26, 2016) (holding criticisms about reliability of plaintiffs' experts' opinions "go to the weight of those opinions and not . . . their admissibility" and concluding "the experts' methodologies [weren't] so unreliable as to preclude certification"); *see also Bell v. 3M Co.*, No. 16-cv-02351-RBJ, 2018 WL 4599689, at \*3 (D. Colo. Sept. 25, 2018) (concluding "defendant's challenges go to the weight of the evidence, not whether the Court can consider the opinions in its analysis of the class certification issues"); *Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 304 (D.D.C. 2018) (holding expert's opinions were sufficiently reliable for court to consider at class certification and challenges to the opinions went to "what weight to afford [the] opinions as part of [the court's] class-certification analysis").

*Second*, Dr. Blaiss's opinions are relevant to the class certification issues. Specifically, plaintiffs allege that defendants engaged in unlawful conduct that delayed Teva's entry of a generic product into the EAI market. Plaintiffs assert that the delay prevented generic

9

**Add. 138**

competition, protected the EpiPen monopoly, and allowed defendants to continue raising the EpiPen's prices.  Plaintiffs rely on their own expert testimony to demonstrate the classwide impact of the delay.  Prof. Meredith Rosenthal opines that almost 95% of EpiPen users would have switched to a Teva generic within one year of its launch.  And, using that figure, she provides an opinion about the damages sustained classwide from the delayed entry of a generic competitor.  Dr. Blaiss's opinions—based on his own observations and experience—are relevant to the generic-delay theory and, specifically, the question whether plaintiffs sustained damages classwide from that delay.  Thus, the court rejects plaintiffs' argument that Dr. Blaiss's opinions don't fit within the facts of the case.

For the above reasons, the court denies the putative class plaintiffs' Motion to Strike the Partial Testimony of Dr. Michael Blaiss.

### 2.  Motion to Strike the Testimony of Professor James Hughes

The putative class plaintiffs also move to strike the testimony of Prof. James Hughes. Prof. Hughes is a college professor who specializes in "the fields of health economics, industrial organization, law and economics, and labor economics."  Doc. 1852-4 at 3 (Hughes Expert Report ¶ 1).  In this MDL, Prof. Hughes generally provides expert testimony on two subjects.

First, Prof. Hughes provides an overview of "the economic and commercial context surrounding the distribution of and payment for prescription drugs in the United States."  *Id.* at 8 (Hughes Expert Report ¶ 12).  More specifically, he explains "the flow of products and payments in the prescription drug space and the roles that various actors, including third-party payors, pharmacy benefit managers ("PBMs"), and consumers, play in the pharmaceutical supply and payment chain."  *Id.* at 5 (Hughes Expert Report ¶ 7).

Second, Prof. Hughes opines about the ascertainability of the putative class in this

lawsuit. *Id.* (Hughes Expert Report ¶ 8). He concludes that the putative class plaintiffs cannot ascertain with sufficient certainty who qualifies as a member of the putative class. This is so, Prof. Hughes asserts, because plaintiffs rely on data that is insufficient to: (1) identify and include the individuals who fit within the class definition, and (2) identify and exclude individuals who never actually paid for an EpiPen device. *Id.* at 8–9 (Hughes Expert Report ¶¶ 13–14).

The putative class plaintiffs argue that the court should strike Prof. Hughes's testimony on both subjects because, they contend, it is neither relevant nor reliable.[3]

### a. Testimony about the Pharmaceutical Industry

The putative class plaintiffs contend that Prof. Hughes's testimony about the pharmaceutical industry is not reliable because it consists of generalized opinions about the industry as a whole—and not a particular drug. Plaintiffs' attack disregards the advisory committee's note to Rule 702. It recognizes that:

> [I]t might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case. . . . For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.

Fed. R. Evid. 702 advisory committee's note to 2000 amendments; *see also United States v.*

---

[3]    The putative class plaintiffs assert that Prof. Hughes is not a health economist. Doc. 1852 at 6. They contend that his current teaching and recent publications involve subjects other than the pharmaceutical industry. And, they allege, other courts have rejected some of Prof. Hughes's opinions. *Id.* at 8. But plaintiffs never argue that Prof. Hughes isn't qualified to provide expert testimony. Defendants respond that plaintiffs have mischaracterized Prof. Hughes's resume and the way courts have considered his expert opinions in other cases. The court finds that plaintiffs' criticisms of Prof. Hughes's academic work and other expert testimony go to the weight his opinions should receive, and not their admissibility. The court finds that Prof. Hughes, who is a Professor of Economics at Bates College specializing in the fields of health economics, industrial organization, law and economics, and labor economics, is qualified to render the expert opinions he provides.

**Add. 140**

*Brinson*, 772 F.3d 1314, 1320 (10th Cir. 2014) (holding that district court did not abuse its discretion by allowing a detective to testify as an expert about the general characteristics of the prostitution trade).

Consistent with the guidance from the advisory committee's note, defendants assert that they offer Prof. Hughes's expert testimony to provide important and relevant background information to help the court understand the highly technical operation of a complex industry. And, they contend, the court can consider Prof. Hughes's opinion about the industry because Rule 702 allows the "venerable practice of using expert testimony to educate the factfinder on general principles."  Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

In response, plaintiffs assert that Prof. Hughes's generalized testimony here just doesn't apply to the facts of the EpiPen market.  Thus, plaintiffs contend, the court should exclude the testimony because it is unhelpful and irrelevant.  For support, plaintiffs cite a portion of Prof. Hughes's deposition transcript where he opines he wouldn't expect to see a positive correlation between the drug price set by the manufacturer (the Wholesale Acquisition Cost, "WAC") and the pharmacy's price for cash paying customers (the Usual and Customary Price, "U&C price") for a given drug.  The putative class plaintiffs argue that Prof. Hughes performed no analysis to reach this conclusion.  And, they contend, his testimony directly conflicts with the analysis that plaintiffs' expert performed on EpiPen price trends.  According to plaintiffs, their expert—Prof. Meredith Rosenthal—analyzed the actual correlation between EpiPen WAC and U&C price and concluded it is "near-perfect."  Doc. 1852 at 16–17.

Defendants respond that Prof. Hughes never opines about the relationship between WAC and U&C price in the pharmaceutical industry.  Also, he offers no opinions about the correlation between these prices specifically for EpiPen products.  Instead, he just offers generalized

**Add. 141**

background information about the industry.  The court agrees with defendants.  Plaintiffs rely on just this one example—Prof. Hughes's response to a deposition question—to argue that his opinions don't fit the facts of the case.  But Prof. Hughes never opines specifically about price correlation.  Instead, his expert opinions consist of general background information about the pharmaceutical industry.  And Rule 702 allows this kind of generalized expert testimony.

Next, the putative class plaintiffs argue, Prof. Hughes's opinion that one of the members of the putative class—*i.e.*, Local 282 Welfare Trust Fund ("Local 282")—bears no financial responsibility for drugs dispensed to its insured members is unreliable because the evidence in the case contradicts his conclusion.  Prof. Hughes opines that it's the employers paying into Local 282—not Local 282 itself—who pay the costs in full for drugs dispensed to Local 282's insured members.  Doc. 1852-4 at 24 (Hughes Expert Report ¶ 48).  Plaintiffs argue that Local 282's Fed. R. Civ. P. 30(b)(6) witness's testimony establishes that Prof. Hughes is incorrect.  This 30(b)(6) witness testified that Local 282 "pays for every prescription drug covered under its plans," and does not "see[k] reimbursement for any part of that cost from any other entity."  Doc. 1852-9 at 4 (Bulding Dep. 198:14–22).  But the 30(b)(6) witness also testified that when Local 282's costs increase, it "potentially [has] to go back . . . and negotiate higher contribution rates to the welfare trust fund."  Doc. 1873-4 at 3 (Bulding Dep. 59:3–25).  So, Prof. Hughes opines, it's the employer-sponsors who ultimately bear the financial responsibility for drug costs.  But, plaintiffs argue, Prof. Hughes conceded in his deposition that the 30(b)(6) witness's testimony "says nothing about the employer sponsor being obligated to make up a shortfall when it occurs," and he doesn't know whether Local 282's employer sponsors actually are obligated to make up a shortfall if one occurs.  Doc. 1852-2 at 104–05 (Hughes Dep. 102:19–103:2).

Based on this competing testimony, plaintiffs argue that the evidence in the case

contradicts Prof. Hughes's opinion that Local 282 bears no financial responsibility for drugs dispensed to its insured members. Also, plaintiffs challenge the methodology Prof. Hughes used to reach his conclusions because he supposedly relied on testimony that—plaintiffs contend— doesn't support his conclusions. But, as summarized above, the parties offer competing evidence that either supports or refutes Prof. Hughes's opinion about Local 282's financial responsibility. These arguments go to the weight that the court should give his opinion, not its admissibility.

Also, plaintiffs argue that Prof. Hughes's opinions aren't supported by the evidence because he conceded that asking an employer sponsor to make more contributions to the fund is "similar" to "a commercial insurer who has to go back and increase premiums" when faced with cost increases. *Id.* at 102–03 (Hughes Dep. 100:20–101:11). And, plaintiffs argue, courts are clear that antitrust defendants may not avoid liability for overcharges simply because the plaintiff was able to pass any additional costs on to someone else. Doc. 1852 at 17 (citing *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367, at *22 (N.D. Cal. Feb. 21, 2017)); *see also In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) ("[D]efendants incorrectly assume that if a class member offsets an overcharge through later savings attributable to the same or related transaction, there is no injury. But antitrust injury occurs the moment the purchaser incurs an overcharge, whether that injury is later offset or not. Here, if a class member is overcharged, there is an injury, even if that class member suffers no damages." (internal citations omitted)).

This argument challenges Prof. Hughes's opinion using a legal argument—that is, plaintiffs contend that Prof. Hughes's opinion does not preclude defendants' liability for antitrust claims under well-settled law. But plaintiffs' legal argument provides no reason to exclude his testimony. This legal argument does not challenge the reliability of Prof. Hughes's reasoning or

the methodology used to form his opinions. Thus, the court denies the putative class plaintiffs' motion to exclude Prof. Hughes's opinions on this basis.

Finally, the putative class plaintiffs assert that the court should exclude Prof. Hughes's expert testimony about the pharmaceutical industry because, they contend, he reached his conclusions before he reviewed the relevant literature and without reviewing the entire contents of the sources he relies on to support his opinions. Thus, plaintiffs argue, Prof. Hughes's opinions are the product of an unreliable and unscientific methodology. The court disagrees.

Plaintiffs take issue with part of Prof. Hughes's deposition testimony where he described the information he reviewed to prepare his expert report. Prof. Hughes testified that he "looked at fact depositions from PBM people, from Local 2[8]2" and he wrote part of his report "based largely on [his] 20 years of experience in examining the pharmaceutical market." Doc. 1852-2 at 48 (Hughes Dep. 46:7–21). Then, Prof. Hughes described that "afterwards [he] went back to look for secondary sources that were consistent with what [he] knew about the industry so that [he] could [c]ite an outside source for [his] outside authority for the fact that [he] was presenting in the report." *Id.* Plaintiffs contend that this testimony shows that Prof. Hughes "cherry-picked" evidence to support his opinions—something an expert may not do. Doc. 1852 at 18 n.79 (citing *Fish v. Kobach*, 309 F. Supp. 3d 1048, 1102 (D. Kan. 2018)).

The court doesn't read Prof. Hughes's testimony the way plaintiffs describe it. Instead, Prof. Hughes testified that he drafted the report based on his 20 years of experience in the field, and then he found secondary sources to support his knowledge. *Daubert* requires an expert to base his testimony either "upon professional studies or personal experience." *Kumho Tire*, 526 U.S. at 152. As defendants assert, Prof. Hughes did both here. He relied on his personal knowledge—drawn, he says, from his 20 years of experience studying the pharmaceutical

industry—to draft the portions of his report describing that industry.  And he verified that knowledge by finding and citing secondary sources that substantiated his assertions.  In short, Prof. Hughes didn't "cherry pick evidence in support of his opinion" like the expert did in *Fish v. Kobach.*  309 F. Supp. 3d at 1102.  Instead, Prof. Hughes backed up his knowledge by citing other authorities to support it.  The court finds no reason to exclude Prof. Hughes's opinions under *Daubert* based on the methodology he used to cite secondary sources when preparing his expert report.

Also, the court doesn't agree with plaintiffs' assertions that Prof. Hughes's opinions are unreliable because he performed an incomplete or cursory review of the materials.  Plaintiffs contend that Prof. Hughes testified that he relied on deposition testimony to form his opinions.  But Prof. Hughes also conceded that he didn't read the full deposition transcript of any of the named plaintiffs or Local 282's 30(b)(6) witness.  Doc. 1852-2 at 48, 104 (Hughes Dep. 46:7–16, 102:9–10).  Plaintiffs argue that Prof. Hughes's limited review has caused him to mischaracterize deposition testimony, thus making his opinions unreliable.

Defendants respond that *Daubert* does not require an expert to review every line of every deposition where the case involves hundreds of pages of deposition testimony.  Instead, an expert need only review the relevant parts of the record to form a reliable opinion.  *See*, *e.g.*, *Milam v. Ranger Ins. Co.*, No. CIV-04-1749-HE, 2006 WL 5347771, at *3 n.9 (W.D. Okla. June 13, 2006) ("Contrary to defendants' suggestion, it is not necessary that an expert witness 'read all the depositions' and turn himself into some sort of 'super juror' in order to offer expert testimony on an issue, assuming other prerequisites to admissibility are met.").  And, defendants contend, Prof. Hughes has characterized the deposition testimony properly based on its context.

The court finds that the parties' dispute about Prof. Hughes's characterization of the

evidence goes to the weight his opinions deserve, but does not undermine their admissibility. Plaintiffs properly have challenged the way Prof. Hughes interpreted the evidence to argue that his opinions don't preclude the court from certifying a class action in this MDL. *See* Doc. 1837 at 47, 49 (Pls.' Reply Mem. in Further Supp. of Mot. for Class Certification). The court will consider these arguments on class certification, but the court refuses to exclude Prof. Hughes's opinions under *Daubert*.[4]

### b.  Opinions about Ascertainability

Next, the putative class plaintiffs argue that the court should exclude Prof. Hughes's opinions about ascertainability of the putative class because, plaintiffs contend, they are unreliable. Plaintiffs advance three arguments to support this request.

*First*, plaintiffs assert, Prof. Hughes's ascertainability opinion is an impermissible legal conclusion. Our Circuit recognizes that "testimony on *ultimate facts* is authorized under [Federal Rule of Evidence] 704," but an expert "may not give an opinion on *ultimate issues of law*." *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) (emphasis added). But here, the court concludes that Prof. Hughes is not offering opinions about ultimate issues of law.

As Prof. Hughes explained in both his expert report and his deposition, he provides an expert opinion about whether plaintiffs have proposed a methodology for analyzing data so that one can identify which consumers qualify as members of the class under the class definition. Doc. 1852-4 at 5 (Hughes Expert Report ¶ 8); Doc. 1852-2 at 111 (Hughes Dep. 109:3–14 ("[M]y assignment is very narrow, is that can you tell who is in—is there a methodology to tell who is in the class and who is not in the class.")). Prof. Hughes concludes that "based on the data and other materials [he has] reviewed, the Plaintiffs do not provide data or a methodology

---

[4]      The court addresses Prof. Hughes's opinions in its Order on the class certification motion at Parts IV.C.1. & IV.D.3.a.

**Add. 146**

for identifying which individuals should be excluded and included in the class." Doc. 1852-4 at 9 (Hughes Expert Report ¶ 16). Prof. Hughes thus bases his opinion on facts he has reviewed in this case. He never opines that plaintiffs fail to satisfy a legal burden to establish ascertainability. To the contrary, Prof. Hughes testified he was not "applying any court's test because it's a legal standard" and "[t]hat would be outside [his] expertise." Doc. 1852-2 at 111 (Hughes Dep. 109:3–14). The court thus concludes that Prof. Hughes isn't offering an impermissible legal opinion.

Second, plaintiffs argue that Prof. Hughes bases his ascertainability opinions on a legal standard that simply doesn't apply in our Circuit. Thus, plaintiffs contend, his opinions aren't relevant to this case. To support this argument, plaintiffs cite Prof. Hughes's deposition transcript. Prof. Hughes testified that ascertainability requires "a methodology upfront that can be used to identify who is in the class and who is not in the class." Doc. 1852-2 at 111–12 (Hughes Dep. 109:14–110:4). And, according to Prof. Hughes, one performs that methodology by "using data that is produced in discovery . . . ." Id. at 117–18 (Hughes Dep. 115:22–116:6). So, as Prof. Hughes testified, he reached his conclusions about ascertainability by reviewing the data that insurers and PBMs had produced in discovery. Doc. 1852-2 at 118 (Hughes Dep. 116:11–22).

Plaintiffs assert that Prof. Hughes's testimony shows that he bases his opinions on the Third Circuit's standard used to determine ascertainability, as defined in Carrera v. Bayer Corp., 727 F.3d 300 (3d Cir. 2013). See id. at 307 (holding the "method of determining whether someone is in the class must be 'administratively feasible'" and a plaintiff cannot "satisfy the ascertainability requirement if individualized fact-finding or mini-trials will be required to prove class membership"). Indeed, defendants argue that plaintiffs bear the burden to demonstrate

ascertainability before the court can certify a class.  Doc. 1873 at 18.  But, plaintiffs respond that defendants are citing a legal standard that doesn't apply in our Circuit.

The Tenth Circuit hasn't imposed a requirement that a putative class must demonstrative an "administratively feasible method" for determining whether putative class members fall within the class definition.  And this court has refused to apply "the Third Circuit's stricter standard from *Carrera* that requires an administratively feasible mechanism for identifying class members . . . ."  *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-md-2591, 2016 WL 5371856, at *2–3 (D. Kan. Sept. 26, 2016) (declining "invitation to apply a standard—one not adopted by the Tenth Circuit—that would preclude certification without a showing that class members may be determined in an administratively feasible manner").  For this reason, plaintiffs ask the court to exclude Prof. Hughes's opinions as irrelevant.

*Daubert* does not require the court to exclude Prof. Hughes's testimony for this reason. As already discussed, Prof. Hughes isn't offering a legal conclusion.  Instead, Prof. Hughes bases his ascertainability opinions on data produced in the case that he used to determine whether one can identify who qualifies as a class member (and who doesn't) under the proposed class definition.[5]  Whether the law requires this kind of methodology to prove ascertainability at the class certification stage is a question of law for the court to decide.  And the court can determine whether Prof. Hughes's ascertainability opinions are relevant under the applicable legal standard when it decides the class certification motion.[6]  The court thus declines to exclude Prof. Hughes's opinions under *Daubert* because it relies on a legal standard from another Circuit.

---

[5]     Plaintiffs also argue that Prof. Hughes's opinions are not reliable because he limited his analysis just to the data produced in the case but did not consider other data from PBMs that they could provide and Prof. Hughes could use to determine ascertainability.  These arguments go to the weight the court should give Prof. Hughes's opinions but not their admissibility.

[6]     The court addresses this question in its Order on the class certification motion at Part IV.C.1.

**Add. 148**

*Finally*, plaintiffs contend that Prof. Hughes did not perform an appropriate analysis before reaching his ascertainability opinions. Thus, plaintiffs argue, Prof. Hughes's opinions are unreliable because he bases them on speculation. Plaintiffs criticize Prof. Hughes for failing to review plaintiffs' expert reports. Doc. 1852-2 at 51 (Hughes Dep. 49:11–15). But, Prof. Hughes explained, he didn't read those reports because plaintiffs' experts had not included any opinions about ascertainability in their reports. *Id.* (explaining that he reviewed none of plaintiffs' expert reports because "they were not on the topic [he] was opining on"). Plaintiffs don't refute the proposition that their expert reports had not proposed a methodology for identifying class members when Prof. Hughes submitted his expert report. But, they contend, Prof. Hughes's methodology is flawed because he relied on a consultant to provide the information about plaintiffs' expert reports but he never verified independently that the expert reports included no opinions about ascertainability. Plaintiffs' argument here asks too much. The court declines to find Prof. Hughes's opinions unreliable simply because he relied on information from a consultant—information that indeed was accurate—when he formed his opinions.

Also, plaintiffs argue that Prof. Hughes's opinions are flawed because he didn't use the data produced in the case to determine whether a consumer paid with a fully-funded HSA, a Mylan coupon, or a flat co-pay. But, Prof. Hughes testified that he doesn't believe it's possible to determine whether a consumer paid for the EpiPen in one of those three ways based on the data produced in the case. Doc. 1852-2 at 113–14, 145–46, 150 (Hughes Dep. 111:16–112:15, 143:25–144:6, 148:15–20). Prof. Hughes's report identifies the data he reviewed and analyzed when forming his opinions. Doc. 1852-4 at 8, 30–40 (Hughes Expert Report ¶¶ 13, 63–84). And, the court finds, Prof. Hughes's methodology for using that data is sufficiently reliable for the court to consider his ascertainability opinions on class certification. Plaintiffs' criticisms

about how Prof. Hughes interpreted the data—and what he concluded the data shows and does not show—go to the weight of his opinions, not their admissibility.  The court declines to exclude Prof. Hughes's opinions from the court's consideration of the class certification motion.

For all these reasons, the court denies the putative class plaintiffs' Motion to Strike the Testimony of Prof. James Hughes.

## B.  Defendants' Motions to Exclude

The Mylan and Pfizer defendants have filed three motions seeking to exclude expert testimony:  (1) Motion to Exclude Expert Opinions of Professor Meredith Rosenthal (Doc. 1602); (2) Motion to Exclude Expert Opinions of Professor Einer Elhauge (Doc. 1604); and (3) Motion to Exclude Opinions and Proposed Testimony of Andrew K. Torrance (Doc. 1847).  The court addresses each motion, in turn, below.

### 1.  Motion to Exclude Expert Opinions of Professor Meredith Rosenthal

Defendants move the court to exclude the expert opinions expressed by the putative class plaintiffs' expert, Prof. Meredith Rosenthal.  Prof. Rosenthal opines about the damages purportedly sustained by the putative class plaintiffs.  *See generally* Doc. 1500-3 (Rosenthal Expert Report).  She has identified certain categories of damages that, she contends, the putative class plaintiffs have sustained on a classwide basis.  *Id.*  And, she has applied certain methodologies to calculate those purported damages.  *Id.*

Defendants argue that the court should exclude some of Prof. Rosenthal's opinions because, they contend, her opinions are unreliable and thus inadmissible under *Daubert*.[7]

---

[7]    Defendants don't challenge Prof. Rosenthal's qualifications.  *See* Doc. 1850 at 10 (explaining that the "focus" of defendants' motion is challenging the methodologies that Prof. Rosenthal used to form her opinions but not her knowledge, training, experience, and qualifications).  But, as Fed. R. Evid. 702 and *Daubert* require, the court finds that Prof. Rosenthal is qualified to render the opinions she has offered at this stage.  Prof. Rosenthal is the C. Boyden Gray Professor of Health Economics and Policy at the

**Add. 150**

Defendants assert four arguments supporting this request.  *First*, defendants contend that Prof. Rosenthal's damages methodology for the 2-Pak theory is an unreliable model for measuring classwide injury.  *Second*, defendants contend that Prof. Rosenthal's ascertainability opinion is flawed and improper rebuttal testimony.  *Third*, defendants argue that Prof. Rosenthal's probability analysis cannot estimate or identify uninjured class members in a reliable fashion. Defendants also assert that her probability analysis constitutes improper rebuttal testimony. *Finally*, defendants argue that the methodologies Prof. Rosenthal used to determine generic delay and Auvi-Q foreclosure damages rely on Prof. Einer Elhauge's unreliable opinions.  So, defendants contend, if the court excludes Prof. Elhauge's opinions under *Daubert*, it also must exclude Prof. Rosenthal's opinions that rely on Prof. Elhauge's opinions.  The court addresses all four arguments, below.

### a.   Methodology for 2-Pak Damages

*First*, defendants seek a *Daubert* ruling excluding Prof. Rosenthal's opinion about the damages allegedly sustained by the putative class members from purchasing the EpiPen in the 2-Pak.  In August 2011, Mylan stopped selling EpiPen products in single packages.  And instead, it began offering the EpiPen exclusively in the 2-Pak (*i.e.*, two EpiPen devices in one package). Mylan asserts that it switched to the 2-Pak in response to medical guidance recommending that patients always carry two EAI devices in case the patient requires more than one dose of

---

Harvard T.H. Chan School of Public Health.  Doc. 1500-3 at 4 (Rosenthal Expert Report ¶ 3).  Her field of research is the economics of the health care industry.  *Id.* And, at Harvard, she has taught undergraduate, Masters-level, and Ph.D.-level health economics and health policy courses.  *Id.* (Rosenthal Expert Report ¶ 4).  Prof. Rosenthal earned an A.B. in International Relations from Brown University and a Ph.D. in Health Policy (Economics Track) from Harvard University.  *Id.* (Rosenthal Expert Report ¶ 6). Prof. Rosenthal has testified as an expert witness in several cases involving alleged anticompetitive conduct in the pharmaceutical industry.  *Id.* at 4, 52–53 (Rosenthal Expert Report ¶ 4, Attach. A).  And, she has published more than 100 peer-reviewed journal articles, essays, and book chapters.  *Id.* (Rosenthal Expert Report ¶ 5).  Her experience and credentials qualify Prof. Rosenthal to provide expert testimony.

**Add. 151**

epinephrine to treat an anaphylactic reaction.  The putative class plaintiffs allege that Mylan's switch to the 2-Pak was not clinically necessary, but instead, Mylan implemented the change to force consumers to purchase two EpiPens instead of one.  And they have retained Prof. Rosenthal to provide a methodology for calculating the classwide damages sustained because Mylan allegedly forced EpiPen customers to buy at least two EpiPens at a time.

      Prof. Rosenthal's report explains that she calculated the "overcharge damages" allegedly sustained from Mylan's switch to the 2-Pak using "the difference between expenditures resulting from the average number of pens per prescription before vs. after the withdrawal."  Doc. 1500-3 at 24 (Rosenthal Expert Report ¶ 54).  Specifically, Prof. Rosenthal compared "the average pen per prescription from the first two quarters of 2011 with the average pen per prescription in the years following that point in time."  *Id.* at 30 (Rosenthal Expert Report ¶ 69).  Prof. Rosenthal asserts that—in a but-for world—consumers would have continued to purchase single pens at the same rate they had manifested in the first two quarters of 2011 for the next seven years, but-for Mylan's switch to selling the EpiPen exclusively in the 2-Pak.  *Id.* at 30–31, 33 (Rosenthal Expert Report ¶¶ 69–73, 77–78); *see also* Doc. 1497-3 at 84–90, 101–104 (Sealed Rosenthal Expert Report Attach. D.1–D.4, Attach. E.3.a–E.3.c).  But, Prof. Rosenthal opines that, in the actual world, Mylan forced an increase in EpiPen consumption by requiring consumers to buy EpiPens in the 2-Pak.  *Id.*  Thus, Prof. Rosenthal concludes, consumers overpaid for the EpiPen after August 2011 because EpiPen purchasers had to buy two EpiPens instead of just one.  *Id.*  And then, Prof. Rosenthal calculates the alleged overcharge damages sustained by EpiPen consumers from the forced increase in their consumption of EpiPens after the switch to the 2-Pak.  *Id.*

      In her Reply Report, Prof. Rosenthal explains that her 2-Pak damages methodology "uses

**Add. 152**

an event study approach." Doc. 1711-1 at 12–13 (Rosenthal Reply Report ¶ 15). Prof. Rosenthal explains how event studies are "widely employed in economic analysis." *Id.* And, she describes how, "[i]n each case, the event study relies on the timing of an event of interest to identify its effects." *Id.* According to Professor Rosenthal, "[t]he power of the event study is the ability to abstract from complex phenomena that are not changing over the short time window of the study—in this case, factors such as patient and physician preferences, comorbidities, and product attributes." *Id.*

Defendants argue that Prof. Rosenthal's analysis here isn't an event study at all. Instead, they say, Prof. Rosenthal has used an unreliable methodology that she invented just to support the putative class plaintiffs' class certification motion. Defendants contend that real event studies are used in securities and finance litigation—not consumer class actions like this one—to show how stock prices have reacted to announcements about economic events. Prof. Rosenthal responds, explaining, "[e]vent studies have also been used in health policy and pharmaceutical economics." Doc. 1711-1 at 13 (Rosenthal Reply Report ¶ 15). And, to support this rebuttal, she cites several peer-reviewed articles from economic publications where, she asserts, event studies were used in pharmaceutical economic analysis. *Id.* (Rosenthal Reply Report ¶ 15 n.18). Defendants respond that each of Prof. Rosenthal's cited articles aren't helpful to her point because each one used event studies to examine the effect on stock prices. Doc. 1884 at 7 n.2.

The court finds that defendants' distinction doesn't preclude the court from considering Prof. Rosenthal's opinion at the class certification stage. The fact that event studies typically are used in securities and finance litigation doesn't undermine the reliability Prof. Rosenthal's methodology. And defendants don't explain why it is improper to use an event study in a consumer class action case like this one. To satisfy *Daubert*'s reliability requirement, the party

offering the expert opinion "'need not prove that the expert is undisputably correct or that the expert's theory is "generally accepted" in the scientific community.'" *Bitler v. A.O Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005) (quoting *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)). Instead, the expert testimony's proponent "'must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements.'" *Id.* (quoting *Mitchell*, 165 F.3d at 781). Here, plaintiffs sufficiently have established that Prof. Rosenthal used a reliable method to reach her conclusions about the 2-Pak. At best, defendants' attacks on the appropriateness of an event study in a consumer class action go to the weight of her opinion, not its admissibility.

Defendants also contend that a valid event study must consider the potential effect of competing factors that may influence the outcome. Defendants argue that Prof. Rosenthal failed to consider such other factors here. Specifically, defendants assert that Prof. Rosenthal's model studies the potential effect of just one factor—the switch to the 2-Pak. But, defendants contend, Prof. Rosenthal failed to consider other factors that could influence consumers' purchases, such as widespread medical guidance issued after 2011 recommending that patients purchase two EAI devices. Defendants argue that the medical guidance could have caused consumers to purchase the 2-Pak after August 2011. And thus, consumers would have based their decisions to purchase in packs of two on a reason entirely independent of Mylan's decision to withdraw the single-pack from the market. But, they assert, Prof. Rosenthal didn't account for other factors like this one. As a result, defendants contend, her study fails to demonstrate that the switch to the 2-Pak was the sole reason why the putative class members bought more EpiPens than they otherwise would have. According to defendants, this omission makes her analysis unreliable. *See*

**Add. 154**

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82,

95–97 (1st Cir. 2014) (affirming district court's decision to exclude expert opinion in form of

event study that didn't appropriately account for other confounding factors that may have

affected company's stock price); *see also Sergeants Benevolent Ass'n Health & Welfare Fund v.*

*Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 95 (2d Cir. 2015) (affirming district court's denial of a

class certification motion and holding Dr. Rosenthal's regression analysis didn't support

plaintiffs' RICO causation theory because she "conceded that she had not been asked by

Plaintiffs' counsel to perform the kind of regression analysis that might have isolated the relative

causal effect of the numerous variables [other than defendant's alleged withholding of safety

information] bearing on the decline in [an antibiotic drug's] sales").

But, Prof. Rosenthal explains why she didn't need to consider whether medical guidance

recommending patients carry two EAI devices would have influenced the outcome of her study.

She opines that the medical guidance "did not change coincident with the removal of the single

injector packaging." Doc. 1711-1 at 13 (Rosenthal Reply Report ¶ 16). Instead, she explains,

"[t]he effects of clinical recommendations are constant before and after the event [she] stud[ies]

and so do not need to be separately accounted for." *Id.* As support, she cites deposition

testimony by the putative class plaintiffs' medical expert, Dr. Jay Portney, who testified that the

medical guidance recommending two EAI devices wasn't a landmark document because it only

published what allergists already knew. *Id.* (Rosenthal Reply Report ¶ 16 n.20). Also, Prof.

Rosenthal explains, her event study "assess[es] the impact of the withdrawal of the single

injector EpiPen using a narrow time window (two quarters pre-withdrawal) to avoid picking up

the effects of other influences," and it "strongly support[s] the casual inference" that

withdrawing "the single injector EpiPen forced the Class to purchase more pens than it would

have [purchased] otherwise." *Id.* at 13–14 (Rosenthal Reply Report ¶ 17).

Plaintiffs argue that the cases defendants cite to support excluding Prof. Rosenthal's opinion involve a failure to consider competing factors that could have influenced the study's outcome. In contrast, here, plaintiffs contend, Prof. Rosenthal didn't have to consider other factors because any such factors—like the prevalence of medical guidance—remained constant before, during, and after Mylan switched to selling the EpiPen exclusively in the 2-Pak.

Defendants argue that the only support for Prof. Rosenthal's conclusion that the other factors remained constant is her own subjective analysis. Defendants criticize Prof. Rosenthal's reliance on plaintiffs' medical expert's testimony. Instead, defendants argue, Prof. Rosenthal should have performed an empirical analysis to determine whether the medical guidance, in fact, influenced customers' purchasing decisions. These arguments go to the weight of Prof. Rosenthal's opinion, but they don't preclude its admissibility. Certainly, "[v]igorous cross-examination" and "presentation of contrary evidence" are "the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted). And defendants appropriately can challenge (and have challenged) Prof. Rosenthal's opinions on class certification in this fashion. *See* Doc. 1636 at 41–45 (Mylan Defs.' Opp'n to Class Pls.' Mot. for Class Certification).[8] But, exercising its discretion, the court concludes that defendants' arguments don't warrant a *Daubert* order excluding Prof. Rosenthal's opinions about the alleged damages the putative class members sustained from Mylan's switch to the 2-Pak.

### b. Ascertainability Opinion

*Second*, defendants ask the court to exclude Prof. Rosenthal's opinion about ascertainability of the class for two reasons: (1) her ascertainability opinion is unreliable because

---

[8]      The court addresses defendants' challenges to Professor Rosenthal's damages opinion in its Order on the class certification motion at Part IV.E.2.a.

she can't identify the customers who actually qualify as class members under the class definition, and (2) her ascertainability opinion is improper rebuttal testimony.

The court addresses the second argument first. This argument contends that the putative class plaintiffs bear the burden to prove that their proposed class is ascertainable. Thus, defendants contend, plaintiffs should have offered any expert opinion about ascertainability in their experts' opening reports. Prof. Rosenthal didn't do so. Instead, Prof. Rosenthal first offered her ascertainability opinion in her Reply Report. Thus, defendants argue, the court should exclude this opinion as improper rebuttal testimony.

Plaintiffs respond that Prof. Rosenthal's Reply provides proper rebuttal testimony in response to criticisms levied by expert opinions that defendants presented in their Opposition to the class certification motion. Specifically, defendants' experts opine that large numbers of proposed class members are uninjured because they never paid for their EpiPens. And, defendants argue, plaintiffs cannot ascertain from the data produced during discovery who actually paid for their EpiPens, and thus who qualifies as a member of the proposed class. Defendants' expert, Prof. James Hughes, asserts that he has reviewed the data and documents produced in discovery and he has concluded they are "insufficient to . . . exclude individuals from the class who did not actually pay for an EpiPen device." Doc. 1852-4 at 9 (Hughes Expert Report ¶ 14). Plaintiffs argue that Prof. Rosenthal's Reply Report merely responds to Prof. Hughes's criticisms about her analysis. *See* Doc. 1711-1 at 3 (Rosenthal Reply Report) (explaining that she is "respond[ing] to the expert report[ ] of . . . Dr. Hughes as [it] pertain[s] to [her] affirmative report on class certification submitted in this matter," and specifically, she "disagree[s] with Dr. Hughes and provide[s] documentation that contradicts his conclusions regarding the so-called 'ascertainability' of Class members"). And thus, plaintiffs contend, Prof.

Rosenthal's ascertainability opinion is proper rebuttal testimony.

Our Circuit has explained that "[r]ebuttal evidence is evidence which attempts to 'disprove or contradict' the evidence to which it is contrasted." *Tanberg v. Sholtis*, 401 F.3d 1151, 1166 (10th Cir. 2005) (quoting *Black's Law Dictionary* 579 (7th ed. 1999)). The Federal Rules specifically limit rebuttal expert testimony to evidence that is "intended solely to contradict or rebut evidence *on the same subject matter* identified by another party" in its expert disclosures. Fed. R. Civ. P. 26(a)(2)(D)(ii) (emphasis added). A court properly may admit rebuttal evidence on a topic when "a party opens the door to [that] topic." *Tanberg*, 401 F.3d at 1166. But generally, courts will exclude "use of a rebuttal expert to introduce evidence more properly a part of a party's case-in-chief, especially if the alleged rebuttal expert is used to introduce new legal theories." *Foster v. USIC Locating Servs., LLC*, No. 16-2174-CM, 2018 WL 4003354, at *2 (D. Kan. Aug. 17, 2018) (citations and internal quotation marks omitted); *see also Koch v. Koch Indus.*, 203 F.3d 1202, 1224 (10th Cir. 2000) ("When plaintiffs, however, seek to rebut defense theories which they knew about or reasonably could have anticipated, the district court is within its discretion in disallowing rebuttal testimony."). In short, the decision to admit or exclude rebuttal testimony is within the trial court's discretion. *Tanberg*, 401 F.3d at 1166.

Here, plaintiffs assert that they couldn't have anticipated Prof. Hughes's criticisms about identifying the individuals who qualify as class members because, they contend, Prof. Hughes relies on an "administrative feasibility" standard for identifying class members and that standard doesn't apply in our Circuit. As with the discussion about the putative class plaintiffs' motion to exclude the opinions of Prof. James Hughes, the parties sharply disagree about the legal requirements for showing ascertainability at class certification. With this motion, seeking to

exclude Prof. Rosenthal's opinions, defendants cite a Pennsylvania case where the court defined the "ascertainability requirement" as "show[ing] that there is a reliable, administratively feasible mechanism that can identify which potential class members fall within the class definition." *In re Wellbutrin XL Antitrust Litig.*, 308 F.R.D. 134, 137 (E.D. Pa. 2015) (citing *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015)). In contrast, plaintiffs argue the Tenth Circuit has no "administrative feasibility" requirement to prove ascertainability on class certification. And, they argue, our court explicitly has rejected such a requirement. *See In re Syngenta AG MIR 162 Corn Litig.*, No. 14-md-2591, 2016 WL 5371856, at *2–3 (D. Kan. Sept. 26, 2016) (declining an "invitation to apply a standard—one not adopted by the Tenth Circuit—that would preclude certification without a showing that class members may be determined in an administratively feasible manner"). Instead, plaintiffs assert, this court has adopted an ascertainability standard that requires that "the class definition must not be too vague, the class must not be defined by subjective criteria, and the class must not be defined in terms of success on the merits." *Id.* at *2 (citing *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659–60 (7th Cir. 2015)).

On this *Daubert* motion, the court declines to decide what standard to apply when determining whether the putative class presently is ascertainable. That is a question the court will decide in its class certification analysis.[9] Here, the court exercises its discretion and refuses to exclude Prof. Rosenthal's opinion as improper rebuttal testimony on this *Daubert* motion. Prof. Rosenthal's Reply Report explicitly recites that she offers her rebuttal opinions in response to Prof. Hughes's criticisms about her analysis. *See* Doc. 1711-1 at 3. The Reply Report cites specific portions of Prof. Hughes's report and explains why Prof. Rosenthal disagrees with his analysis of the ascertainability question. *See id.* at 27–28 (Rosenthal Reply Report ¶¶ 44, 46–

---

[9]     The court addresses this question in its Order on the class certification motion at Part IV.C.1.

49).  The court finds that Prof. Rosenthal's ascertainability opinion is proper rebuttal testimony.

Now, the court turns back to defendants' first argument supporting their request that the court exclude Prof. Rosenthal's opinion about the ascertainability of the class.  Defendants contend that Prof. Rosenthal doesn't have a reliable methodology for ascertaining three types of EpiPen consumers to determine whether these consumers qualify as members of the class under the class definition.  The three types of consumers are:  (1) consumers who paid nothing, (2) consumers who had flat co-pays for the EpiPen, and (3) consumers who paid cash for their EpiPen products.[10]

Defendants assert that the law in our Circuit requires the putative class plaintiffs to define the class using a definition that is """"precise, objective, and presently ascertainable.""""  *See In re Syngenta AG MIR 162 Corn Litig.*, 2016 WL 5371856, at *1 (quoting *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 444 (D. Kan. 2006) (quoting *Manual for Complex Litig.* § 221.222, at 270 (4th ed. 2005))); *see also Shook v. El Paso Cty.*, 386 F.3d 963, 972 (10th Cir. 2004) (recognizing that "the lack of identifiability is a factor that may defeat Rule 23(b)(3) class certification").  And, defendants contend, Prof. Rosenthal hasn't used a reliable methodology to ascertain who qualifies (and does not qualify) as a member of the class under the Tenth Circuit's standard for any of the three categories of consumers.  The court addresses each argument for each type of consumer, below.

### i.    Consumers Who Paid Nothing

In the first category of consumers, defendants explain that Mylan issued coupons to consumers who, in many instances, used the coupons to pay nothing for their EpiPens.  And, if the consumer paid nothing to purchase an EpiPen, that consumer doesn't qualify as a member of

---

[10]      As discussed below, only the third category of consumers qualify for class membership. Consumers in the first and second categories would not qualify if they never paid for their EpiPens.

the class under the class definition.

Prof. Rosenthal offers a methodology for identifying this first category of consumers so that they aren't included in the class.  Doc. 1711-1 at 21–22 (Rosenthal Reply Report ¶ 33).  She asserts, "[t]here are individual identifiers, provider identifiers, and dates in the Mylan coupon data that will permit matching with paid pharmacy claims."  *Id.*  To illustrate, Prof. Rosenthal used CVS/Caremark pharmacy claims data to "cross reference with the Mylan coupon data and identify the prescriptions where copay coupons were used."  *Id.*  By "[m]atching on exact combinations of fill date, physician identification number, [National Drug Code] and/or Rx number," Prof. Rosenthal was able to "link the copay coupon information with the CVS/Caremark pharmacy claims . . . ."  *Id.*  Prof. Rosenthal opines that "[m]any examples like this can be observed in the merged data," and thus, "data exists such that—at the appropriate time—we can link coupons with pharmacy records and determine their effect on whether an individual Class member was injured."  *Id.*

Defendants say Prof. Rosenthal's methodology is wrong.  For support, they rely on their own expert's analysis.  Defendants' expert, Prof. Hughes, asserts that he tried to match all the transactions listed in the produced PBM claims data with Mylan's coupon data using Prof. Rosenthal's proposed methodology.  Doc. 1850-1 at 10–11 (Hughes Decl. ¶ 20).  And, according to Prof. Hughes, he was able to match fewer than 16% of the transactions listed in the Mylan coupon data with the PBM claims data.  *Id.*  Thus, defendants assert, Prof. Rosenthal's methodology fails to account for a large number of consumers who paid nothing for the EpiPen using a coupon.

Defendants' criticisms about Prof. Rosenthal's methodology go to the weight of her opinion but not its admissibility.  With his analysis, Prof. Hughes recognizes that the

methodology allows for some identification of coupon users—even if less than 16%.  And, plaintiffs assert, discovery is continuing.  So, to the extent discovery produces additional identifying information, Prof. Rosenthal may be able to use her methodology to identify more coupon users.  As our Circuit has recognized, *Daubert* doesn't require the court to decide whether Prof. Rosenthal's opinions are "undisputably correct."  *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016) (citation and internal quotation marks omitted).  Instead, the court must determine whether "the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements."  *Id.* at 1217–18 (citations and internal quotation marks omitted).  So, the court's *Daubert* inquiry should "'focus . . . solely on [the expert's] principles and methodology, not on the conclusions that they generate.'"  *Id.* at 1217 (quoting *Daubert*, 509 U.S. at 595).  On that issue, the court finds that Prof. Rosenthal's methodology for identifying EpiPen coupon users sufficiently is reliable that the court properly may consider her opinions on class certification.

### ii.     Consumers Who Had Flat Co-Pays

For the second type of consumers—*i.e.*, ones who had flat co-pays—defendants assert that Prof. Rosenthal's methodology cannot determine reliably who falls into this category.  Consumers who paid a single, flat co-pay for their EpiPens fall outside the class definition because they would have made the same copayment whether they purchased a branded EpiPen or a generic product.  Thus, defendants contend, plaintiffs must show a reliable method for identifying these consumers and excluding them from the class.

Prof. Rosenthal opines that she can identify co-pay consumers reliably using data maintained by PBMs.  She explains that, in two other pharmaceutical cases, "[d]eclarations

submitted by PBMs . . . specifically identified and confirmed that data are available through the PBMs sufficient not only to identify class members but also to determine whether or not they had a fixed copay or other coinsurance arrangements."  Doc. 1711-1 at 15–16 (Rosenthal Reply Report ¶ 20).  Prof. Rosenthal suggests that "[t]hese data must be available in order to allow insurers and their PBMs the ability to process prescription claims at the retail level."  *Id.*  And, "[t]hese PBM declarations confirm the obvious that these data can be provided if requested."  *Id.*  Specifically, Prof. Rosenthal cites one PBM declaration that identifies the types of data "generally maintained in an industry standard format created by the National Council for Prescription Drug Programs  [("NCPDP")] . . . ."  *Id.*  Prof. Rosenthal also opines that the PBM declarations from these other cases "are entirely consistent with the data produced by multiple PBMs in this matter."  *Id.* at 16 (Rosenthal Reply Report ¶ 21).

Defendants contend, in response, that the *Wellbutrin* court rejected a similar opinion by Prof. Rosenthal.  *In re Wellbutrin XL Antitrust Litig.*, 308 F.R.D. 134, 150–51 (E.D. Pa. 2015).  In that case, the court found that the class "ha[d] not carried its burden of affirmatively demonstrating by a preponderance of the evidence that there is a reliable, administratively feasible method of ascertaining the class" because its "evidence in support of ascertainability consist[ed] mainly of conclusory statements by its experts that records exist that could be used to ascertain the class and the existence of NCPDP standards."  *Id.* at 151 (citations and internal quotation marks omitted).  *Wellbutrin* held that "[t]his evidence is not enough to show by a preponderance of the evidence that the class is ascertainable."  *Id.*  Importantly, the court reached this decision when it decided whether the *Wellbutrin* plaintiffs had shouldered their burden to establish that class certification was warranted under Fed. R. Civ. P. 23(b)(3).[11]  *Id.*  But the

---

[11]        The court recognizes that the *Wellbutrin* court also applied the Third Circuit's "administrative feasibility" standard for determining the class's ascertainability.  308 F.R.D. at 151.  Plaintiffs assert that

court didn't exclude Prof. Rosenthal's opinions as unreliable under *Daubert*.[12]

In short, *Wellbutrin*'s conclusion doesn't apply here because plaintiffs have made a stronger showing than plaintiffs did there. Prof. Rosenthal's report provides a direct, specific, and principled explanation how she can avoid the *Wellbutrin* problem. Prof. Rosenthal's opinion here doesn't rely on conclusory statements. Instead, she has offered a reliable method for identifying these consumers using PBM data. Defendants' challenges about whether the PBM data actually is available in this case—as opposed to other cases—go to the weight of her opinions. The court declines to exclude her opinions for this reason.

### iii.    Consumers Who Paid Cash

Finally, defendants assert that Prof. Rosenthal offers no reliable methodology for identifying the EpiPen consumers who paid cash for their EpiPen purchases. In her Reply Report, Prof. Rosenthal responds to the concerns described in Prof. Hughes's Expert Report about the availability of data for cash payers. Doc. 1711-1 at 29 (Rosenthal Reply Report ¶ 48). Prof. Rosenthal identifies two means to gather information about cash-paying EpiPen consumers. "First, the individuals will have records on the transactions." *Id.* "Second, pharmacy records will contain information on these transactions . . . ." *Id.* She points out that "Plaintiffs have in fact produced a large sample of pharmacy records for cash payers in the form of the IQVIA Xponent data." *Id.* But, she concedes that the IQVIA Xponent data "used in [her] report do not have patient identifiers (IQVIA protects these for good reason)." *Id.* Nevertheless, Prof. Rosenthal opines that "such identifiers do in fact exist at the dispensing pharmacies and

---

this is not the appropriate standard for determining ascertainability under our court's governing law. As already discussed, this Order doesn't decide that issue.

[12]    The *Wellbutrin* court did exclude another of Prof. Rosenthal's opinions under *Daubert*—but the excluded opinion is not relevant here. 308 F.R.D. at 146–47.

**Add. 164**

presumably the Court could compel their production if it were deemed necessary." *Id.*

Again, defendants cite the *Wellbutrin* case as support for excluding Prof. Rosenthal's methodology for identifying consumers who paid cash for EpiPens. Defendants assert that the *Wellbutrin* court was "not persuaded by [Prof. Rosenthal's] conclusory statements" that "records at the retail pharmacy and PBM level . . . can be used to identify class members" when she had not "examined or analyzed these pharmaceutical records." *In re Wellbutrin XL Antitrust Litig.*, 308 F.R.D. at 150. But, as already discussed, the *Wellbutrin* court considered Prof. Rosenthal's opinions in the context of determining whether class certification was appropriate. *Id.* at 150–51. It didn't exclude her opinion about identifying consumers with pharmaceutical records under *Daubert* as unreliable. Instead, it found that her opinions didn't support class certification under Rule 23(b)(3).

The court is persuaded that defendants have come forward with legitimate and even substantiated questions about Prof. Rosenthal's opinions for cash payers. But the governing law doesn't use that threshold as the standard for excluding an expert's opinion. Instead, the standard inquires whether Prof. Rosenthal has marshaled "sufficient facts to validate [her opinions] in the eyes of the law . . . ." *Pioneer Ctrs.*, 858 F.3d at 1342 (citation and internal quotation marks omitted). Mindful that "rejection of expert testimony is the exception rather than the rule," Fed. R. Evid. 702 advisory committee's notes to 2000 amendments, the court exercises its discretion and declines to exclude Prof. Rosenthal's methodology for identifying consumers who paid cash for EpiPens. On balance, Prof. Rosenthal offers a reasonably reliable method for identifying these consumers using either their own or pharmacy records. In the end, merits discovery may substantiate Prof. Hughes's view. The task of gathering pharmacy records may prove overwhelming because it requires collecting data from about 65,000 pharmacies,

**Add. 165**

more than 23,000 of which are independent.  Doc. 1850 at 16.  Also, defendants question whether class members will have records showing both that they purchased an EpiPen and that they paid more than nothing for their purchase (meaning that insurance, coupons, or patient assistance didn't cover the entire price of the products).  Doc. 1884 at 11.  These arguments test the weight of Prof. Rosenthal's opinion, but they don't preclude its admission from the court's consideration of the class certification motion.[13]

The court declines to exclude Prof. Rosenthal's ascertainability opinion under *Daubert*.[14]

### c.  Probability Opinion

*Next*, defendants argue that the court should exclude Prof. Rosenthal's probability opinion.  This opinion "estimate[s] the percentage" of putative class members "who might not have suffered an overcharge from the particular misconduct alleged by Plaintiffs."  Doc. 1711-1 at 29–30 (Rosenthal Reply Report ¶ 50).  Defendants give four reasons for excluding Prof. Rosenthal's probability opinion:  (1) the opinion depends on unreasonable assumptions that the record doesn't support; (2) the opinion lacks support in the relevant field and case law; (3) the opinion is incapable of measuring classwide injury; and (4) it is improper rebuttal testimony. The court addresses each of defendants' arguments, in turn, below.

---

[13]    The court addresses the weight to give Prof. Rosenthal's opinion about the ascertainability of the putative class members in the Order on the class certification motion at Part IV.C.1.

[14]    Defendants ask that, if the court declines to exclude Prof. Rosenthal's ascertainability opinion as unreliable under Rule 702 or improper rebuttal testimony, the court give defendants an opportunity to depose Prof. Rosenthal about the ascertainability opinion in her Reply Report, introduce additional expert rebuttal testimony, and submit supplemental briefing in opposition to plaintiffs' Motion for Class Certification.  The court denies this request.  Prof. Rosenthal submitted her Reply Report on April 26, 2019.  Defendants had plenty of time to review and respond to this Reply Report before the court held its June 11-12, 2019 hearing on the Motion for Class Certification.  Also, Prof. Hughes has had the chance to review and comment on Prof. Rosenthal's Reply Report.  *See, e.g.*, Doc. 1850-1 (May 21, 2019 Decl. of Dr. James W. Hughes in Supp. of Defs.' Mot. to Exclude Expert Opinions of Professor Meredith Rosenthal).  For all these reasons, the court denies defendants' request.

### i. Unsupported Assumptions

Defendants argue the court must exclude Prof. Rosenthal's probability opinion as unreliable because it is not "based upon conclusions from established evidentiary facts." *United States v. Rice*, 52 F.3d 843, 847 (10th Cir. 1995); *see also Cochrane v. Schneider Nat'l Carriers, Inc.*, 980 F. Supp. 374, 378 (D. Kan. 1997) (excluding expert opinion that was "based on unjustified assumptions" and "therefore will not assist the trier of fact"). To support this argument, defendants direct the court to three assumptions that Prof. Rosenthal makes in her analysis.

*First*, defendants assert that Prof. Rosenthal wrongly assumes the same probability for the rate that each third party payor ("TPP") will reimburse the purchase of a branded EpiPen or 2-Pak. *See* Doc. 1711-1 at 31–33 (Rosenthal Reply Report ¶¶ 54, 56). Defendants contend her assumption is not supported by the record. For support, they cite portions of Mylan's expert's report that identify differences among TPPs that, the competing expert contends, Prof. Rosenthal failed to consider when forming her opinions. Doc. 1850 at 19. These differences include variations in formularies, benefit design, negotiating power, and rebate payment. *Id.*

*Second*, defendants contend that Prof. Rosenthal uses an arbitrary and unfounded estimate of 95% to calculate the rate consumers would have switched from the EpiPen to a generic EAI device. Doc. 1850 at 20; *see also* Doc. 1711-1 at 30–31 (Rosenthal Reply Report ¶ 53, n.59). Again relying on Mylan's expert's opinion, defendants argue Prof. Rosenthal's generic conversion assumption is just wrong. Doc. 1850 at 20. They assert her assumption is flawed because she didn't consider other evidence of lower generic switching rates, including evidence of the Teva generic's performance and forecasts. *Id.* Defendants also refute Prof. Rosenthal's assertion that her methodology "can accommodate a range of yardsticks." Doc.

1711-1 at 19 (Rosenthal Reply Report ¶ 27). They contend that any reduction in her generic conversion assumption still doesn't account for the probability that the consumers are brand loyalists who would have continued purchasing the EpiPen even if a generic EAI was available. Doc. 1850 at 21.

*Third*, defendants assert that Prof. Rosenthal's 2-Pak probability calculations are unreliable. Using a Mylan slide deck from May 2010, Prof. Rosenthal estimates that 65% of patients would have preferred to purchase a 2-Pak instead of a single EpiPen. Doc. 1711-1 at 32–33 (Rosenthal Reply Report ¶ 55, n.61). Defendants argue that her assumption is flawed because it ignores evidence showing that, after May 2010, doctors were recommending and patients were preferring to purchase EpiPens in packages of two.

All of defendants' criticisms about the assumptions Prof. Rosenthal uses to support her probability opinion go to the weight of her opinion testimony, but not its admissibility. Prof. Rosenthal's Reply Report adequately explains why she made the assumptions her probability analysis made and why, she contends, those assumptions are proper under the facts of the case. Doc. 1711-1 at 30–33 (Rosenthal Reply Report ¶¶ 53–56). And, her Reply Report rebuts the criticisms that Mylan's expert makes about those assumptions. *Id.* at 19–20, 24–25 (Rosenthal Reply Report ¶¶ 27–29, 37–39). Defendants' challenges to those assumptions don't show that Prof. Rosenthal's probability opinion is so unreliable that the court must exclude it. *See, e.g.*, *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367, at *28 (N.D. Cal. Feb. 21, 2017) (denying motion to exclude expert opinion because it was based on "reasonable assumptions and evidence, and supported by reasoned principles as well as academic scholarship" and while "some of those assumptions [were] disputed," those disputes did not "make [the expert's] reliance on them improper").

Instead, defendants' challenges more properly are presented through the "presentation of contrary evidence" on class certification because these are "the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).  And, indeed, defendants have asserted these challenges in their Opposition to the class certification motion.  *See, e.g.*, Doc. 1636 at 41–43 (criticizing Prof. Rosenthal's failure to account for consumers who would have purchased a 2-Pak even if a single pack was available), 53–55 (challenging Prof. Rosenthal's assumption that 95% of consumers would have switched to a generic), 60–61 (explaining how brand loyalty and rebates may result in no injury to a consumer).[15]  The court declines to exclude Prof. Rosenthal's probability opinion based on the assumptions she made to support it.

### ii.      Unsupported in the Field or Case Law

Next, defendants assert that Prof. Rosenthal's probability opinion is unreliable because her methodology has no support in the field or the case law.  Defendants concede that Prof. Rosenthal's Reply Report opines that "health economists routinely use probabilities to estimate the distribution of harms and benefits to populations from a range of policy and clinical interventions."  Doc. 1711-1 at 30 (Rosenthal Reply Report ¶ 51).  And she cites two articles as support for this assertion.  *Id.* (Rosenthal Reply Report ¶ 51, n.57).  Relying on an opinion from Mylan's expert, defendants argue that these two articles don't use the same methodology that Prof. Rosenthal has used.  Doc. 1850 at 22.  And thus, they contend, plaintiffs can't show that her methodology has support in the field.  Plaintiffs respond that Mylan's expert merely tries to distinguish Prof. Rosenthal's methodology from the ones discussed in the two cited articles.  But, they contend, Mylan's expert doesn't refute Prof. Rosenthal's basic premise that health

---

[15]      The court addresses Prof. Rosenthal's probability opinions in its Order on the class certification motion at Part IV.E.2.b.ii.

**Add. 169**

economists routinely use probabilities to analyze the distribution of harms and benefits to a population.

Also, defendants assert that no court ever has accepted Prof. Rosenthal's probability analysis. For support, defendants assert that "plaintiffs in one recent case submitted Prof. Rosenthal's probability analysis as the leading piece of evidence that they argued warranted consideration of the First Circuit's denial of class certification. But the district court rejected the analysis and plaintiffs' motion." Doc. 1850 at 23 n.8 (citing Electronic Order, *In re Asacol Antitrust Litig.*, No. 15-cv-12730-DJC (D. Mass. Apr. 11, 2019), ECF No. 772). As plaintiffs correctly point out, the Massachusetts order defendants cite is a three-paragraph text order denying a motion for leave to file a renewed motion for class certification because it "would be futile" and "would involve re-litigation of matters previously decided." Electronic Order, *In re Asacol Antitrust Litig.*, No. 15-cv-12730-DJC (D. Mass. Apr. 11, 2019), ECF No. 772. The text order says nothing about Prof. Rosenthal or that the court is rejecting her analysis. *Id.*

In contrast, plaintiffs assert that the First Circuit considered a probability analysis "similar" to the one offered here by Prof. Rosenthal, along with other summary judgment evidence, and concluded that a TPP plaintiff had submitted sufficient causation proof to survive summary judgment. Doc. 1860 at 23 (citing *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 915 F.3d 1, 13–14 (1st Cir. 2019) (holding district court erred by granting defendant's summary judgment motion)). Specifically, Prof. Rosenthal had opined in *Celexa & Lexapro* that a defendant pharmaceutical company's "spending on promotions in general correlated positively with sales." *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 915 F.3d at 12. She concluded that the defendant's off-label promotions had produced 76% of Celexa prescriptions and 54% of Lexapro prescriptions. *Id.* at 13. And "Dr. Rosenthal estimated that if [the TPP

**Add. 170**

plaintiff] paid for as few as five independent prescriptions, there would be a 98% chance that at least one was the result of off-label marketing." *Id.* The First Circuit noted that the record showed the TPP plaintiff likely paid for more than five prescriptions, and "[s]o the odds that [the TPP plaintiff] was not harmed if the drugs were, indeed, ineffective was likely infinitesimal (assuming the prescriptions were independent of one another)." *Id.* Thus, the First Circuit concluded, the TPP plaintiff "could establish causation and injury at least for any TPP who paid for more than a handful of different patients' prescriptions." *Id.* at 14.

The First Circuit also recognized that "there is room for reasonable disagreement on the merits of Dr. Rosenthal['s]" assumptions, but it recognized that a jury could accept them "as reasonable." *Id.* at 13. And while the court noted that the district court had not yet conducted a *Daubert* analysis of the experts' opinions, *id.*, the Circuit nevertheless didn't find any flaws with Dr. Rosenthal's analysis. To the contrary, the court considered her opinion when reversing the summary judgment order. *Id.* at 13–14.

After examining the parties' competing arguments, the court is unpersuaded by defendants' argument that Prof. Rosenthal's methodology lacks sufficient support in the field to require excluding her opinions on class certification. Defendants' disagreements about her methodology go to the weight of her opinion, which the court can consider when deciding the class certification motion.[16]

### iii.   Incapable of Measuring Classwide Injury

Defendants next argue that Prof. Rosenthal's probability opinion is unreliable because it is not capable of measuring classwide injury. Defendants assert that plaintiffs have the burden to establish classwide injury which, they contend, requires a showing of actual injury to all or

---

[16]   The court addresses Prof. Rosenthal's probability opinions in its Order on the class certification motion at Part IV.E.2.b.ii.

substantially all class members.  Instead, defendants assert, Prof. Rosenthal's probability opinion simply estimates the percentage of putative class members "who *might not* have suffered an overcharge from the particular misconduct alleged by Plaintiffs."  Doc. 1711-1 at 29–30 (Rosenthal Reply Report ¶ 50) (emphasis added).  Thus, defendants contend, Prof. Rosenthal's opinion is not reliable because it doesn't establish the actual percentage of consumers who, in fact, sustained an injury.

Plaintiffs respond that they aren't required to establish the percentage of consumers who actually sustained injuries to prevail on class certification.  Instead, they contend, class certification just requires that plaintiffs show "there is no basis to conclude that a 'great number' of members could not have been harmed as alleged by plaintiffs."  *In re Syngenta AG MIR 162 Corn Litig.*, 2016 WL 5371856, at *4 (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012)).  And, plaintiffs argue, Prof. Rosenthal's analysis sufficiently demonstrates that few consumers could not have sustained harm from defendants' alleged misconduct.  Doc. 1711-1 at 29–33 (Rosenthal Reply Report ¶¶ 50–56).  In their Reply, defendants argue that this isn't the correct standard for determining predominance on a Rule 23 motion.  And, even if it were, Prof. Rosenthal's opinion doesn't satisfy that standard.

These arguments go to the merits of the class certification motion.  The court will decide when ruling the class certification motion whether plaintiffs have shouldered their burden to establish classwide injury sufficient to certify a class under Rule 23.  And it will consider whether Prof. Rosenthal's expert opinions constitute sufficient evidence to support class certification under the governing case law.[17]  But defendants' arguments here don't establish that Prof. Rosenthal's opinion about the percentage of uninjured class members is so unreliable that

---

[17]     As previously mentioned, the court addresses Prof. Rosenthal's probability opinions in its Order on the class certification motion at Part IV.E.2.b.ii.

**Add. 172**

the court must exclude it under *Daubert*.

Also, defendants argue, Prof. Rosenthal's model cannot assess which class members, if any, were harmed by each individual theory of liability. Defendants assert that plaintiffs are required to "tie each theory of antitrust impact to an exact calculation of damages." *Comcast Corp. v. Behrend*, 569 U.S. 27, 37 (2013). Defendants assert that Prof. Rosenthal's analysis flunks this test because she shows "how combining multiple sources of impact reduces the probability of a class member remaining uninjured." Doc. 1711-1 at 34 (Rosenthal Reply Report ¶ 58). Plaintiffs respond that Prof. Rosenthal properly considered multiple theories of harm in her analysis because class plaintiffs have proposed certifying a class that includes multiple theories of liability, including the alleged generic delay and improper switch to the 2-Pak.

The court recognizes that *Comcast* differs from this case. In *Comcast*, plaintiffs alleged four different theories of antitrust impact, but the district court "accepted [just one of the theories] of antitrust impact as capable of classwide proof and rejected the rest." 569 U.S. at 31. The Supreme Court held that the district court erred by certifying a class based on an expert's regression model that "assumed the validity of all four theories of antitrust impact initially advanced" by plaintiffs, even though the district court had rejected three of those theories. *Id.* at 36. Thus, the Court found that the model "falls far short of establishing that damages are capable of measurement on a classwide basis," and "[w]ithout presenting another methodology," plaintiffs could not prove "Rule 23(b)(3) predominance." *Id.* at 34. Instead, the Court reasoned that "[q]uestions of individual damage calculations will inevitability overwhelm questions common to the class." *Id.*

That's not the posture of this case. Plaintiffs have asserted several theories of liability. And, at this stage, the court hasn't excluded any of the theories that Prof. Rosenthal uses in her

analysis.  Plaintiffs assert that Prof. Rosenthal's theory is consistent with *Comcast* because, in that case, the Supreme Court explained that "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory."  *Id.* at 35.  And, because plaintiffs have identified several theories that purportedly injured the putative class members—thus producing damages—it was proper for Prof. Rosenthal to combine the theories in her analysis.  *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013) (recognizing that "it was not the existence of multiple theories in [*Comcast*] that precluded class certification; it was the plaintiffs' failure to base all the damages they sought on the antitrust impact—the injury—of which the plaintiffs were complaining").  Also, plaintiffs distinguish Prof. Rosenthal's probability opinion from the model excluded in *Comcast* because her probability opinion isn't a damages measurement.  Prof. Rosenthal provided her damages opinions elsewhere in her expert report, and there, she separated her damage opinions among the various theories.

The court agrees that defendants' arguments about *Comcast* don't preclude the court from considering Prof. Rosenthal's probability opinion on class certification.

### iv.    Improper Rebuttal Testimony

Last, defendants assert that Prof. Rosenthal's probability methodology is improper rebuttal testimony.  Similar to their arguments directed at the ascertainability opinion, above, defendants argue that Prof. Rosenthal should have offered a model to assess the possibility of uninjured class members in her opening report.  Thus, defendants contend, the probability opinion she offers in her Reply Report constitutes improper rebuttal testimony.

Plaintiffs respond that, after Prof. Rosenthal submitted her initial report, defendants filed their Opposition to the class certification motion.  It argued that plaintiffs' proposed class

definitions contain too many uninjured class members.  And one of Mylan's experts (Dr. John H. Johnson, IV) issued a report criticizing the conclusions announced in Prof. Rosenthal's initial report.  Plaintiffs assert that Prof. Rosenthal's Reply Report properly responds to the arguments raised by defendants' Opposition and Mylan's expert.  The court agrees with them.

Prof. Rosenthal's Reply Report explicitly recites that she offers her rebuttal opinions in response to Dr. Johnson's criticisms about her analysis, including his assertions that Prof. Rosenthal's analysis fails to account for uninjured class members.  *See* Doc. 1711-1 at 3; *see also id.* at 29–37 (Rosenthal Reply Report ¶¶ 50–60).  Also, the Reply Report cites specific portions of Dr. Johnson's report and gives Prof. Rosenthal's reasons for disagreeing with his conclusions.  *See id.* at 20–24 (Rosenthal Reply Report ¶¶ 30–36).  Exercising its discretion, the court declines to exclude Prof. Rosenthal's probability opinion as improper rebuttal testimony.

For all these reasons, the court rejects defendants' request that the court exclude Prof. Rosenthal's probability opinion under *Daubert*.[18]

### d.  Professor Rosenthal's Opinions that Rely On Professor Elhauge's Opinions

*Finally*, defendants assert that the court should exclude Prof. Rosenthal's opinions that rely on the opinions of another one of the putative class plaintiffs' experts.  Prof. Rosenthal reaches some of her conclusions by relying on opinions offered by Professor Einer Elhauge.  *See, e.g.*, Doc. 1500-3 at 33 (Rosenthal Expert Report ¶ 79), Doc. 1711-1 at 18–19, 37 (Rosenthal

---

[18]     Similar to the request above about Prof. Rosenthal's ascertainability opinion, defendants ask that, if the court declines to exclude Prof. Rosenthal's probability opinion, the court allow defendants to depose Prof. Rosenthal about the probability opinion in her Reply Report, introduce additional expert rebuttal testimony, and submit supplemental briefing opposing plaintiffs' Motion for Class Certification.  The court denies this request for the same reasons discussed above.  *See supra* note 14.  Also, the court recognizes that Mylan's expert, Dr. Johnson, has had the chance to review and comment on Prof. Rosenthal's Reply Report.  *See, e.g.*, Doc. 1850-2 (May 21, 2019 Decl. of Dr. John H. Johnson, IV in Supp. of Defs.' Mot. to Exclude Expert Opinions of Professor Meredith Rosenthal).

**Add. 175**

Reply Report ¶¶ 26, 61). Defendants contend that Prof. Elhauge's opinions are unreliable and

inadmissible under *Daubert*. And, by separate motion, they ask the court to exclude his opinions

from the court's consideration of the class certification motion. *See* Doc. 1604.

The court addresses defendants' motion to exclude Prof. Elhauge's opinions in the next

section of this Order. As discussed below, the court rejects defendants' premise—that the court

should exclude any of Prof. Elhauge's opinions that Prof. Rosenthal has relied on when forming

her opinions. Consequently, the court rejects defendants' final argument for excluding Prof.

Rosenthal's opinions.

For the reasons explained, the court denies defendants' motion to exclude Prof.

Rosenthal's expert opinions.

### 2. Motion to Exclude Expert Opinions of Professor Einer Elhauge

Defendants next ask the court to exclude the expert opinions of Prof. Einer Elhauge.

Prof. Elhauge opines that Mylan entered into exclusionary contracts with PBMs and its

EpiPens4Schools program which harmed the entire putative class by foreclosing a part of the

market to Auvi-Q (a rival EAI device manufactured and sold by Sanofi-Aventis U.S. LLC

("Sanofi")). Doc. 1500-2 at 6 (Elhauge Expert Report ¶ 3). According to Prof. Elhauge,

Mylan's market foreclosure, in turn, decreased Auvi-Q sales and prevented Auvi-Q from

competing with Mylan, thereby reducing Mylan's incentives to lower its prices across the market

and across the putative class.[19] *Id.*

Defendants assert three arguments to support their request that the court exclude Prof.

Elhauge's opinions. First, defendants contend that Prof. Elhauge is not qualified to render

---

[19]     Prof. Elhauge also offers opinions about market definition and market power. Doc. 1500-2 at 1
(Elhauge Expert Report ¶ 1). Defendants don't challenge the admissibility of these opinions on class
certification. But defendants reserve their right to challenge these opinions at a later stage. Doc. 1886 at
9 n.1.

**Add. 176**

opinions based on econometric models.  Second, defendants argue that Prof. Elhauge's

econometric analyses are either unreliable or no longer relevant to the case.  And finally,

defendants assert that Prof. Elhauge's opinions rely on improper and unreliable rebuttal

testimony that doesn't suffice to cure the defects in his initial analysis.  The court addresses each

argument, below.

### a.  Professor Elhauge's Qualifications

Defendants assert that Prof. Elhauge is not qualified to render his opinions because he is

neither an economist nor an econometrician (an economist with highly specialized training in

mathematics and statistics who builds economic models).  Plaintiffs recognize that Prof. Elhauge

is not an economist or an econometrician, but, they argue, Prof. Elhauge is well-qualified to

testify as an expert in antitrust economics.  Also, plaintiffs assert, Prof. Elhauge has extensive

expertise applying economics and econometrics to antitrust issues.  Thus, they argue, he is

qualified to render the opinions he offers in this case.  The court agrees with plaintiffs.  Prof.

Elhauge is qualified to opine on the topics that he offers here.

Prof. Elhauge is the Petrie Professor of Law at Harvard Law School, where he teaches

antitrust law, health policy, and other subjects.  Doc. 1500-2 at 6–7 (Elhauge Expert Report ¶ 4).

Prof. Elhauge has authored or coauthored several books about antitrust law and economics.  *Id.*

Also, he has authored many articles involving economic analysis of antitrust and other legal

issues, including articles on monopolization, bundled discounts, loyalty discounts, and reverse

payment settlements.  *Id.*  Since 1991, Prof. Elhauge has written more than 40 legal articles that

leading law reviews and bar journals have published.  *Id.* at 81–85.  Also, Prof. Elhauge has

testified as an expert witness on antitrust economics in dozens of federal cases, as well as before

Congress, arbitration panels, and international competition agencies.  *Id.* at 7 (Elhauge Expert

Report ¶ 5).  His expert testimony has included testimony about reverse payment settlements, other horizontal agreements, vertical agreements, mergers, monopolization and exclusionary conduct, price discrimination, health economics, patent economics, and contract economics.  *Id.*  Courts have referred to Prof. Elhauge as a """"highly qualified antitrust titan.""""  *See, e.g.*, *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 830 (D.N.J. 2015) (quoting *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5767415, at *4 (E.D. Pa. July 29, 2015) (quoting *Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 273 (D. Mass. 2008))).

In his deposition testimony, Prof. Elhauge conceded that he is "not an expert in econometrics . . . ."  Doc. 1861-2 at 12 (Elhauge Dep. 29:8–23).  Also, he testified that he doesn't come up with "new, novel econometric methods."  *Id.*  But, Prof. Elhauge testified that he has "expertise . . . applying econometrics to antitrust issues."  *Id.*  And he considers himself an expert in "the application of econometrics to antitrust issues."  *Id.* at 11–12 (Elhauge Dep. 28:25–29:3).  That's what Prof. Elhauge says he did in this case—*i.e.*, apply econometric methods to antitrust issues by performing regression analyses to estimate the effects of Mylan's exclusionary contracts with PBMs.[20]

At least two courts have found that Prof. Elhauge is qualified to perform this type of expert analysis, even though he is not an econometrician.  *See, e.g.*, *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5767415, at *5 (E.D. Pa. July 29, 2015) (rejecting argument that Prof. Elhauge was not qualified to provide expert testimony, recognizing

---

[20]    Defendants argue that Prof. Elhauge isn't just applying econometrics to antitrust issues here. Instead, they contend, he's "attempted" to "com[e] up with a new econometric method"—something he's not qualified to do.  Doc. 1886 at 8.  But defendants don't explain how Prof. Elhauge's analysis invokes an entirely new econometric method.  Instead, as Prof. Elhauge testified, he applies *proven* econometric methods in his analysis to determine the effects of Mylan's exclusionary contracts with PBMs.  Doc. 1861-2 at 13 (Elhauge Dep. 31:5–8).

**Add. 178**

that "[t]here is no serious question that Prof. Elhauge possess[es] skill or knowledge in conducting regression analysis in antitrust cases that is greater than the average layman even if it were conceded that his expertise with multiple regression analysis as an econometric tool in general is not as deep as that of an econometrician," and concluding that his "lack of econometric/economic credentials" affected the weight but not the admissibility of his testimony (citations and internal quotation marks omitted)); *see also Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, No. 05-12024 PBS, 2009 WL 3053855, at *3 (D. Mass. Sept. 21, 2009) (finding that Prof. Elhauge was qualified to provide expert testimony because the court-appointed expert in econometrics "pinpointed no methodological flaws or technical errors in the econometric analysis that Professor Elhauge presented" and concluding that his "lack of econometric/economic credentials affects the weight, not the admissibility, of Professor Elhauge's testimony").

And, in a third case, the court found Prof. Elhauge's econometric analysis sufficiently reliable to deny the defendant's motion to exclude under *Daubert*. *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 831–42 (D.N.J. 2015). Although the defendant there never challenged Prof. Elhauge's qualifications, the court summarized Prof. Elhauge's educational background, professional experience, publications, and expert testimony; and the court concluded that he is "eminently qualified" to provide expert opinions in the form of econometric analysis. *Id.* at 830.

For the same reasons, the court finds that Prof. Elhauge is qualified to render his expert opinions in this case.

### b. The Reliability and Relevancy of Professor Elhauge's Econometric Analyses

Next, defendants argue that the court should exclude Prof. Elhauge's opinions about Auvi-Q market foreclosure and delayed generic entry because, defendants contend, Prof.

Elhauge used flawed econometric analyses to support his opinions.

### i.      Auvi-Q Foreclosure Analysis

Prof. Elhauge opines that "Mylan's exclusionary contracts with PBMs . . . foreclose[ed] a part of the market to Auvi-Q . . . ."  Doc. 1500-2 at 6 (Elhauge Expert Report ¶ 3).  Defendants assert that this opinion is unreliable because Prof. Elhauge bases his conclusion on a flawed regression analysis that failed to account for "serial correlation."  Doc. 1854 at 8, 14–16.

"Multiple-regression analysis is a statistical tool used to determine the relationship between an unknown variable (the 'dependent' variable) and one or more 'independent' variables that are thought to impact the dependent variable."  *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1260 (10th Cir. 2014) (citing Saks, Michael J., et al., *Reference Manual on Scientific Evidence* 179, 181 (2d ed. 2000)); *see also* Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," in *Reference Manual on Scientific Evidence* 303, 305 (3d ed. 2011), https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf (hereinafter "Reference Guide on Multiple Regression") (explaining that regression analysis "involves a variable to be explained— called the dependent variable—and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable").

In Prof. Elhauge's regression model, the dependent variable is Auvi-Q's market share, and the two independent variables are:  (1) the percentage of lives subject to PBM coverage restrictions on Auvi-Q, and (2) the price ratio of Auvi-Q and EpiPen.  Doc. 1500-2 at 57–58 (Elhauge Expert Report ¶ 112).  Thus, Prof. Elhauge's model tests whether either of the two independent variables affects the size of Auvi-Q's market share (the dependent variable).

Defendants contend, however, Prof. Elhauge's model is unreliable because it relies on underlying data that is "serially correlated."  Specifically, Prof. Elhauge relied on Auvi-Q market

share data for six PBMs over a 34-month period, thus producing 204 data points for Prof. Elhauge's regression analysis.  Doc. 1500-2 at 56–57 (Elhauge Expert Report ¶ 110).  But, defendants contend, these data points are not independent sample results.  Instead, defendants argue, the data points are "serially correlated" because PBMs generally decide formulary placement on an annual basis.  So, if a PBM had chosen to restrict Auvi-Q in January, it generally would restrict Auvi-Q in every month for the rest of the year.  Defendants argue that Prof. Elhauge's regression model fails to control for the fact that PBMs generally don't adjust their formularies one month at time.  Thus, defendants contend, his data points are "serially correlated," meaning that they aren't independent and thus make the variables appear far more correlated than they actually are.  *See* Reference Guide on Multiple Regression, at 355 (defining "serial correlation" as "[t]he correlation of the values of regression errors of time").  And, according to Mylan's expert, when one controls for this serial correlation embedded in Prof. Elhauge's model, the model isn't capable of generating a statistically significant result.  Thus, defendants contend, Prof. Elhauge's model is unreliable.

Plaintiffs respond by citing Prof. Elhauge's Expert Reply Report.  In that Report, Prof. Elhauge recognizes that serial correlation is present in his foreclosure regression but, he explains, serial correlation "does not make the regression biased in favor of finding a significant foreclosing effect."  Doc. 1711-2 at 40 (Elhauge Expert Reply Report ¶ 81).  Instead, Prof. Elhauge asserts, the presence of serial correlation only affects the statistical significance of the results.  *Id.*  And, Prof. Elhauge explains his regression model does produce statistically significant results when one uses "clustered standard errors" to control for serial correlation.  *Id.*; *see also id.* at 40–42 (Elhauge Expert Reply Report ¶¶ 80–84).  Although "using clustered standard errors reduces the statistical power of the regression by effectively grouping all

observations at the same PBM," one can "obtain statistical significance" by "includ[ing] more PBMs." *Id.* at 40 (Elhauge Expert Reply Report ¶ 81).  Also, one can reduce serial correlation significantly by "adding PBM fixed effects to the regression." *Id.* at 40–41 (Elhauge Expert Reply Report ¶ 82).

The court finds that Prof. Elhauge's Reply Report sufficiently explains how to account for serial correlation in his model.  Defendants' criticisms about his regression analysis—particularly the criticism asserted by Mylan's expert—go to the weight of Prof. Elhauge's opinions, but not their admissibility.  *See, e.g.*, *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 929 (W.D. Wis. 2007) (refusing to exclude expert opinion based on an econometric model because the expert "accounted for the existence of serial correlation and the need to correct for it" and thus "his method is not so inherently flawed as to preclude him from establishing whether defendants' alleged wrongdoing had any effect on the price of copper" and whether the expert "erred in applying his model and whether he failed to properly correct for serial correlation are jury questions not amenable to resolution on summary judgment").  Defendants can challenge—and have challenged—Prof. Elhauge's opinions about class certification by offering competing expert opinions.[21]  *See* Doc. 1636 at 49, 49 n.43 (Mylan Defs.' Opp'n to Class Pls.' Mot. for Class Certification).  But the court declines to find that Prof. Elhauge's analysis is inherently unreliable such that the court should exclude it.  The court thus denies defendants' Motion to Exclude Prof. Elhauge's opinions about Auvi-Q market foreclosure based on PBM exclusionary contracts.

### ii.    EpiPens4Schools Program Analysis

Prof. Elhauge also opines that "Mylan's exclusionary contracts with . . . its

---

[21]    The court addresses defendants' challenges to Professor Elhauge's opinion in its Order on the class certification motion at Parts IV.E.2.a. & IV.E.2.d.

EpiPens4Schools program . . . foreclose[ed] a part of the market to Auvi-Q . . . ." Doc. 1500-2 at 6 (Elhauge Expert Report ¶ 3). Defendants assert that the court should exclude Prof. Elhauge's opinions for two reasons. *First*, defendants argue that Prof. Elhauge bases his opinion on an inaccurate assumption—*i.e.*, that Mylan imposed exclusivity requirements in exchange for free EpiPens for schools through its EpiPens4Schools program. Defendants assert that the factual record doesn't support this assumption because, from 2013 to 2015, 96% of schools participating in the EpiPens4Schools Program were not subject to any exclusivity requirements. Defendants contend that plaintiffs' discovery of these facts has compelled them to abandon "any independent causally related damages based on the EpiPen4Schools program." Doc. 1590-3 at 2 (May 14, 2019 email from plaintiffs' liaison counsel).

*Second*, defendants contend, the court should exclude Prof. Elhauge's opinions because they are no longer relevant now that plaintiffs have abandoned this theory in their case. Plaintiffs concede that Prof. Elhauge's opinions about the EpiPens4Schools program no longer matter because plaintiffs aren't pursuing this theory. Doc. 1861 at 26. And, they explain, Prof. Elhauge's Expert Reply Report makes clear that he already has withdrawn his opinion about the EpiPens4Schools program. Doc. 1711-2 at 46 (Elhauge Expert Reply Report ¶ 90) (assuming "no foreclosing impact from the EpiPens4Schools program because [Prof. Elhauge] understand[s] that plaintiffs have abandoned that claim"). Thus, plaintiffs assert, the court shouldn't exclude an already-withdrawn opinion, but instead, the court should find that defendants' arguments are moot.

Defendants disagree that the issue is moot. Prof. Elhauge offered an opinion about the EpiPens4Schools program in his initial report. And, defendants contend, the correct procedural device is for the court to grant defendants' motion to exclude the opinion as uncontested so that

no question exists about the status of this theory in further proceedings before this court or on

appeal. The court agrees with defendants. Because plaintiffs concede that they have abandoned

an independent claim for damages based on the EpiPen4Schools program, the court excludes

Prof. Elhauge's opinions on this subject from its consideration at the certification stage because

they no longer are relevant to this case. *See Fertik v. Stevenson*, No. 12-10795-PBS, 2016 WL

4148193, at *3 (D. Mass. Aug. 4, 2016) (prohibiting an expert from testifying about a "now-

abandoned theory").

###        iii.        Delayed Generic Entry Analysis

Finally, defendants seek to exclude Prof. Elhauge's opinions about delayed generic entry

because, they contend, his opinions aren't reliable and have no probative value. Prof. Elhauge

opines that "reverse payments in patent settlements . . . injure competition across the market (and

thus across the class) when they result in generic entry dates that are later than the entry date that

would have occurred without that payment in a no-payment settlement." Doc. 1500-2 at 5

(Elhauge Expert Report ¶ 2). Using various data points, Prof. Elhauge has developed a model

that, he opines, can "determine the generic entry date in a no-payment settlement that would

have been economically rational given [the parties'] actual bargaining power." *Id.* Specifically,

Prof. Elhauge "illustrate[s] this classwide methodology, showing that with a $100 million reverse

payment amount, the no-payment settlement entry date that would have been economically

rational given their actual bargaining power would have been March 13, 2014, some 15.3 months

earlier than the entry date in the actual settlement." *Id.* Defendants contend that Prof. Elhauge's

opinions about delayed generic entry are unreliable for several reasons.

*First*, defendants argue, Prof. Elhauge's opinions are flawed because he predicts an entry

date for a Teva generic EAI occurring before Teva even had secured FDA approval for its

generic product.  The FDA didn't approve the Teva generic until August 16, 2018.  Doc. 1854 at

18 n.11 (citing FDA, *FDA Approves First Generic Version of EpiPen* (Aug. 16, 2018),

https://www.fda.gov/news-events/press-announcements/fda-approves-first-generic-version-

epipen).  Defendants thus contend that no settlement could have prevented Teva from entering

the market before the date when the FDA approved Teva's introduction of its EAI device.

     The putative class plaintiffs respond that Teva's actual market entry date is irrelevant to

Prof. Elhauge's analysis.  Prof. Elhauge explained how he used factual data from the record to

determine Teva's expectations for a generic entry date.  Doc. 1500-2 at 39–40, 43 (Elhauge

Expert Report ¶¶ 71, 78).  And, Prof. Elhauge described how his analysis "addressed only the

economically rational ***entry date in a but-for settlement agreement***" and "expressly disclaimed

offering any opinion on whether Teva would have ***actually*** been able to enter on that settlement

entry date given any obstacles, such as the need for FDA approval."  Doc. 1711-2 at 23 (Elhauge

Reply Report ¶ 45) (emphasis in original).  Prof. Elhauge further explained "the fact that after the

settlement Teva may have actually struggled to obtain FDA approval does not bear on what the

entry date would have been in the but-for settlement, which can only be affected by expectations

at the time of settlement."  *Id.* at 24 (Elhauge Reply Report ¶ 47).  Prof. Elhauge recognized that

FDA approval may affect plaintiffs' ability to prove "actual causation" if Teva struggled to

secure FDA approval for reasons not caused by anticompetitive conduct.  *Id.*  But, Prof. Elhauge

"simply stayed within [his] assignment of analyzing the entry date in a but-for settlement that the

parties would have rationally agreed to," and he "[left] it to plaintiffs to establish through other

evidence whether in the but-for world Teva would have actually obtained FDA approval and

been able to enter by that but-for settlement date."  *Id.*  Prof. Elhauge asserts that "[s]taying

within [his] assignment does nothing to undermine the reliability or classwide nature of the

methodology [he] used to determine the economically rational entry date in the but-for settlement." *Id.* The court agrees.

Defendants also contend that Prof. Elhauge's model is flawed because he testified that the actual entry day and actual alleged payment don't matter, but instead, they are "illustrative" placeholders to show that one can apply this model to any set of facts. Doc. 1605-1 at 10 (Elhauge Dep. 64:16–25). But, defendants argue, the model can't demonstrate classwide harm unless it calculates an entry date before June 22, 2015—the date of the Teva settlement agreement. Defendants contend that, if Teva wasn't entering the market until after June 22, 2015 anyway, then defendants couldn't have caused any delay in Teva's generic entry because it entered the settlement before then. For this reason, defendants contend that Prof. Elhauge's model is flawed.

The putative class plaintiffs expose the weakness of this argument. As plaintiffs explain, to prove causation—*i.e.*, that defendants' conduct delayed the entry of a Teva generic—plaintiffs just need to show that Teva would have entered the market sooner than it did but for the reverse payment settlement. For example, if plaintiffs prove that, but for a reverse payment settlement, Teva would have entered the market on June 23, 2015—the day after the settlement—plaintiffs still will have shown that the reverse payment settlement delayed generic entry by more than three years. Thus, defendants' argument on this front doesn't persuade the court that Prof. Elhauge's model is unreliable simply because it may calculate an entry date following the date of the settlement agreement.

*Second*, defendants assert that Prof. Elhauge's opinions are unreliable because his analysis simply assumes that defendants made a $100 million reverse payment settlement to Teva, but he has no factual basis for this assumption. The court disagrees. Prof. Elhauge has

explained why he used the $100 million reverse payment settlement in his calculation. Prof. Elhauge says that he used a 15% patent strength estimate and the parties' profit projections to calculate "that reverse payment must have been at least $47.8 million to get Teva to agree to the actual settlement." Doc. 1711-2 at 19 (Elhauge Reply Report ¶ 37); *see also* Doc. 1500-2 at 43–44 (Elhauge Expert Report ¶ 80); Doc. 1497-2 at 43–44 (Sealed Elhauge Expert Report ¶ 80). Prof. Elhauge then "used a hypothetical reverse payment amount of $100 million to illustrate how [his] methodology would apply and produce a predicted but-for settlement entry date using classwide evidence and a classwide method." Doc. 1711-2 at 19 (Elhauge Reply Report ¶ 37). Prof. Elhauge explained that he did so "because there is still a significant amount of non-coordinated discovery remaining and because the point at this stage was simply to show a reliable classwide methodology, which can be illustrated by a reverse payment amount of $100 million as well as any other." *Id.* And, he explained, his model can estimate the but-for entry date for any given settlement amount ranging from $47.8 to $446 million. Doc. 1500-2 at 45–46 (Elhauge Expert Report ¶ 85, fig.12). Prof. Elhauge sufficiently has explained why he used the $100 million reverse payment settlement in his model. Defendants' argument on this point doesn't show that Prof. Elhauge's use of this data point at this stage for illustrative purposes renders his opinions unreliable.

*Third*, defendants argue Prof. Elhauge's analysis is flawed because he assumed a patent strength of 15% (meaning that Teva had a 85% chance of prevailing in its lawsuit challenging the EpiPen patent). Defendants assert that this assumption conflicts with the opinion of plaintiffs' patent litigation expert (Prof. Andrew Torrance) who opines that the EpiPen patent strength was as high as 30%. But, Prof. Elhauge explains why he chose 15% patent strength for his model. Prof. Elhauge recognized that "any patent strength from 0–30% was equally possible

given Professor Torrance's opinion." Doc. 1711-2 at 19 (Elhauge Reply Report ¶ 36). "But if any patent strength from 0–30% is equally possible," Prof. Elhauge concluded "that means that the ***expected*** patent strength was 15%, and it is the overall expectation that drives the settlement analysis." *Id.* (emphasis in original). Thus, Prof. Elhauge asserts "15% is the appropriate estimate to use for an expected patent strength." *Id.* Prof. Elhauge also explains that his model can estimate delay across a range of assumed patent strengths. Doc. 1500-2 at 46–47 (Elhauge Expert Report ¶ 86). And, his Report includes a Figure showing "the effect of varying the patent strength up to as high as it could possibly have been while still being consistent with Mylan having rationally accepted the actual settlement and paid the illustrative $100 million reverse payment amount." *Id.*; *see also id.* (Elhauge Expert Report fig.13). Defendants criticize this model because, they contend, it ignores "the other equally likely values—including values that result in no generic delay." Doc. 1886 at 11 (citation and internal quotation marks omitted). But the court finds that this argument goes to the weight of Prof. Elhauge's opinion, not its admissibility.

*Finally*, defendants assert that Prof. Elhauge's analysis is based on an unproven model, never accepted by any court as reliable. But, as plaintiffs point out, at least three courts have approved Prof. Elhauge's methodology in pay-for-delay cases. *See, e.g.*, *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 174 (S.D.N.Y. 2018) (denying motion to exclude Prof. Elhauge's opinion that "it would have been economically rational for both parties to enter into a no-payment settlement in a but-for world by specific dates" and rejecting defendants' arguments that his opinions "are speculative, internally inconsistent, and contradicted by the evidence" because "Defendants' disagreements with Plaintiffs' expert are appropriate subjects for cross-examination"); *In re Androgel Antitrust Litig. (No. II)*, No. 1:09-

MD-2084-TWT, 2018 WL 2984873, at *17 (N.D. Ga. June 14, 2018) (concluding that Prof. Elhauge's reverse payment settlement opinion, as well as other evidence, sufficiently supported plaintiffs' alternative settlement theory to survive defendants' summary judgment motion and noting that "[a]ny criticism the Defendants have of the experts' methodologies or conclusions are best handled through cross-examination and the production of contrary evidence"); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1186–88 (N.D. Cal. 2017) (denying motion to exclude Prof. Elhauge's opinions in an antitrust lawsuit involving Lidoderm patches because, though "defendants [were] correct that Elhauge could point to no other case where an expert has employed the exact model he employs here, both the components of his model (estimating parties' bargaining strengths and expectations of patent strength) and the assumptions that go with it (the parties' own pre-settlement forecasts) are consistent with accepted economic theory and well-established principles"). *See also* Doc. 1648-1 at 8 (Elhauge Dep. 167:4 –19) (explaining that Prof. Elhauge has used the same methodology in other cases to evaluate a but-for settlement date, including the *Namenda*, *Lidoderm*, and *Androgel* cases).

Defendants also contend that Prof. Elhauge's model is unreliable because it "would render class certification essentially 'automatic' in every 'pay for delay' case, regardless of the actual facts." Doc. 1854 at 9. At least two courts have rejected this very argument. *See, e.g.*, *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d at 173 (rejecting defendants' argument that "Professor Elhauge presumes that *any* payment from a patentee to a prospective generic, regardless of its size or the reasons for making it, causes anticompetitive delay" because it was "a mischaracterization of [his] analysis"); *In re Androgel Antitrust Litig.*, 2018 WL 2984873, at *17 (rejecting defendants' argument that Prof. Elhauge's "model[ ] assume[s] that a

reverse payment always causes delay" and concluding that his "model[ ] assume[s] nothing of the sort" but, instead, Prof. Elhauge "use[d] [his] experience and knowledge in the field to conclude that reverse payments cause delay, and [he] confirm[ed] that conclusion in [his] model[ ] addressing the specific settlement at issue in this case").

Similarly here, Prof. Elhauge has used his experience and knowledge in the field to conclude that reverse payments cause generic delay. Doc. 1500-2 at 5 (Elhauge Expert Report ¶ 2). Then, using "the parties' actual settlement, profit projections, and estimates about the patent litigation and reverse payment value," Prof. Elhauge "calculate[d] their actual bargaining strength and then use[d] that information to determine the generic entry date in a no-payment settlement that would have been economically rational given their actual bargaining power." *Id.* Defendants' criticisms of his methodology go to the weight the court should give his opinions, but they don't undermine the reliability of his opinions sufficient to exclude them. The court thus declines to exclude Prof. Elhauge's opinions about delayed generic entry as unreliable.

### c. The Reliability of Professor Elhauge's Rebuttal Testimony

Last, defendants' motion argues that the court should exclude analyses that Prof. Elhauge presented in his Reply Report for two reasons. *First*, defendants argue, Prof. Elhauge's Reply Report contains improper rebuttal testimony. *And second*, defendants assert that the analyses in the Reply Report are unreliable.

### i. Rebuttal Testimony

Defendants assert that Prof. Elhauge's Reply Report contains two "new" analyses that he should have disclosed in his initial report. Doc. 1854 at 20. According to defendants, these analyses are improper rebuttal testimony. Plaintiffs respond that Prof. Elhauge doesn't offer any new analyses in his Reply Report. Instead, plaintiffs contend, his Reply Report properly

responds to the criticisms that Mylan's expert made about Prof. Elhauge's regression analyses. Thus, plaintiffs argue, the analyses in his Reply Report are proper rebuttal testimony.

As already discussed, "[r]ebuttal evidence is evidence which attempts to 'disprove or contradict' the evidence to which it is contrasted." *Tanberg v. Sholtis*, 401 F.3d 1151, 1166 (10th Cir. 2005) (quoting *Black's Law Dictionary* 579 (7th ed. 1999)). "When a party opens the door to a topic, the admission of rebuttal evidence on that topic becomes permissible." *Id.* (citation omitted). "Permissible does not mean mandatory, however; the decision to admit or exclude rebuttal testimony remains within the trial court's sound discretion." *Id.* (citation omitted).

Defendants take issue with various modifications that Prof. Elhauge made to his regression analysis. Doc. 1711-2 at 36 (Elhauge Reply Report ¶ 70). Defendants assert that these modifications are substantive changes that produce entirely new damage figures, as depicted in a series of 24 new tables. *Id.* at 45–64. But, as Prof. Elhauge's Reply Report makes clear, he made the modifications to his regression analysis specifically in response to Mylan's expert's critiques. *See id.* at 36 (Elhauge Reply Report ¶ 70) (summarizing the criticisms made by Mylan's expert about Prof. Elhauge's model and explaining that "[n]one of these critiques are valid, but the results of the regression are similar even if one modifies the regression to address his critiques."). Prof. Elhauge's modifications thus rebut Mylan's expert's testimony on the same subject matter. So, the court finds, this modified regression is proper rebuttal testimony.

Also, defendants object to the analysis in Prof. Elhauge's Reply Report that purports to separate damages calculations for third party payors ("TPPs") and cash end-payors. Again, Prof. Elhauge offers this opinion in his Reply Report to rebut Mylan's expert's opinion that his method "cannot determine how overcharges differ between third party payors (TPPs) and cash

end-payors." Doc. 1711-2 at 69 (Elhauge Reply Report ¶ 103). And, Prof. Elhauge explains, he

calculated separate damages using Mylan's rebate data. *Id.* (Elhauge Reply Report ¶ 105).

Plaintiffs assert that defendants did not produce this rebate data until after Prof. Elhauge

completed his initial Report and his deposition. Defendants concede that "Plaintiffs used data

that Mylan produced after Prof. Elhauge's initial Report was submitted" but, defendants contend,

"those data were not required to perform Prof. Elhauge's analyses." Doc. 1886 at 12 n.11.

Defendants assert that "Mylan had already produced the bulk of its data well in advance of Prof.

Elhauge's initial Report, and those data were equally amenable to use in his analysis." *Id.* The

court declines to accept defendants' conclusory assertion that Prof. Elhauge could have

performed his regression with data Mylan already had produced. Because the parties agree that

Prof. Elhauge relied on data that Mylan produced after he completed his initial Report and sat for

his deposition,[22] the court refuses to find that Prof. Elhauge's analysis is improper rebuttal

testimony.

In sum, the court rejects defendants' arguments that Prof. Elhauge's Reply Report offers

improper rebuttal testimony.[23]

---

[22]    Defendants assert that Prof. Elhauge described "some version" of this analysis at his deposition but plaintiffs refused to produce the analysis when defendant requested it. Doc. 1854 at 21. Plaintiffs assert that defendants wrongly equate the "rough estimate" that Prof. Elhauge testified about at his deposition with the analysis he provided in his Reply Report. Doc. 1861 at 24. As discussed, Prof. Elhauge performed the analysis using Mylan rebate data produced *after* his deposition. So the court agrees with plaintiffs that the analysis described in his deposition differs from the analysis found in the Reply Report.

[23]    Defendants ask that, if the court declines to exclude Prof. Elhauge's testimony, the court give defendants an opportunity to depose Prof. Elhauge about the analysis in his Reply Report, introduce additional expert rebuttal testimony, and submit supplemental briefing in opposition to plaintiffs' Motion for Class Certification. The court denies this request. As plaintiffs correctly explain, defendants had ample opportunity to review and respond to Prof. Elhauge's Report (issued on April 29, 2019) before the court held its June 11-12, 2019 hearing on the Motion for Class Certification. Also, this case is a long way from trial, and Mylan's expert has had the chance to review and comment on Prof. Elhauge's rebuttal opinions. *See*, *e.g.*, Doc. 1605-7 (May 21, 2019 Decl. of Dr. John H. Johnson, IV in Supp. of Defs.' Mot. to Exclude Expert Opinions of Professor Einer Elhauge). The court thus denies defendants' request.

**Add. 192**

### ii.   Reliability of Reply Report's Analyses

Next, defendants assert, the analyses in Prof. Elhauge's Reply Report are unreliable. They assert three reasons why the court should exclude them.

*First*, defendants assert that the Reply Report's analysis is unreliable because Prof. Elhauge omits the relative price of EpiPen and Auvi-Q from his regression model. Defendants assert that price is a "major factor" that influences Auvi-Q sales—the dependent variable in the regression analysis. Doc. 1854 at 22. And, "to be admissible, a regression analysis must control for the 'major factors' that might influence the dependent variable." *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 400 (S.D.N.Y. 2014) (citation omitted). By excluding price from his regression model, defendants argue, Prof. Elhauge has no way to determine whether the effect he observes in his regression results from Mylan's PBM contracts or, instead, the higher price of Auvi-Q.

Plaintiffs respond that one of Prof. Elhauge's rebuttal analyses simply added PBM fixed effects to the regression analysis in response to criticism by Mylan's expert. *See* Doc. 1711-2 at 40–41 (Elhauge Reply Report ¶ 82). But the regression never eliminated the price variable, and thus, the analysis still controlled for price. *Id.* Plaintiffs concede that another one of Prof. Elhauge's rebuttal analyses did drop the price variable, but, plaintiffs explain, the analysis continues to use time and PBM fixed effects to control for any differences in price across time or between PBMs. *Id.* at 35 (Elhauge Reply Report ¶ 68). Also, Prof. Elhauge specifically excluded the price variable in response to the criticisms lodged by Mylan's expert. *Id.* at 36 (Elhauge Reply Report ¶ 70).

The parties' competing arguments about Prof. Elhauge's exclusion of the price variable and whether he properly controlled for this factor in his regression go to the probative value of

his analysis.  *See, e.g.*, *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1260–61 (10th Cir. 2014) ("Consequently, the exclusion of major variables or the inclusion of improper variables may diminish the probative value of a regression model.  But such defects do not generally preclude admissibility, and courts allow use of a regression model as long as it includes the variables accounting for the major factors." (citing *Bazemore*, 478 U.S. at 400)).  But defendants' attacks don't establish that Prof. Elhauge's analysis is inadmissible under *Daubert*.

*Second*, defendants argue that Prof. Elhauge's rebuttal analysis employs the wrong standard for statistical significance.  More specifically, Prof. Elhauge uses a 0.10 threshold for statistical significance.  But, defendants contend, the conventional level of statistical significance used by both the scientific community and the courts is 0.05.  *See Apsley v. Boeing Co.*, 691 F.3d 1184, 1198 (10th Cir. 2012) ("The significance level is typically placed at 5%."); *see also* Reference Guide on Multiple Regression, at 320 ("In most scientific work, the level of statistical significance required to reject the null hypothesis (i.e., to obtain a statistically significant result) is set conventionally at 0.05, or 5%.").

Plaintiffs respond that Prof. Elhauge used the 0.10 threshold in just one of his regressions—one that he offered to respond to Mylan's expert's criticisms about his failure to account for serial correlation.  *See* Doc. 1711-2 at 40–41 (Elhauge Reply Report ¶ 82).  And, while defendants assert that 0.05 is the accepted threshold, they don't cite any authority *requiring* an expert to use this standard.  Indeed, the Reference Guide on Multiple Regression— the authority defendants cite in their motion—recognizes that:

> The use of 1%, 5%, and, sometimes, 10% levels for determining statistical significance remains a subject of debate.  One might argue, for example, that when

regression analysis is used in a price-fixing antitrust case to test a relatively specific alternative to the null hypothesis (e.g., price fixing), a somewhat lower level of confidence (a higher level of significance, such as 10% ) might be appropriate.

Reference Guide on Multiple Regression, at 321 n.48.

Also, courts generally have found that challenges to statistical significance go to the weight, but not the admissibility, of a regression model. *See, e.g.*, *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 362–63 (7th Cir. 2001) (explaining that "[t]he 5 percent test is arbitrary" and "[t]he question whether a study is responsible and therefore admissible under the *Daubert* standard is different from the weight to be accorded to the significance of a particular correlation found by the study.  It is for the judge to say, on the basis of the evidence of a trained statistician, whether a particular significance level, in the context of a particular study in a particular case, is too low to make the study worth the consideration of judge or jury."); *Kurtz v. Kimberly-Clark Corp.*, 414 F. Supp. 3d 317, 331 (E.D.N.Y. 2019) ("Regressions should not be excluded on the ground that they fail to meet arbitrary thresholds of statistical significance."); *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 1351040, at *15 (N.D. Cal. Apr. 4, 2014) ("The Court finds that the fact that these two variables are not statistically significant at the 1%, 5%, and 10% levels goes to the weight, not the admissibility of [the] model."). Similarly, here, the court finds that defendants' arguments about the statistical significance of Prof. Elhauge's analysis go to the weight the court should give his opinions when deciding the class certification motion.  But, they do not preclude the court from considering it on class certification.

*Finally*, defendants assert that one of Prof. Elhauge's rebuttal analyses uses the wrong test for statistical significance.  Defendants explain that there are two tests for statistical significance:  a two tailed test and a one-tailed test.  A two-tailed test allows for "the effect [on

the dependent variable] to be either positive or negative."  Reference Guide on Multiple

Regression, at 321.  And a one-tailed test is used "when the expert believes, perhaps on the basis

of other direct evidence presented at trial, that the alternative hypothesis is either positive or

negative, but not both."  *Id.*

Prof. Elhauge's Reply Report explains that he used a one-tailed test in his regression.  He

also explains why.  Doc. 1711-2 at 41 (Elhauge Reply Report ¶ 82 n.146) ("A one-sided test is

appropriate here because we are only interested in whether the regression shows a significant

negative (foreclosing) effect of the formulary restrictions, and because there is no plausible

theory under which the formulary restrictions would increase Auvi-Q's share.").  Stated another

way, Prof. Elhauge assumed that the formulary restrictions only could produce a negative effect

on Auvi-Q's market share (*i.e.*, the dependent variable).  And thus, he used a one-tailed test for

this regression.

Defendants assert that Prof. Elhauge's use of the one-tailed test makes his analysis

unreliable because both the scientific community and the courts prefer the two-tailed test.  *See,*

*e.g.*, *Palmer v. Shultz*, 815 F.2d 84, 95–96 (D.C. Cir. 1987) (concluding that "generally two-

tailed tests are more appropriate in Title VII cases"); *Smith v. City of Bos.*, 144 F. Supp. 3d 177,

196 (D. Mass. 2015) (observing in a Title VII case, "[t]he weight of the case law appears to favor

two-tailed tests.").  *See also* Reference Guide on Multiple Regression, at 321 (explaining that use

of the two-tailed test "is usually appropriate").  But, as plaintiffs note, defendants cite no

authority that requires an expert to use a two-tailed test as a condition for finding the expert's

opinions admissible under *Daubert*.  And, plaintiffs contend, the expert should have discretion to

decide whether to use a one-tailed or two-tailed test based on the regression that he is testing.

Indeed, the Reference Guide on Multiple Regression explains:

> [A]n expert might use a one-tailed test in a patent infringement case if he or she strongly believes that the effect of the alleged infringement on the price of the infringed product was either zero or negative. (The sales of the infringing product competed with the sales of the infringed product, thereby lowering the price.) By using a one-tailed test, the expert is in effect stating that prior to looking at the data it would be very surprising if the data pointed in the direct opposite to the one posited by the expert.

Reference Guide on Multiple Regression, at 321. And the Guide cautions: "Because there is some arbitrariness involved in the choice of an alternative hypothesis, courts should avoid relying solely on sharply defined statistical tests." *Id.*

Plaintiffs assert that it was proper for Prof. Elhauge to use a one-tailed test in this particular regression because, he determined, it's not realistic to expect that defendants' exclusionary contracts ever would cause Auvi-Q's market share to increase. Defendants respond with the conclusion of Mylan's expert. He opines that—for at least two major PBMs—Prof. Elhauge's regression actually shows that formulary restrictions caused Auvi-Q's market share to increase. Thus, defendants assert, the data is capable of producing either a positive or negative effect. And, they contend, Prof. Elhauge should have used a two-tailed test in his regression.

The court refuses to exclude Prof. Elhauge's opinion simply because Mylan's expert disagrees with it. Prof. Elhauge has explained his reasons for using the one-tailed test. And even if a factfinder ultimately would reject his reasoning, his reasoning is, at worst, plausible. Defendants' attacks against Prof. Elhauge's decision don't show that his opinions are unreliable or preclude their admissibility. The court thus declines to exclude Prof. Elhauge's opinions based on his use of the one-tailed test for one of his regressions.

In sum, the court grants defendants' Motion to Exclude Prof. Elhauge's opinions in part and denies it in part. The court grants the motion to exclude his opinions about Auvi-Q market foreclosure based on Mylan's EpiPens4Schools program because plaintiffs since have abandoned

this theory.  And, the court denies defendants' motion in all other respects.

### 3. Motion to Exclude Opinions and Proposed Testimony of Professor Andrew K. Torrance

Finally, defendants ask the court to exclude opinions and proposed testimony of Prof. Andrew K. Torrance.  Prof. Torrance offers opinions about the patent lawsuit that King Pharmaceuticals (a Pfizer subsidiary) filed against Teva alleging that Teva's generic version of the EpiPen infringed two of King's EpiPen patents ("Teva patent litigation").  Prof. Torrance opines about Teva's likelihood of success in the Teva patent litigation had the parties not settled the lawsuit.  Also, Prof. Torrance opines about the costs and duration of the Teva patent litigation had the parties not settled.

Defendants base their motion to exclude on three arguments.  *First*, defendants contend that Prof. Torrance fails to explain how he reached his conclusion that Teva had a greater than 70% chance of prevailing in the Teva patent litigation.  *Second*, defendants assert that Prof. Torrance's opinions don't fit with the factual record.  *Third*, defendants argue that Prof. Torrance didn't apply accepted methods and principles for analyzing patent invalidity.  All these reasons, defendants assert, render Prof. Torrance's opinions unreliable.  And thus, defendants assert, the court should exclude them.  The court addresses each of the three arguments, separately, below.

### a. Professor Torrance Adequately Explained How He Reached His Conclusions.

*First*, defendants argue that Prof. Torrance doesn't explain how he determined Teva's likelihood of success in the Teva patent litigation.  Defendants assert that Prof. Torrance offers nothing but baseless speculation to support his conclusions.  Thus, defendants contend, Prof. Torrance's opinions will not help decide whether it was reasonable for Teva to settle the Teva patent litigation.

Plaintiffs respond that Prof. Torrance bases his opinions on both: (1) his experience as a patent attorney, legal scholar, and law professor,[24] and (2) his review of materials that he considered when forming his opinions. Doc. 1849-1 at 19, 21 (Torrance Dep. 240:8–16, 257:8–258:18). As plaintiffs explain in response, other courts have found similar expert testimony admissible under *Daubert* when the expert bases his opinions about the likelihood of success in litigation on his experience and his review of the relevant litigation materials. *See, e.g.*, *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 187–88 (S.D.N.Y. 2018) (denying motion to exclude opinions of a "patent attorney with extensive experience in the area of patent law" about "the likelihood [of success] in [a patent] lawsuit" because the expert "unquestionably has the expertise to evaluate the things he assessed—from expert reports to patent file folders—and to draw conclusions about who is more likely to win a patent lawsuit"); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503, 2018 WL 563144, at *16 (D. Mass. Jan. 25, 2018) (refusing to exclude opinion of patent law expert who opined about the likelihood of success in patent litigation "based upon his own expertise and experience in the field of patent law"); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1186–87 (N.D. Cal. 2017) (denying motion seeking to exclude expert testimony about likely outcome of patent litigation when the expert had reached his conclusions by "applying his scientific background

---

[24]     Defendants' motion never asserts directly that Prof. Torrance's opinions are inadmissible under *Daubert* because he isn't qualified to provide expert testimony. But, in a footnote, defendants suggest that Prof. Torrance doesn't have sufficient patent litigation experience "that would qualify him to opine on the likely outcome of the underlying patent litigation." Doc. 1848 at 8 n.10. Plaintiffs respond that Prof. Torrance is well-qualified to provide expert testimony based on his experience as a patent attorney, his education, his extensive scholarship and publication in the patent field, and his teaching experience. Doc. 1862 at 8–11. The court agrees. Prof. Torrance's experience and education qualify him to opine about Teva's likelihood of success in the Teva patent litigation. Defendants' criticisms about Prof. Torrance's experience in patent litigation trials, and the role he played in those trials, go to the weight of his opinions, not their admissibility.

**Add. 199**

and knowledge to his review of the trial record"); *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 765–67 (E.D. Pa. 2015) (denying motion to exclude expert's opinion about the chances of prevailing in underlying patent litigation because the expert—a patent law professor—was "a qualified expert offering appropriate expert testimony" and had reached his conclusions after "review of the briefs, pleadings, [Abbreviated New Drug Application], and underlying patent at issue in the . . . litigation").

For the same reasons, the court refuses to exclude Prof. Torrance's opinions here. Prof. Torrance sufficiently explained how he reached his conclusions—using his experience in the field of patent law and his review of the relevant materials. *See, e.g.*, *F & H Coatings, LLC v. Acosta*, 900 F.3d 1214, 1224 (10th Cir. 2018) (finding no error in admission of expert testimony because the expert's "experience and industry knowledge were sufficient . . . to find that his expert conclusions . . . were reliable").

Defendants also attack Prof. Torrance's conclusions by citing their own expert's critique of Prof. Torrance's report. Doc. 1848 at 9–10. Defendants' expert believes that Prof. Torrance's opinions are flawed because he failed to consider the trial court's decision denying Teva's pretrial motion for judgment as a matter of law. *Id.* Also, defendants' expert asserts that Prof. Torrance's conclusion that Teva had a relatively large probability of infringing one of the EpiPen patents doesn't comport with his opinion that Teva also had an above 70% chance of success in the Teva patent litigation. *Id.* at 10. These arguments go to the weight the court should give Prof. Torrance's opinion on class certification—not whether the court should exclude them altogether as unreliable.

The court rejects defendants' first argument supporting their motion to exclude Prof. Torrance's opinions under *Daubert*.

### b. Professor Torrance's Opinions Sufficiently Fit with the Facts of the Case to Allow their Admission.

*Second*, defendants argue that Prof. Torrance's opinions about Teva's likelihood of success in the Teva patent litigation are untethered to the factual record because he relies on arguments that the parties never raised at trial in the Teva patent litigation, or ones that the parties waived during the course of the litigation. More specifically, defendants assert that Prof. Torrance's opinions are unreliable because he bases them on: (1) the patent prosecution history, even though the parties never raised this subject at trial in the Teva patent litigation; (2) an "unenforceability" defense based on inequitable conduct, even though Teva never raised this defense in the Teva patent litigation; and (3) an "obviousness" defense to patent infringement, even though Teva never asserted this defense in the Teva patent litigation.

Plaintiffs respond that Prof. Torrance doesn't offer opinions about Teva's likelihood of success *at trial*. Instead, Prof. Torrance opines about Teva's likelihood of prevailing "in any final adjudication by the Court of Appeals for the Federal Circuit." Doc. 1500-4 at 4–5 (Torrance Expert Report ¶ 3.a.). Thus, plaintiffs contend, defendants' criticisms that Prof. Torrance's opinions aren't tethered to the *trial* record don't matter for purposes of determining their reliability. And, even so, plaintiffs assert that the trial record supports Prof. Torrance's opinions.

The parties to the Teva patent litigation settled their dispute after they had tried their case to a district judge in a bench trial—but before the district judge had issued a decision. So, defendants argue, the trial record that the Federal Circuit would consider on appeal was complete. And, according to defendants, Prof. Torrance's opinions rely on arguments that Teva never asserted at trial or ones that it had waived at trial. Plaintiffs disagree.

*First*, plaintiffs explain that the patent's prosecution history is relevant because the

**Add. 201**

Federal Circuit applies a two-step process when deciding patent infringement claims.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1581 (Fed. Cir. 1996) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)).  In the first step, the court determines "the proper construction of the asserted claim."  *Id.* at 1581–82 (citing *Markman*, 52 F.3d at 976).  In the second step, the court determines "whether the accused method or product infringes the asserted claim as properly construed."  *Id.*

The Federal Circuit has explained that "[t]he first step, claim construction, is a matter of law, which [the Federal Circuit] review[s] de novo."  *Id.* at 1582 (citing *Markman*, 52 F.3d at 979).  And, when conducting this de novo review, the Federal Circuit looks "first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, *the prosecution history*."  *Id.* (emphasis added).  So, plaintiffs assert, Prof. Torrance properly relied on the prosecution history when forming his opinions about Teva's likelihood of success in the Teva patent litigation because, even though the parties may not have cited the prosecution history during trial, the Federal Circuit still could rely on the prosecution history during its de novo review of claim construction on appeal.  The court agrees with plaintiffs. Prof. Torrance's reliance on the prosecution history does not render his opinions unreliable.

*Next*, plaintiffs argue that the unenforceability defense based on inequitable conduct could apply in the Teva patent litigation because the parties had identified it as a contested issue of fact and law in the Intelliject litigation (a lawsuit related to the Teva patent litigation).  Doc. 1837-8 at 3 (Pls.' Statement of Contested Issues of Fact and Law ¶ 13 ("Whether Intelliject has proven by clear and convincing evidence that the '432 Patent is unenforceable due to patent misuse?")).  Plaintiffs explain that a finding of unenforceability for the '432 Patent in the related Intelliject litigation would operate as *res judicata* in the Teva patent litigation, if the cases hadn't

73

**Add. 202**

ended with the parties' settlements—ones that plaintiffs describe as "anticompetitive pay-for-delay settlement[s]."  Doc. 1862 at 18.

Defendants counter that the defense asserted in the Intelliject litigation (and cited by plaintiffs) was unenforceability based on *patent misuse*—not unenforceability based on inequitable conduct.  Indeed, the issue recited in the Statement of Contested Issues of Fact and Law reads:  "Whether Intelliject has proven by clear and convincing evidence that the '432 Patent is unenforceable *due to patent misuse*?"  Doc. 1837-8 at 3 (Pls.' Statement of Contested Issues of Fact and Law ¶ 13) (emphasis added).  And, the court agrees with defendants that an inequitable conduct defense differs from a patent misuse defense.  *See Resqnet.Com, Inc. v. Lansa, Inc.*, No. 01 Civ.3578(RWS), 2004 WL 1627170, at *4 (S.D.N.Y. July 21, 2004) ("Patent misuse and inequitable conduct are different defenses.  Misuse is a defense based upon the idea that a patent properly procured has been broadened in scope impermissibly so as to be used to impose an unreasonable restraint in competition . . . [i]nequitable conduct, on the other hand, renders the patent unenforceable permanently, and involves concealing facts or being dishonest in the procurement of the patent"); *see also Electro Source, LLC v. Nyko Techs., Inc.*, Nos. CV 01-10825 DT (BQRx), CV 02-520 DT (BQRx), 2002 WL 34536682, at *12 (C.D. Cal. Apr. 15, 2002) (explaining that "patent misuse [claims] differ from . . . inequitable conduct claims" because "[i]nequitable conduct relates to the *means of obtaining* a patent, and deems any patent obtained by such means unenforceable" while "[p]atent misuse relates to the enforcement of a patent after it has been obtained").

Prof. Torrance's report suggests that certain actions taken by the patent inventors before the United States Patent and Trademark Office ("USPTO") could amount to inequitable conduct.  *See* Doc. 1500-4 at 21 (Torrance Expert Report ¶ 49 (opining that the inventor's failure to file

timely an Information Disclosure Statement "[a]t best . . . suggests carelessness, and, at worst, a desire to postpone consideration by the examiner of potentially damaging prior art")); *see also* Doc. 1497-4 at 30 (Sealed Torrance Expert Report ¶ 72 (explaining that, based on Prof. Torrance's review of the patent application history, it suggests that the inventors did not submit some potentially relevant prior art to the USPTO during prosecution)).  But neither Teva nor Intelliject raised inequitable conduct as an affirmative defense in the underlying patent litigation. Thus, defendants argue, the inequitable conduct defense was waived.  So, according to defendants, the trial court never would have considered the inequitable conduct defense in rendering its decision in the Teva patent litigation.  And, Teva never could assert this defense in an appeal to the Federal Circuit because it had waived the defense.

The court agrees with defendants that it is unlikely that the Federal Circuit would consider an inequitable conduct defense based on the Teva patent litigation record.  But it's not impossible.  Generally, "'a federal appellate court does not consider an issue not passed upon below.'"  *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1322 (Fed. Cir. 2008) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)).  However, appellate courts also have "the discretion to decide when to deviate from this general rule of waiver . . . ."  *Id.* (citing *Singleton*, 428 U.S. at 121); *see also Celgene Corp. v. Peter*, 931 F.3d 1342, 1356 (Fed. Cir. 2019) (recognizing that the Federal Circuit has "discretion to reach issues raised for the first time on appeal").  Although "[d]eparting from the general rule of waiver is appropriate only in limited circumstances," the Federal Circuit may consider an issue not presented to the lower tribunal when there is "an intervening change in the law" or when "the 'interest of justice' guides [the Federal Circuit] to consider the issue despite the fact that it was not raised below."  *Celgene*, 931 F.3d at 1356 (citations omitted).

**Add. 204**

When considering whether to exclude Prof. Torrance's opinion, the court is guided by Rule 702's advisory committee's notes.  They recognize that "rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702 advisory committee's notes to 2000 amendments; *see also In re Syngenta AG MIR 162 Corn Litig.*, No. 14-md-2591-JWL, 2017 WL 1738014, at \*2 (D. Kan. May 4, 2017).  While *Daubert* requires the court to serve as a gatekeeper for expert testimony, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain "the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596 (citation omitted).  Ultimately, the "district court has 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'"  *In re Syngenta AG MIR 162 Corn Litig.*, 2017 WL 1738014, at \*2 (quoting *Kumho Tire*, 526 U.S. at 152); *see also Vining v. Enter. Fin. Grp.*, 148 F.3d 1206, 1218 (10th Cir. 1998) ("The admission of expert testimony is left to the sound discretion of the trial court.").

Also, *Daubert* doesn't require the court to decide whether Prof. Torrance's opinions are "undisputably correct."  *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016) (citation and internal quotation marks omitted).  Instead, the court must determine whether "the method employed by the expert to reach his conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements."  *Id.* at 1217–18 (citations and internal quotation marks omitted).  Thus, when performing the *Daubert* inquiry, the court should "'focus . . . solely on [the expert's] principles and methodology, not on the conclusions that they generate.'"  *Id.* at 1217 (quoting *Daubert*, 509 U.S. at 595).

The court is satisfied here that Prof. Torrance has used a reliable methodology to reach his opinions about Teva's likely success in the Teva patent litigation.  Defendants' criticisms

about his opinions—*i.e.*, that Prof. Torrance relied on defenses that Teva never asserted in the Teva patent litigation—go to the weight the court should give them on class certification. But, the court refuses to exclude his opinions from consideration.

*Finally*, plaintiffs assert that the "obviousness" defense to the validity of the '432 patent was at issue in both the Teva patent litigation and the Intelliject litigation. *See* Doc. 1837-8 at 2–3 (Pls.' Statement of Contested Issues of Fact and Law ¶¶ 7–9, 11, 12); *see also* Doc. 1837-9 at 2–3 (Teva's Statement of Contested Issues of Fact and Law ¶¶ C.–E.). Defendants concede that Teva asserted the obviousness defense in the Statement of Contested Issues of Fact and Law. Doc. 1888 at 12. But, they argue, Teva did not pursue this defense at trial. Defendants contend that Teva based its invalidity defense at trial on "the legal doctrine of anticipation"—and not that "the '432 patent was invalid for obviousness." *Id.* For support, defendants cite a single passage from the trial transcript where counsel clarified that Teva was "asserting an anticipation defense based on the *'429 patent*," but "not asserting derivation" or "prior invention." Doc. 1888-5 at 4 (Tr. 403:6–13) (emphasis added). With this statement, counsel may have limited Teva's use of the invalidity defense to anticipation based on the '429 patent, but it didn't waive the other obviousness defenses that Teva asserted based on the '316 and '686 patents. *Compare* Doc. 1837-9 at 2 (Teva's Statement of Contested Issues of Fact and Law ¶ C. ("Whether one or more of the asserted claims . . . of the '432 patent, are invalid as anticipated or obvious . . . by . . . the '429 patent")) *with id.* at 2–3 (Teva's Statement of Contested Issues of Fact and Law ¶¶ D.–E. (asserting an invalid as obvious defense based on the '316 and '686 patents)). Based on this record, the court can't conclude that Teva waived its obviousness defense at trial such that the Federal Circuit would refuse to consider this defense on appeal. And, the court declines to find Prof. Torrance's opinions unreliable because he considered an obviousness defense when

forming his conclusions about Teva's likelihood of success in a final adjudication before the Federal Circuit.

In sum, the court agrees with plaintiffs that the way in which Prof. Torrance considered the trial record and what the Federal Circuit could consider on appeal does not render his opinions unreliable or require their exclusion under *Daubert*. The court thus denies this aspect of defendants' Motion to Exclude Prof. Torrance's opinions.

### c. Professor Torrance Adequately Applied Accepted Methods and Principles for Analyzing Patent Invalidity.

*Last*, defendants argue that Prof. Torrance's opinions are inadmissible because he did not analyze the validity of the '432 patent consistent with the governing law. Prof. Torrance opines that the '432 patent claims are "quite weak, and likely invalid" due to obviousness. Doc. 1500-4 at 31 (Torrance Expert Report ¶ 74); *see also* 35 U.S.C. § 103 ("A patent for a claimed invention may not be obtained . . . if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains."). The Supreme Court has established a framework for analyzing whether a patent is invalid for obviousness under 35 U.S.C. § 103. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). Under that framework, "'the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.'" *Id.* (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966)).

Defendants assert that Prof. Torrance failed to apply this legal framework because his report neither (1) explains how he construed the claims of the '432 patent, nor (2) analyzes the prior art. Defendants thus contend that Prof. Torrance's opinions are unreliable because the

expert never applied the accepted standard for analyzing patent invalidity due to obviousness.

Plaintiffs respond that Prof. Torrance's report both construes the claims and analyzes the prior art. Also, plaintiffs assert that Prof. Torrance confirmed that he performed this work in his deposition. For support, plaintiffs cite Prof. Torrance's report where he recited: "To form my opinion, I analyzed a variety of information, materials, and documents, the most relevant of which are the litigated patents themselves, the prosecution histories of those patents, and the materials and records related to the litigations." Doc. 1500-4 at 13 (Torrance Expert Report ¶ 27).

With respect to the patent itself, Prof. Torrance described how he reviewed the patent and explained how one must interpret the claims of the patent to understand the invention it protects. *Id.* at 14 (Torrance Expert Report ¶¶ 29–30). Prof. Torrance also reviewed the patent's litigation history, including the trial court's *Markman* rulings. *Id.* at 16, 29 (Torrance Expert Report ¶¶ 37, 71). And, he concluded that "the claim constructions adopted by the judge would have disadvantaged King and Meridian more than [Teva and Intelliject]." *Id.* at 30 (Torrance Expert Report ¶ 71). Defendants respond that none of these passages explain *how* Prof. Torrance construed the claims. In his deposition, Prof. Torrance conceded that he included no "particular section on claim construction" in his report. Doc. 1849-1 at 17 (Torrance Dep. 231:24–232:16). But, Prof. Torrance explained, claim construction was something that he considered when forming his opinions and is found "throughout the report." *Id.* Plaintiffs don't provide any specific citations showing where Prof. Torrance construed the claims in the report.

With respect to the prior art, Prof. Torrance explains that he "reviewed the available prosecution histories of each of the patents at issue," taking a "particular interest [in] the variety of prior art references and legal grounds for rejection the examiners identified . . . ." Doc. 1500-

4 at 15 (Torrance Expert Report ¶ 34); *see also id.* at 18 (Torrance Expert Report ¶ 42 (explaining that Prof. Torrance considered a number of factors when forming his conclusions including "the number and complexity of asserted patent claims in each patent" and "the volume of relevant prior art")). Based on his review, Prof. Torrance concluded the '432 patent's claimed invention included "key elements" such as "a lack of kickback and a second locked extended position of the needle cover" that make it "highly likely that there exists prior art relevant to auto-injectors that discloses these simple elements." *Id.* at 30–31 (Torrance Expert Report ¶ 74). Plaintiffs don't provide any specific citations showing exactly which prior art Prof. Torrance considered when forming his opinions. As Prof. Torrance testified, he "refer[s] to the prior art usually as a group" in his report. Doc. 1849-1 at 27 (Torrance Dep. 346:9–25). But also, Prof. Torrance testified about specific prior art that he considered in his report. *Id.* (Torrance Dep. 347:5–348:22 (referring to his discussion of the '686, '458, and '336 patents in ¶¶ 48.a., 51, 60, and 62 of his expert report)).

The court agrees with defendants. Prof. Torrance's report never explains how he construed the claims or how he compared those construed claims to the prior art before reaching his conclusion that the '432 patent is likely invalid due to obviousness. Instead, the report contains general references about his analysis of the claims and prior art. *See, e.g.*, 1500-4 at 27, 29, 30–31, 36 (Torrance Expert Report ¶¶ 65, 66, 70, 74–76, 92). And, plaintiffs' only response to defendants' argument on this point is Prof. Torrance's vague explanation that the claim construction analysis is found "throughout the report." Doc. 1862 at 15 (citing Doc. 1849-1 at 27 (Torrance Dep. 232:15)).

Nevertheless, the court declines to exclude Prof. Torrance's opinion on this basis. Prof. Torrance correctly cites the law governing patent validity. *See, e.g.*, Doc. 1500-4 at 12–13

(Torrance Expert Report ¶ 26 (citing *KSR Int'l Co.*, 550 U.S. 398)).  And, Prof. Torrance says he applied this law to reach his conclusions.  *See id.* at 23–24, 27, 30–31, 36 (Torrance Expert Report ¶¶ 56, 57, 65, 74, 92).  Defendants have the better end of the criticisms that the report lacks an explanation *how* Prof. Torrance reached his conclusions after applying the appropriate governing standard.  But that doesn't mean the court should exclude his opinions.  While closer than other decisions, these criticisms, the court finds, go to the weight of his opinions, not their admissibility.  The court thus denies defendant's Motion to Exclude Prof. Torrance's opinions on this ground.

For all these reasons, the court denies defendants' Motion to Exclude Opinions and Proposed Testimony of Andrew K. Torrance.

### III.  Conclusion

This Order has ruled the five pending motions seeking to exclude certain experts' opinions from the court's consideration of the putative class members' Motion for Class Certification.

For reasons explained above, the court denies the two motions filed by the putative class plaintiffs—*i.e.*, their (1) Motion to Strike the Partial Testimony of Dr. Michael Blaiss (Doc. 1584), and (2) Motion to Strike the Testimony of Prof. James Hughes (Doc. 1852).

The court grants in part and denies in part defendants' Motion to Exclude Expert Opinions of Professor Einer Elhauge (Doc. 1604).  The court grants the motion to exclude his opinions about Auvi-Q market foreclosure based on Mylan's EpiPens4Schools program because plaintiffs since have abandoned this theory.  In all other respects, the court denies defendants' Motion to Exclude Expert Opinions of Professor Einer Elhauge.

And, the court denies the other two motions filed by defendants—*i.e.*, their (1) Motion to

Exclude Opinions and Proposed Testimony of Andrew K. Torrance (Doc. 1847), and (2) Motion to Exclude Expert Opinions of Professor Meredith Rosenthal (Doc. 1602).

**IT IS THEREFORE ORDERED BY THE COURT THAT** the putative class plaintiffs' Motion to Strike the Partial Testimony of Dr. Michael Blaiss (Doc. 1584) is denied.

**IT IS FURTHER ORDERED THAT** defendants' Motion to Exclude Expert Opinions of Professor Meredith Rosenthal (Doc. 1602) is denied.

**IT IS FURTHER ORDERED THAT** defendants' Motion to Exclude Expert Opinions of Professor Einer Elhauge (Doc. 1604) is granted in part and denied in part, as specified in this Order.

**IT IS FURTHER ORDERED THAT** defendants' Motion to Exclude Opinions and Proposed Testimony of Andrew K. Torrance (Doc. 1847) is denied.

**IT IS FURTHER ORDERED THAT** the putative class plaintiffs' Motion to Strike the Testimony of Professor James Hughes (Doc. 1852) is denied.

**IT IS SO ORDERED.**

**Dated this 27th day of February, 2020, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree_____**
**Daniel D. Crabtree**
**United States District Judge**

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the Court's CM/ECF system on March 12, 2020.  I further certify that Plaintiffs have consented to e-mail service and that a copy of the foregoing was served on March 12, 2020 via e-mail on:

Ryan Hudson, Liaison Counsel for Plaintiffs
Ryan@sharpbarton.com

/s/ Catherine E. Stetson
Catherine E. Stetson

*Counsel for Petitioners*